# Exhibit 7

## NU HORIZONS INVESTMENT GROUP, LLC

## OPERATING AGREEMENT

**THIS OPERATING AGREEMENT** (as amended and/or restated from time to time, this "***Agreement***") of Nu Horizons Investment Group, LLC, a Delaware limited liability company (the "***Company***") is made and entered into as of the [ _1_ ] day of [ _January_ ], 2016, by and among Russell Simmons and Tim Leissner (each, a "***Manager***"), and each person admitted as a member from time to time (each in its capacity as a member of the Company, the "***Members***"), in accordance with the provisions of the Delaware Limited Liability Company Act, 6 Del. C. §18-101, et seq., as amended (the "***Act***"), as follows:

## ARTICLE 1

## NAME, PURPOSE AND OFFICES OF COMPANY

**1.1      Name.**  The name of the Company is Nu Horizons Investment Group, LLC.  The affairs of the Company shall be conducted under the Company name, or such other name as the Managers may designate from time to time.

**1.2      Purpose.**  The primary purpose of the Company is to provide the Members with the opportunity to realize long-term appreciation from investments in the Securities of companies selected by the Managers and approved by the Investment Board (each a "***Portfolio Company***" and collectively, the "***Portfolio Companies***").  The general purposes of the Company are to buy, sell, hold, and otherwise invest in Securities of every kind and nature and rights and options with respect thereto, including, without limitation, stock, notes, bonds, debentures and evidence of indebtedness; to exercise all rights, powers, privileges, and other incidents of ownership or possession with respect to Securities held or owned by the Company; to enter into, make, and perform all contracts and other undertakings; and to engage in all activities and transactions as may be necessary, advisable, or desirable to carry out the foregoing.

**1.3      Authorized Person.**  The execution, delivery, and filing of the certificate of formation (the "***Certificate of Formation***") by the "authorized person" (within the meaning of the Act) identified in the Certificate, are hereby ratified and approved.  With respect to the Company, each Manager is, with effect as of the formation of the Company, designated as an "authorized person" within the meaning of the Act.

**1.4      Principal Office.**  The principal office of the Company shall be located at such place or places as the Managers may from time to time designate.  The principal office of the Company shall initially be c/o Rush Communications, 980 Sixth Avenue, Suite 401, New York, NY 10018.

**1.5      Registered Agent and Office.**  The Company shall maintain a Delaware registered office and agent for the service of process as required by the Act.  In the event the registered agent ceases to act as such for any reason or the registered office changes, the Managers shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be.

120760574 v5

# ARTICLE 2

## TERM OF COMPANY

**2.1     Term.**  The term of the Company commenced upon the date of the filing of the Certificate of Formation with the Office of the Secretary of State of the State of Delaware.  The term of the Company shall terminate as provided in paragraph 10.1.

**2.2     Events Affecting a Member.**  Except as required by the Act, the death, bankruptcy, withdrawal, insanity, incompetency, temporary or permanent incapacity, retirement, resignation, expulsion, liquidation, dissolution, reorganization, merger, sale of all or substantially all the stock or assets of, or other change in the ownership or nature of a Member shall not, in and of itself, dissolve the Company.

**2.3     Events Affecting the Managers.**  Except as provided in paragraph 10.1(a)(ii) and to the fullest extent permitted by law, the bankruptcy, expulsion, resignation, removal or withdrawal, liquidation, dissolution, reorganization, merger, sale of all or substantially all the stock or assets of, or other change in the ownership or nature of the Managers shall not, in and of itself, dissolve the Company, and upon the happening of any such event, the affairs of the Company shall be continued by the remaining Members or any successor manager appointed by a Majority in Interest of the Members.

# ARTICLE 3

## NAMES, ADMISSION, AND WITHDRAWAL

**3.1     Name and Address.**  The name and address of the Members and the amount of each Member's capital contributions are set forth on a schedule maintained as part of the Company's books and records in the Company's principal office and shall be available upon request from any Member.

**3.2     Admission of Additional Members.**  Additional Members may be admitted from time to time, or the capital contributions of existing Members may be increased, with the consent of the Managers and the Investment Board.

**3.3     Withdrawal of a Member.**  No Member may withdraw or resign as a Member without the written consent of the Managers and the Investment Board.

# ARTICLE 4

## CAPITAL ACCOUNTS, CAPITAL CONTRIBUTIONS
## AND DEFAULT OF THE MEMBER

**4.1     Capital Accounts.**  An individual Capital Account shall be maintained for each Member and Manager.

**4.2     Capital Contributions.**

**(a)**     Each Member shall contribute capital to the Company from time to time as agreed upon by the Managers and such Member.   All capital contributions from the Members shall be made to the Company by wire transfer or other transfer of immediately available U.S. funds.  Except as

120760574 v5

set forth in paragraph 4.2(b), in no event shall any Member be required to contribute additional capital to the Company.

**(b)** Notwithstanding anything contained herein to the contrary, each Member shall also contribute capital to the Company (i) upon execution of this Agreement, in an amount equal to its *pro rata* share (in proportion to its relative Ownership Percentage) of an initial $60,000 reserve to cover initial Company expenses (less any amount contributed by Russell Simmons pursuant to this paragraph 4.2(b)) and (ii) at any time and upon ten (10) days' prior written notice, in an amount equal to its *pro rata* share (in proportion to its relative Ownership Percentage) of any additional expenses of the Company that have been specifically approved by the Manager and a Majority in Interest of the Members (less any amount contributed by Russell Simmons pursuant to this paragraph 4.2(b)). Russell Simmons (for so long as he remains a Manager) shall contribute capital equal to 50% of any such initial reserve or approved Company expenses. Notwithstanding the foregoing, the Managers may, in their sole discretion, elect not to call for capital contributions in respect of any specific item of Company expenses.

**(c)** Except as set forth in paragraph 4.2(b), neither the Managers nor the Executive Member (in their capacities as such) shall have any obligation to contribute capital to the Company.

**4.3    Default of a Member.** The Company shall be entitled to enforce the obligation of the Members to make contributions of capital to the Company in accordance with paragraph 4.2 or return distributions in accordance with paragraph 7.3, and the Company shall have all remedies available at law or in equity in the event any such contribution (or return of distributions) is not so made. A Member shall pay all costs and expenses incurred by the Company in connection with such Member's failure to make a capital contribution (or return distributions), including, without limitation, attorneys' fees and all fees and expenses incurred in connection with any legal proceeding relating to the failure of such Member to make such a contribution (or return distributions). Notwithstanding anything contained herein to the contrary, the Managers shall be permitted to withhold distributions to be made to a defaulting Member pursuant to Article 7 or Article 10 equal to the amount of such unpaid capital contribution (or return of distributions) and recover such unpaid contribution (or return obligation) thereon by setoff against any such distributions so withheld. The Managers may, in their sole discretion, elect to remove such defaulting Member from the Company, in which such event (a) one hundred percent (100%) of the defaulting Member's Capital Account balance shall be forfeited and reallocated to the Capital Accounts of the non-defaulting Members proportionally, based on, with respect to each such Member, the ratio that its Ownership Percentage immediately prior to such calculation bears to the aggregate Ownership Percentages of all Members (other than the defaulting Member) and (2) the defaulting Member's Ownership Percentage shall be reduced to zero. If any Capital Account balance remains for the defaulting Member, then such Capital Account shall thereafter continue to be reduced by allocations of management fee and other expenses of the Company assuming a deemed Ownership Percentage for such defaulting Member equal its Ownership Percentage immediately prior to such default.

## ARTICLE 5

### ALLOCATIONS

**5.1    Allocation of Profit and Loss.** Except as hereinafter provided in this Article 5, Profit or Loss for each Accounting Period shall be allocated to the Capital Accounts of all Members in a manner such that as of the end of each Accounting Period the balance in each Member's Capital Account is equal to the amount each such Member would be entitled to receive pursuant to paragraph 7.5(a) if the Company were liquidated at the end of such Accounting Period pursuant to the terms of Article 10 (assuming that all assets of the Company were disposed of at their Adjusted Asset Values).

### 5.2     Tax and Regulatory Compliance.

(a)     Income, gain, loss and deductions shall be allocated for income tax purposes generally in the manner in which the corresponding Profit and Loss is credited or debited (as the case may be) to their respective Capital Accounts; *provided, however,* that any difference between the Adjusted Asset Value and adjusted tax basis of any asset shall be reconciled, solely for income tax purposes, in accordance with the principles of Code Section 704(c) using any method permitted by the Treasury Regulations and selected by the Managers.

(b)     Notwithstanding the allocations set forth in Section 5.1, profits, losses and items thereof shall be allocated to the Members in the manner and to the extent required by the Treasury Regulations under Section 704(b) of the Code, including without limitation, the provisions thereof dealing with Company minimum gain chargebacks, Member minimum gain chargebacks, qualified income offsets, Company nonrecourse deductions, Member nonrecourse deductions, and the provisions dealing with deficit capital accounts in Sections 1.704-2(g)(1), 1.704-2(i)(5), and 1.704-1(b)(2)(ii)(d).   The Members shall exercise the utmost good faith in cooperating to amend this Agreement to effect the changes, if any, recommended by the professional tax advisers of the Company to cause compliance with Code Section 704(b) and the Treasury Regulations promulgated thereunder.

