**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

        -against-

TIM LEISSNER,

                       Defendant.

**THIRD-PARTY PETITION OF
RUSSELL SIMMONS FOR
HIMSELF AND DERIVATIVELY
ON BEHALF OF NU HORIZONS**

18-CR-439 (MKB)

       Petitioner Russell Simmons, derivatively on behalf of Nu Horizons Investment Group

LLC ("Nu Horizons") and directly on his own behalf, asserts a legal interest in the 3,325,942

shares of stock in Celsius Holdings, Inc. held in a J.P. Morgan Chase Bank brokerage account

with an account number ending in "7002" in the name of Kimora Lee Simmons (the "Celsius

Shares") and petitions this Court, pursuant to Title 21, United States Code, Section 853(n) and

Federal Rule of Criminal Procedure 32.2(c), for a hearing to adjudicate the validity of the interest

of Russell Simmons and Nu Horizons in the Celsius Shares.  In support of this Petition, Petitioner

states as follows:

**I.**      **PROCEDURAL HISTORY**

       1.      In or about June 2018, Defendant Tim Leissner was arrested on a Complaint.

       2.      Defendant Leissner was released upon a bond shortly after his arrest.

       3.      On information and belief, the bond was secured by approximately 3,972,659

shares shares of stock in Celsius Holdings, Inc. held in brokerage account number ending in

"7002" in the name of Kimora Lee Simmons.  This included the Celsius Shares that the

Government seeks to forfeit.

       4.      Defendant Leissner pled guilty on August 28, 2018.  When he pled guilty, he had

an agreement with the government to forfeit $43.7 million.

5.     The government agreed to apply the full value of the Celsius Shares to Defendant Leissner's $43.7 million obligation if the government was able to successfully forfeit the Celsius Shares.  On August 28, 2018, the total value of the Celsius Shares, based on the market closing price of $4.20 per share was $13,968,956.4.[1]

6.     On information and belief, on or about the day Defendant Leissner pled guilty, the Court modified Defendant Leissner's Conditions of Release so that the bond was no longer secured by any shares of stock in Celsius Holdings, Inc.  It appears that the government's agreement to make this modification allowed Defendant Leissner's wife, Kimora Lee,[2] to obtain control of the 646,717 shares that Leissner had not agreed to forfeit.  As of the day before the filing of this petition, the value of the shares that the government agreed to release to Kimora Lee is over $60 million.

7.     On or about November 1, 2018, on consent of Defendant Leissner, this Court entered a Preliminary Order of Forfeiture (the "Preliminary Order") against the defendant pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) and 28 U.S.C. § 2461(c), which directed the entry of a forfeiture money judgment in the amount of $43,700,000.00 (the "Forfeiture Money Judgment"), as: (a) property, real or personal, involved in the defendant's violation of 18 U.S.C. § 1956(h), or property traceable to such property; (b) property, real or personal, constituting or derived from proceeds treacable to the defendant's violation of 18 U.S.C. § 371; and/or (c) substitute assets, pursuant to 21 U.S.C. § 853(p) and 18 U.S.C. § 982(b)(1).

---

[1] A copy of Nasdaq's historical data for Celsius Holdings, Inc.'s stock price for August 28, 2018 is attached as Exhibit 1.

[2] Petitioner understands that there is some dispute over whether Kimora Simmons's marriage to Defendant Leissner was valid, but that they were continuing to cohabitate and hold themselves out as husband and wife at that time.

8.      On June 15, 2021, the Court set a date for the trial of Roger Ng in *United States v. Ng Chong Hwa*, 18-cr-00538-MKB-2.

9.      On April 8, 2022, a jury convicted Roger Ng after a lengthy trial at which Defendant Leissner was the government's primary witness.

10.     At the trial of Roger Ng, Defendant Leissner admitted that he owned, either directly or indirectly, a variety of assets independent of the Celsius Shares, including a luxurious Beverly Hills mansion that was worth over $25 million.  Defendant Leissner testified, "I had my suspicions" that the money used to purchase this mansion were proceeds of the crime to which he pled guilty.  However, the government did not require him to forfeit the mansion or other property.  *See* 3/8/22 Trial Transcript, *United States v. Ng Chong Hwa*, 18-cr-00538-MKB, (cited herein as "Tr.") Exhibit 2b at 2296.

11.     On August 17, 2022, the government moved for the entry of a preliminary order of forfeiture that directed Defendant Leissner to forfeit the full amount of the $43.7 million Forfeiture Money Judgment and forfeit the Celsius Shares.  The government requested that the net value of the Celsius Shares be applied to this $43.7 million Forfeiture Money Judgment.  As of that date, the total value of the Celsius Shares, based on the market closing price of $98.98 per share was $ 329,201,739.[3]  At that value, Defendant Leissner would not be required to make *any* payment toward the Forfeiture Money Judgment if the value of the Celsius Shares were applied to his Forfeiture Money Judgment.  The preliminary order of forfeiture does not require Defendant Leissner to forfeit any other assets that he obtained with proceeds of his crime.[4]

---

[3] A copy of Nasdaq's historical data for Celsius Holdings, Inc.'s stock price for August 17, 2022 is attached as Exhibit 3.

