# EXHIBIT 2a

1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
2  ------------------------------x
                                   18-CR-538(MKB)
3  UNITED STATES OF AMERICA,
                                   United States Courthouse
4         Plaintiff,              Brooklyn, New York

5         -against-              March 1, 2022
                                   9:30 a.m.
6  NG CHONG HWA, also known as
   "Roger Ng",
7
          Defendant.
8
   ------------------------------x
9
               TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
10        BEFORE THE HONORABLE MARGO K. BRODIE
             UNITED STATES CHIEF DISTRICT JUDGE
11                     BEFORE A JURY

12

13 APPEARANCES

14 For the Government:      UNITED STATES ATTORNEY'S OFFICE
                           Eastern District of New York
15                         271 Cadman Plaza East
                           Brooklyn, New York 11201
16                         BY:  DREW GODFREY ROLLE, ESQ.
                                ALIXANDRA ELEIS SMITH, ESQ.
17                         Assistant United States Attorneys

18
   Attorney for Defendant:  BRAFMAN & ASSOCIATES, P.C.
19                          256 Fifth Avenue - Suite 2nd Floor
                            New York, New York 11201
20                          BY:  MARC A. AGNIFILO, ESQ.
                                 TENY R. GERAGOS, ESQ.
21                               ZACH INTRATER, ESQ.
                                 JACOB KAPLAN, ESQ.
22
   Court Reporter:         LINDA D. DANELCZYK, RPR, CSR, CCR
23                         Phone:  718-613-2330
                           Fax:    718-804-2712
24                         Email:  LindaDan226@gmail.com

25 Proceedings recorded by mechanical stenography.  Transcript
   produced by computer-aided transcription.

1    Q    And you learned about that makeup payment from the

2    defendant?

3    A    Yes, Roger had told me.

4    Q    Did you have a relationship with Terence Geh like that of

5    the defendant's?

6    A    No.  Definitely not, sir.

7         I knew Terence, but we never socially mixed or had,

8    you know -- had a friendly relationship that way.  No, sir.

9    Q    Did you, through Capital Place, ever loan Terence Geh

10   money?

11   A    No.

12   Q    Now, you have mentioned that you spoke to Jho Low as well

13   about the defendant's detention in Singapore?

14   A    Yes, sir.

15   Q    And, again, why were you staying in communication with

16   Jho Low about that subject?

17   A    Because, again, we shared a concern that Roger had been

18   put in this situation and that he was being questioned about

19   this very scheme that we were trying to hide and that we knew

20   was illegal, so we shared the same concern.

21        I was also trying to see if Jho, in fact, was, you

22   know, making an effort to get Roger out of Singapore and back

23   to Malaysia, which he said he was doing, confirming what Hwee

24   Bin had told me before, that he was speaking to the Prime

25   Minister and the Attorney General to seek his release.

1    Q    You mentioned that in your discussions with Hwee Bin that

2    you had talked about not communicating with the defendant

3    directly anymore?

4    A    Yes.

5    Q    What did you mean by that?

6    A    Hwee Bin was afraid, and I shared that concern too, that

7    as Roger was being investigated in Singapore that his phone

8    was no longer secure in terms of communicating on that phone,

9    meaning that he would either be listened to or any messages

10   going to him would be received by the authorities there.  So

11   it was my understanding from her, and I shared that, that that

12   phone was no longer secure to communicate with Roger.

13   Q    So how were you supposed to communicate?  Was there any

14   understanding about that?

15   A    Yes, through her.

16   Q    Through Hwee Bin?

17   A    That's correct.

18   Q    And how would you communicate through Hwee Bin?

19   A    We would speak numerous times.

20        We essentially had a practice to be -- to use

21   WeChat, which is the Chinese version of WhatsApp, or a

22   communication app on the phone, and we thought that was at

23   least a step removed from any other authorities around the

24   world and that China would probably be a safe bet with WeChat.

25   So we stuck to WeChat at that time.

1    Q    Do you remember what your chat names were for each other?

2    A    Mine was Forza with a Z, and her's was Morning Dew, I

3    believe.

4    Q    And did you communicate with Hwee Bin at the morning dew

5    WeChat?

6    A    Yes.  We started communicating quite frequently, yes.

7    Q    For WeChat, you can text message?

8    A    Yes.

9    Q    Can you also make phone calls?

10   A    Yes, phone and video calls.  It's really similar to what

11   we know as WhatsApp here mostly.