## ARTICLE 6

## COMPANY EXPENSES

### 6.1     Company Expenses.

(a)     The Company shall be responsible for all operating expenses incurred in connection with the formation, management, operations and liquidation of the Company, including without limitation all out-of-pocket costs and expenses incurred in the holding, purchase, sale or exchange of Securities (whether or not ultimately consummated), all legal, tax, audit (and/or surprise examination, if required) and accounting fees and expenses, expenses associated with the Company's financial reports, tax returns and other tax forms and statements, any taxes, fees or other governmental charges levied against the Company, all costs incurred in connection with the offering of membership interests in the Company, all liquidation costs, fees, and expenses, expenses for consulting services, bookkeeping services, out-of-pocket fees and expenses relating to outsourced finance, accounting, administrative and back-office services, out-of-pocket fees and expenses related to regulatory compliance, the cost of liability and other premiums for insurance, and all fees, costs and expenses relating to Arbitration, litigation and threatened litigation involving the Company, including the Company's indemnification obligation pursuant to this Agreement, and all other expenses properly chargeable to the activities of the Company (as reasonably determined by the Managers).  Each of the Company and the Managers agree to reimburse the other as appropriate to give effect to the provisions of paragraph 6.1 in the event that either such party pays an obligation that is properly the responsibility of the other.

(b)     If, in the sole discretion of the Managers, Company assets remain insufficient to fulfill any obligations or liabilities of the Company, the Managers may (i) pay such expenses on behalf of the Company and seek reimbursement from the Company, (ii) offset distributions (including in kind distributions) to be made to the Members on a *pro rata* basis and recover any such unreimbursed expenses, (iii) sell Securities held by the Company and apply the proceeds towards the payment of such expenses, (iv) recall prior distributions from the Company to its Members in an amount equal to the amount of the shortfall required to permit the Company to satisfy such obligation, *pro rata* in reverse order of prior distributions made by the Company to the Members or (v) call additional capital contributions in accordance with paragraph 4.2(b).

# ARTICLE 7

## WITHDRAWALS BY AND DISTRIBUTIONS TO THE MEMBERS

**7.1    Interest.**  No interest shall be paid to any Member on account of his, her or its interest in the capital of, or on account of his, her or its investment in, the Company.

**7.2    Withdrawals by the Members.**  No Member shall be permitted to withdraw any amount from its Capital Account without the written consent of the Managers and the Investment Board.

**7.3    Member's Obligation to Repay or Restore.**

**(a)**    Except as required by law or the terms of this Agreement, no Member shall be obligated at any time to repay or restore to the Company all or any part of any distribution made to it from the Company in accordance with the terms of this Article 7 or Article 10, and shall not be obligated at any time to restore or repay any deficit in such Member's Capital Account.

**(b)**    Notwithstanding any other provision of this Agreement to the contrary, in the event the Company is obligated to return distributions to any Portfolio Company or any other investment counterparty, each Member shall return its *pro rata* share of such obligation (determined in accordance with relative distributions received from the Company by the Members) upon ten (10) business days' notice from the Managers.  The obligation set forth in the immediately preceding sentence shall survive the termination of the Company and shall terminate only upon termination of the Company's obligations to the Portfolio Companies or any other investment counterparty.  In the event that a Member fails to return distributions to the Company as required under this Agreement, the Managers shall be entitled to enforce such obligation, and the Company shall have all remedies available at law or in equity if any such contribution is not so made.

**7.4    Tax Distributions.**  Subject to the maintenance of reasonable cash reserves, at any time after the end of each calendar year during the Company's term, the Company shall distribute to each Member  (including the Executive Member and the Managers) in cash an amount up to the excess, if any of (a) the Applicable Tax Rate multiplied by the net taxable income allocated to such Member as a result of such Member's ownership of an interest in the Company for such calendar year, over (b) all prior cash distributions made pursuant to this paragraph 7.4 or paragraph 7.5 during such calendar year.  Notwithstanding the foregoing, the Managers shall have the authority, in their sole discretion, to make good faith estimates of amounts expected to be distributable pursuant to the first sentence of this paragraph 7.4 with respect to a given calendar year and to distribute such estimated amounts to the Members as advances from time to time during such calendar year.  The "***Applicable Tax Rate***" shall mean the combination of the highest state and Federal and Medicare tax rates payable by individuals who are resident in California, applied by taking into account the character of the taxable income in question (e.g., long-term capital gains, ordinary income, etc.), as reasonably determined by the Managers.  Distributions made pursuant to paragraph 7.4 shall be deemed advances under, and shall reduce the distributions to be made under, the relevant provisions of paragraph 7.5.

**7.5    Discretionary Distributions.**

**(a)**    The Managers may cause the Company to distribute cash or Securities or other Company assets from time to time in its sole discretion (subject to the prior approval of the Investment Board).  Distributions pursuant to this paragraph 7.5 shall be apportioned first to all Members in accordance with their respective Ownership Percentages (solely as an interim step in calculating final

120760574 v5

distributions pursuant to the following provisions of this paragraph 7.5(a)) and then amounts so apportioned to such Members shall be further divided between each such Member on the one hand and Russell Simmons and the Executive Member on the other hand as follows:

        **(i)**    First, to the Members until each of the Members has received aggregate distributions pursuant to paragraph 7.4 and this paragraph 7.5(a)(i) (with any in-kind distributions valued in accordance with paragraph 11.2) equal to its aggregate capital contributions.

        **(ii)**    Thereafter, an amount equal to forty-nine percent (49%) to Russell Simmons (for so long as he remains a Manager), two percent (2%) to the Executive Member and the remainder to the Members (pro rata in proportion to their relative Ownership Percentages).

        **(b)**    The level of distributions due to the Executive Member shall be subject to reduction in the event, and as of the date that, the Executive Member ceases to provide services to the Company in the manner directed by the Managers.  The amount of the reduction shall be four percent (4%) of the Executive Member's interest multiplied by the Vesting Shortfall.  "Vesting Shortfall" shall be that number obtained by subtracting from 24 the number of months that Executive Member served the Company prior to any reduction determined under this paragraph.  For the avoidance of doubt, after two years of service, the Executive Member's interest shall be fully vested and no longer subject to reduction.  In the event of any reduction of the Executive Member's interest pursuant to this paragraph 7.5(b), distribution entitlements as set forth in paragraph 7.5(a)(ii) shall be adjusted by increasing the amounts distributable to the Members and Russell Simmons proportionately.

        **(c)**    Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Member on account of his, her or its interest in the Company if such distribution would violate the Act or other applicable law.

        **(d)**    Securities distributed in kind shall be subject to such conditions and restrictions as the Managers determine are legally required or appropriate.  Immediately prior to any distribution in kind, the Deemed Gain or Deemed Loss of any Securities distributed shall be allocated to the Capital Accounts of the Members as Profit or Loss pursuant to Article 5.

        **7.6**    **Withholding Obligations.**

        **(a)**    If and to the extent the Company is required by law, including FATCA, (as determined in good faith by the Managers) to make payments ("***Tax Payments***") with respect to any Member in amounts required to discharge any legal obligation of the Company or the Managers to make payments to any governmental authority with respect to any federal, state, local or foreign tax liability of such Member arising as a result of such Member's interest in the Company, then the amount of any such Tax Payments shall be deemed to be a loan by the Company to such Member, which loan shall: (i) be secured by such Member's interest in the Company, (ii) bear interest at the prime rate determined by the Company's bank, and (iii) be payable upon demand.  Amounts paid in respect of interest on such loan shall be treated as Profit of the Company and shall not be treated as a capital contribution by such Member.

        **(b)**    If and to the extent the Company is required to make any Tax Payments with respect to any distribution to a Member, either (i) such Member's proportionate share of such distribution shall be reduced by the amount of such Tax Payments (*provided that* such Member's Capital Account shall be adjusted pursuant to the terms of this Agreement for such Member's full proportionate share of the distribution), or (ii) such Member shall promptly pay to the Company prior to such distribution an amount of cash equal to such Tax Payments.  In the event a portion of a distribution in kind is retained by

120760574 v5

the Company pursuant to clause (i), such retained Securities may, in the sole discretion of the Managers, either (1) be distributed to the Members in accordance with the terms of this Agreement, or (2) be sold by the Company to generate the cash necessary to satisfy such Tax Payments.  If the Securities are sold, then for purposes of income tax allocations only under this Agreement, any gain or loss on such sale or exchange shall be allocated to the Member to whom the Tax Payments relate.

**(c)**     Each Member will, as applicable, take such actions as are required to establish to the reasonable satisfaction of the Managers that such Member is (i) not subject to the withholding tax obligations imposed by Section 1471 of the Code and (ii) not subject to withholding tax obligations imposed by Section 1472 of the Code.  In addition, each Member will assist the Company and the Managers with any applicable information reporting or other obligation imposed on the Company, the Managers, or their respective Affiliates, pursuant to the FATCA.  As used herein, "***FATCA***" means the Foreign Account Tax Compliance provisions enacted as part of the U.S. Hiring Incentives to Restore Employment Act and codified in Sections 1471 through 1474 of the Code, all rules, regulations and other guidance issued thereunder, and all administrative and judicial interpretations thereof.