[4] For example, at trial Defendant Leissner testified that he was not required to forfeit millions of dollars in investments in companies such as "Friendsurance" and "PureForm" that he purchased with money he obtained from his co-conspirators.  Exhibit 2b, 3/8/22 Tr. at 2294-96.

12.     On March 3, 2023, the Court entered an Amended Preliminary Order of Forfeiture forfeiting any interest that Defendant Leissner had in the Celsius Shares.

13.     On April 6, 2023, the government sent notice of the Amended Preliminary Order of Forfeiture to Petitioner Simmons's counsel.

## II.     NATURE AND EXTENT OF PETITIONER'S RIGHT, TITLE AND INTEREST

### A.     Background on Petitioner Simmons, Kimora Lee, Defendant Leissner and Nu Horizons.

14.     Petitioner Simmons married Kimora Lee in December 1998. Simmons and Lee were business partners and involved in business together both before and after their marriage in 1998. They have two daughters who were born in 2000 and 2002 respectively.

15.     Petitioner Simmons and Kimora Lee were divorced in 2009, but remained friends and remained involved in business affairs together after their divorce.

16.     In or about 2011, Petitioner Simmons formed Derivative Petitioner Nu Horizons at which time he was the sole member and Manager of Nu Horizons.  A copy of the Certificate of Formation for Nu Horizons Investment Group, LLC, signed on August 19, 2011 by Petitioner Russell Simmons and filed on that date with the Delaware Secretary of State, is attached hereto as Exhibit 4.

17.     In 2014,  Kimora Lee married Tim Leissner.  At the time of his marriage to Lee, Tim Leissner was an investment banker at Goldman Sachs.

18.     Tim Leissner and Petitioner Simmons also developed and maintained a relationship of trust based in part on their relationship as co-parents.

### B.     Nu Horizons' Investments in Celsius Holdings, Inc.

19.     In or about the second half of 2014, Russell Simmons learned of an investment opportunity in a company called Celsius Holdings, Inc.  Celsius Holdings, Inc. was an energy

drink company that had developed a marketing strategy that included using celebrities as influencers to promote its energy drink products. Celsius Holdings, Inc. encouraged Mr. Simmons to invest in the company both financially and by acting as a celebrity promoter of its products. For example, in or about September 2014 a presentation deck was provided to Mr. Simmons titled "Russell Simmons 9-15-14," which described Celsius Holdings, Inc.'s "2015 Celsius Marketing Plan." The presentation included a page titled "Celebrities Love Celsius," with photos of various celebrities holding cans of Celsius energy drinks, includind Mario Lopez, Sofia Vergara, FloRida, and Petitioner Russell Simmons. The photo of Petitioner Simmons was accompanied by the caption, "Russell Simons Co-founder of Def Jam and creator of popular fashion line Phat Farm drinks Celsius for the great taste and healthy energy." Attached hereto as Exhibit 5 is a copy of the Russell Simmons 9-15-14 presentation deck.

20. Petitioner Simmons found the Celsius brand and products compelling and during the period from late 2014 to early 2015 he began developing a plan to invest in Celsius Holdings, Inc. both by purchasing Celsius Holding, Inc. stock and by using his marketing resources, including the resources of companies he had founded, to enhance the value of Celsius Holdings, Inc. by actively promoting its products. He approached several potential investors about joining him in investing in Celsius Holdings, Inc. and discussed this possible investment with executives at Celsius Holdings, Inc.

21. After discussing the possibility of co-investing in Celsius Holdings, Inc. with multiple investor groups, Petitioner Simmons ultimately decided to invest in Celsius Holdings, Inc. with Tim Leissner through Nu Horizons, the company that Mr. Simmons had formed in 2011.

22. On April 20, 2015, Nu Horizons and other investors entered into a Common Stock Purchase Agreement to purchase 3,370,787 shares of stock in Celsius Holdings, Inc. for a

purchase price of $3,000,000.  The address listed for Nu Horizons was "Rush Communications, 512 Seventh Avenue, 43rd Floor, New York, NY  10018."  Rush Communications was a company founded by Russell Simmons in or about 1992.  A copy of the Common Stock Purchase Agreement is attached hereto as Exhibit 6.

23.      On or about April 21, 2015, Nu Horizons paid Celsius Holdings, Inc. $3 million, pursuant to the Common Stock Purchase Agreement.  The wire payment was wired from an account of Asian Sports Ventures HK.  On information and belief, Defendant Leissner arranged to have this wire payment (the "$3 Million Wire Payment") made on behalf of Nu Horizons.  In exchange for the $3 Million Wire Payment, Nu Horizons acquired title to 3,370,787 shares of stock in Celsius Holdings, Inc., including the Celsius Shares.

24.      In addition, on or about April 20, 2015 Nu Horizons purchased 168,539 shares of stock in Celsius Holdings, Inc. from CDS Ventures of South Florida, LLC for $150,000, pursuant to a Secondary Convertible Promissory Note Purchase Agreement with CDS Ventures of South Florida, LLC, a copy of which is attached hereto as Exhibit 7.

**B.      Petitioner's Contribution of Value Through Promotion of Celsius Holdings, Inc.**

25.      In his capacity as an owner of Nu Horizons, petitioner Simmons began contributing substantial personal resources to promoting Nu Horizons' investment immediately after Nu Horizons entered into the Common Stock Purchase Agreement.