12   Q    And how -- what method of communication were you using to

13   talk to Jho Low during that time?

14   A    The same.  We had switched from Blackberry messengers to

15   WeChat around about the same time.

16   Q    And what were the reasons for going to WeChat?

17        You talked about security around the Blackberry.

18   Did you understand there was a security aspect to WeChat.

19   A    Yeah.  The same thing, we thought that, you know, WeChat

20   being owned by a Chinese company called Tencent, we thought it

21   was safer, away from the authorities, like in America or

22   Singapore, that we understood were investigating us.

23   Q    If you could turn to tab 136A in your binder.  It's

24   Government Exhibit 2602-C-1 for identification.

25        Do you see that, sir.

1    A    Yes, sir.

2    Q    What do you recognize the document to be?

3    A    It's -- it's that WeChat exchange which I am on.

4         MR. ROLLE:  Your Honor, we would offer Government

5    Exhibit 2602-C-1.

6         MR. AGNIFILO:  One second, Your Honor.

7         THE COURT:  Mr. Rolle, I assume you're offering it

8    as redacted?

9         MR. ROLLE:  Yes, Your Honor.

10        THE COURT:  Is there any objection?

11        MR. AGNIFILO:  There is not an objection.  I think

12   there is some confusion as to numbers that we're working on.

13        We have no objection.  I think that might change the

14   number at some point.

15        MR. ROLLE:  Judge, it's marked on the screen as

16   2601-C-1, but it's actually being offered as 2602, so we will

17   correct the exhibit stamp on this document, but we would offer

18   it in its redacted form at this time.

19        MR. AGNIFILO:  And we do not object.

20        THE COURT:  It is admitted.

21        (Government Exhibit 2602, was received in evidence.)

22   Q    Mr. Leissner, you said you recognize this as a WeChat?

23   A    That's right, sir.

24   Q    And there is something that says participants?

25   A    Yes.

1    Q    The third line from the top?

2    A    That's right.

3    Q    It is a series of letters and then it says Forza Inter?

4    A    That was my WeChat name.

5    Q    That's you?

6    A    That's right.

7    Q    And then another similar series of letters and numbers.

8    And then it says Super Energizer Bunzzz with three Z's?

9    A    Yes.

10   Q    Who's that?

11   A    That's Jho Low.

12   Q    And there's a series of messages after that?

13   A    Yes, sir.

14   Q    The date of the first message below that, it's from Jho

15   Low?

16   A    Yes, that's correct.

17   Q    What's the date?

18   A    It is 31st of October, 2017.

19   Q    Jho Low says, "Can't talk"?

20   A    Yes.

21   Q    And then the next message is also from Jho Low?

22   A    Yes.

23   Q    "Call when up"?

24   A    That's right.

25   Q    Then the following message is also from Jho Low?

1    A    Yes.

2    Q    What's the date of that message?

3    A    It is the 1st of November, 2017.

4    Q    Could you read the message Jho Low sent to you on

5    November 1, 2017?

6    A    Yes.

7         "After 77 days of Singapore CAD holding on to Roger

8    Ng, Malaysian, former Goldman Sachs, passport allowing him

9    freedom of movement in Singapore but not allowed to leave

10   Singapore.  Roger Ng went to court to demand back his passport

11   that Singapore CAD was being unreasonable."

12   Q    And just to orient us, what is Jho Low reporting to you

13   in this message?

14   A    He's basically referring to the detention of Roger in

15   Singapore with his passport being taken away.

16   Q    The incident you just talked about?

17   A    That's right.  Correct.

18   Q    And did you have an understanding as to why Jho Low was

19   sending you an update on the defendant's detention in

20   Singapore?

21   A    Because I had communicated with him and asked him

22   questions around this, so had Hwee Bin.  We all, three of us,

23   shared our grave concerns that Roger was in custody,

24   effectively in Singapore, or at least could not leave the

25   country and was being interviewed by the police and the

1    authorities.

2    Q    What was reported in the fourth line, fourth item in Jho

3    Low's message?

4    A    "They came but he was in meeting with BSI banker, Yak Yew

5    Chee, Tim Leissner and JL, in discussions on Aabar."

6    Q    And BSI was the bank you testified about last week?

7    A    That's right.  Correct.

8    Q    The bank that would receive the money in connection with

9    the scheme, you understood?