## ARTICLE 8

## MANAGEMENT DUTIES AND RESTRICTIONS;  LIMITED PARTNER COMMITTEE

### 8.1     Management.

**(a)**     Except as otherwise set forth herein (including any approvals required by the Investment Board or the Members), the Managers shall have the sole and exclusive right to manage, control, and conduct the affairs of the Company and to do any and all acts on behalf of the Company permitted by applicable law.  The Managers shall have the power on behalf of, and in the name of, the Company to carry out and implement any and all of the objects and purposes of the Company.  All acts, decisions and consents of the Managers shall require unanimous approval of the Managers.  The Managers may delegate matters to one or more third parties, including a Chief Financial Officer, Chief Operating Officer or other employee of the Company.  The Managers are hereby authorized to enter into, by itself or on behalf of the Company, an agreement (and any modifications, amendments extensions, renewal, or termination thereof) with an Affiliate of a Manager (a "***Service Company***") for the provision of certain administrative, operational or other services with respect to the Company on terms determined and agreed to by the Managers; *provided, that* the Company shall not compensate the Service Company for any such services.  Pursuant to such services agreement, the duties of the Service Company may include, without limitation, identifying, evaluating and approving the Company's investments and its dispositions thereof (subject to any approval of the Investment Board required as set forth herein).

**(b)**     The Company, and the Managers on behalf of the Company, may enter into and perform subscription agreements with Members, side letters, management services agreements, and any documents contemplated thereby or related thereto and any amendments thereto, without any further act, vote or approval of any person (except for any approval of the Investment Board required as set forth herein), including any Member, notwithstanding any other provision of this Agreement.  The Managers are hereby authorized to enter into the documents described in the preceding sentence on behalf of the Company, but such authorization shall not be deemed a restriction on the power of the Managers to enter into other documents on behalf of the Company.

**(c)**     The Members hereby acknowledge that the Managers may be prohibited from taking action for the benefit of the Company: (i) due to confidential information acquired or obligations incurred in connection with an outside activity done by the Managers, the Service Company or any of their respective members, managers, directors, officers, employees, agents, Affiliates, or their respective

Affiliates; (ii) in consequence of the Managers, a Service Company, or any of their respective members, managers, directors, officers, employees, agents, Affiliates or their respective Affiliates serving as an officer, director, consultant, agent, advisor or employee of any Portfolio Company or any entity affiliated with any Portfolio Company; or (iii) in connection with activities undertaken by the Managers, a Service Company or any of their respective members, managers, directors, officers, employees, agents, Affiliates, or their respective Affiliates prior to the formation of the Company, including as a result of any prior investments in any of the Portfolio Companies.  Neither the Managers nor any Affiliate of the Managers shall be liable to the Company or any Member for any failure to act for the benefit of the Company in consequence of a prohibition described in the preceding sentence.

     **8.2**    **Designation of the Managers.**  The Managers initially shall be the parties listed as such in the preamble to this Agreement.  Additional Managers may be appointed by the then serving Managers (if any) and a Majority in Interest of the Members.

     **8.3**    **Removal or Resignation of the Managers.**  A Manager may not be removed as a manager of the Company.  A Manager may voluntarily resign as a manager of the Company upon written notice to the other then serving Managers (if any) and a Majority in Interest of the Members.

     **8.4**    **Restrictions on the Members.**  Notwithstanding anything that may be contained herein to the contrary, no Member shall take part in the control or management of the affairs of the Company or have any authority to act for or on behalf of the Company or, except as otherwise provided herein, to vote on any matter relative to the Company and its affairs.  In addition, except as otherwise provided herein, no Member shall have the right or power to: (a) withdraw or reduce its contribution to the capital of the Company; (b) to the fullest extent permitted by law, cause the dissolution and winding up of the Company; or (c) demand or receive property in return for its capital contributions.  For purposes of the Act, the Members shall constitute a single class or group of members.

     **8.5**    **Certain Determinations by the Managers.**  All matters concerning allocations, distributions and tax elections (except as may otherwise be required by the income tax laws) and accounting procedures not expressly and specifically provided for by the terms of this Agreement shall be determined in good faith by the Managers and such determination shall be final and conclusive.

     **8.6**    **Investments**.  Notwithstanding any other provision of this Agreement, the Company shall not make any investment in the Securities of any issuer without the prior approval of the Investment Board (where Tim Leissner also casts a vote in favor of such approval for so long as he remains a member of the Investment Board), other than the temporary investment of idle funds.

     **8.7**    **Borrowing**.  The Company shall not be permitted to borrow or maintain outstanding any indebtedness in amounts in excess of ten percent (10%) of the cost basis of Securities then held.

     **8.8**    **Other Activities.**

     **(a)**    The Members: (i) acknowledge that a Service Company, the Managers and their respective members, managers, directors, officers, employees, agents, Affiliates and their respective Affiliates are or may be involved in other financial, investment and professional activities, including but not limited to: management of or participation in other investment funds; venture capital, private equity, public equity and real estate investing; purchases and sales of Securities; investment and management counseling; otherwise making investments or presenting investment opportunities to third parties; founding, organizing or promoting new companies; and serving as officers, directors, advisors, consultants, and agents of other entities; and (ii) agree that, a Service Company, the Managers and their respective members, managers, directors, officers, employees, agents, Affiliates and their respective

Affiliates may engage for their own accounts and for the accounts of others in any such ventures and activities (without regard to whether the interests of such ventures and activities conflict with or are adverse with those of the Company); and (iii) agree that the Company shall have no interest, obligation or special legal right to invest in the Portfolio Companies.  Neither the Company nor any Member shall have any right by virtue of this Agreement or the existence of the Company in and to such ventures or activities or to the income or profits derived therefrom, and the Service Company, the Managers and their respective members, managers, directors, officers, employees, agents, Affiliates and their respective Affiliates shall have no duty or obligation to make any reports to the Members or the Company with respect to any such ventures or activities.

**(b)**     Notwithstanding any duty otherwise existing at law or in equity, each Member hereby agrees that the Managers may offer the right to participate in investment opportunities of the Company (in whole or in part) (including, without limitation, any contractual right of first refusal, co-sale right or other similar rights made available to the Company as a result of holding Securities in any Portfolio Company) to other private investors, groups, partnerships, corporations or other entities, including, without limitation, any Member, any other investment vehicles managed by the Managers or a Service Company or their respective Affiliates, whenever the Managers, in their sole discretion, so determine.  The Managers or their respective Affiliates may charge fees or carried interests with regard to the portion, if any, of any investment opportunity, which the Managers so allocate to persons other than the Company.  Notwithstanding any duty otherwise existing at law or in equity, the Managers and their members, managers, directors, officers, employees, agents, Affiliates and their respective Affiliates may organize, manage, serve as a manager, general partner or in a similar capacity, or serve as the primary source of transactions for other investment funds or pursue other business activities. Each Member acknowledges that the Managers or their respective Affiliates may form other investment vehicles to invest in some or all of the investments made by the Company and in proportions determined by the Managers in their sole discretion.

**(c)**     The Company is expressly permitted to invest in Portfolio Companies in which the Managers or a Service Company, or their respective Affiliates or vehicles managed by them, holds a pre-existing interest.

**8.9**     **Investment Board.**  The Company will have an Investment Board (the "***Investment Board***") consisting of five (5) members. The Managers shall have the right to appoint three (3) representatives to the Investment Board, and a Majority in Interest of the other Members (other than the Executive Member) shall be entitled to appoint two (2) representatives.  Initially, the Investment Board shall consist of Russell Simmons, Osman Eralp, Rich Slomovitz, Tim Leissner and Kimora Lee Simmons.  The duties of the Investment Board will include (a) consideration of any approvals sought by the Managers pursuant to the terms of this Agreement; (b) approving or disapproving all investments by the Company and its dispositions thereof; (c) approving or disapproving distributions pursuant to paragraph 7.5 of this Agreement; and (d) such advice and counsel as is requested by the Managers in connection with the Company's investments and other Company matters.  All actions, consents or approvals of the Investment Board shall require a majority of its members serving at the time such action, consent or approval is taken (where Tim Leissner also casts a vote in favor of such action, consent or approval for so long as he remains a member of the Investment Board), which actions, consents or approvals may be carried out by telephone, facsimile or electronic mail or other means reasonably acceptable to the Managers.  To the fullest extent permitted by law, neither the members of the Investment Board, nor the Members on behalf of whom such members act as representatives, shall owe any duties (fiduciary or otherwise) to the Company or any other Member in respect of the activities of the Investment Board, except to act in good faith.

120760574 v5

## ARTICLE 9

### INVESTMENT REPRESENTATION AND TRANSFER OF COMPANY INTERESTS

**9.1**     **Representations of the Member.**  Each Member severally represents to the Company and the Managers as follows:

**(a)**     The Member is (i) an "*accredited investor*" within the meaning of Regulation D under the Securities Act, (ii) a "*qualified client*" within the meaning of Rule 205-3 under the United States Investment Advisers Act of 1940, as amended, and (iii) a "*qualified purchaser*" within the meaning of that term as defined in Section 2(a)(51) of the United States Investment Company Act of 1940, as amended.