26.      On April 21, 2015, the day after Nu Horizons signed the purchase agreement, the New York Business Journal published an article about Simmons backing Celsius Holdings, Inc., which discussed an interview with Simmons describing his plans to promote the company using digital platforms, celebrity friends and fans and featuring ads for it within his other businesses-- All Def Digital and World Start Hip-Hop.   A copy of this article is attached hereto as Exhibit 8.

27.    That same day, in an article entitled "Hip-Hop Business Magnate Russell Simmons Invests in Celsius," the CSP Daily News discussed the contribution that Russell Simmons would make to Celsius Holdings, Inc.:

> Russell Simmons is a business icon who is a visionary that has created industries throughout his career. His business successes have spanned music, film, television, fashion, video games, online and financial services. He has moved into the world of digital marketing through the formation of three companies and will prove to be a significant strategic partner in the growth of Celsius.

The article quoted Simmons stating that "[a]s a practicing yogi and vegan, I'm always cognizant of my health and what I put into my body. I found Celsius at a local market, fell in love with the drink's clean energy and called Kimora immediately. It was clear we needed to learn more about the company."  A copy of this article is attached hereto as Exhibit 9.

28.    Mr. Simmons's vigorous promotion of Celsius products continued over the next two years, during which he worked closely with the Celsius Holdings, Inc. marketing team on numerous occasions.  This contributed significant value to Nu Horizons' investment in Celsius Holdings, Inc. stock.

29.    For example, on April 23, 2015, Celsius Holdings, Inc.'s official Instagram account featured an image of Simmons and Kimora Lee and Celsius products. This same post also thanked celebrities Snoop Dogg, Kenny Hamilton, Deepa Chopra, Marlon Wayans, and Angela Simmons for the support of  Simmons's promotion of Celsius products, which Simmons had made possible. The promotional image used in this post was later tweeted by other celebrities such as Dwayne Wade, Omar Epps, Kobe Bryant and Gabrielle Union, who congratulated Simmons and Kimora Lee on the partnership with Celsius Holdings, Inc.  Copies of these posts are attached hereto as Exhibit 10.

30.     On or about May 11, 2015, in Celsius Holdings, Inc.'s Q1 2015 Conference Call, the company emphasized the positive impact that Russell Simmons could bring the Celsius brand due to his influence. The company's CEO, Gerry David opined that the company's "strategic partnership and equity investment" including "Russell Simmons" and other investors would "broaden our reach across consumer channels, and will further strengthen our position in both domestic and global markets." He noted "Russell Simmons is a business icon who has created industries, and has built several companies." He also commented specifically on the massive response that the company already had seen as a result of Russell Simmons's promotion efforts that were part of Celsius Holdings Inc.'s "strategic partnership" with Nu Horizons, noting "Russell [Simmons] and Kimora [Lee]'s influence and consumer reach to the urban culture was demonstrated last week, where within 36 hours of our announcement of this new strategic partnership, over 300 million impressions were generated to consumers regarding the Celsius brand. Sports music, movies, and television celebrities shared the Celsius brand to all of their followers." The company's CEO explained that the company viewed Russell Simmons as critical to its future success, noting that the "goal of Celsius in conjunction with Russell Simmons and Kimora Lee Simmons, is to have the urban culture individuals to [sic] want to make Celsius a part of their daily lifestyle. We want this urban culture group to have a sense of ownership of the Celsius brand." A copy of an article containing a transcript of this call is attached hereto as Exhibit 11.

31.     Petitioner Simmons exceeded Celsius Holdings, Inc.'s expectations, and more than kept up his end of the bargain with Celsius Holdings, Inc. Among other things, beginning in June 2015, Simmons began featuring Celsius Holdings, Inc. in his weekly live comedy show, All Def Comedy Live. Celsius Holdings, Inc. used photos from these shows, many of which featured

well-known celebrities, as promotional materials on the company's Instagram account. These included posts by Celsius Holding, Inc. featuring celebrities, many holding or drinking Celsius energy drink products.  These included posts on June 25, 2015 (featuring Jasmine Sanders, Cynthia Bailey, Peter Thomas, Tahiry Jose, and DJ Printz); July 12, 2015 (featuring Robert Powell); July 16, 2015; August 13, 2015; August 14, 2015 (featuring A$AP Rocky); August 27, 2015; October 1, 2015 (featuring Flo Rida sitting next to Russell Simmons with a Celsius product); and November 10, 2015 (prominently displaying the Celsius logo on an add for All Def Comedy performance of Tony Rock).  Copies of these posts are attached hereto as Exhibit 12.

32.     On February 17, 2016 Simmons gave an interview to HipHopDX to promote Celsius Holdings, Inc., in which he touted Celsius Holdings, Inc.'s products as a healthier alternative to other energy drinks on the market. The article quotes Simmons explaining how after he met the owners of the company and "began a dialog with them, he assembled a team of investors he thought would add value, not only money, to the company."  The article noted of Simmons' promotional efforts that "The early results appear promising. Simmons, who inspired the company's Sparkling Watermelon and Sparkling Grape Rush flavors, says Celsius is the #1 drink in its category in Sweden and that 8,000 7-Elevens have agreed to carry the drink" after Simmons gave a speech to 7-Eleven executives.  A copy of the HipHopDX article is attached hereto as Exhibit 13.