10   A    That's right.

11   Q    And the bank that you, the defendant and Jho Low went to

12   a meeting?

13   A    Well, yes.  Roger and I went to that meeting in Singapore

14   for that lunch that I had described last week.  Jho Low was

15   not in attendance at that lunch, but he had briefed us just

16   before the lunch about what we were expected to say and

17   present.

18   Q    He was in that separate room?

19   A    Correct.

20   Q    In the restaurant?

21   A    Uh-hum.

22   Q    And if we could read -- if you could read the last

23   portion after the fifth item, what Jho Low was reporting to

24   you?

25   A    "Looks like SG" -- that stands for Singapore -- "is still

1   going full force.  Not sure if as result of AG statement" --

2   AG, Attorney General statement -- "that 1MDB investigations

3   still ongoing."

4          "Today, SG" -- Singapore -- "also announced further

5   prohibitions on individuals involved in 1MDB breaches."

6   Q    Do you recall what your reaction was to receiving this

7   kind of information about the defendant's detention in

8   Singapore and the status?

9   A    Yes, sir.  It was -- it continued to be great concern

10  that these investigations weren't stopping, they were

11  intensifying in nature, and now one of us who were part of the

12  scheme from the London meeting onwards was, in fact, detained

13  by one of the authorities.  That's a big shift.  That's a big

14  change and caused me great concern at the time about what

15  might happen to me as well, especially, also, because I was in

16  the U.S. with my family and also traveling around the world.

17         So, yeah, it gave me a pause to think what my

18  situation would be.

19  Q    And by this point, you said November 2017, you had been

20  under subpoena in the United States since 2016?

21  A    Correct.

22  Q    But had you ever had to sit down or be interviewed or

23  questioned at any point after receiving that subpoena by any

24  authorities?

25  A    I personally had never been interviewed.  There was a

1    meeting that one of my lawyers -- it was in Los Angeles -- had

2    with the Department of Justice, but I personally had never

3    been interviewed.  That's correct.

4    Q    So when the defendant was detained in Singapore, was that

5    the first time that you understood someone was being asked

6    questions directly about the criminal scheme?

7    A    Yes.  That was the first time I had seen it firsthand

8    that somebody of this -- of the inner circle, if you were, had

9    been arrested or detained.

10   Q    And if you could turn to tab 136 B, Government Exhibit

11   2602-C-2 for identification.

12            Do you recognize that document.

13   A    Yes, sir.  That's, again, a WeChat exchange.

14   Q    Were you part of the WeChat exchange in this exhibit?

15   A    Yes, sir.

16            MR. ROLLE:  We would offer Government Exhibit

17   2602-C-2 Your Honor.

18            MR. AGNIFILO:  No objection, Your Honor.

19            THE COURT:  It's admitted.

20            (Government Exhibit 2602-C-2, was received in

21   evidence.)

22   Q    Who is this WeChat exchange between, you and who else?

23   A    It's me, Forza Inter, and Morning Dew is Hwee Bin.

24   Q    Morning Dew was Hwee Bin?

25   A    That's right.

# EXHIBIT 2b

1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK
2

- - - - - - - - - - - - - - - - X
3

UNITED STATES OF AMERICA,   : 18-CR-00583(MKB)
4                        :
        -against-         :
5                        :
                        : United States Courthouse
6  NG CHONG HWA, also known as  : Brooklyn, New York
  "Roger Ng,"             :
7                        :
        Defendant.       : Tuesday, March 8, 2022
8                        : 9:30 a.m.
9                        :

- - - - - - - - - - - - - - - - X
10

       TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
11       BEFORE THE HONORABLE MARGO K. BRODIE
         United States CHIEF DISTRICT JUDGE
12

13            A P P E A R A N C E S:

For the Government: BREON S. PEACE , ESQ.
14           United States Attorney
            Eastern District of New York
15             271 Cadman Plaza East
            Brooklyn, New York 11201
16         BY:  ALIXANDRA ELEIS SMITH, ESQ.
             DREW GODFREY ROLLE, ESQ.
17             DYLAN A. STERN, ESQ.
             Assistant United States Attorneys
18

19         U.S. DEPARTMENT OF JUSTICE
           Criminal Division - Money Laundering
20         and Asset Recovery Section
           1400 New York Avenue, NW
21         Room 7113
           Washington, DC 20530
22         BY:  JENNIFER AMBUEHL, ESQ.