**(b)**     The Member has the legal capacity and full power and authority to enter into this Agreement and upon its execution and delivery, this Agreement will be a valid and binding obligation of the Member.  The Member has such knowledge and experience in financial and business matters that the Member is capable of evaluating the merits and risks of the investment in the Company, and the Member is able to bear the economic risk of such investment including the risk of complete loss.

**(c)**     The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the performance of the obligations hereunder will not conflict with or result in any violation of or default under any provision of any other agreement or instrument to which the Member is a party or any license, permit, franchise, judgment, order, writ or decree, or any statute, rule or regulation, applicable to the Member.  No suit, action, claim, investigation or other proceeding is pending or, to the actual knowledge of the Member, after reasonable inquiry, is threatened against the Member that questions the validity of this Agreement or any action taken or to be taken pursuant to this Agreement.

**(d)**     The Managers shall have the right, in their sole discretion, to reject a subscription, in whole or in part, and the subscription shall be deemed to be accepted only when the Member has been admitted to the Company as a Member (i.e., Member's subscription was accepted by the Managers).

**(e)**     The Member confirms that such Member has been advised to consult with such Member's attorney regarding legal matters concerning the Company and to consult with independent tax advisers regarding the tax consequences of investing in the Company.  The Company makes no representations or warranties with respect to the tax consequences of the terms of this Agreement.

**(f)**     The Member has had access to such information concerning the Company as the Member deems necessary to enable the Member to make an informed decision concerning the purchase of an interest in the Company.  The Member has had access to the Managers and has had the opportunity to ask questions of, and receive answers satisfactory to the Member from, the Managers concerning the offering of interests in the Company and the Company generally.  The Member has obtained all additional information requested by the Member to verify the accuracy of all information furnished in connection with the offering of interests in the Company.

**(g)**     The Member understands that its interest in the Company has not been registered under the Securities Act or any securities law of any state of the United States or any other jurisdiction, in each case in reliance on an exemption for private offerings, and the Member acknowledges that the

120760574 v5

Member is purchasing an interest in the Company without being furnished any offering literature or prospectus other than this Agreement.

(h)     The Member is aware that (i) the Member must bear the economic risk of investment in the Company for an indefinite period of time, possibly until final winding up of the Company, (ii) because the interest has not been registered under the Securities Act, there is currently no public market for its securities, (iii) the Member may not be able to avail itself of the provisions of Rule 144 of the Securities Act with respect to the interest, and (iv) the interest cannot be sold unless subsequently registered under the Securities Act or an exemption from such registration is available.  The Member understands that the Company is under no obligation, and does not intend, to effect any such registration at any time.  The Member also understands that sales or transfers of the interest are further restricted by the provisions of this Agreement and, as applicable, securities laws of other jurisdictions and the states of the United States.

(i)     Except as otherwise disclosed in writing to the Managers prior to its investment in the Company, the Member represents and warrants that (i) the equity owners of Member have not increased their capital investments for the purpose of making an investment in the Company, (ii) Member has made investments prior to the date hereof or intends to make investments in the near future and each beneficial owner of Member will share in the same proportion in each investment made or to be made, and (iii) Member's investment in the Company will not constitute more than forty percent (40%) of the capital of Member.  Except as otherwise disclosed in writing to the Managers prior to its investment in the Company, assuming Member holds less than ten percent (10%) of the aggregate capital contributions of the Company, Member will count as a single beneficial owner for purposes of Section 3(c)(1) of the United States Investment Company Act of 1940, as amended.

(j)     Member does not have, in purchasing an interest in the Company, a principal purpose of permitting the Company to satisfy the 100 partner limitation contained in Treasury Regulations Section 1.7704-1(h)(1) and, to the best of Member's knowledge, no owner of a beneficial interest in Member has such a purpose.

(k)     Except as otherwise disclosed in writing to the Managers prior to its investment in the Company, Member hereby certifies, represents and warrants that Member is neither (i) an "employee benefit plan" as defined in section 3(3) of the United States Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), (ii) a plan described in section 4975(e)(1) of the Internal Revenue Code of 1986, as amended from time to time (and any corresponding provisions of succeeding law), nor (iii) an entity which is deemed to be a "benefit plan investor" under the Final Regulation of the Department of Labor, published in the Federal Register on November 13, 1986, as modified by Section 3(42) of ERISA because its underlying assets include "plan assets" by reason of a plan's investment in the entity.

(l)     Member hereby acknowledges the Managers' intent is to comply with all applicable federal, state and local laws designed to combat money laundering and similar illegal activities.  In furtherance of such efforts, Member hereby represents, covenants, and agrees that, to the best of Member's knowledge and based on reasonable investigation: (i) none of Member's capital contributions to the Company (whether payable in cash or otherwise) shall be derived from money laundering or similar activities deemed illegal under federal laws and regulations; (ii) to the extent within Member's control, none of Member's capital contributions to the Company will cause the Company, the Managers or any of their respective personnel or affiliates to be in violation of federal anti-money laundering laws, including without limitation the Bank Secrecy Act (31 U.S.C. 5311 et seq.), the United States Money Laundering Control Act of 1986 or the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, and any rules and regulations promulgated thereunder; (iii) when requested by the Managers,

Member will provide any and all additional information reasonably deemed necessary to ensure compliance with all applicable laws and regulations concerning money laundering and similar activities; and (iv) Member understands and agrees that if at any time it is discovered that any of the foregoing representations are incorrect, or if otherwise required by applicable law or regulation related to money laundering and similar activities, the Managers may undertake appropriate actions to ensure compliance with applicable law or regulation.

   **(m)** Neither the Member nor any of its equity or beneficial owners has been subject to a Regulation D Rule 506(d) disqualifying event and is not subject to any proceeding or event that could result in any such disqualifying event.  Member will immediately notify the Managers in writing if Member or any of Member's equity or beneficial owners becomes subject to a disqualifying event at any date after the date hereof.

   **(n)** The Member acknowledges that (i) there can be no assurance that the Member will receive distributions from the Company in an amount equal to its investment in the Company, (ii) the timing of profit realization, if any, is highly uncertain, (iii) the success of the Company's investments in Portfolio Companies could be significantly impacted by changing external economic conditions, (iv) notwithstanding any prior experience that the Managers may have in making investments similar to the Portfolio Companies, there can be no assurance that the Managers will be able to duplicate prior levels of success, and (v) an investment in the Company should only be considered if Member can reasonably afford a loss of its entire interest.

   **(o)** Member hereby agrees to deliver to the Company or the Managers any documents, certificates or other information, executed in such form as the Company or the Managers may reasonably require to effect the admission of Member as a member of the Company and maintain the Company's compliance with applicable laws.  Member hereby agrees to provide the Company with a current U.S Internal Revenue Service Form W-9 and any other information as may be reasonably requested by the Managers for tax withholding and reporting purposes and compliance with applicable laws. Member hereby certifies, represents and warrants that the representations and warranties made by the Member in this Agreement are true and correct with respect to the Member.

   **9.2** **Restrictions on Transfers of Company Interests.**  No Member shall sell, assign, pledge, encumber, mortgage, hypothecate, gift, grant a participation interest in, or otherwise dispose of or transfer all or a portion of its interest in the Company (directly or indirectly) (a "***Transfer***") without the written consent of the Managers and the Investment Board, which consent may be given or withheld in their sole and absolute discretion.  Any such Transfer by a Member in contravention of any of the provisions of this Agreement shall be void and ineffective, and shall not bind, or be recognized by, the Company.  Notwithstanding the foregoing, if the Transfer of a Member's interest in the Company is required by the operation of law, the transferee shall receive only the economic rights associated with that interest and shall not be admitted to the Company as a Member nor have any rights to participate in the affairs of the Company as a Member without the written consent of the Managers and the Investment Board.  Any Member who requests or otherwise seeks to effect a Transfer hereby agrees to reimburse the Company for any expenses reasonably incurred by the Company in connection with such transaction, including the costs of seeking and obtaining any legal opinion requested by the Managers and any other legal, tax, accounting and miscellaneous expenses, whether or not such transfer is consummated. At its election, and in any event if the transferor has not reimbursed the Company for any transfer expenses incurred by the Company in preparing for or consummating a proposed or completed transfer within ten (10) days after the Managers have delivered to such Member written demand for payment, the Managers may seek reimbursement from the transferee of such interest (or portion thereof), including a charge to the Capital Account related to such interest with such transfer expenses.  A transferee of a Member's

interest shall become a substituted Member only with the consent of the Managers and the Investment Board, and only if such transferee executes any and all instruments reasonably required by the Managers.

**9.3    Transfer by Managers.** No Manager shall sell, assign, mortgage, pledge or otherwise dispose of its interest in the Company except (a) in connection with the change or technical reconstitution of the form of legal entity of such Manager, or (b) with the prior written consent of a Majority in Interest of the Members.