33.     Simmons also promoted Celsius products in videos and on television interviews. For example, on or about April 24, 2015, Simmons appeared on Bloomberg TV to discuss Celsius products.  In or about June 2015, Simmons was interviewed about Celsius on Al Jazeera.  In or about June 2015, a video of Simmons discussing the investment in Celsius was published by Inc.com.  In or about April 2016, Simmons appeared on CBS Los Angeles morning show to

discuss how he believed in Celsius Holdings, Inc.'s products and noted that he had bought a financial interest in Celsius Holdings, Inc.

**B.    Nature of Petitioner's Interest in Celsius Holdings, Inc. and the Celsius Shares**

34.    The ownership structure of Nu Horizons was set forth in the LLC Operating Agreement of Nu Horizons, entered into by Petitioner Simmons, Kimora Lee, and Defendant Leissner and dated January 1, 2016 (the "Nu Horizons Operating Agreement").  The Nu Horizons Operating Agreement is governed by Delaware law.  A copy of the Nu Horizons Operating Agreement is attached hereto as Exhibit 14.

35.    Under the Nu Horizons Operating Agreement (1) Leissner was (along with Simmons) an additional Manager of Nu Horizons ; (2) Defendant Leissner's alter-ego vehicle, Cuscaden Capital Limited, was the 51% member of derivative Petitioner Nu Horizons; and (3) Lee  --  Simmons' former wife, continued friend, mother of his children and his business affiliate -- was an Advisor to Nu Horizons and Member of the Nu Horizons Investment Board,  pursuant to Section 8.9 of the Nu Horizons Operating Agreement.

36.    Pursuant to the 2016 Nu Horizons Operating Agreement, Petitioner Simmons owned a 49% interest in all the assets of Nu Horizons.

37.    In April 2016, Tim Leissner joined the board of directors of Celsius Holdings, Inc. as a designee of the Investors pursuant to the Investors' Rights agreement entered into as part of the April 20, 2015 transaction discussed above.

38.    Following Nu Horizons' purchases of the shares of stock in Celsius Holdings, Inc. for $3,150,000, Celsius Holdings, Inc. filed multiple statements with the U.S. Securities and Exchange Commission reflecting this purchase for value of the Celsius Shares by Nu Horizons, including Celsius Holdings, Inc. Form 10-12G/A, dated September 28, 2016, which stated that in

April 2015, "Tim Leissner / Russell Simmons" made an investment in April 2015 in the amount of "$3,150,000 (invested through Nu Horizons Investment Group, LLC)." That Form 10-12G/A also listed, in the section "Security Ownership of Certain Beneficial Owners and Management" Russell Simmons as the beneficial owner of 3,539,326 shares of common stock. Leissner was separately listed as the beneficial owner of the same number of shares. Both entries share the same footnote reference, which stated that 3,539,326 "Represents shares of common stock held by Nu Horizons Investment Group, LLC over which Mesrs. Leissner and Simmons share voting and dispositive power." A copy of the Celsius Holdings, Inc. Form 10-12G/A, dated September 28, 2016, is attached hereto as Exhibit 15.

39. An additional purchase of 433,333 shares of stock in Celsius Holdings, Inc. was made in the name of Nu Horizons or about February 2017, which brought the total number of shares of stock in Nu Horizons to 3,973,159 shares, as reflected in the Form 10-K filed by Celsius Holdings, Inc. on March 30, 2017, a copy of which is attached hereto as Exhibit 16.

40. On information and belief, the 433,333 shares of stock in Celsius Holdings, Inc. purchased in or about February 2017 are not included in the Celsius Shares that the government seeks to forfeit.

**B. Fraudulent Schemes of Defendant Leissner and His Wife Kimora Lee**

41. In the first half of 2018, Defendant Leissner and his wife, Kimora Lee, were aware that the U.S. Department of Justice was conducting an investigation into the conspiracy to which he ultimately pled guilty. Indeed, they already had become increasingly concerned about the investigation by the end of 2017. As Defendant Leissner testified at the trial of Roger Ng, he had learned in November 2017 that Roger Ng had been arrested. Jho Low, a co-conspirator of Ng and Leissner, texted Leissner on November 1, 2017 that Ng had been detained in Singapore. This gave Leissner and his co-conspirators "grave concerns" because they understood that Roger Ng

"could not leave the country and was being interviewed by the police and the authorities."
(Exhibit 2a, Ng Trial Transcript. at 1295 (Leissner Direct); *see generally id*. at 1291-95.) As
Leissner explained, the detention of Ng in November 2017 was a "big change" in Leissner's view
as to whether Leissner himself might be arrested or charged:

> Q      Do you recall what your reaction was to receiving this kind of information about
> the defendant's detention in Singapore and the status?
>
> A Yes, sir. It was -- it continued to be great concern that these investigations weren't
> stopping, they were intensifying in nature, and now one of us who were part of the scheme
> from the London meeting onwards was, in fact, detained by one of the authorities. That's a
> big shift. That's a big change and caused me great concern at the time about what might
> happen to me as well, especially, also, because I was in the U.S. with my family and also
> traveling around the world.
>
> So, yeah, it gave me a pause to think what my situation would be.