23  Court Reporter:   **SOPHIE NOLAN**
              225 Cadman Plaza East/Brooklyn, NY 11201
24           NolanEDNY@aol.com
  *Proceedings recorded by mechanical stenography, transcript*
25  *produced by Computer-Aided Transcription*

1    A P P E A R A N C E S:  (Continued)

2

3    For the Government:   U.S. DEPARTMENT OF JUSTICE
                            Criminal Division - Fraud Section
4                           700 13th Street, NW
                            10th Floor
5                           Washington, DC 20005
                          BY:  BRENT S. WIBLE, ESQ.

6

7    For THE DEFENDANT:    BRAFMAN & ASSOCIATES, P.C.
                            256 Fifth Avenue
8                           2nd Floor
                            New York, New York 10001
9                         BY:  MARC A. AGNIFILO, ESQ.
                              TENY ROSE GERAGOS, ESQ.
10                            ZACH INTRATER, ESQ.
                              JACOB KAPLAN, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   interest payment on a 1MDB bond?

2   A    Yes, he told me that it was the case, yes.

3   Q    Okay.  Now, the 145 million euros was in euros and not in

4   dollars because you knew that Low wanted to avoid the U.S.

5   banking system?

6   A    That was my understanding from him, yes.

7   Q    And he told you that specifically, correct?

8   A    Yes.

9   Q    All right.  He said that he was -- he didn't want to do

10  transactions in dollars because he was concerned about United

11  States law enforcement, right?

12  A    Yes, he was concerned about the Federal Reserve Bank, in

13  particular.

14  Q    Okay.  And is it your understanding that the reason this,

15  the 145 million was in euros was because Low didn't want to

16  deal in dollars?

17  A    That's right, correct.

18  Q    So you took 145 million euro into Midas, your shell

19  company from the Seychelles that had a bank in the Bahamas,

20  right?

21  A    Yes.

22  Q    Now, as of May 2017, you transferred your interest in

23  Midas to Kimora Lee Simmons-Leissner, correct?

24  A    As I described it, beneficially.

25  Q    Beneficially.  All right.  And this 145 million euro,

1  that was Midas' only money?

2  A    Yes.

3  Q    Because Midas didn't do any business, correct?

4  A    Correct.

5  Q    And Midas at your direction moved money to many different

6  other locations and many other different transactions,

7  correct?

8  A    That's correct.

9  Q    And you used fake contracts to paper over these

10 transactions?

11 A    That's correct again, yes.

12 Q    And you used fake contracts that were drafted by this

13 lawyer in Mauritius, Mitch Barrett?

14 A    No, I think they were drafted by Jho and other persons.

15 Q    So Mitch Barrett didn't draft any of those?

16 A    No.

17 Q    They were drafted by Low and who else?

18 A    I don't know who else, but Jho had the blueprint for

19 these.

20 Q    And there's a fake contract to paper over the transfer

21 that was supposedly from the Kuwaiti sheikh to Midas?

22 A    That's correct.

23 Q    And this fake contract was a product supply agreement

24 where supposedly Midas was selling steel and something called

25 bitumen to the Kuwaiti sheikh's company?

1   A    That's correct.

2   Q    But this was, this was all fake; Midas didn't have any

3   steel business or bitumen business, right?

4   A    That's correct, yes.

5   Q    Okay.  And then you and Kimora Lee Simmons directed tens

6   of millions of dollars into investments, correct?

7   A    No, she never did that.  I did.

8   Q    You did that?

9   A    Yes.

10  Q    You put money back into a company called Baby Phat?

11  A    That's correct.

12  Q    What company was that?

13  A    That's the company that my wife used to own and I bought

14  back 70 percent of it.

15  Q    You put money into a volleyball league called AVP?

16  A    That's correct.

17  Q    You put money into an insurance company called

18  Friendsurance?

19  A    Yes, but not from that money, sir.

20  Q    What money went into Friendsurance?

21  A    That was done in 2013 so I don't recall which bonds were

22  used for that.

23  Q    You put money into a cannabis company called PureForm?

24  A    Yes, sir.

25  Q    And did you put money into Capital Place Holdings?

1  A     Yes.  -- no, sorry, I don't think so, sir.  I don't

2  recall that.  Capital Place Holdings?