**9.4    Requirements for Transfer.**   Notwithstanding the foregoing, the Transfer of the Member's interest in the Company, or any part thereof, shall not be permitted if such Transfer would (a) result in a violation of any law, rule, or regulation, (b) result in a violation of any agreement in which the Company is a party, (c) require the Company to register as an investment company under the U.S. Investment Company Act of 1940, as amended, (d) require the Company, the Managers or a Service Company to register as an investment adviser under the U.S. Investment Advisers Act of 1940, as amended, (e) result in the Company's assets being considered, in the opinion of counsel for the Company, as "plan assets" within the meaning of the U.S. Employee Retirement Income Security Act of 1974, as amended, or any regulations proposed or promulgated thereunder, (f) increase the number of Members; or (g) result in the Company being classified for United States federal income tax purposes as an association taxable as a corporation.   Prior to effecting any such Transfer, the Managers shall have received an opinion satisfactory to it, or shall have waived the requirement of such an opinion, covering the substance of the immediately previous sentence.

# ARTICLE 10

## DISSOLUTION AND LIQUIDATION OF THE COMPANY

**10.1    Termination.**

    **(a)**    The Company shall dissolve, and the affairs of the Company shall be wound up upon the earlier of:

        **(i)**    the consent of the Managers and the Investment Board; or

        **(ii)**    the entry of a decree of judicial dissolution pursuant to the Act.

    **(b)**    In the event that the Company is dissolved pursuant to the provisions of clause (ii) of this paragraph 10.1, the Members shall elect one or more liquidators to manage the liquidation of the Company in the manner described in this Article 10.  Except as provided in the immediately preceding sentence, the Managers shall carry out the duties of the liquidator hereunder.

**10.2    Winding Up Procedures.**

    **(a)**    Promptly upon final dissolution of the Company, the affairs of the Company shall be wound up and the Company liquidated.  Profits and Losses (and items thereof) with respect to the Company realized during the winding up period shall be allocated among the applicable Capital Accounts of the Members pursuant to Article 5.

    **(b)**    Distributions in liquidation may be made in cash or in kind or partly in cash and partly in kind in accordance with paragraph 7.5.  The Managers or the liquidator shall use its best

judgment as to the most advantageous time for the Company to sell investments or to make distributions in kind.

**10.3    Payments in Liquidation**.  The assets of the Company shall be distributed in liquidation of the Company in the following order:

**(a)**    to the creditors of the Company (other than the Members) in satisfaction of the liabilities of the Company, in the order of priority established by law, either by payment or the reasonable provision for payment thereof;

**(b)**    to the Members, in repayment of any loans made to, or other debts owed by, the Company to such Members; and

**(c)**    the balance, if any, to the Members in the respective amounts each would receive if such distributions were made pursuant to the provisions of paragraph 7.5.

**10.4    Return of Excess Distributions.**  Upon liquidation of the Company pursuant to this Article 10, each of Russell Simmons and the Executive Member, respectively, shall be required to promptly pay back to the Company any applicable Tax Adjusted Excess Distributions (as defined below). The "*Tax Adjusted Excess Distributions*" with respect to Russell Simmons shall mean the positive amount, if any, of (x) the cumulative distributions received by Russell Simmons over the life of the Company pursuant to Article 7 and paragraph 10.3(c) (excluding amounts received by Russell Simmons in respect of his capital contributions, if any, and amounts returned to the Company by Russell Simmons pursuant to the terms of this Agreement), *minus* (y) the cumulative distributions that would have been received by Russell Simmons (excluding amounts received by Russell Simmons in respect of his capital contributions, if any, and amounts returned to the Company by Russell Simmons pursuant to the terms of this Agreement) calculated as if all distributions made by the Company to the Members since inception were retained by the Company and distributed among the Members as of the date of the Company's final liquidating distribution pursuant to paragraph 7.5(a); *provided, however,* that the amount of repayment described in this paragraph 10.4 shall be limited to the cumulative distributions made pursuant to Article 7 and paragraph 10.3(c) and received by Russell Simmons over the life of the Company (excluding amounts received by Russell Simmons in respect of his capital contributions, if any, and amounts returned to the Company by Russell Simmons pursuant to the terms of this Agreement) reduced by the product of such positive amount multiplied by the Applicable Tax Rate, as such rate may be in effect as of the time of any computation called for by this paragraph 10.4.  The "*Tax Adjusted Excess Distributions*" with respect to the Executive Member shall be determined in the manner set forth in the immediately preceding sentence, as applied by substituting the words "Executive Member" in place of "Russell Simmons" in each instance in which such term appears.

# ARTICLE 11

## FINANCIAL ACCOUNTING AND TAX MATTERS

**11.1    Financial Accounting; Fiscal Year.**  The books and records of the Company shall be kept in accordance with the provisions of this Agreement and otherwise on a tax basis accounting or another recognized method of accounting determined by the Managers.  Except as otherwise determined by the Managers, the Company's fiscal year shall be the calendar year.

**11.2    Valuation of Investments Distributed In Kind .**  Subject to the specific standards set forth below, the valuation of Securities and other assets and liabilities under this Agreement that are distributed in kind shall be at fair market value.  Except as may be required under applicable Treasury

Regulations, no value shall be placed on the goodwill or the name of the Company, the Company's office, records, files and statistical data or any intangible assets of the Company in the nature of or similar to goodwill in determining the value of the interest of any Member in the Company or in any accounting among the Members.

       **(a)**    The following criteria shall be used for determining the fair market value of Securities distributed in kind:

       **(i)**    If traded on one or more securities exchanges or quoted on the automated screen-based quotation and trade execution system operated by The NASDAQ OMX Group, Inc., or any successor thereto ("**NASDAQ**"), the value shall be deemed to be the Securities' closing price on the principal of such exchanges on the valuation date.

       **(ii)**    If actively traded over the counter, the value shall be deemed to be the average of the closing bid and ask prices of such Securities on the valuation date.

       **(iii)**    If there is no active public market, the value shall be the fair market value thereof, as determined by the Managers, taking into consideration the purchase price of the Securities, developments concerning the issuer subsequent to the acquisition of the Securities, any financial data and projections of the investee company provided to the Managers, any contractual restrictions on sale of the Securities, indications of public float and liquidity of Securities, and such other factor or factors as the Managers may deem relevant.

       **(b)**    If the Managers in good faith determine that, because of special circumstances, the valuation methods set forth in this paragraph 11.2 do not fairly determine the value of a Security to be distributed in kind, the Managers shall make such adjustments or use such alternative valuation method as they reasonably deem appropriate.

       **(c)**    The Managers shall have the power at any time to determine, for all purposes of this Agreement, the fair market value of any other assets and liabilities of the Company.

       **11.3**    **Supervision; Books and Records.**  Proper and complete books of account of the business of the Company, copies of the Company's federal, state and local tax returns for each fiscal year, a current schedule of members, this Agreement and the Company's Certificate of Formation shall be kept under the supervision of the Managers at the Company's principal office. Notwithstanding anything in this Agreement to the contrary, the schedule of members shall only be available for inspection or copying upon the Managers' consent, which may be withheld in their sole and absolute discretion. Notwithstanding the foregoing, the Managers shall have the benefit of the confidential information provisions of Section 18-305(c) of the Act and the obligation to make Confidential Information available or to furnish Confidential Information shall be subject to paragraph 13.11.

       **11.4**    **Tax Returns and Information.**

       **(a)**    The Managers shall deliver or cause to be delivered to each Member quarterly summaries of the Company's investments.

       **(b)**    The Managers shall use reasonable efforts to cause IRS Form 1065, Schedule K-1 to be prepared and delivered to the Members within ninety (90) days after the close of each of the Company's fiscal years.

**11.5    Tax Matters Partner.**  Osman Eralp shall be the Company's tax matters partner under the Code and under any comparable provision of state law.  The tax matters partner shall have the right to resign as tax matters partner by giving thirty (30) days' written notice to each Member.  Upon such resignation, a successor tax matters partner shall be selected by a Majority in Interest of the Members.  The tax matters partner is authorized to represent the Company before taxing authorities and courts in tax matters affecting the Company and the Members in their capacity as such and shall keep the Members informed of any such administrative and judicial proceedings.  If the tax matters partner is required by law or regulation to incur fees and expenses in connection with tax matters not affecting all the Members, then the Company shall be entitled to reimbursement from those Members on whose behalf such fees and expenses were incurred.  Each Member shall provide to the Company upon request such information or forms which tax matters partner may reasonably request with respect to the Company's compliance with applicable tax laws.  To the fullest extent permitted by law, but subject to the limitations and exclusions of paragraph 13.4, the Company agrees to indemnify the tax matters partner and its agents and save and hold them harmless, from and in respect to all (a) fees, costs and expenses in connection with or resulting from any claim, action, or demand against the tax matters partner, the Managers or the Company that arise out of or in any way relate to the tax matters partner's status as tax matters partner for the Company, and (b) all such claims, actions, and demands and any losses or damages therefrom, including amounts paid in settlement or compromise of any such claim, action, or demand.