(*Id*. at 1296 6-18)

42.     While the concerns of Defendant Leissner and Kimora Lee were escalating in the
first half of 2018 (a fact not known to Petitioner Simmons), Kimora Lee discussed with Petitioner
Simmons the possibility of purchasing his interest in Nu Horizons.  Based on these discussions,
Petitioner Simmons understood that Kimora Lee contemplated a transaction in which Simmons
would sell his interest in Nu Horizons and in Rush Digital Media, LLC, another company founded
by Simmons, to Keyway Pride Limited LLC ("Keyway Pride"), a company that Simmons
understood to be owned by Kimora Lee.  Petitioner Simmons and Kimora Lee, in contemplation
of such a prospective transaction, signed a letter of intent (the "LOI") dated April 26, 2018
memorializing Simmons's intent to sell all of his interests in Nu Horizons and Rush Digital

Media, LLC to Keyway Pride "conditioned upon the negotiation, execution and delivery of the Definitive Agreement in mutually satisfactory final form and payment of the Purchase Price (U.S.$ 14,250,000)…within ninety (90) days of the date hereof…" A copy of this LOI is attached hereto as Exhibit 17.

43. Unbenownst to Petitioner Simmons, while Kimora Lee purported to negotiate the purchase of Simmons's interest in Nu Horizons, Defendant Leissner and Kimora Lee were secretly conspiring to sell Petitioner Simmons's interest in Nu Horizons behind his back. According to a Schedule 13G filed on or about May 21, 2018, as of May 9, 2018, Nu Horizons already was owned by Keyway Pride, not Leissner or Simmons. The Schedule 13G was executed by Defendant Leissner on behalf of Nu Horizons. With regard to the 3,972,659 shares that previously had been identified as owned beneficially by Defendant Leissner and Petitioner Simmons, the Schedule 13G stated as follows:

> All of the 3,972,659 shares of Common Stock are held of record by Nu Horizons Investment Group, LLC, which is 100% held by Keyway Pride Ltd LLC, which is held 100% by Midas Commodities Agents Delaware LLC. On May 9, 2018, 100% of the membership interests in Midas Commodities Agents Delaware LLC were acquired by Newland Inc. Limited. Newland Inc. Limited is 100% held by Oryx Investment Limited, which is 100% held by Ghanim Saad M Al Saad AL-KUWARI.

A copy of this Schedule 13G is attached hereto as Exhibit 18.

44. As Defendant Leissner testified during the criminal trial of Roger Ng, Ghanim Al Saad, the ultimate beneficial owner of Newland Inc. Limited, was from Qatar and was business associates with the former Prime Minister of Qatar. Exhibit 2b, Tr. at 2301-02. Leissner described the sale of assets to Newland Inc. Limited as motivated in part by his goal of "asset protection." *Id*. at 2303:10. Defendant Leissner was seeking asset protection because of his concern that he might be arrested and his assets might be seized.

45.     As part of their pursuit of "asset protection," Defendant Leissner and Kimora Lee went to Switzerland to research the secrecy policies of Swiss banks and then researched banks in Lichtenstein.  *Id.* at 2303:16-21.  Leissner preferred the banks in Liechtenstein, which had "greater bank secrecy even than Switzerland."  *Id.* at 2307:2-5.  To take advantage of this secrecy and to protect their assets from being subject to judicial proceedings in the United States, Defendant Leissner and Kimora Lee traveled to Vaduz, the capital of Liechtenstein, where they "met with lawyers and potential trust companies or trustees in the county" and also "one or two banks."  *Id.* at 2307:7-16.

46.     As Defendant Leissner further explained at the trial of Roger Ng, Defendant Leissner and Kimora Lee pursued the strategy of selling various assets they owned (or claimed to own) to Newland Inc. Limited, and then transferring the proceeds of these sales to a bank in Liechtenstein, where the money would be protected by the bank secrecy laws in effect in Liechtenstein.  *Id.* at 2307:17-2308:24.

47.     Of course, the assets that Leissner and Lee purported to sell to the Qatari purchaser included Russell Simmons's 49% interest in Nu Horizons, which they did not own.  By transferring the shares of stock in Celsius Holdings, Inc. out of Mr. Simmons's name, putting them in the name of Keyway Pride Ltd LLC, and selling them to a Qatari investor, Defendant Leissner willfully defrauded Petitioner Simmons.  By declaring Ghanim Al Saad to be the beneficial owner of Nu Horizons and the shares of stock in Celsius Holdings, Inc., Defendant Leissner willfully defrauded Derivative Petitioner Nu Horizons.

48.     Because Petitioner Simmons was unaware of the scheme pursued by Defendant Leissner and Kimora Lee and did not know that Leissner had already transferred the shares of

stock in Celsius Holdings, Inc. out of his name, he continued to negotiate with his ex-wife Kimora Lee in good faith to sell his interest in Nu Horizons, as contemplated by the LOI.

49.     On or about May 25, 2018, Russell Simmons, Keyway Pride, Rush Digital Media, LLC and Nu Horizons entered into a Stock Transfer Agreement (the "Stock Transfer Agreement"). A copy of this Stock Transfer Agreement is attached hereto as Exhibit 19.