3  Q     Yes.

4  A     I don't recall that.

5  Q     All right.  And you bought through Keyway Pride, the

6  shell company owned by Kimora, a $25 million mansion in

7  Beverly Hills, right?

8  A     That was bought from Keyway Pride, yes.

9  Q     So the -- so Keyway Pride actually bought the $25 million

10 home in Beverly Hills, right?

11 A     That's correct.

12 Q     And this was with money that was Low's money?

13 A     Again, you're making that assumption.  I described how

14 that fund flow worked and I had my suspicions but we had that

15 discussion about where the money came from.

16 Q     And your suspicion is that that house in Beverly Hills

17 was Low's money?

18 A     Yes.

19 Q     Because you had no reason to think that Sheikh Sabah

20 would give you a dime, do you?

21 A     Yes.  There was no other business contact with him.

22 Q     And the FBI and the Department of Justice, they let you

23 live in that mansion after your arrest, right?

24 A     Yes, I lived there.

25 Q     They let you keep the mansion, right?

1  A    They haven't forfeited that mansion.

2  Q    They didn't forfeit it, right?

3        As you sit here today, it's still not forfeited,

4  right?

5  A    That's correct.

6  Q    And then you directed more than 15 million euro in at

7  least five different transactions to another Keyway Pride

8  limited company, this one owned by Judy?

9  A    No, sir.  I don't recall that, no.

10  Q    Was there a second Keyway Pride?

11  A    There was a Keyway Pride in Hong Kong, yes.

12  Q    Was there a Keyway Pride that was incorporated in the

13  British Virgin Islands?

14  A    Yes.

15  Q    And who owned that company?

16  A    Judy did.

17  Q    And did you, did you direct more than 15 million euro to

18  move from Midas to the Keyway Pride BVI company owned by Judy?

19  A    No, sir, I don't recall that.

20  Q    Now, everything that you would have moved from Midas came

21  from the same source, right?

22  A    Correct.

23  Q    Now, you testified, I think, on direct examination that

24  you ended up with about 80 million of Jho Low's money from

25  these transactions -- well, let me back up.

1          You ended up with $80 million from these

2     transactions, correct?

3     A    That statement is correct, yes.

4     Q    And of -- you used 25 million on the Beverly Hills house,

5     right?

6     A    That's right.

7     Q    Okay.  You made investments of various businesses,

8     correct?

9     A    Yes, sir.

10         By the way, that money is to be repaid is my

11    understanding.

12    Q    To be repaid?

13    A    Yes.

14    Q    To be repaid to who and when?

15    A    The agree -- well, to the sheikh.

16    Q    To the sheikh?

17    A    Yes.

18    Q    So you think the sheikh is waiting on this money from

19    you?

20    A    There was an arbitration request for that money, yes.

21    Q    And where is the money?

22    A    It's as you described it just now, made into, put into

23    investments.

24    Q    Do you have any intent to pay the sheikh the money?

25    A    Well, it has to be -- it can only be done once assets are

1   sold and, two, as the resolution worked with my lawyers with

2   any of these matters that I talked about here.

3   Q    So as you sit here today, you fully intend to do what you

4   need to do to pay the sheikh back his money?

5   A    I would be guided by my lawyers, sir.

6            (Continued on next page.)

1          THE COURT:  Mr. Agnifilo, are we going to break for

2   lunch?

3          MR. AGNIFILO:  Yes, we can stop for lunch.

4          THE COURT:  Ladies and gentlemen, please do not

5   discuss the case.  Please enjoy your lunch.  Please be back at

6   a quarter to 2.

7          (Jury exits.)

8          THE COURT:  You may be seated.

9          Mr. Agnifilo, I just wanted a sense of how much

10  longer you're going to be.

11          MR. AGNIFILO:  I'm going to really try hard to

12  finish today and not speak too fast while I'm doing it but I'm

13  going to try very hard to finish today.

14          THE COURT:  I was hoping you would finish and we

15  would have some other testimony today.

16          MR. AGNIFILO:  I know, I know, Judge.

17          THE COURT:  Okay.  All right.  I'll see the parties

18  back at a quarter to 2.

19

20

21

22

23

24

25

1          AFTERNOON SESSION

2              (In open court; jury present.)