# ARTICLE 12

## CERTAIN DEFINITIONS

**12.1    Accounting Period.**  Accounting Period shall refer to the period beginning on the 1st day of January and ending on the 31st of December; *provided, however,* that the Managers may elect to commence a new Accounting Period on (i) the date of any change in the Members' respective interests in the Profits or Losses of the Company during such calendar year except on the first day thereof, or (ii) any other date the Managers shall determine.  An Accounting Period shall terminate immediately prior to the commencement of a new Accounting Period (or if no new Accounting Period has been commenced, on December 31) and the final Accounting Period shall terminate on the date the Company shall terminate.

**12.2    Adjusted Asset Value.**  The Adjusted Asset Value with respect to any asset shall be the asset's adjusted basis for federal income tax purposes, except as follows:

> **(a)**    The initial Adjusted Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset at the time of contribution, as determined by the Managers.

> **(b)**    In the discretion of the Managers, the Adjusted Asset Values of all Company assets may be adjusted to equal their respective gross fair market values, as determined by the Managers and the resulting unrecognized Profit or Loss allocated to the applicable Capital Accounts, as of the following times:  (i) the acquisition of an additional interest in the Company by any new or existing Member; and (ii) the distribution by the Company to a party of Company assets, unless all parties receive simultaneous distributions of either undivided interests in the distributed property or identical Company assets in proportion to their interests in Company distributions.

> **(c)**    The Adjusted Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Managers, and the resulting unrecognized Profit or Loss allocated to the applicable Capital Accounts of the parties, as of the following times:  (i) the termination of the Company for United States federal income tax purposes pursuant to Code Section 708(b)(1)(B); and (ii) the termination of the Company by expiration of the Company's term.

16

**12.3    Affiliate.**  An Affiliate of any person shall mean any person that directly, or indirectly through one or more intermediaries, controls, or is controlled by or is under common control with the person specified or over which the person specified has direct or indirect investment control; *provided, however,* the term "Affiliate" with respect to the Managers and the Service Company shall not include any investment held by the Company.

**12.4    Capital Account.**  The Capital Account of each party shall consist of its original capital contribution, if any, (a) increased by any additional capital contributions, its share of Profit that is allocated to it pursuant to this Agreement, and the amount of any Company liabilities that are assumed by it or that are secured by any Company property distributed to it, and (b) decreased by the amount of any withdrawals by it, its share of Loss that is allocated to it pursuant to this Agreement, and the amount of any of its liabilities that are assumed by the Company or that are secured by any property contributed by it to the Company.  The foregoing provision and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b)(2)(iv), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event the Managers shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Treasury Regulations, the Managers may make such modification, *provided that* it is not likely to have more than an insignificant effect on the total amounts distributable pursuant to Article 7 and Article 10.

**12.5    Code.**  The Code is the Internal Revenue Code of 1986, as amended (or any corresponding provisions of succeeding law).

**12.6    Deemed Gain or Deemed Loss.**  The Deemed Gain from any in kind distribution of Securities shall be equal to the excess, if any, of the fair market value of the Securities distributed (valued in accordance with paragraph 11.2), over the aggregate Adjusted Asset Value of the Securities distributed. The Deemed Loss from any in kind distribution of Securities shall be equal to the excess, if any, of the aggregate Adjusted Asset Value of the Securities distributed over the fair market value of the Securities distributed (valued in accordance with paragraph 11.2).

**12.7    Executive Member**.  The Executive Member shall be Osman Eralp.

**12.8    Ownership Percentage.**  The Ownership Percentage for each Member shall be determined by dividing the amount of each Member's capital contributions by the sum of the aggregate capital contributions of all Members. The sum of the Members' Ownership Percentages shall be one hundred percent (100%).

**12.9    Percentage in Interest; Majority in Interest .**  A specified fraction or percentage in interest of the Members shall mean Members of the Company whose capital contributions, stated as a percentage of the aggregate capital contributions of the Company, equal or exceed the required fraction or percentage in interest of all such Members.  A Majority in Interest shall mean more than fifty percent (50%) in interest.  Any membership interest owned or controlled by a defaulting Member shall be deemed not to be outstanding for purposes of any determination under this Agreement of a particular percentage in interest of the Members.

**12.10   Profit or Loss.**  Profit or Loss shall be an amount computed for each Accounting Period as of the last day thereof that is equal to the Company's taxable income or loss for such Accounting Period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

120760574 v5

**(a)**       Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be added to such taxable income or loss;

**(b)**       Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profit or Loss pursuant to this paragraph shall be subtracted from such taxable income or loss;

**(c)**       Gain or loss resulting from any disposition of a Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Adjusted Asset Value of the asset disposed of rather than its adjusted tax basis;

**(d)**       The difference between the gross fair market value of all Company assets and their respective Adjusted Asset Values shall be added to such taxable income or loss in the circumstances described in paragraph 12.2;

**(e)**       The amount of any Deemed Gain or Deemed Loss on any Securities distributed in kind shall be added to or subtracted from (as the case may be) such taxable income or loss to the extent not taken into account under clause (d) above.

**12.11   Securities.**   Securities shall mean securities of every kind and nature and rights and options with respect thereto, including stock, notes, bonds, debentures, evidences of indebtedness and other business interests of every type, including partnerships, joint ventures, proprietorships and other business entities.

**12.12   Securities Act.**   Securities Act is the United States Securities Act of 1933, as amended.

**12.13   Treasury Regulations.**   Treasury Regulations shall mean the Income Tax Regulations promulgated under the Code, as such Treasury Regulations may be amended from time to time (including corresponding provisions of succeeding Treasury Regulations).

# ARTICLE 13

## OTHER PROVISIONS

**13.1   Governing Law.**   This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among the residents of such state made and to be performed entirely within such state.

**13.2   Limitation of Liability of the Member.**   Except as required by law, neither the Managers nor any Member shall be bound by, nor be personally liable for, the expenses, liabilities, or obligations of the Company in excess of their respective capital contributions to the Company.

**13.3   Exculpation.**   Neither a Service Company, the Managers (including without limitation any Manager acting as tax matters partner or as liquidator), the tax matters partner, each liquidator, each member, manager, shareholder, employee, director,  officer, consultant, agent or Affiliate of any of the foregoing (collectively, the "***Covered Persons***") shall be liable, responsible or accountable in damages or otherwise to any Member or the Company for honest mistakes of judgment, or for losses due to such mistakes, action, or inaction, or to the negligence, dishonesty, or bad faith of any employee, broker, or

other agent of the Company.  To the fullest extent permitted by law, no Covered Person shall be liable to the Company or any Member with respect to any action or omission taken or suffered by any of them in good faith if such action or omission is taken or suffered in reliance upon and in accordance with the opinion or advice of legal counsel (as to matters of law), or of accountants (as to matters of accounting), or of investment bankers, accounting firms, or other appraisers (as to matters of valuation). Notwithstanding any of the foregoing to the contrary, the provisions of this paragraph and the immediately following paragraph shall not be construed so as to relieve (or attempt to relieve) any Covered Person of any liability by reason of such Covered Person's commission of gross negligence or intentionally wrongful conduct.  Notwithstanding any other provision of this Agreement, to the extent that, at law or in equity, a Manager has duties (including fiduciary duties) and liabilities relating thereto to the Company, any Member or any other person bound by this Agreement, such Manager acting under this Agreement shall not be liable to the Company, any Member or any other person bound by this Agreement for breach of fiduciary duty for its good faith reliance on the provisions of this Agreement, and the provisions of this Agreement, to the extent that they restrict or eliminate the duties (including fiduciary duties) and liabilities (by specifying a duty of care or otherwise) of any Covered Person to the Company or any Member otherwise existing at law or in equity or otherwise, are agreed by the Members to replace such duties and liabilities of such Covered Person.

### 13.4    Indemnification.

(a)      The Company agrees to indemnify, out of the assets of the Company only (including the proceeds of liability insurance, offsets against future distributions, and proceeds from the sale of Securities), the Covered Persons to the fullest extent permitted by law and to save and hold them harmless from and in respect of all (i) fees, costs, and expenses, including legal fees, paid in connection with or resulting from any claim, action, controversy, dispute, judgment or demand against the Covered Persons that arise out of or in any way relate to the Company, its properties, business, or affairs and (ii) such claims, actions, controversies, disputes, judgments and demands and any losses, damages or liabilities resulting from such claims, actions, controversies, disputes, judgments and demands, including amounts paid in settlement or compromise of any such claim, action or demand; *provided*, that this indemnity shall not extend (except in the case of any liquidator other than the Managers, who need only have acted in good faith in order to receive the benefit of indemnification under this paragraph) to any conduct which constitutes gross negligence or intentionally wrongful conduct.

(b)      At the election of the Managers, expenses incurred by any Covered Person in defending a claim or proceeding covered by this paragraph may, to the fullest extent permitted by law, be paid by the Company in advance of the final disposition of such claim or proceeding, *provided* the Covered Person undertakes to repay such amount if it is ultimately determined that such Covered Person was not entitled to be indemnified.

(c)      At its election, the Managers may cause the Company to purchase and maintain insurance, at the expense of the Company and to the extent available, for the protection of any Covered Person or potential Covered Person against any liability incurred in any capacity which results in such person being an Covered Person (provided that such person is serving in such capacity at the request of the Company or the Managers), whether or not the Company has the power to indemnify such person against such liability.