50.     At the time Petitioner Simmons entered into the Stock Transfer Agreement, he had no idea that Defendant Leissner already had secretly sold, or purported to sell, Nu Horizons to Ghanim Al Saad as part of his asset protection scheme.

51.     Consistent with the LOI, the Stock Transfer Agreement stated that Simmons would transfer his "entire Ownership Percentage…in Nu Horizons" as well as his Class A Common Units of Rush Digital Media, LLC to Keyway Pride "at an aggregate purchase price of $14,250,000" "[s]ubject to the terms and conditions" of the Stock Transfer Agreement.

52.     Neither Keyway Pride nor Kimora Lee ever paid what Keyway Pride was required to pay under the Stock Transfer agreement. Keyway Pride therefore failed to honor the terms of the Stock Transfer Agreement.

53.     On June 10, 2018, Defendant Leissner was unexpectedly arrested by the FBI at an international airport in Washington, D.C. where he was scheduled to meet with his lawyer.

54.     After Defendant Leissner's arrest, he and Kimora Lee tried to come up with a bail package to secure his release. Leissner and Lee decided to use the Celsius Shares together with other shares of stock in Celsius Holdings, Inc. to secure his release from jail, which was a stunningly brazen ploy given that (a) the Celsius Shares were owned by Nu Horizons, not Defendant Leissner and Kimora Lee, (b) Defendant Leissner had already entered into a fraudulent agreement to sell Nu Horizons, including the Celsius Shares, to Ghanim Al Saad; (c) Defendant

Leissner and Kimora Lee knew that the Stock Transfer Agreement through which Kimora Lee purportedly obtained a 49% interest in Nu Horizons was fraudulent; and (d) Defendant Leissner and Kimora Lee knew that Keyway Pride had not paid a penny toward the purchase price in the Stock Transfer Agreement, which would have made this stock worthless as security for a bond even if the purchase by Keyway Pride had not been unlawful.

55.     To further their fraudulent scheme, Defendant Leissner and Kimora Lee signed a document bearing the date June 26, 2018 that read as follows:

**TO WHOM IT MAY CONCERN:**

The undersigned, Tim Leissner, as Manager of Nu Horizons Investment Group LLC ("Nu Horizons"), and Kimora Lee Simmons-Leissner, in her personal capacity, confirm that 3,972,659 million shares in Celsius Holdings, Inc. have been temporarily loaned to Kimora Lee Simmons-Leissner for purposes of the bond in connection with Federal Case 1:18-cr-00439 and will be returned when such collateral is no longer required.

A copy of this document dated June 26, 2018 is attached hereto as Exhibit 20.

56.     On information and belief, Defendant Leissner and Kimora Lee used this improper "loan" to transfer 3,972,659 million shares of stock in Celsius Holdings, Inc., including the Celsius Shares, to the J.P. Morgan Chase Bank brokerage account with an account number ending in "7002" in the name of Kimora Lee Simmons that is referenced in the Amended Preliminary Order of Forfeiture.

57.     This scheme worked, and Leissner was released on a bond secured by the Celsius Shares and other shares of stock in Celsius Holdings, Inc. that Defendant Leissner and Kimora Lee did not own.

58.     On information and belief, Defendant Leissner did not disclose to the government or to the Court that the Celsius Shares were owned by Nu Horizons, which he had fraudulently sold to an entity owned by Ghanim Al Saad, or that Keyway Pride had not yet made the payment

required under the Stock Transfer Agreement to obtain Simmons's interest in Nu Horizons. On information and belief, these nondisclosures were a fraud on both the government and the Court.

59.     On or about November 1, 2018, Defendant Leissner pled guilty pursuant to a plea agreement, as discussed above.

60.     In or about December 2018, with Keyway Pride and Kimora Lee having performed none of the obligations under the Stock Transfer Agreement (including, most significantly, the obligation to pay the money due to Simmons thereunder), Simmons and Lee and her entities Keyway Pride and Erok Ventures LLC, entered into a superseding Member Interest Transfer Agreement (the "MITA") that expressly nullified and voided, *ab initio*, the LOI and the Stock Transfer Agreement. A copy of the MITA is attached hereto as Exhibit 21.

61.     Specifically, the MITA's "Entire Agreement" provision reads as follows:

> 7.8 <u>Entire Agreement</u>. This Agreement contains the entire understanding among the Parties and supersedes any prior written or oral agreements between them respecting the subject matter of this Agreement **including, without limitation, that certain Letter Agreement, dated April 26, 2018, between the Withdrawing Member and the Continuing Member and that certain Stock Transfer Agreement, dated May 25, 2018, among the Withdrawing Member, the Continuing Member, Nu Horizons Investment Group, LLC and Rush Digital Media, LLC, each of which agreements are hereby deemed null and void ab initio.** There are no representations, agreements, arrangements or understandings, oral or written, between the Parties relating to the subject matter of this Agreement that are not fully set forth herein. (emphasis added)

As is clear from that language, which Kimora Lee repeatedly affirmed by executing the MITA twice, the MITA unambiguously acknowledged Simmons' ownership interest in Nu Horizons and nullified the Stock Transfer Agreement and the transactions reflect therein, including Simmons' conditional resignation as Manager of Nu Horizons and Simmons' transfer of his ownership interest in Nu Horizons.