3              THE COURT:  Please be seated.

4              I hope you enjoyed your lunch.

5              Mr. Agnifilo?

6              MR. AGNIFILO:  Yes.  Thank you, Judge.

7              (The witness, TIM LEISSNER, resumed the stand.)

8    CROSS-EXAMINATION

9    BY MR. AGNIFILO:

10   Q    Good afternoon, Mr. Leissner.

11   A    Good afternoon.

12   Q    Do you know someone named Ghanim bin Sayed?

13   A    Ghanim Al Sayed, yes.

14   Q    And who is -- it's GHI -- I just want to make sure we're

15   talking about the same person, G-H-I-N-A-M, bin Sayed?

16   A    No, I don't think that's correct.  I think you're talking

17   about Ghanim, G-H-A-N-I-M?

18   Q    That's right.

19   A    Al Sayed?

20   Q    Yes, that's exactly.  Who is that?

21   A    He is a business partner of mine that I had known for a

22   few years.

23   Q    Okay.  And is he from Kuwait?

24   A    No.  He's from Qatar.

25   Q    From Qatar?  Okay.  And at some point, you were going to

1  try and transfer assets out of Kimora's name to Ghanim bin

2  Sayed?

3  A    Ghanim Al Sayed, yes.

4  Q    Tell us what you were going to do.

5  A    The intention was to effectively sell the holding

6  companies that owned the assets that I had funded over the

7  years to him or to one of his Hong Kong entities for

8  consideration, meaning for money.  That was the basic idea,

9  yes.

10  Q    And Ghanim -- is that how I say his name?

11  A    Yes.

12  Q    And Ghanim was business partners with someone named

13  Sheikh Hamad bin Khalifa Al Thani?

14  A    Yes.

15  Q    Former Prime Minister of Qatar?

16  A    That's correct as well.

17  Q    And Ghanim had an entity called Newland Limited?

18  A    That's correct.

19  Q    What was Newland Limited, what was it?

20  A    As far as I understand, it was just a holding company

21  that was going to hold these assets that I was going to

22  transfer into it.

23  Q    Tell me if this is right:  You and Kimora decided that

24  she was going to sell her rights to all of the investments

25  that you made, including the Keyway Pride California which

1   owned the $25 million Beverly Hills house, to Ghanim for

2   $170 million?

3   A    It wasn't she and her.  I had worked on that transaction,

4   sir.  I had put this together, but I mean, essentially, yes,

5   it was involving all the assets I had funded over the years

6   into Newland in Hong Kong.

7   Q    And this was all to get the assets away from the United

8   States?

9   A    There were several considerations.  One, of course, was

10  what you described as being a, an asset protection.  The way

11  that you described it doesn't actually work.  The assets were

12  in the United States so the assets don't move.  The ownership

13  was transferred offshore or the intention was that the

14  ownership was being transferred offshore.  The assets

15  themselves stay where they are.

16  Q    In May of 2018, did you and Kimora go, were you in

17  Switzerland?

18  A    Yes, sir.

19  Q    And at the time, were you researching banks in

20  Liechtenstein?

21  A    That's correct as well, yes.

22  Q    And why were you researching banks in Lichtenstein in May

23  of 2018?

24  A    To hold the consideration that if Newland was actually

25  buying those assets from me, that the consideration could be

1   invested in Liechtenstein.

2   Q    Okay.  And the advantages of being investigated in

3   Liechtenstein is that you would do it in a trust?  How would

4   you do it?

5   A    Many different ways.  Trust is one way of doing it, yes.

6   Q    How were you thinking about doing it?

7   A    It was potentially a trust.  We never got there at the

8   end in our discussions but a trust was one of the

9   considerations.

10  Q    Okay.  And do you remember doing -- you checked, you did

11  Google research on or about May 17, 2018 into a bank called

12  LGT Bank Qatar, do you remember doing that?

13  A    What's the bank's name?

14  Q    LGT Bank in Qatar.

15  A    Maybe so.  I can't remember that.

16  Q    Okay.  Do you know --

17  A    LGT is a Liechtenstein bank, not a Qatari bank.

18  Q    LGT is a bank that's controlled by the Principality of

19  Liechtenstein, correct?

20  A    That's my understanding, yes.

21  Q    And you were doing research on LGT Bank in Liechtenstein,

22  correct?