(d)      The provisions of this paragraph shall remain in effect as to each Covered Person whether or not such Covered Person continues to serve in the capacity that entitled such person to be indemnified.   The foregoing right of indemnification shall inure to the benefit of the executors, administrators, personal representatives, successors or assigns of each such Covered Person.

120760574 v5

(e)     The rights to indemnification and advancement of expenses conferred in this paragraph shall not be exclusive and shall be in addition to any rights to which any Covered Person may otherwise be entitled or hereafter acquire under any law, statute, rule, regulation, charter document, by-law, contract or agreement.

(f)     The Managers may make, execute, record and file on their own behalf and on behalf of the Company all instruments and other documents (including one or more separate indemnification agreements between the Company and individual Covered Persons) that the Managers deem necessary or appropriate in order to extend the benefit of the provisions of this paragraph to the Covered Persons; *provided* that, such other instruments and documents authorized hereunder shall be on the same terms as provided for in this paragraph except as otherwise may be required by applicable law.

(g)     The Members intend that, to the maximum extent provided by law, as between (1) a Portfolio Company and (2) the Company, this paragraph shall be interpreted to reflect an ordering of liability for potentially overlapping or duplicative indemnification payments as follows: first, the Portfolio Company shall have primary liability; and second, the Company shall have secondary liability.  The possibility that a Covered Person may receive indemnification payments from the Portfolio Company shall not restrict the Company from making payments under this paragraph to a Covered Person that is otherwise eligible for such payments, but such payments by the Company are not intended to relieve the Portfolio Company from liability that it would otherwise have to make indemnification payments to such Covered Person.  If a Covered Person that has received indemnification payments from the Company actually receives indemnification payments from the Portfolio Company or under any insurance policy for the same damages, such Covered Person shall repay the Company as soon as practicable to the extent of such duplicative payments.   To the extent that the Company is required to provide such indemnification payments pursuant to the terms of this Agreement, it hereby waives and releases the Managers and their respective Affiliates (other than the Company), from any claims for contribution, subrogation or any other recovery of any kind in respect of indemnification payments paid by the Company.   As used in this paragraph, "*indemnification payments*" made or to be made by the Portfolio Company shall be deemed to include (i) advancement of expenses with regard to indemnification obligations, (ii) payments made or to be made by any successor to the indemnification obligations of the Portfolio Company and (iii) payments made or to be made by or on behalf of the Portfolio Company (or such successor) pursuant to an insurance policy or similar arrangement.

**13.5     Execution and Filing of Documents.**  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or by electronic mail in portable document format (PDF) (or other similar electronic service) will be effective as delivery of a manually executed signature page of this Agreement.

**13.6     Other Instruments and Acts.**  Each of the Managers and Members agrees to execute any other instruments and to perform any other acts that are or may be reasonably necessary or appropriate to effectuate the intent and purpose of this Agreement.

**13.7     Binding Agreement.**  This Agreement shall be binding upon the Members, the Managers and any of their transferees, successors, assigns, and legal representatives.

**13.8     Notices.**  Any notice or other communication that one party desires to give to another party shall be in writing, and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally

120760574 v5

recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be addressed to the other party at the address shown in the books and records of the Company or at such other address as a party may designate by five (5) days' advance written notice to the other party.

**13.9    Power of Attorney.**  By signing this Agreement, the Members designate and appoint each Manager as their true and lawful attorney, in their name, place, and stead to make, execute, sign, and file any amendment to the Certificate and such other instruments, documents, or certificates that may from time to time be required of the Company by the laws of the United States of America, the laws of the State of Delaware, or any other state or foreign jurisdiction in which the Company shall do business in order to qualify or otherwise enable the Company to do business in such jurisdictions.  This power of attorney is coupled with an interest and shall survive and not be affected by the subsequent death, incapacity, disability, dissolution, termination or bankruptcy of the Member granting such power or attorney.

**13.10    Arbitration.**

**(a)**    Except as otherwise agreed to in writing by the Managers, any claim, dispute, or controversy of whatever nature arising out of or relating to this Agreement, including, without limitation, any action or claim based on tort, contract, or statute (including any claims of breach), or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement ("***Claim***"), shall be resolved by final and binding arbitration ("***Arbitration***") before a single arbitrator ("***Arbitrator***") selected from and administered by JAMS Inc. (the "***Administrator***") in accordance with its then existing comprehensive arbitration rules or procedures.  The Arbitration shall be held in Los Angeles, California.

**(b)**    Depositions may be taken in any Arbitration commenced under this provision.

**(c)**    The Arbitrator shall, within fifteen (15) calendar days after the conclusion of the Arbitration hearing, issue a written award and statement of decision describing the essential findings and conclusions on which the award is based, including the calculation of any damages awarded.  The Arbitrator shall be authorized to award compensatory damages, but shall not be authorized (i) to award non-economic damages, such as for emotional distress, pain and suffering or loss of consortium, (ii) to award punitive damages, or (iii) to reform, modify or materially change this Agreement or any other agreements contemplated hereunder; *provided, however,* that the damage limitations described in parts (i) and (ii) of this sentence will not apply if such damages are statutorily imposed.  The Arbitrator also shall be authorized to grant any temporary, preliminary or permanent equitable remedy or relief he or she deems just and equitable and within the scope of this Agreement, including, without limitation, an injunction or order for specific performance.

**(d)**    Each party shall bear its own attorney's fees, costs, and disbursements arising out of the Arbitration, and shall pay an equal share of the fees and costs of the Administrator and the Arbitrator; *provided, however,* that the Arbitrator shall be authorized to determine whether a party is substantially the prevailing party, and if so, to award to that substantially prevailing party reimbursement for its reasonable attorneys' fees, costs and disbursements (including, for example, expert witness fees and expenses, photocopy charges, travel expenses, etc.), and/or the fees and costs of the Administrator and the Arbitrator.  Absent the filing of an application to correct or vacate the Arbitration award under Title 10 of the Delaware Code sections 5713 through 5717, each party shall fully perform and satisfy the Arbitration award within fifteen (15) days of the service of the award.

**(e)**    BY AGREEING TO THIS BINDING ARBITRATION PROVISION, THE PARTIES UNDERSTAND THAT, EXCEPT AS OTHERWISE AGREED TO IN WRITING BY THE

120760574 v5

MANAGERS, THEY ARE WAIVING CERTAIN RIGHTS AND PROTECTIONS WHICH MAY OTHERWISE BE AVAILABLE IF A CLAIM BETWEEN THE PARTIES WERE DETERMINED BY LITIGATION IN COURT, INCLUDING, WITHOUT LIMITATION, THE RIGHT TO SEEK OR OBTAIN CERTAIN TYPES OF DAMAGES PRECLUDED BY THIS PARAGRAPH, THE RIGHT TO A JURY TRIAL, CERTAIN RIGHTS OF APPEAL, AND A RIGHT TO INVOKE FORMAL RULES OF PROCEDURE AND EVIDENCE.

     **(f)**     This paragraph shall be construed to the maximum extent possible to comply with the laws of the State of Delaware, including, to the extent applicable, the Uniform Arbitration Act (10 Del. C. § 5701 et seq.) (the "***Delaware Arbitration Act***"). If, nevertheless, it shall be determined by a court of competent jurisdiction that any provision or wording of this paragraph shall be invalid or unenforceable under the Delaware Arbitration Act, to the extent applicable, or other applicable law, such invalidity shall not invalidate all of this paragraph. In that case, this paragraph shall be construed so as to limit any term or provision so as to make it valid or enforceable within the requirements of the Delaware Arbitration Act or other applicable law, and, in the event such term or provision cannot be so limited, this paragraph shall be construed to omit such invalid or unenforceable provision.

     **13.11**   **Confidentiality of Company Information**.

     **(a)**     This Agreement and all financial statements, tax reports, valuations, reports, reviews, analyses or other materials, and all other documents and information concerning the affairs of the Company and its investments, including, without limitation, information about the Portfolio Companies (collectively, the "***Confidential Information***"), that any Member may receive or that may be disclosed, distributed or disseminated (whether in writing, orally, electronically or by other means) to any Member or its representatives or otherwise as a result of its ownership of an interest in the Company, constitute proprietary and confidential information about the Company, the Managers, a Service Company and their respective Affiliates, and the Portfolio Companies (the "***Affected Parties***"). Each Member acknowledges and agrees that the Affected Parties derive independent economic value from the Confidential Information not being generally known and that the Confidential Information is the subject of reasonable efforts to maintain its secrecy. Each Member further acknowledges and agrees that the non-public Confidential Information is a trade secret, the disclosure of which is likely to cause substantial and irreparable competitive harm to the Affected Parties or their respective businesses. Each Member agrees to hold all Confidential Information in confidence, and not to disclose any Confidential Information to any third party without the prior written consent of the Managers. Each Member also agrees that any document constituting or containing, or any other embodiment of, any Confidential Information shall be returned to the Company upon the Managers' request. Notwithstanding any provision of this Agreement to the contrary, the Managers may withhold disclosure of any Confidential Information (other than this Agreement or tax reports) to any particular Member if the Managers reasonably determine that the disclosure of such Confidential Information to such Member may result in the general public gaining access to such Confidential Information or that such disclosure is not in the best interests of the Company or the Portfolio Companies. Notwithstanding the foregoing, each Member may disclose Confidential Information: (a) to its officers, directors, trustees, equity owners, wholly-owned subsidiaries, employees, and outside experts (including but not limited to its attorneys and accountants) on a "need to know" basis, so long as such persons are bound by the same duties of confidentiality to the Company as such Member, and so long as such Member shall remain liable for any breach of this paragraph by such persons; (b) to the extent that such information is required to be disclosed by applicable law in connection with any governmental, administrative, or regulatory proceeding or filing (including any inspection or examination), after reasonable prior written notice to the Managers (except where such notice is expressly prohibited by law); (c) to the extent that such information was received from a third party not subject to confidentiality limitations and such Member can establish that it rightfully received such information from such party other than as a result of the breach of this paragraph by Member or such party; or (d) to the extent that the information provided by the

Company is otherwise publicly available in the absence of any improper or unlawful action on the part of such Member.