62.     At some unknown date, Defendant Leissner signed a document dated February 5, 2020 in which he continued to assert that the transfer from Nu Horizons to Kimora Lee was a "loan," rather than a theft, but acknowledged that Simmons was still the beneficial owner of 49% of the Celsius Shares:

**TO WHOM IT MAY CONCERN:**

> I, Tim Leissner, as Manager of Nu Horizons Investment Group LLC ("Nu Horizons"), confirm that Russell Simmons is the beneficial owner of 49% of the 3.9 million shares that Nu Horizons acquired in 2015 net of any capital contributions made by other Members of Nu Horizons, in accordance with the Operating Agreement dated January 1, 2016. I further confirm that these shares have been temporarily loaned to Kimora Lee Simmons-Leissner for the purposes of the bond in connection with Federal Case 1:18-cr -00439 and will be returned when such collateral is no longer required.

Defendant Leissner's concession that Simmons was the beneficial owner of 49% of the Celsius Shares was indisputable as of that date, even setting aside the fraudulent nature of the Stock Transfer Agreement, in light of the MITA that had rendered the Stock Transfer Agreement void. A copy of this document dated February 5, 2020 is attached hereto as Exhibit 22.

63.     By acknowledging that Simmons was still the beneficial owner of 49% of the Celsius Shares, however, Defendant Leissner was implicitly acknowledging that the "loan" of the Celsius Shares, which had been made without Simmons's knowledge, was really just a theft of the Celsius Shares.  Under the Nu Horizons Operating Agreement at, *inter alia* Section 8.1(a), defendant Leissner had no right, without first obtaining the approval of Petitioner Simmons (and which approval was neither sought nor obtained) to make any transfer, loan, sale, hypothecation, encumbrance, or assignment, of any assets of Nu Horizons.  For the same reason, Defendant Leissner putting the Celsius Shares in the account of Kimora Lee and using them to secure his bond violated the Nu Horizons Operating Agreement.

## III.  PETITIONER'S RIGHT, TITLE AND INTEREST RENDERS THE ORDER FORFEITING THE CELSIUS SHARES INVALID

64.     Nu Horizons' right, title and interest in the Celsius Shares renders the Preliminary Order of Forfeiture entered against Defendant Leissner invalid.  Nu Horizons owns the Celsius Shares, not Defendant Leissner.  Defendant Leissner never owned the Celsius Shares.  To the extent that any forfeiture order is appropriate in connection with Defendant Leissner's interest in investments owned by Nu Horizons, the only interest even potentially subject to forfeiture would be an interest Defendant Leissner had in Nu Horizons, not in assets owned by Nu Horizons.

65.     In addition, in light of the evidence proffered by Petitioner concerning the purchase of the Celsius Shares, including filings by Celsius Holdings, Inc. stating that Nu Horizons was a purchaser for value, the order forfeiting the Celsius Shares is invalid because there has been no showing by the government that the Celsius Shares were proceeds of Defendant Leissner's crime.  The only fact that the government has proffered in support of its application for the Amended Preliminary Order of Forfeiture was Defendant Leissner's *consent* to forfeit the Celsius Shares.  However, this consent is not evidence that the Celsius Shares were actually proceeds of the conspiracy to violate the Foreign Corrupt Practices Act to which Defendant Leissner pled guilty.  First, Defendant Leissner's agreement to forfeit the shares is not even a factual assertion about the origin of the money with which Nu Horizons paid for the Celsius Shares.  Second, Defendant Leissner will effectively receive $43.7 million (credited against his forfeiture money judgment) if the government succeeds in forfeiting the Celsius Shares.  Under these circumstances, Defendant Leissner's agreement to a deal under which the payment for the Celsius Shares is treated as proceeds of his crime (even if it is not) is utterly unreliable.  If the government has evidence tracing the payment made to Celsius Holdings, Inc. to proceeds of the charged conspiracy to violate the Foreign Corrupt Practices Act, it must use that evidence to

prove the Celsius Shares are proceeds of Defendant Leissner's crime. The government should not be permitted to forfeit property of Nu Horizons without even demonstrating that the property is subject to forfeiture.

## IV.   PETITIONER IS A BONA FIDE PURCHASER FOR VALUE OF THE RIGHT, TITLE AND INTEREST IN THE CELSIUS SHARES

66.   Nu Horizons is a bona fide purchaser for value of the right, title and interest in the Celsius Shares, because Nu Horizons received the Celsius Shares as part of a arms' length exchanges for value that included $3,150,000, as well as Nu Horizons' valuable efforts to promote the Celsius products.

67.   Petitioner Simmons's interest in Nu Horizons is a bona fide interest which has existed since 2011 when he created Nu Horizons. Since that time, Petitioner Simmons has made significant contributions of value to Nu Horizons relating not only to the valuable promotion of Celsius Holdings, Inc. products in connection with Nu Horizons investment, but also other investments of Nu Horizons, such as its investment in All Def Digital, which Mr. Simmons founded in 2013. Mr. Simmons is a bona fide purchaser for value of his interest in Nu Horizons.