23  A    I don't remember doing that research, sir.

24  Q    Okay.  Let me show you -- hold on.  Just for

25  identification, it's Defense Exhibit 97.

1    I'm just going to ask you to look at the second page

2 there.

3    (Pause.)

4 Q    So the only question is -- take a look at it.

5 A    Yes, sir.

6 Q    All right.  So the question is only -- so I asked you if

7 you remembered doing internet research or Google research off

8 your phone into LGT Qatar and you said you didn't remember?

9 A    Yes.

10 Q    Okay.  Does that refresh your recollection one way or the

11 other?

12 A    I'm sorry, sir, no.

13 Q    All right.  No problem.  Well, while you have it, hold on

14 for a second.

15 A    Yes.

16 Q    Do you remember doing research into different

17 Liechtenstein banks?

18    In other words, you were just looking at what banks,

19 what options do I have in Liechtenstein by way of banks?

20 A    Yes.

21 Q    Okay.  What do you remember researching about that?

22 A    First of all, which banks were available in Liechtenstein

23 and just informing myself about them because I actually had

24 never done business there so I was just trying to get a

25 general education who's in Liechtenstein, you know, and who,

1  are they big, small, what are they known for, et cetera, more

2  general research really.

3  Q    And why Liechtenstein of all countries?

4  A    It was one of those countries that I felt was a safe

5  place for that cash to go especially in a trust form.

6  Q    And without getting too much into the details, they have

7  a tradition of bank secrecy?

8  A    Yes, a fairly good tradition.

9  Q    Okay.  And what do you mean by a good tradition?  It's a

10  rigorous bank secrecy tradition, correct?

11  A    That's right.

12  Q    Meaning that the banks can't tell people outside the bank

13  about their customers?

14  A    I'm sure that's a very big oversimplification.  It is a

15  very sound system of bank secrecy.  I don't know sitting here

16  today the exact rules that would apply for international

17  inquiries or the like, but in terms of jurisdictions, it's

18  certainly one of those that is better known for its secrecy.

19  Q    Okay.  So you didn't want a bank in the United States.  A

20  bank in the United States would do you no good in this regard.

21  A    Again, the intention was not to have it in the United

22  States, yes.

23  Q    Right.  Right.  And you didn't even opt for a bank in

24  Switzerland which also has a tradition of bank secrecy, am I

25  right?

1   A    It does, yes.

2   Q    You opted for Liechtenstein and is that because you

3   thought Liechtenstein had greater bank secrecy even than

4   Switzerland?

5   A    Yes, I believe so.

6   Q    Okay.  I can take that from you.

7        Now, did you and Kimora actually travel to

8   Liechtenstein?

9   A    Yes, we did.

10  Q    Okay.  And you went to Vaduz, the capital?

11  A    Yes.

12  Q    And what did you and Kimora do when you were in Vaduz,

13  Liechtenstein?

14  A    We met with lawyers and potential trust companies or

15  trustees in the country and I think we also met with one or

16  two banks.

17  Q    Okay.  And what exactly was the plan?  What were you

18  going to do in Liechtenstein, you and Kimora?

19  A    Well, sorry, what were we going to do in Liechtenstein?

20  You mean, post those meetings?

21  Q    Yes.  You're having meetings with lawyers and banks and

22  all of that.

23  A    Right.

24  Q    What's the plan?

25  A    Well, the intention was that if we were to get this

1  consideration from Newland as part of the transaction that we

2  described earlier, that either all or part of that money could

3  be invested with one of the banks in Liechtenstein.

4  Q    And do you recall how long you and Kimora were in

5  Liechtenstein?

6  A    One day.

7  Q    And how much money were you planning on putting in this

8  trust structure or whatever structure was going to be in

9  Liechtenstein?  How much money are we talking about?

10  A    I think 140, $150 million.

11  Q    And where was that money at the moment?  In other words,

12  when you and Kimora went to Liechtenstein, where was the

13  money?

14  A    It was still in the assets that we talked about

15  transferring or selling to Newland.  So the money was nowhere.

16  It was only the assets.

17  Q    It was in assets?

18  A    That's correct.

19  Q    You would have to sell the assets?

20  A    That was the intention.

21  Q    Okay.  And then pool together all the money?

22  A    That's right.

23  Q    And then put it in a bank in Liechtenstein?

24  A    That's correct.

25  Q    Now, you didn't tell the FBI anything about what you just