**(b)** In addition, with respect to each Member that is a "fund of funds" or a similar pooled investment vehicle (but specifically excluding any pension, retirement or similar benefit plan) (a "***Pooled Vehicle Member***"), the Pooled Vehicle Member shall be permitted to make disclosure to its direct equity owners (expressly excluding permission to make disclosure to any indirect or other beneficial owners) that are subject to a written confidentiality agreement or obligation that provides a degree of protection to the Company comparable to that provided in this paragraph 13.11 of solely the following Confidential Information: (i) the Pooled Vehicle Member's status as a Member of the Company, (ii) the amount of such Pooled Vehicle Member's Capital Commitment, (iii) the total amount of such Pooled Vehicle Member's Capital Commitment that has been drawn down pursuant to capital calls, (iv) the total amount of distributions received by the Pooled Vehicle Member from the Company, (v) the Pooled Vehicle Member's net internal rate of return with respect to the Company's performance as prepared by such Pooled Vehicle Member; provided that any disclosure of the Pooled Vehicle Member's net internal rate of return shall state expressly or be accompanied by a statement that such information has been prepared by the Pooled Vehicle Member and not the Company, the Managers or any Affiliate thereof, (vi) the net asset value of the Pooled Vehicle Member's interest in the Company (both cost and market value), (vii) such ratios and performance information calculated by the Pooled Vehicle Member using the information in clauses (ii) through (vi) above, including the ratio of net asset value plus distributions to contributions (i.e., the "multiple"); provided that any disclosure of such ratios and performance information shall state expressly or be accompanied by a statement that such information has been prepared by the Pooled Vehicle Member and not the Company, the Managers or any Affiliate thereof, (viii) quarterly and annual reports summarizing the status of the Pooled Vehicle Member's investment in the Company (without disclosure of any information concerning the Portfolio Company, other than the name of such Portfolio Company, a description of the business of such Portfolio Company and information regarding the industry and geographic location of such Portfolio Company, the Company's cost basis in the Portfolio Company, the Company's carry value of its investment in the Portfolio Company and, upon liquidity of the Portfolio Company, the Company's rate of return related to such investment (the "***Portfolio Confidential Information***")), (ix) the name and address of the Company and the Managers, and (x) a description of the Company's investment purpose; *provided, however,* that no Pooled Vehicle Member may provide Portfolio Confidential Information to an equity owner of such Pooled Vehicle Member that is subject to any "freedom of information," "sunshine" or other law, rule or regulation that imposes upon such equity owner an obligation to make information available to the public.

### 13.12   Amendment.

**(a)** Subject to paragraph 13.12(b), this Agreement may be amended only with the written consent of the Managers and a Majority in Interest of the Members; *provided*, *however*, that any provision of this Agreement requiring the written vote or consent of a greater percentage in interest of the Members may be waived, modified, amended or deleted only with the vote or written consent of the Managers and such greater percentage in interest of the Members as is required by such provision.

**(b)** Notwithstanding paragraph 13.12(a), (i) unless each Member adversely affected thereby in a manner different than the other Members has expressly consented in writing to such amendment, no amendment of this Agreement may modify the method of making Company allocations or distributions, modify the method of determining the Ownership Percentage of any Member, reduce any Member's Capital Account, modify any provision of this Agreement pertaining to limitations on liability of the Members, and (ii) no amendment of this Agreement may increase a Member's Capital Commitment without the consent of such Member.

120760574 v5

      **(c)**      The Company's or any Manager's (or its managers', members' or employees') noncompliance with any provision hereof in any single transaction or event may be waived prospectively or retroactively in writing by the same percentage in interest of the Members that would be required to amend such provision pursuant to paragraphs 13.12(a) or (b). No waiver shall be deemed a waiver of any subsequent event of noncompliance except to the extent expressly provided in such waiver.

      **(d)**      Notwithstanding the other provisions of this paragraph 13.12, the Managers, without the consent of any other Member, may amend any provisions of this Agreement (i) to add to the duties or obligations of the Managers or surrender any right granted to the Managers herein; (ii) to cure any ambiguity or correct or supplement any provision herein which may be inconsistent with any other provision herein; (iii) to correct any printing, stenographic or clerical errors or omissions in order that this Agreement shall accurately reflect the agreement among the Members and Managers; or (iv) to add, on or before the final closing, any provisions that have been requested by one or more Members and that are determined by the Managers to be favorable to all Members to which such provisions apply; *provided, however,* that no amendment shall be made pursuant to this paragraph 13.12(d) unless such amendment will not (1) subject any Member to any materially adverse economic consequences or (2) diminish or waive in any material respect the duties and obligations of the Managers to the Company or the Members.

      **13.13  Entire Agreement.**  This Agreement constitutes the full, complete, and final agreement of the Members and Managers and supersedes all prior agreements between and among the Members and Managers with respect to the Company. Notwithstanding the provisions of this Agreement or of any subscription agreement of a Member, it is hereby acknowledged and agreed that the Managers on their own behalf or on behalf of the Company, without the approval of any Member or any other person, may enter into a side letter or similar agreement to or with a Member which has the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or of any subscription agreement. The parties hereto agree that any terms contained in a such side letter or similar agreement to or with a Member shall govern with respect to such Member notwithstanding the provisions of this Agreement or of any subscription agreement.

      **13.14  Severability.**  Each provision of this Agreement shall be considered severable, and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement that are valid, enforceable and legal

      **13.15  Liability for Third Party Reports.**  In no event shall the Company or the Managers, or any of their respective Affiliates, have any liability to any Member with respect to any information disseminated to any such Member, where such information originated from any third party, including without limitation, any entity in which the Company has made an investment, including the Portfolio Companies.

      **13.16  Anti-Money Laundering.**  Notwithstanding any other provision of this Agreement, the Managers, in their own name and on behalf of the Company, shall be authorized without the consent of any person, including any other Member, to take such action as it determines in its sole discretion to be necessary or advisable to comply with any anti-money laundering or anti-terrorist laws, rules, regulations, directives or special measures, including the actions contemplated in any subscription agreement related to the Company.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

120760574 v5

**IN WITNESS WHEREOF,** the parties hereto have executed this Operating Agreement on the date first above written.

**MANAGERS:**

_____
Russell Simmons

_____
Tim Leissner

**MEMBER (ENTITY):**

Name: _Cascadez Capital Limited_
(print name of entity)

By: _____
(signature)

Name: _TIM LEISSNER_
(print name of signatory)

Title: _____

**Initial Capital Contribution (USD):** _9.65 million_

**EXECUTIVE MEMBER:**

By: _____
(signature)

Name: _____
(print name)

**MEMBER (INDIVIDUAL):**

By: _____
(signature)

Name: _____
(print name)

**Initial Capital Contribution (USD):** _____

THE SECURITIES EVIDENCED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS PURSUANT TO SEC RULE 144 OR THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT COVERING SUCH SECURITIES OR THE MANAGERS RECEIVE AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE MANAGERS, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT.

**SIGNATURE PAGE TO THE OPERATING AGREEMENT OF**
**NU HORIZONS INVESTMENT GROUP, LLC**

120760574 v5

**IN WITNESS WHEREOF,** the parties hereto have executed this Operating Agreement on the date first above written.

**MANAGERS:**

_____
Russell Simmons

_____
Tim Leissner

**MEMBER (ENTITY):**

Name: _____
      (print name of entity)

By: _____
      (signature)

Name: _____
      (print name of signatory)

Title: _____

Initial Capital Contribution (USD):_____

**EXECUTIVE MEMBER:**

By: _____
      (signature)

Name: OSMAN ERALP_____
      (print name)

**MEMBER (INDIVIDUAL):**

By: _____
      (signature)

Name: RUSSELL SIMMONS_____
      (print name)

Initial Capital Contribution (USD): $1,145,000

THE SECURITIES EVIDENCED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS PURSUANT TO SEC RULE 144 OR THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT COVERING SUCH SECURITIES OR THE MANAGERS RECEIVE AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE MANAGERS, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT.

120760574 v5