68.   In addition, Petitioner Simmons contributed value to Nu Horizons' investment in the Celsius Shares. Celsius Holdings, Inc. had a marketing strategy that specifically focused on making use of celebrities like Mr. Simmons to promote its products. From the time Celsius Holdings, Inc. first entered into negotiations with Mr. Simmons to sell the Celsius Shares, the company made clear that it valued Mr. Simmons's marketing efforts and expected to profit from them. Mr. Simmons's value as a celebrity influencer was in high demand when the Celsius Shares were purchased, and this value was was an important consideration to Celsius Holdings, Inc. in its agreement to sell the Celsius Shares to Nu Horizons. Moreover, Mr. Simmons's subsequent actions to support and promote the Celsius brand clearly reflected that Mr. Simmons

also understood that his value as a promoter and influencer were part of Nu Horizons' investment in the Celsius Shares and were of value to Nu Horizons.

## V. PETITIONER WAS AT THE TIME OF PURCHASE REASONABLY WITHOUT CAUSE TO BELIEVE THAT THE PROPERTY WAS SUBJECT TO FORFEITURE

69.     Petitioner Simmons was without reason to know that the payments of $3,150,000 were subject to forfeiture.

70.     Petitioner Simmons was without reason to know that the payments of $3,150,000 were property, real or personal, involved in the violation of 18 U.S.C. §1956(h), or property traceable to such property; and (b) property, real or personal, constituting or derived from proceeds traceable to a violation of 18 U.S.C. § 371.

71.     In particular, Petitioner Simmons was without reason to know that the payments of $3,150,000 were proceeds of a conspiracy to violate the Foreign Corrupt Practices Act by making a payment to a foreign official corruptly and for the purpose of influencing the official or inducing the official to violate the official's lawful duty or secure an improper advantage for an issuer.

72.     Indeed, to this day Petitioner Simmons is not aware of a factual basis to believe that the payments of $3,150,000 were proceeds of such a conspiracy.  To the extent that Defendant Leissner agreed to treat the payments of $3,150,000 as proceeds of a conspiracy to violate the Foreign Corrupt Practices Act, this appears to be motivated by the fact that in exchange for this agreement, the government effectively paid Defendant Leissner $43.7 million by agreeing to use the proceeds of the Celsius Shares, which are worth far more than $43.7 million, to satisfy Leissner's forfeiture money judgment in this case, and agreeing to let Leissner keep the millions of dollars in other assets that the government alleged that he obtained by criminal means.  Other than Mr. Leissner's self-interested agreement to consent to forfeit the

Celsius Shares in exchange for this $43.7 milion, Mr. Simmons is not aware of any evidence that the $3 Million Wire Payment was proceeds of the conspiracy of which Mr. Leissner was convicted.

73. Derivative Petitioner Nu Horizons also was without reason to know that the payments of $3,150,000 were subject to forfeiture. On information and belief, Nu Horizons never was informed of facts that would give it reason to know that the payments of $3,150,000 were proceeds of a conspiracy to violate the Foreign Corrup Practices Act. Nu Horizons is not aware of any facts known by Defendant Leissner that would have given him reason to know that the payments of $3,150,000 were proceeds of a conspiracy to violate the Foreign Corrupt Practices Act, even assuming that Defendant Leissner himself conspired to violate the Foreign Corrupt Practices Act. However, even if Defendant Leissner was aware of such facts, and Nu Horizons is not aware of any credible evidence of such awareness, this knowledge could not be ascribed to Nu Horizons.

## VI.  RELIEF SOUGHT

74. Petitioner asks that the Court:

a. find that Nu Horizons has a valid right title and interest to the Celsius Shares or, in the alternative, that Nu Horizons has right title and interest to 49% of the Celsius Shares;

b. find that Petitioner Simmons is the beneficial owner of the Celsius Shares or, in the alternative, is the beneficial owner of 49% of the Celsius Shares;

c. find that no other petitioner or claimant has right, title or interest in the Celsius Shares;

d.  order the government to transfer the Celsius Shares to Petitioner Simmons or, in the alternative, order the government to transfer 49% of the Celsius Shares to Petitioner Simmons;

e.  vacate the Preliminary Order of Forfeiture as to the Celsius Shares, or in the alternative, modify the Preliminary Order of Forfeiture to apply to only 51% of the Celsius Shares; and

f.  exclude the Celsius Shares from any final order of forfeiture this Court may issue or, in the alternative, exclude 49% of the Celsius Shares from any final order of forfeiture this Court may issue.

Dated:  May 5, 2023                                        Respectfully submitted,


                                                           PRYOR CASHMAN LLP

                                                           By:      */s/ Jeffrey Alberts*
                                                                    Jeffrey Alberts
                                                                    7 Times Square, Suite Level 40
                                                                    New York, NY 10036
                                                                    Tel: 212-326-0800
                                                                    Email: jalberts@pryorcashman.com
                                                                    *Attorneys for Petitioner Russell Simmons*

## **VERIFICATION**

Pursuant to Title 28, United States Code, Section 1746, I, the undersigned Petitioner, hereby declare under penalty of perjury that the facts recited in the foregoing Petition are true and correct to the best of my knowledge, information and belief.

Dated: May 5, 2023

RUSSELL SIMMONS
Petitioner, derivatively on behalf of Nu Horizons
and directly on his own behalf