# PRYOR CASHMAN LLP

New York | Los Angeles | Miami

7 Times Square, New York, NY 10036-6569  Tel: 212-421-4100  Fax: 212-326-0806        www.pryorcashman.com

**Jeffrey Alberts**
Partner

Direct Tel: 212-326-0800
Main Fax: 212-326-0806
jalberts@pryorcashman.com

April 24, 2024

**VIA ECF**

The Honorable Magistrate Judge James R. Cho
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

>   Re:   *In re Forfeiture Order of Tim Leissner*
>          **23-MC-1505 (MKB)**

Dear Magistrate Judge Cho,

Pursuant to the Court's Order entered on April 5, 2024, the government, petitioner Russell Simmons ("Mr. Simmons") derivatively on behalf of Nu Horizons Investment Group LLC ("Nu Horizons"), and petitioner Kimora Lee Simmons ("Ms. Lee" and, together with the government and Simmons, the "Parties"), respectfully submit this joint letter to the Court setting forth their respective views as to their dispute over the scope of discovery at this stage of the case.

## Mr. Simmons's Position

## I.   **Procedural Background**[1]

This discovery dispute relates to a discovery order issued following the Court's ruling on the government's motion to dismiss Mr. Simmons's Petition.  On December 26, 2023, the Court granted the government's motion to dismiss Mr. Simmons's direct claim and denied the government's motion to dismiss Mr. Simmons's derivative claim on behalf of Nu Horizons.  (ECF

---

[1] The Court summarized the facts relevant to these disputes in its Order directing the parties to conduct limited discovery. (ECF No. 32 at 2-3.)  Capitalized terms not defined herein shall have the same meaning as defined in the Court's Order directing the parties to conduct limited discovery.  (ECF No. 32.)

Mr. Simmons notes that both the government and Ms. Lee make factual assertions that not only do not come from Mr. Simmons Verified Petition, but are highly contested and have never been established.  For example, the government alleges that it has traced the proceeds of illegal bribes to the purchase of the Celsius Shares, but it never proved any such thing.  Indeed, in its application for the Amended Preliminary Order of Forfeiture it was legally required to make this showing and made no attempt to do so.  It has never revealed any factual basis for this secret "tracing," and the Court should not credit these unsubstantiated allegations, especially while the government is refusing to produce in discovery documents related to these factual allegations.



The Honorable James R. Cho
April 24, 2024
Page 2

No. 24 (the "MTD Order")  In denying the government's motion to dismiss Mr. Simmons's
derivative claim, the Court rejected the government's argument that Mr. Simmons's claim should
be dismissed because he had executed a Stock Transfer Agreement ("STA") and assignment
instrument that transferred all of his interest in Nu Horizons to Keyway Pride before filing his
Petition and held that Mr. Simmons had met his burden to plead that he had standing to assert a
derivative claim on behalf of Nu Horizons. (*Id*. at 8–12.)  The Court also concluded that Mr.
Simmons's Petition sufficiently pleaded that Nu Horizons was a bona fide purchaser for value of
the Celsius Shares under 21 U.S.C. § 853(n)(6)(B). (*Id*. at 12–15.)

On January 12, 2024, the government moved for reconsideration of the Court's
December 2023 Order, arguing that the order denying the government's motion to dismiss Mr.
Simmons's derivative claim on behalf of Nu Horizons "did not address the government's
arguments that, based on the allegations in the Petition and an assignment instrument attached
among exhibits to the Petition, the Petitioner had conveyed away his alleged interest in Nu
Horizons more than five years before the filing of the Petition." (ECF No. 25 at 3.)  Mr.
Simmons opposed the motion. (ECF No. 26.)  The Court again rejected the government's
argument that Mr. Simmons's Petition should be dismissed for failure to plead standing based on
his execution of the STA and assignment and denied the government's Motion for
Reconsideration by Order dated February 9, 2024. (ECF No. 32 (the "MTD Reconsideration
Order".)  However, the Court noted that the government "has raised a question as to whether
Petitioner's membership interest in Nu Horizons at the time of the filing of the Petition" was
sufficient for standing, and directed the parties to engage in discovery on the issue of whether Mr.
Simmons had an ownership interest in Nu Horizons as of the date of the filing of the
Petition. *Id*. at 10.

## II.    Mr. Simmons's Request for Documents Relevant to the Government's Standing Argument

Because the Court has already held—twice—that Mr. Simmons "has sufficiently alleged
standing to pursue a derivative claim on behalf of Nu Horizons," (MTD Order at 12), the
standing dispute is no longer over the sufficiency of Mr. Simmons's factual pleading.  Mr.
Simmons pled plausible facts that, if assumed to be true, establish that he had standing to assert a
claim on behalf of Nu Horizons and set forth a factual basis for inferring that he had an
ownership interest in Nu Horizons.  The government has attacked Mr. Simmons's allegations
that he has an ownership interest in Nu Horizons with an argument that Mr. Simmons will be
unable to prove that he has standing because he transferred all of his interest in Nu Horizons to
Keyway Pride in 2018 pursuant to the STA and the assignment attached to the STA and he did
not re-acquired an interest in Nu Horizons before filing his Petition.

In response to the government's argument that Mr. Simmons sold his interest in Nu
Horizons in 2018 and never re-acquired it, Mr. Simmons seeks documents relating to the following



The Honorable James R. Cho
April 24, 2024
Page 3

counter-arguments (and which may also lead to the discovery of a factual basis for other counter-arguments, as discussed below):

(1) the STA with assignment did not have the effect of transferring Mr. Simmons's interest in Nu Horizons, because it did not meet the conditions set forth in the Operating Agreement of Nu Horizons;

(2) the STA with assignment was ineffective in transferring Mr. Simmons's interest in Nu Horizons, because Ms. Lee did not have the authority to enter into an enforceable or effective agreement on behalf of Nu Horizons when she signed the STA on behalf of Nu Horizons;

(3) the STA with assignment was unenforceable and ineffective, because it was part of a fraud on Mr. Simmons to acquire his interest in Nu Horizons in exchange for no payment and through an entity that Ms. Lee had sold without informing Mr. Simmons;

(4) the STA with assignment was unenforceable and ineffective because it was done as part of an illegal money laundering conspiracy involving Ms. Lee and Mr. Leissner; and

(5) the STA with assignment was rendered void ab initio through the execution of the MITA in or about December 2018.

In order to obtain documents matter that bear on, or that reasonably could lead to other documents that could bear on, these standing counter-arguments, on February 16, 2024, Mr. Simmons served document requests on the government, a copy of which is attached hereto as Exhibit 1, and on Ms. Lee.[2] The government served responses and objections to these document requests on March 1, 2024, under which the government did not agree to produce any documents. Counsel for Mr. Simmons and the government thereafter met and conferred regarding the government's objections. The government subsequently agreed to produce documents in response to four of Mr. Simmons's document requests. Ms. Lee has refused to produce any documents in response to Mr. Simmons's document requests. As set forth in further detail below, the disputed requests fall into four general categories:

A. Requests Relating to SEC Schedule 13G Disclosures;
B. Requests Relating to the LOI, STA and MITA;
C. Requests Relating to Knowledge and State of Mind of Ms. Lee and Defendant Leissner and Their Alleged Conspiracy; and
D. Requests Relating to Subsequent Statements About Ownership of Nu Horizons or the Celsius Shares.

---

[2] Mr. Simmons' RFPs to the government and to Ms. Lee are identical apart from certain definitions that are not relevant to this dispute.



The Honorable James R. Cho
April 24, 2024
Page 4

**III.**     **Mr. Simmons is Entitled to Discovery Relevant to His Standing Arguments**

     A.  Documents are Relevant if They Bear On, Or Reasonably Could Lead to Other Matter That could Bear On, Whether Mr. Simmons Had an Ownership Interest <u>in Nu Horizons When He Filed His Petition.</u>

     Pursuant to Fed. R. Civ. P. 26(b)(1), a party is entitled to discover any "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." "Information is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Relevance is a matter of degree, and the standard is applied more liberally in discovery than it is at trial." *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 47 (E.D.N.Y. 2018) (quoting *Vaigasi v. Solow Mgmt. Corp.*, No. 11 Civ. 5088(RMB)(HBP), 2016 WL 616386, at *11 (S.D.N.Y. Feb. 16, 2016)). Relevancy under Rule 26 is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any issue that is or may be in the case." *Hutchins v. Palmer*, No. CV12-5927(JFB)(AKT), 2015 WL 13713335, at *7 (E.D.N.Y. Mar. 31, 2015) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

     "If relevant and proportional, then the party that objects to the discovery must establish that the request should be denied." *Thomas v. City of New York*, 336 F.R.D. 1, 2 (E.D.N.Y. 2020) (citing *N. Shore-Long Island Jewish Health Sys., Inc*., 325 F.R.D. at 48 ("Once the requesting party has made a prima facie showing of relevance, 'it is up to the responding party to justify curtailing discovery.'")); *see also Pegoraro v. Marrero*, 281 F.R.D. 122, 128–29 (S.D.N.Y. 2012) ("A party resisting discovery has the burden of showing specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [discovery device] is not relevant or how each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden.") (citation and internal quotation marks omitted).

     It should be noted that while the government admits that the legal standard for relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim or defense," throughout its argument, the government applies a new standard it invents from whole cloth, namely "a document is relevant only if it *bears directly* on the threshold standing issue." The Court should reject the government's self-serving misstatement of the law. Documents are relevant for purposes of the discovery ordered in this action if they bear on, or reasonably could lead to other matter that could bear on the standing dispute concerning whether Mr. Simmons had an ownership interest in Nu Horizons when he filed his Petition. Mr. Simmons is not limited to only obtaining documents that bear directly on that issue. The issue before the Court is whether documents are discoverable, not admissible at trial.



The Honorable James R. Cho
April 24, 2024
Page 5

      B.  The Government and Ms. Lee Cannot Avoid Producing Relevant Documents By
             <u>Challenging the Legal Basis for Mr. Simmons's Standing Arguments</u>

      Both the government and Ms. Lee argue that they should not be required to produce documents relevant to Mr. Simmons's standing arguments because the Court should rule now on their challenge to the legal basis for these arguments.  As a preliminary matter, it should be noted that the government's attempt to focus discovery only on whether the STA and assignment were executed and actually transferred Mr. Simmons's interest in Nu Horizons to Keyway Pride are essentially an attempt to relitigate, for the third time, its position that the Court can determine from the pleadings alone that Mr. Simmons lacks standing based on his execution of the STA and the assignment.  The Court rejected this argument twice already and should not permit the government to resurrect it to avoid the very discovery that the Court ordered.  The government may not agree with Mr. Simmons's legal theories or the Court's rejection of its legal argument, but it cannot avoid producing document relevant to Mr. Simmons's legal theories.  The government may well believe that there ultimately will be no genuine dispute as to any material fact and it will be entitled to judgment as a matter of law, but the time to make this argument is after it produces factually relevant documents, not prior to discovery.

      Even if the Court had not already ruled on the government's standing arguments twice, the government and Ms. Lee still could not rely on legal attacks on the viability of Mr. Simmons's standing arguments to avoid producing documents relevant to those arguments, because such legal arguments are not a proper basis on which to refuse to produce discovery. *See N. Shore-Long Island Jewish Health Sys., Inc.,* 325 F.R.D. at 48–49 (E.D.N.Y. 2018) ("Because Northwell lacks a viable fraud claim, the logic goes, information relevant only to that claim is not discoverable within the scope of Fed. R. Civ. P. 26. However, and as Northwell points out, MultiPlan's opposition to a discovery motion is not the proper forum for raising challenges to the viability of Northwell's claims, nor are such challenges proper grounds to preclude otherwise appropriate discovery) (internal cite omitted); *see also XChange Telecom Corp. v. Sprint Spectrum L.P.,* No. 14-CV-54(GLS/CFH), 2015 WL 773752, at *3 (N.D.N.Y. Feb. 24, 2015) ("[I]t is not presently appropriate…to determine whether the substantive issues raised during the briefing should lead to the decision that… the discovery demands are inappropriate. Instead such arguments regarding the viability of the remaining claims and defenses should be properly presented, in a dispositive motion, before the District Judge."); *Electrified Discounters, Inc. v. MI Techs., Inc*., No. 3:13-CV-1332(RNC), 2015 WL 2383618, at *6 (D. Conn. May 19, 2015) ("Because an adjudication on the merits normally comes only after discovery, it is no objection to a[ ] [discovery request] that it relates to a defense or claim which is insufficient in law.") (citation omitted) For this reason, the arguments offered by the government and Ms. Lee about whether arguments are legally sufficient under Delaware or California law are premature.



The Honorable James R. Cho
April 24, 2024
Page 6

## IV.    All of Mr. Simmons's Disputed Requests are Relevant to His Standing Arguments

The Court should deny the motions for a protective order as to Mr. Simmons's requests for documents relating to SEC Schedule 13G disclosures, the LOI, STA and MITA; the knowledge and state of mind of Ms. Lee and Defendant Leissner and their criminal conspiracy; and subsequent statements about ownership of Nu Horizons or Celsius Shares, because each of these requests bears on, or reasonably could lead to other matter that could bear on, Mr. Simmons's derivative standing.

### A.    Requests Relating to the SEC Schedule 13G Disclosures are Relevant

In the Verified Petition filed by Mr. Simmons, he alleges that "[a]ccording to a Schedule 13G filed on or about May 21, 2018, as of May 9, 2018, Nu Horizons already was owned by Keyway Pride, not Leissner or Mr. Simmons," and quotes the following disclosure made in that Schedule 13G:

> All of the 3,972,659 shares of Common Stock are held of record by Nu Horizons Investment Group, LLC, which is 100% held by Keyway Pride Ltd LLC, which is held 100% by Midas Commodities Agents Delaware LLC. On May 9, 2018, 100% of the membership interests in Midas Commodities Agents Delaware LLC were acquired by Newland Inc. Limited. Newland Inc. Limited is 100% held by Oryx Investment Limited, which is 100% held by Ghanim Saad M Al Saad AL-KUWARI.

(Simmons Verified Petition ¶ 43 & Exhibit 18.)

Mr. Simmons further alleges that the STA was entered into by Mr. Simmons, Keyway Pride, Rush Digital Media, LLC and Nu Horizons, on or about May 25, 2018, which is *after* the filing date of the Schedule 13G that stated Keyway Pride, not Mr. Simmons, owned Nu Horizons and that Midas, not Ms. Lee, owned Keyway Pride.  (Simmons Verified Petition ¶ 49 & Exhibit 19.)

In order to obtain documents that bear on, or that reasonably could lead to other matter that could bear on, the impact that the facts disclosed in the Schedule 13G had on Mr. Simmons's ownership interest in Nu Horizons, Mr. Simmons has requested documents concerning

- the Schedule 13G itself (Request 1);
- the interest of Midas in Keyway Pride referenced in the Schedule 13G (Request 2);
- the ownership or control of Midas, including acquisition described in the Schedule 13G (Request 3);



- the ownership or control of Keyway Pride (Request 4); and
- the acquisition in 2018 of a direct or indirect interest in Nu Horizons or the Celsius Shares by the following entities mentioned in the Schedule 13G: AL-KUWARI, Oryx, Newland, Midas, Keyway Pride, as well as any other person. (Request 5).

These requested documents concerning the transactions referenced in the Schedule 13G are relevant to several of Mr. Simmons's arguments that he owned Nu Horizons when he filed a petition derivatively on behalf of Nu Horizons.  As a preliminary matter, as quoted above, the Schedule 13G states that on May 21, 2018, Nu Horizons was "100% held by Keyway Pride Ltd LLC."  While Mr. Simmons disputes the truth of that statement and contends that he had an ownership interest in Nu Horizons on May 21, 2018, it is hard to imagine a more directly relevant statement about whether Nu Horizons was owned by Mr. Simmons than a statement that it was owned by someone else.  Documents that imply that Mr. Simmons lost his interest in Nu Horizons are as relevant as documents that imply that Mr. Simmons retained his interest in Nu Horizons.  To the extent that any party has documents concerning a transaction after the purchase of the Celsius Shares and prior to May 21, 2018 in which Keyway Pride Ltd LLC or any other party came to acquire an interest in Nu Horizons, these documents bear on whether Mr. Simmons had lost his interest in Nu Horizons and reasonably could lead to other matter that could bear on Mr. Simmons's interest in Nu Horizons between 2018 and the filing of his Petition.

These requested documents also are independently relevant to the validity of the STA itself.  Mr. Simmons disputes the contention of the government and Ms. Lee that he lost his ownership interest in Nu Horizons when he executed the STA and assignment because Ms. Lee did not own or otherwise have the authority to sign the STA on behalf of Keyway Pride when she signed it.  As reflected in the Schedule 13G, but unbeknownst to Mr. Simmons at the time, Ms. Lee had secretly sold Keyway Pride (evidently while misrepresenting that Keyway Pride owned 100% of Nu Horizons) to Midas, which was 100% held by Newland, which was 100% held by Oryx, which was 100% held by Ghanim Saad M Al Saad AL-KUWARI.  (*See* Verified Petition ¶50 ("At the time Petitioner Simmons entered into the Stock Transfer Agreement, he had no idea that Defendant Leissner already had secretly sold, or purported to sell, Nu Horizons to Ghanim Al Saad as part of his asset protection scheme.")  Documents concerning whether Ms. Lee no longer owned Keyway Pride when she signed the STA on behalf of Keyway Pride are relevant to the validity of the STA because the STA was ineffective if it was not executed by Keyway Pride.

Ms. Lee argues that she had the authority to sign on behalf of Keyway Pride even if she did not own it, because under a document that she has not yet produced she retained managerial authority over Keyway Pride after the sale, which entitled her to execute contracts on behalf of



The Honorable James R. Cho
April 24, 2024
Page 8

Keyway Pride, even if it AL-KUWARI beneficially owned 100% of it. Even if Ms. Lee did have documents supporting this seemingly implausible arrangement under which a businessman from Qatar asks the head of a women's fashion brand to manage his new company's investment decisions, Mr. Simmons certainly is entitled to discovery about the nature of this business relationship and authority and not just rely on the document that Ms. Lee's counsel cherry-picks and agrees to produce in support of her legal position.

Documents suggesting that Ms. Lee no longer owned Keyway Pride when she signed the STA on behalf of Keyway Pride also are powerful evidence that the STA was part of a fraudulent conspiracy involving Ms. Lee and her husband Defendant Leissner against Mr. Simmons, who had been misinformed that he was selling his interest in Nu Horizons to an entity wholly controlled by his ex-wife, Ms. Lee, not to an entity owned by an entity, Newland, that was ultimately owned by a person from Qatar, Ghanim Saad M Al Saad AL-KUWARI. Mr. Simmons would have no reason to believe Newland would ever pay him. Indeed, as Defendant Leissner testified at the trial of Roger Ng, it was part of his "asset protection" scheme to sell assets (presumably assets he controlled directly or indirectly through Ms. Lee and others) to Newland, and then transfer the proceeds of these sales to a bank in Liechtenstein, where the money would be protected by the bank secrecy laws in effect in Liechtenstein. (*See* Verified Petition ¶46 (citing trial transcript).) If the STA was part of this Newland asset protection scheme and Keyway Pride entered into the STA with the intention of transferring the assets to Liechtenstein and never paying Mr. Simmons, then the STA is ineffective as a fraud on Mr. Simmons, which means Mr. Simmons never transferred his interest in Nu Horizons.

The arguments put forward by the government and Ms. Lee that Mr. Simmons's allegations about Ms. Lee's participation in a conspiracy with her husband Defendant Leissner are "wholly speculative" are simply false. The Verified Petition devotes 8 pages to this scheme, quoting extensively from the exhibits and testimony at the trial of Roger Ng. (Verified Petition ¶¶41-63.) The government and Ms. Lee are entitled to dispute Mr. Simmons's legal theory, but the Court should not allow them to prevail on these arguments by withholding documents that they possess relating to these theories.

Similarly, the effort by the government and Ms. Lee to avoid discovery by attacking the legal theories on which Mr. Simmons may rely at the summary judgment stage of this litigation is premature and improper. As noted above, "opposition to a discovery motion is not the proper forum for raising challenges to the viability of … claims, nor are such challenges proper grounds to preclude otherwise appropriate discovery." *N. Shore-Long Island Jewish Health Sys., Inc.,* 325 F.R.D. at 48–49 (arguments about whether a fraud claim is legally viable are an improper basis for opposing discovery on that claim).

For this reason, the arguments advanced by the government that the Court should assume that the dispute over standing will require only evidence concerning whether a valid assignment



The Honorable James R. Cho
April 24, 2024
Page 9

was entered into because "a fraudulent transfer is not void, but voidable" are premature (and would fail at this stage at any rate both because the MITA *did* void the transfer ab initio and because this does not address whether the assignment was ineffective under the Nu Horizons Operating agreement or because of fraud). At any rate, the case on which the government prematurely relies for its argument about the law that applies to contracts created to defraud a counterparty, *Sharp Int'l Corp. v. State St. Bank & Trust Co.*, 302 B.R. 760, 778 (E.D.N.Y. 2003), *aff'd*, 403 F.3d 43 (2d Cir. 2005) concerns fraudulent conveyance in the bankruptcy context, which is about creditor protection and "fair consideration," not conspiracies to defraud a contractual counterparty. Similarly, the case on which Ms. Lee relies for its argument about the law that supposedly limits derivative standing in circumstances of fraud, *Arkansas Teachers Ret. Sys. v. Countrywide Fin. Corp.*, 75 A.3d 888, 894 (Del Sup. Ct. 2013), addresses only a circumstance in which a stockholder owning shares in a company loses standing to assert a breach of duty claim *due to that company's merger with another company*. It does not address a fraud where a purchaser enters into a contract to purchase shares with the intent to defraud the seller by paying nothing. *See, e.g., Frank Perez Fam. Tr. Dated 5/3/10 v. Wells Fargo Bank,* No. 5:18-CV-7569(SJO)(AFMx), 2018 WL 6332280, at *2 (C.D. Cal. Oct. 26, 2018) (where there is fraud in the assignment of a promissory note, it renders the note void, not merely voidable)

Mr. Simmons cannot even know what arguments the evidence produced in discovery ultimately will support and it is unfair and legally improper to require him to advance and defend those arguments before he obtains in discovery the documents that bear on, or that reasonably could lead to other matter that could bear on, the ownership of Nu Horizons from 2018 through the filing of his petition. Documents relating to (a) whether Ms. Lee and/or Defendant Leissner had entered into a secret transaction to sell Nu Horizons before the STA was executed, (b) whether Ms. Simmons had sold Keyway Pride before she signed the STA in the name of Keyway Pride, and (c) whether the STA was ineffective because it was executed for the purpose of defrauding Mr. Simmons easily meet that relevance standard.

B.  Requests Relating to LOI, STA and MITA are Relevant

The LOI, STA, and MITA are the core legal agreements bearing on the disputes over whether Mr. Simmons transferred his legal interest in Nu Horizons to Keyway Pride in 2018 and whether the MITA voided any such transfer. Mr. Simmons requested documents relating to these agreements in Requests 7, 8, and 10. Ms. Lee argues that she should not have to produce any of the requested documents relating to these agreements, while the government has agreed to produce documents concerning the LOI and MITA, but as to the STA has agreed only to produce documents concerning the negotiation of that agreement and the intent and ability of Keyway Pride and Ms. Lee to pay consideration under the STA.



The Honorable James R. Cho
April 24, 2024
Page 10

The Court should deny the government's and Ms. Lee's motions for a protective order as to these documents. The LOI is an expression of the intent of Mr. Simmons and Ms. Lee concerning the proposed transaction. The STA was the agreement to effectuate that transfer, although Mr. Simmons disputes that this transfer was effective. Finally, the MITA expressly rendered the transfer under the STA void ab initio, which voided any transfer of Mr. Simmons's interest in Nu Horizons (even if such a transfer had occurred, which Mr. Simmons disputes). Documents relating to these agreements are relevant to the dispute over standing, because they are likely to support or undermine inferences that Ms. Lee had authority to execute the STA, that Ms. Lee and Defendant Leissner intended to use the STA to defraud Mr. Simmons as part of their asset protection scheme, and more generally shed light on the understanding various parties had of the nature, purpose, meaning and effect of these agreements, all of which is disputed in connection with the arguments over standing.

    C.   Requests Relating to Knowledge and State of Mind of Ms. Lee and Defendant <u>Leissner and Their Alleged Conspiracy are Relevant</u>

There is a strong evidentiary basis, even before the commencement of discovery, for the inference that Ms. Lee and her husband, Defendant Leissner, were participating in an unlawful asset protection scheme when Ms. Lee signed the STA. (*See* Verified Petition ¶41-63.) As noted above, Defendant Leissner testified at the trial of Roger Ng that before he was arrested in 2018, and as part of the "asset protection" scheme to transfer assets to a jurisdiction that would protect these assets from legal process, he and Ms. Lee travelled to Liechtenstein and Switzerland to meet with advisors concerning the bank secrecy laws in these jurisdictions. (*See* Verified Petition ¶45 (citing trial transcript).) Trial evidence further demonstrated that their asset protection scheme specifically involved selling assets to Newland, which was ultimately owned by Ghanim Al Saad, and then transferring the proceeds of the sales to a bank subject to bank secrecy laws that would make it difficult for anyone to recover those assets. (*Id*. ¶44)

In light of this evidence, there is very good reason for Mr. Simmons to believe that Ms. Lee signed the STA on behalf of Keyway Pride as part of a fraud on Mr. Simmons. First, it appears that Ms. Lee intended the STA to effectuate a transfer to Newland, the very entity at the center of the asset protection scheme, because the Schedule 13G disclosure discussed above states that Keyway Pride was transferred to Newland weeks before the STA was signed. Second, Ms. Lee entered into the transaction when her husband, Defendant Leissner, was on notice of law enforcement inquiries into the criminal conspiracy to which he pled guilty and they were working together to effectuate the asset protection scheme to hide their assets. Third, Ms. Lee concealed from Mr. Simmons that she no longer owned the entity, Keyway Pride, that was agreeing to pay Mr. Simmons for his interest in Nu Horizons, and that it was now beneficially owned by Al Saad. Fourth, Mr. Simmons was, in fact, never paid under the STA for his interest in Nu Horizons. All of this strongly suggests that Ms. Lee's intention was to transfer the Nu



The Honorable James R. Cho
April 24, 2024
Page 11

Horizons membership interest to Newland (and ultimately Al Saad), transfer the proceeds of that sale to a bank account in Liechtenstein, and leave Mr. Simmons with nothing.

In order to obtain documents that bear on, or that reasonably could lead to other matter that could bear on, whether the STA was part of an unlawful conspiracy by Ms. Lee and Defendant Leissner to defraud Mr. Simmons and engage in money laundering, Mr. Simmons has requested documents concerning:

- Ms. Lee's knowledge of the 2018 Department of Justice investigation or Leissner's participation in the crime to which he pled guilty or other wrongdoing before Leissner's arrest (Request 6);
- the intent of Keyway Pride and Ms. Lee to pay consideration under the Stock Transfer Agreement, and their ability to make such payment (Request 8(b));
- whether any assets held by Ms. Lee or Keyway Pride in May 2018 were proceeds of a crime (Request 8(c)); and
- advice sought or obtained by Ms. Lee and/or Leissner in 2018 concerning asset protection (Request 9).

As articulated above, understanding the circumstances under which the STA was executed could be dispositive on the issue of Mr. Simmons's standing.  If, at the time these agreements were executed, Ms. Lee and Mr. Leissner were knowingly attempting to commit a fraud on Mr. Simmons, then the agreements would be ineffective and Mr. Simmons never transferred his interest in the Celsius Shares.

In addition, if Mr. Simmons's interest in Nu Horizons was transferred as part of a fraud, this would create a constructive trust sufficient to protect Mr. Simmons's standing.  "Various courts have found that a constructive trust constitutes a superior interest and confers standing in a forfeiture proceeding."  *United States v. Lesak*, No. 07 CR. 0396 (GEL), 2009 WL 1788411, at *6 (S.D.N.Y. June 23, 2009) (refusing to dismiss Petition for lack of standing as Petitioner had alleged superior interest in fraudulently obtained forfeited property); *see also Willis Mgmt. (Vermont), Ltd. v. United States,* 652 F.3d 236, 245 (2d Cir. 2011*)* ("if a constructive trust properly should be imposed on particular property that was in the possession of the defendant, it was never truly the defendant's property and is not subject to forfeiture to the United States in the first instance.").

Ms. Lee's argument that the purchase of Nu Horizons could not have been part of a fraud on Mr. Simmons because at the time Mr. Simmons was motivated to sell Nu Horizons because he was addressing sexual misconduct allegations makes so little sense that it is hard to view this argument as anything other than a transparent attempt to embarrass Mr. Simmons and drag his name through the mud.  The fact that Mr. Simmons was financially vulnerable and motivated to distance himself from his investments obviously is consistent with Ms. Lee and Defendant



The Honorable James R. Cho
April 24, 2024
Page 12

Leissner conspiring to defraud him.  As Ms. Lee's criminal counsel knows well, it is a common practice of criminals to prey on people who are financially vulnerable and use that very vulnerability and desperation to take advantage of them.  Ms. Lee's allegation that she knew her ex-husband was motivated to distance himself from his investments not only does not disprove that she defrauded him, it is a plausible explanation of why she thought she could get away with it.

> **D.  Requests Relating to Subsequent Statements About Ownership of Nu Horizons or Celsius Shares are Relevant**

Mr. Simmons requests several categories of documents created after the execution of the STA and the MITA that reflect the understanding of various persons concerning the ownership of Nu Horizons.  In order to obtain documents that bear on, or that reasonably could lead to other matter that could bear on, the ownership of Nu Horizons, Mr. Simmons has requested documents concerning:

- direct or indirect ownership of Nu Horizons or the Celsius Shares (Request 11), including but not limited to
  - tax filings by Nu Horizons;
  - tax filings by any purported owner of Nu Horizons, including Tim Leissner, Kimora and Keyway Pride;
  - financial records, including, but not limited to, account statements, books of account, and ledgers reflecting the assets of any purported owner of Nu Horizons, including Tim Leissner, Kimora and Keyway Pride;
  - agreements negotiated or entered into by Nu Horizons or by any other person referencing Nu Horizons; and
  - SEC filings referencing Nu Horizons; and credit or loan applications by any person referencing any interest in Nu Horizons as an asset or liability;
- documents submitted to the government in support of Leissner's bond hearing concerning the Celsius Shares, Nu Horizon, or Keyway Pride (Request 12);
- the appearance bond, including the unredacted transcript of the bond hearing and all documents provided to the Court concerning the Celsius shares (Request 13);
- the purported "loan or transfer" of the Celsius Shares from Nu Horizons to Ms. Lee or Keyway Pride (Request 14);
- the brokerage account with an account number ending in "7002," from which the Celsius Shares were seized (Request 15);
- Leissner's recognition of Mr. Simmons' beneficial ownership of the Celsius Shares (Request 16);
- the affidavit submitted in support of the search warrant authorizing the seizure of the Celsius Shares (Request 17).



The Honorable James R. Cho
April 24, 2024
Page 13

Statements made after 2018 concerning the ownership of Nu Horizons or the Celsius Shares are highly relevant to whether Mr. Simmons owned Nu Horizons when he filed his petition. Such statements are textbook examples of documents that bear on, and could lead to other matter that could bear on, whether Mr. Simmons owned Nu Horizons between the signing of the STA and the filing of Mr. Simmons's Petition.

As a preliminary matter, statements about the ownership of the Celsius Shares should be treated for discovery purposes as statements about the ownership of Nu Horizons. It is common for people to discuss their financial interest in assets without reciting every entity involved in their indirect ownership of the assets. For example, it is likely that persons asserting that they own the Celsius Shares are implicitly asserting that they have an ownership interest, or an indirect ownership interest in Nu Horizons. Thus, for example, if Ms. Lee made a statement, whether in a financial statement or otherwise, that she, AL-KUWARI or Mr. Simmons owned the Celsius Shares, it is likely that she would implicitly be stating that they had a direct or indirect interest in Nu Horizons, even if she did not spell out in the statement how they had the interest in the Celsius Shares. Even if Ms. Lee opposes this inference, Mr. Simmons has the right to obtain such statements in discovery for the purpose of exploring whether they support (or undermine) the inference that Keyway Pride, or Mr. Simmons, owned Nu Horizons.

Neither does it undermine the relevance of statements concerning the ownership of Nu Horizons or the Celsius Shares that the statements were made after the MITA was signed. Where there is a dispute over ownership of property, particularly in the context of a forfeiture case, evidence of the behavior of parties asserting an ownership interest after the transaction is often highly relevant to the question of ownership. In short, if a party asserts that it owns property, but then makes subsequent statements that it did not own the property, whether in tax filings, SEC filings, accounting statements, in support of a bond application or otherwise, these subsequent statements often are strong evidence concerning ownership. Subsequent statements that a party did own the property are similarly relevant. If Ms. Lee, Defendant Leissner or any other person made statements, or otherwise acted in ways, that are inconsistent with the positions now being asserted by Ms. Lee's counsel or government attorneys in relation to the ownership of Nu Horizons, Mr. Simmons has a right to obtain evidence of those statements or actions in discovery.

## V.     The Government's Arguments on Burden Fail To Show Good Cause for Issuing a Protective Order.

The government "has the burden of showing specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [discovery device] is not relevant or how each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden." *Pegoraro*, 281 F.R.D. at 128–29



The Honorable James R. Cho
April 24, 2024
Page 14

(quotation & citation omitted).  The government's argument on burden, however, is completely lacking in factual support, other than the blanket statement that the entire 1MDB database, most of which has nothing at all to do with any of the disputes in this action, contains 5.7 million documents from various sources.  The government does not even pretend that it has run searches for terms related to the contested requests or tried to limited the requests to the most relevant custodians.  The government cites cases stating that in some cases it would be an undue burden to have to conduct a page-by-page review of "ten million pages" or "millions of pages" as if the government and Mr. Simmons entered into discussions about relevant custodians and search terms and Mr. Simmons is insisting on broad terms and lists of custodians that hit on millions of pages of documents.  That simply never happened.  Mr. Simmons is willing to negotiate custodians and search terms that are efficient and avoid any undue burden.  The possibility that some unidentified list of search terms and custodians might yield a burdensome number of documents is not a basis for refusing to produce even a single page of documents in response to a request that is relevant, which is the government's current position.  The government cannot seek to forfeit hundreds of millions of dollars' worth of assets, but then refuse to commit resources to producing relevant documents to the person whose assets they seek to forfeit.

In light of the government's complete failure to show good cause for issuing a protective order that would narrow the scope of any of the relevant request for documents, the Court should deny the government's request for a protective order based on burden.  The government has not even offered a suggestion of what such an order limiting the scope would look like, apparently hoping the Court will agree that the *possibility* of undue burden warrants an order authorizing the government to not produce a single page of documents that the government argues are not relevant.  That position is absurd and the government does not, and could not, identify any legal support for such a position.  The cases on which the government relies involve a court considering the actual burden of reviewing documents, not uninformed speculation about what the burden might be if the requesting party takes an unreasonable position on search terms and custodians.

## VI.   The Court Should Deny the Government's Motion for a Protective Order as to All Interview Notes and Memoranda

In response to Mr. Simmons's request for interview notes and memoranda containing relevant statements, the Government argues that these materials are undiscoverable in their entirety as "attorney work-product," regardless of the relevance of the fact statements in these materials.  However, as the structure of the Government's argument implies, there are several holes in its argument that it attempts unsuccessfully to patch by mere ipse dixit.[3]

---

[3] We note that the government asserted the law enforcement privilege in its responses and objections, but has not moved for a protective order on this basis.  Moreover, such a motion would be futile because government agencies



The Honorable James R. Cho
April 24, 2024
Page 15

First, as the Government's own cited case explains, "it is not necessarily the case that when a law enforcement agent conducts a witness interview as part of a criminal investigation, he does so as an agent of a Government attorney… Accordingly, to the extent the memoranda here were prepared by individuals acting as law enforcement investigative agents, rather than as agents of the criminal prosecutors involved in the case, they are not entitled to attorney work-product protection." *United States ex rel. Landis v. Tailwind Sports Corp*., 303 F.R.D. 419, 424 (D.D.C. 2014).

Second, even the interview notes and memoranda prepared at the direction of a Government attorney may still be discoverable as "fact" work-product. "Factual work product may be embedded in attorney memoranda of witness statements" and to hold that "a lawyer's interview notes are always opinion work product" would "inappropriately immunize parties and permit them to hide relevant non-privileged facts contained in those memoranda—a concept contrary to the vitality of the adversary system." *In re HealthSouth Corp. Sec. Litig.,* 250 F.R.D. 8, 12 (D.D.C. 2008). Of course, this is even more true for a law enforcement agent's notes than for an attorney's notes. As the Government recognizes, "substantially verbatim witness statements contained in interview memoranda that have not been sharply focused or weeded by an attorney" constitute fact work-product, to which the Government blanketly counters that all of the reports reflect the "thought processes of FBI agents" (tellingly, not the thought processes of attorneys). *Tailwind Sports Corp*, 303 F.R.D. at 425. That distinction aside, an *in camera* inspection might well reveal that "[t]o the extent that the statements imply the attorney's questions from which inferences might be drawn as to his thinking, those inferences merely disclose the concerns a layman would have as well as a lawyer in these particular circumstances, and in no way reveal anything worthy of the description 'legal theory.'" *In re John Doe Corp*.,

---

seeking to assert this privilege "must make a clear and specific evidentiary showing of the nature and extent of the harm that is likely to be encountered if disclosure is permitted, and they may not rely simply on generalized reiterations of the policies underlying the privilege." *Schiller v. City of New York*, 252 F.R.D. 204, 207 (S.D.N.Y. 2008), modified on reconsideration, No. 04 Civ. 7922, 04 Civ. 7921 (RJS)(JCF), 2008 WL 4933645 (S.D.N.Y. Oct. 6, 2008) (internal citations omitted). The government has not done so. Even had the Government attempted to meet its burden, the importance of the requested information to this ancillary proceeding would outweigh any such showing. As explained in *Moroughan v. Cnty. of Suffolk*, it is "hard to overestimate the importance "of "notes taken by a trained police investigator regarding interviews with witnesses to the events alleged in the complaint" as "they go directly to the claims asserted in the complaint" and have "significant value for impeachment purposes if the witnesses testify inconsistently with what the notes show they told the investigator." No. CV 12-512 (JFB) (AKT), 2015 WL 2412365, at *4 (E.D.N.Y. May 20, 2015). Accordingly, the court found that the notes' "substantial value to the plaintiff… outweighs other pertinent considerations and compels their disclosure." *Id.* Other courts have made similar findings. *See Tri-State Hosp. Supply Corp. v. United States,* No. CIV.A. 00-1463(HHK)(JMF), 2005 WL 3447890, at *10 (D.D.C. Dec. 16, 2005) (compelling disclosure where "In light of the nature of Tri-State's claims, in particular its claims that the government's actions were meritless and that the government knew its actions were meritless, this information is critical… There is no substitute for the written, contemporaneous evidence of how and why Customs investigated Tri-State.").



The Honorable James R. Cho
April 24, 2024
Page 16

675 F.2d 482, 493 (2d Cir. 1982) (ordering production of interview notes).  And, contrary to the Government's position, "[i]n producing any memoranda that contain 'fact' work-product, the Government may redact and log any portions that include indicia of opinion work-product, such as attorney notes or highlighting."  *Tailwind Sports Corp*, 303 F.R.D. at 426.

     Third, and finally, courts have routinely recognized that litigants have a "substantial need" for these materials and have compelled their disclosure on that basis.  "Critical to the court's determination" of substantial need is "the nature of" the claims asserted, and where "[a]t the heart and soul of [the] claims is the government's motivation and legal and factual basis" for, for example "pursuing criminal prosecution, issuing civil penalties, and referring the case to DOJ for collection of those penalties," disclosure of documents that directly bear on those issues and "go to the heart of the issues in the litigation" "may be discoverable" even though they "are in large part opinion work product."  *Tri-State Hosp. Supply Corp. v. United States,* No. CIV.A. 00-1463(HHK)(JMF), 2005 WL 3447890, at *6 (D.D.C. Dec. 16, 2005) (finding that there was a "sufficient need" to review "ordinary work product and opinion work product" and that "no substitute exists for this contemporaneous evidence of the government's decision making").  *See also Tailwind Sports Corp*, 303 F.R.D. at 425 ("statements given to FBI agents and other criminal investigators… are critical sources of evidence for both sides. They can be expected to identify the principal witnesses in the case, both inculpatory and exculpatory; to provide the witnesses' initial, unadorned testimony on the key issues; and to reveal how the witnesses' testimony and recollections may have changed over time.");  *In re John Doe Corp*., 675 F.2d at 492 ("The need for the contents of the interviews is self-evident. Quite apart from the truth of the matters asserted therein, which is clearly pertinent, the statements may be relevant simply for the fact they were made because they may tend to prove what [the Government] knew and when it knew it. On that issue, the notes may be the only available evidence.").

     At this stage of discovery, Mr. Simmons is seeking what is presumably a small number of statements from witnesses discussing facts relevant to the standing of Mr. Simmons.  This would include, for example statements that Defendant Leissner made to the government about Mr. Simmons's ownership interest in Nu Horizons.  Such statements are highly relevant and may well be outcome-determinative in the litigation.  It is unlikely that such statements reflect attorney work product as they were recorded by agents, not lawyers.  Finally, even if they do contain attorney work product, this can be addressed through redactions.  The Government should therefore be ordered to produce the requested interview notes and memoranda.



The Honorable James R. Cho
April 24, 2024
Page 17

## **The Government's Position**

        For the reasons set forth below, a protective order should be issued as to various documents sought by Simmons that fall outside the limited scope of discovery authorized by the Court and/or are protected from disclosure as privileged under the rules that govern discovery in the ancillary proceeding.

## I.    **Factual and Procedural Background**

### A.    <u>The Criminal Case Against Tim Leissner</u>

        1Malaysia Development Berhad ("1MDB") was a strategic investment and development company wholly owned and controlled by the government of Malaysia.  The International Petroleum Investment Company ("IPIC") was a sovereign wealth fund wholly owned by the government of Abu Dhabi.

        In 2012 and 2013, 1MDB engaged in three bond transactions (the "1MDB Bond Transactions") that, collectively raised more than $6 billion for 1MDB.  The 1MDB Bond Transactions were either directly or indirectly guaranteed by IPIC.  The purpose of the funds raised by the 1MDB Bond Transactions was to support energy- and infrastructure-related projects that would benefit the Malaysian people.

        The Goldman Sachs Group, Inc., together with its subsidiaries and affiliates (collectively, "Goldman"), facilitated the 1MDB Bond Transactions.  During this period, defendant Tim Leissner was a partner at Goldman who worked on the bond deals.  Leissner agreed with others, including Ng Chong Hwa, also known as "Roger Ng" ("Ng"), another Goldman employee, and Low Taek Jho, also known as "Jho Low" ("Low"), a Malaysian financier, to pay bribes to foreign officials in Malaysia and Abu Dhabi, including officials at 1MDB and IPIC.  In exchange for these corrupt payments, the 1MDB officials agreed to hire Goldman to orchestrate the 1MDB Bond Transactions.  For its work on the 1MDB Bond Transactions, Goldman ultimately earned more than $600 million in fees and revenue.

        In total, with regard to the proceeds of the 1MDB Bond Transactions, Ng, Leissner and Low conspired to divert and launder billions of dollars into accounts that Low personally controlled.  Specifically, the government has traced approximately $1.6 billion in bribes from the bond proceeds that were paid to officials at 1MDB and IPIC, and other governments officials in Malaysia and Abu Dhabi, and traced more than $1 billion in kickbacks paid to Ng, Leissner, Low and others involved in the scheme.  For their roles in the conspiracy, Low and his associates received more than $1.42 billion, Leissner received approximately $73.4 million and Ng received $35.1 million.



The Honorable James R. Cho
April 24, 2024
Page 18

Leissner used his profits from the scheme to fund investments and purchases, including the purchase of the Celsius Shares.  First, in anticipation of receiving kickbacks from the 1MDB Bond Transactions, the co-conspirators formed a network of bank accounts designed to conceal their connection to the funds, including an account held in the name of "Blackstone Asia Real Estate Partners" (the "Blackstone Account"), a bank account controlled by one of Low's associates; and an account held in the name of  "Capital Place Holdings" (the "Capital Place Account"), which listed Leissner's wife, Judy Chan Leissner, as the authorized user.  On or about and between approximately 2012 and 2013, corrupt payments of over $137,500,000 were made from the Blackstone Account to the Capital Place Account, which Leissner subsequently used to distribute bribe and kickback payments, and to receive his share of the illegal proceeds.

Following these transfers into the Capital Place Account of illegal proceeds, on or about June 5, 2014, a transfer in the amount of approximately $6,818,975 was made from the Capital Place Account to an account held in the name of a professional sports team.  The investigation revealed that these funds represented a purported "loan" from Leissner to one of his business associates ("Individual-1").  The source of the payment characterized as a loan to Individual-1 was therefore illegal proceeds from the above-described bribery and money laundering scheme.

The Investigation further revealed that in or about April 2015, Individual-1 returned the loan to Leissner by remitting the owed funds to various bank accounts designated by Leissner.  One of the payments included a wire transfer on or about April 21, 2015 in the amount of approximately $3,000,000 from "Asian Sports Ventures HK" to Celsius Holdings, Inc., a company engaged in the development and sale of an energy drink.  Leissner sat on the Board of Directors of Celsius, and Ng was an officer of the company. The investigation further revealed that the aforementioned wire transfer was used as payment for 3,370,787 shares of Celsius stock, which were issued to Nu Horizons.  Accordingly, the Celsius stock that was issued to Nu Horizons was obtained using proceeds from the 1MDB bond scheme.

B.    Procedural History

On or about March 5, 2021, the Honorable Peggy Kuo, United States Magistrate Judge for the Eastern District of New York, issued a warrant authorizing the seizure of 3,370,787 shares of Celsius stock, finding probable cause to believe that the shares were subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and 982(a)(1), as: (i) property constituting or derived from proceeds traceable to violations of the Foreign Corrupt Practices Act (the "FCPA"), codified at 15 U.S.C. §§ 78dd-1, et seq., and a conspiracy to violate the FCPA, in violation of U.S.C. § 371; and (ii) property involved in money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

On or about March 3, 2023, the Honorable Margo K. Brodie, Chief United States District Judge for the Eastern District of New York, entered an Amended Preliminary Order of



The Honorable James R. Cho
April 24, 2024
Page 19

Forfeiture against Leissner imposing a forfeiture money judgment, in addition to directing the forfeiture of all right, title and interest in the Celsius Shares as: (a) property, real or personal, involved in the violation of 18 U.S.C. § 1956(h), or property traceable to such property; and (b) property, real or personal, constituting or derived from proceeds traceable to a violation of 18 U.S.C. § 371.  See United States v. Tim Leissner, No. 18-CR-439, ECF No. 68 (the "Amended Preliminary Order").

Following the entry of the Amended Preliminary Order, the government took steps to commence the ancillary proceeding by publication of a notice of the forfeiture and sending notice to known potential claimants with an interest in the Celsius Shares about when and where to file any claim to the asset.  Notice of the forfeiture was posted on an official government website (www.forfeiture.gov) for a 30-day period that began on May 2, 2023.  On May 5, 2023, a petition was filed on behalf of Lee individually seeking to contest the forfeiture of certain of the Celsius Shares.  See ECF No. 3.  In addition, on the same date, a petition was filed on behalf of Ng seeking to contest the forfeiture of the certain of the Celsius Shares.  See ECF No. 4.  Further, on the same date, a petition was filed by Simmons on behalf of himself and derivatively on behalf of Nu Horizons seeking to contest the forfeiture of the Celsius Shares. See ECF No. 5 (the "Simmons Petition").  On May 22, 2023, a petition was filed on behalf of Ken Siazon seeking to contest the forfeiture of certain of the Celsius Shares.  See ECF No. 8.

By Order entered on December 26, 2023, the Court granted, in part, the government's motion to dismiss the Simmons Petition, dismissing Simmons' individual claims to the Celsius Shares but allowing his derivative claim on behalf of Nu Horizons to proceed.  See ECF No. 24 (the "Partial Dismissal Order").  The government moved for reconsideration of the Partial Dismissal Order, and while the motion was denied, the Court responded by directing the Parties to engage in limited discovery on the threshold issue of whether Simmons held a membership interest in Nu Horizons as of the date of filing his petition sufficient to confer standing upon him to assert a derivative claim.  See ECF No. 32.[4]

On February 16, 2024, Simmons propounded upon the government a first set of requests seeking production of seventeen categories of documents.  See Simmons First Set of Requests, attached hereto as Exhibit A.  The government responded by agreeing to search for and produce, to the extent such documents exist, non-privileged documents responsive to four of the requests, specifically Request Nos. 7, 8(a), 10 and 11, subject to entry of an appropriate protective order.  See id.; Government's Amended Responses and Objections, attached hereto as Exhibit B.

---

[4]     The standing issue is rooted in the requirement that, in order to assert a derivative claim, an individual must allege that he was a member of the corporate entity "at the time of the transaction complained of."  Fed. R. Civ. P. 23.1(b)(1).  While "Rule 23.1 . . . does not expressly require that a derivative plaintiff be a shareholder at the time of suit[,] such a requirement is implied by the rule . . . ."  Werfel v. Kramarsky, 61 F.R.D. 675, 679 (S.D.N.Y 1974).



The Honorable James R. Cho
April 24, 2024
Page 20

On March 15, 2024, the District Court extended the deadline for the completion of the initial phase of discovery on standing to May 17, 2024, and referred the Parties to Your Honor for the resolution of any discovery disputes.  At a status conference held on April 5, 2024, Your Honor set a deadline for this joint submission by the Parties addressing the present discovery dispute.

C.      The Limited Discovery Order and Simmons' Broad Discovery Requests

The threshold issue is whether Simmons held a membership interest in Nu Horizons as of the date that he filed his claim in this forfeiture proceeding.  The nature and time period of Simmons' interest arises from a series of agreements transferring Simmons' interest in Nu Horizons to Lee and/or entities associated with her.  In particular, as alleged in the Simmons Petition, on or about April 26, 2018, Simmons and Lee signed a letter of intent (the "LOI") memorializing Simmons' intent to sell all of his interests in Nu Horizons to Keyway Pride, a company controlled by Lee.  See Simmons Petition ¶ 42.  As further alleged in the Petition, on or about May 25, 2018, Simmons, Keyway Pride, Rush Digital Media, LLC (a company founded by Simmons), and Nu Horizons entered into a Stock Transfer Agreement (the "Stock Transfer Agreement"), which directed the transfer of Simmons' "entire Ownership Percentage . . . in Nu Horizons," among other assets, to Keyway Pride "at an aggregate purchase price of $14,250,000."  See Simmons Petition ¶¶ 49, 51.  Despite these clear agreements, the Petition alleges that in or about 2018, Simmons, Lee, Keyway Pride, and Erok Ventures LLC (another company controlled by Lee) entered into a superseding Member Interest Transfer Agreement that nullified and voided both the LOI and Stock Transfer Agreement, thus preserving the Petitioner's interest in Nu Horizons and entitling him to certain of the Celsius Shares.  See Simmons Petition ¶ 61.

In light of the focused discovery the District Court has ordered, the government has agreed to produce the following categories of documents, to the extent any exist in the government's possession or control, as within the scope of the District Court's limited discovery order:

| Request No. | Subject Matter |
| --- | --- |
| 7 | The Letter of Intent dated April 26, 2018 |
| 8(a)-(b) | The Stock Transfer Agreement executed on or about May 25, 2018 |
| 10 | The Membership Interest Transfer Agreement entered into in or about December 2018 |
| 11 | The direct or indirect ownership or control of Nu Horizons or the Celsius Shares between 2018 and the present |



The Honorable James R. Cho
April 24, 2024
Page 21

Despite the narrow inquiry the Court ordered, Simmons has served on the government a series of broad requests to which the government has lodged objections, for the various reasons stated in Exhibit B.  These include documents[5] concerning:

| Request No. | Subject Matter |
| --- | --- |
| 1 | May 2018 SEC Schedule 13G listing Keyway Pride as the 100% owner of Nu Horizons |
| 2 | Midas Commodities' interest in Keyway Pride |
| 3 | Ownership or control of Midas Commodities |
| 4 | Ownership or control of Keyway Pride |
| 5 | A 2018 acquisition in Nu Horizons or the Celsius Shares by third parties |
| 6 | Lee's knowledge of Leissner's conduct vis-à-vis 1MDB |
| 8(c) | Whether any assets held by Lee or Keyway Pride were proceeds of a crime |
| 9 | Advice sought or obtained by Lee or Leissner concerning asset protection |
| 12-13 | An appearance bond for Leissner |
| 14 | A loan or transfer of the Celsius Shares from Nu Horizons to Lee or Keyway Pride |
| 15 | Ownership and control of a brokerage account into which the Celsius Shares were transferred |
| 16 | A February 5, 2020 document regarding a purported ex post facto statement by Leissner regarding beneficial ownership of the Celsius Shares |
| 17 | The affidavit submitted in support of the warrant authorizing seizure of the Celsius Shares |

II.   **Argument**

A.   The Documents Sought from the Government by Simmons Fall Outside the Scope of Authorized Discovery

In the District Court's February 2024 order, the Court ruled that the Parties are to engage in limited discovery focused on the specific question of whether Simmons held a membership interest in Nu Horizons at the time the Simmons Petition was filed.  This issue is central to the question of whether Simmons has standing to bring the instant derivative claim on Nu Horizons' behalf.  Apart from the requests to which the government has consented, Simmons' other requests are beyond the scope of that narrow order and are thus irrelevant and improper.

---

[5]    In Simmons' request for production, the term "document" is specifically defined to include FBI-302s and interview notes on which the FBI-302s are based.



The Honorable James R. Cho
April 24, 2024
Page 22

    1.    <u>Legal Standard</u>

Federal Rule of Civil Procedure 26 provides that a party is entitled to discovery on "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim of defense." <u>Henry v. Morgan's Hotel Grp., Inc.</u>, No. 15-CV-1789 (ER) (JLC), 2016 WL 303114, at *3 (S.D.N.Y. Jan 25, 2016) (internal citations omitted). However, Rule 26(b)(1) is intended to "encourage judges to be more aggressive in identifying and discouraging discovery overuse" and to limit discovery that has "little bearing" on the issues being litigated  by emphasizing the need to analyze proportionality before ordering production of relevant information. <u>Id.</u>; <u>State Farm Mut. Auto Ins. Co v. Fayda</u>, No. 14-CV-9792 (WHP)(JCF), 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015). A court should consider both the nature of information sought and whether its production is "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).

The party seeking discovery bears the initial burden of proving the discovery is relevant. <u>Citizens Union of N.Y. v. Att'y Gen. of N.Y.</u>, 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017).

In this case, given the limited scope of the District Court's discovery order, a document is relevant only if it bears directly on the threshold standing issue.

    2.    <u>Discussion</u>

The requests to which the government objects fall well beyond the scope of the limited discovery that the District Court ordered and are thus irrelevant. Instead, the requests purport to seek evidence to support Simmons' wholly speculative claim that Leissner and Lee were engaged in some sort of criminal conspiracy to defraud Simmons and that the existence of such a conspiracy renders unenforceable the Stock Transfer Agreement by which Simmons agreed to convey away any interest in Nu Horizons. Such a tenuous foundation cannot support the discovery requests Simmons has propounded, which are disproportionate to the narrow scope of the District Court's discovery order and, as discussed below, have little bearing on the specific issue being litigated. Moreover, the requests go beyond even that speculative theory.

Moreover, even if, as Simmons speculates, the Stock Transfer Agreement was procured through some misconduct, Simmons still conveyed away his interest in Nu Horizons, undermining his entire argument. As alleged in the Simmons Petition, on or about May 25, 2018, Simmons, Keyway Pride, Rush Digital Media, LLC, and Nu Horizons entered into the Stock Transfer Agreement, by which Simmons agreed to transfer his entire ownership interest in Nu Horizons to Keyway Pride. <u>See</u> Simmons Petition ¶¶ 49, 51. In addition to entering the contract, Simmons did, in fact, convey all of his interest in Nu Horizons to Keyway Pride, as



The Honorable James R. Cho
April 24, 2024
Page 23

reflected in the assignment instrument executed by Simmons.  <u>See</u> Ex. A to Stock Transfer Agreement, ECF No. 5-20 (the "Assignment").  The Assignment provides that "Transferor [defined as Simmons] hereby sells, assigns and transfers unto Transferee [defined as Keyway Pride] his entire Ownership Percentage . . . of Nu Horizons . . . ."  <u>Id.</u>  In essence, even if the Stock Transfer Agreement was unenforceable as to future performance (which it was not), that would not affect Simmons' <u>actual</u> conveyance to Keyway Pride of his purported interest in Nu Horizons pursuant to the Assignment, which is a separate and independent legal instrument that took immediate effect.[6]

In other words, the transfer to Keyway Pride of Simmons' purported membership interest in Nu Horizons <u>actually</u> occurred, which renders irrelevant Simmons' speculation that the Stock Transfer Agreement was unenforceable due to fraudulent conduct.  To the extent that Lee or Leissner potentially defrauded Simmons — an unfounded accusation at this point, and nothing more — Simmons' remedy is to seek redress in a civil action.  In fact, Simmons has filed such an action in Los Angeles Superior Court under Case No. 21STCV18852, which is currently pending and which centers around the transfer of Simmons' interest in Nu Horizons to Keyway Pride and the transfer of the Celsius Shares to Lee in connection with Leissner's bond proceeding.  Simmons could pursue such discovery in that action.  This Court is not the proper forum for pursuing such relief, and Simmons' requests are beyond the scope of the discovery the District Court has ordered in this ancillary proceeding.[7]  <u>See, e.g., United States v. Lanvin</u>, 942

---

[6]       It is hornbook law that a present transfer, such as the conveyance of Simmons' purported interest in Nu Horizons to Keyway Pride by virtue of the executed Assignment, does not constitute a contract.  Perillo, Contracts § 18.3, at 605 ("[A]n assignment is a present transfer — an executed transaction . . . ."); <u>DC3 Ent., LLC v. John Galt Ent.</u>, 412 F. Supp. 2d 1125, 1141 (W.D. Wash. 2006) ("It is important not to confuse an assignment, which is a present transfer, with a contract, which is a promise of future performance.").

[7]       If Simmons wanted to set aside the Assignment on the grounds of fraud, he would have to allege at least one of the following: (1) the transferor was insolvent or would be rendered insolvent by the transfer in question; (2) the transferor making the conveyance was a defendant in an action for money damages who failed to satisfy a judgment entered against him; (3) the transferor was engaged or was about to engage in a business transaction for which its remaining property constituted unreasonably small capital; or (4) the transferor believed it would incur debts beyond its ability to pay.  <u>See Sharp Int'l Corp. v. State St. Bank & Trust Co.</u>, 302 B.R. 760, 778 (E.D.N.Y. 2003).  Simmons' Petition is devoid of any such allegations and thus there is no basis on which the Assignment could be set aside.  Even if there was a basis to do so, the conveyance would not be void per se.  <u>Wash. State Inv. Bd. v. Odebrecht S.A.</u>, 461 F. Supp. 3d 46, 78 (S.D.N.Y. 2020) ("A fraudulent transfer is not void, but voidable . . . .").  Simmons would have had to take affirmative steps to void his own conveyance, which he has not done and would be estopped from so doing in any event.  <u>See id.</u>



The Honorable James R. Cho
April 24, 2024
Page 24

F.2d 177, 187 (3d Cir. 1991) (holding that victim of conduct unrelated to offense giving rise to forfeiture could not seek redress in ancillary proceeding).

   Accordingly, the requests set forth above that seek to uncover information to support Simmons' speculation of some misconduct by Leissner and Lee (Requests 8(c), 9, 17) have no bearing on Simmons' completed conveyance of his purported interest in Nu Horizons to Keyway Pride and, in turn, also have no bearing on the central question of whether Simmons held a membership interest in Nu Horizons as of the date of the filing of the Simmons Petition.

   Similarly, Requests 1, 2, 3, 4, 5 and 14—which bear upon ownership or control of third-party entities Keyway Pride, Midas Commodities, and third-party owners of the Celsius Shares—are irrelevant because, as described above, they do not concern whether Simmons had an ownership interest in Nu Horizons at the time the petition was filed.  That inquiry is answered by Requests 7, 8(a)-(b), 10 and 11, to which the government agreed to produce any responsive documents.  Requests 1, 2, 3, 4, 5 and 14 also have no relevance because they go only to the fraud argument described above that is not only baseless but also has no bearing on the threshold standing issue.

   Simmons contends that Request 1, which concerns the transactions referenced in Celsius's SEC Schedule 13G filed on May 21, 2018 (the "Schedule 13G"), is relevant because the Schedule 13G itself stated that Nu Horizons was 100% held by Keyway Pride.[8]  He argues that documents concerning the ownership interest of any person or entity in Nu Horizons is relevant to determining his standing here.  Simmons is incorrect, however, and his request is overbroad.  As discussed above, the only documents and information relevant to the sole question at issue here are those captured by Requests 7, 8(a)-(b), 10 and 11, which document Simmons' interest (or lack thereof) in Nu Horizons at the time he filed his Petition.  Simmons should not be permitted to obtain discovery about other persons and entities related to Nu Horizons merely because Simmons himself previously had an interest in the entity.

   Simmons also maintains Request 1 is relevant because the Schedule 13G suggests Lee had sold her interest in Keyway Pride as part of an asset protection scheme prior to May 25, 2018.  If this is true, Simmons claims, Lee lacked authority to sign the Stock Transfer Agreement, rendering it ineffectual.  This argument also lacks merit.  Simmons conflates the separate nature of a contract and an assignment, as well as the distinction between ownership and

---

[8]  It should be noted that the Schedule 13G was filed after the LOI was signed (April 26, 2018) and mere days before execution of the Stock Transfer Agreement (May 25, 2018) which, as alleged in the Simmons Petition, both contemplated the transfer to Keyway Pride of Simmons' entire ownership interest in Nu Horizons.  <u>See</u> Simmons Petition ¶¶ 42, 49, 51.  Thus, the statement in the Schedule 13G is consistent with contemporaneous documents that captured the parties' intent.



control of corporate entities. As discussed above, the validity of the Stock Transfer Agreement has no effect on Simmons' conveyance to Keyway Pride of his interest in Nu Horizons pursuant to the Assignment, which is a separate and independent legal instrument. In addition, even if Lee held no interest in Keyway Pride as of May 25, 2018, as Simmons speculates, that would have no impact on her ability to enter into the Stock Transfer Agreement as manager of Keyway Pride, which counsel for Lee has represented is the case under Keyway Pride's operating agreement that will be produced in discovery following entry of a protective order.

Further, Simmons makes the strained argument that Lee's divestiture of her interest in Keyway Pride is "powerful evidence" of a conspiracy between Leissner and Lee to defraud Simmons out of his interest in Nu Horizons. Simmons further contends that this purportedly secret divestment led him to be "misinformed" about the entity to which he was selling his Nu Horizons interest, rendering the Stock Transfer Agreement itself a nullity. Simmons is mistaken. Not only did Lee remain at all relevant times in control of Keyway Pride (as per the operating agreement referenced above), but the Stock Transfer Agreement (i) includes a merger provision explaining that the contract contained the full and complete understanding of the parties; and (ii) lacks any representations about the ownership of Keyway Pride. See ECF Dkt. No. #5-20. Therefore, the ownership of Keyway Pride was not a material term of the Stock Transfer Agreement, and Simmons' belated and self-interested claim that it should affect the transactions undertaken in furtherance of that agreement is a matter that is appropriately litigated in the civil action in California, not in this ancillary proceeding.

Likewise, the requests concerning the appearance bond for Leissner (Requests 12 and 13), Lee's knowledge of Leissner's criminal conduct vis-à-vis 1MDB (Request 6), whether any assets held by Lee or Keyway Pride were proceeds of a crime (Request 8(c)), any advice sought or obtained by Lee or Leissner concerning asset protection (Request 9) have no bearing on the question before the Court. At best, these requests are efforts to seek to uncover information about the alleged ongoing conspiracy against Simmons—a question irrelevant to whether Simmons in fact conveyed away his interest in Nu Horizons. For example, Request 6 essentially calls for all of the government's evidence of the illegal bond transactions described above. Request 17 is for the seizure warrant affidavit for the Celsius Shares, which was filed under seal. The affidavit is irrelevant to Simmons' ownership claims; the shares are subject to seizure and forfeiture because they are criminal proceeds.

For the first time in this litigation, Simmons alleges that misconduct by Leissner and Lee is also relevant because it gives rise to a constructive trust sufficient to protect his derivative standing. Based upon the allegations in the Simmons Petition, however, Simmons is unable to satisfy the requirements for imposing a constructive trust over his alleged interest in Nu Horizons. The elements necessary for a constructive trust are "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject res made in reliance on that promise; and (4) unjust enrichment." In re First Cent. Fin. Corp., 377 F.3d 209, 212 (2d



The Honorable James R. Cho
April 24, 2024
Page 26

Cir. 2004) (citing United States v. Coluccio, 51 F.3d 337, 340 (2d Cir. 1995)).  The Second Circuit has recognized that the first element, the existence of a confidential or fiduciary relationship, is "of prime importance in the establishment of a constructive trust."  United States v. Khan, No. 97-6083, 1997 WL 701366, at *2 (2d Cir. Nov. 10, 1997).  "Purely commercial transactions do not give rise to a fiduciary relationship."  Id. (citations omitted).

Here, even if Leissner and Lee conspired against him (which is only a speculative allegation), Simmons cannot satisfy the first and most important prong of the analysis.  It is undisputed that the relationship between Simmons and Lee was defined by "[p]urely commercial transactions"—namely, the various agreements concerning Simmons' conveyance of his interest in Nu Horizons—and this does not give rise to a "confidential or fiduciary relationship." The constructive trust argument therefore fails at the threshold.  Moreover, the existence of a written agreement between the parties, like the Stock Transfer Agreement executed by Simmons, precludes any finding of "unjust enrichment."  In re First Cent. Fin Corp., 377 F.3d at 213-14.  The constructive trust argument fails on this basis as well.

Moreover, because the agreements at issue contain integration clauses, extrinsic evidence—such as that sought in Requests 1-6, 8(c), 9 and 12-17—is immaterial.  Courts in this Circuit have held that a general integration clause may preclude a claim of fraud-in-the-inducement where the "clause and its surrounding contract were the product of arm's-length negotiations between sophisticated parties."  AT&T Corp. v. Atos IT Sols. & Servs., Inc., No. 21-CV-4550 (VSB) (RWL), 2024 WL 379952, at *12 (S.D.N.Y. Feb. 1, 2024); see Primedia Enthusiast Publ'n Inc. v. Ashton Int'l Media, Inc., No. 02-CV-9997, 2003 WL 22220375, at *6 (S.D.N.Y. Sept. 25, 2003) ("[C]ourts may disregard a fraudulent inducement claim and give effect to a contract when the parties have negotiated at arms lengths and they are sufficiently sophisticated that they could have easily protected themselves either through obtaining readily available information or alternatively including a protective clause in the agreement.").

In this case, it is beyond dispute that Simmons was a sophisticated party represented by sophisticated counsel and the Stock Transfer Agreement was the product of arm's-length negotiations.  This is fatal to Simmons' claims of fraudulent inducement, and his related discovery requests should be precluded.  Instead, the threshold inquiry of Simmons' standing can be determined from the face of the agreements at issue without any further discovery from the government beyond those categories of documents that it has already agreed to produce.



The Honorable James R. Cho
April 24, 2024
Page 27

B.     The Documents Sought from the Government by Simmons Would be Unduly
       Burdensome to Collect, Search and Produce

In addition to being beyond the scope of the limited discovery the District Court
ordered, requiring the government to produce discovery in response to the requests to which the
government objects would be unduly burdensome.

The Court should thus issue a protective order confirming that discovery in this
case is limited to those categories of documents the government has already agreed to produce.

1.     Legal Standard

Under Rule 26(b)(2)(C), courts impose a proportionality test to weigh the interests
of the parties to determine whether discovery, even if relevant, should be allowed to proceed.
Thus, pursuant to Rule 26(b)(2)(C), a court may limit or deny discovery when, for example,
"such discovery sought is unreasonably cumulative or duplicative, or can be obtained from some
other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ.
P. 26(b)(2)(C)(i).  Similarly, a court may limit discovery when "the burden or expense of the
proposed discovery outweighs its likely benefit." Id.

In deciding whether a particular request is unduly burdensome, courts consider,
among other things: (i) the information's relevance, (ii) the need of the party for the documents,
(iii) the breadth of the document request, (iv) the time period covered by it and (v) the
particularity with which the documents are described.  In re Bayerische Motoren Werke AG, 22
MC 115 (VB), 2022 WL 2817215, at *5 (S.D.N.Y. July 19, 2022).

"A party or any person from whom discovery is sought may move for a protective
order," which may be issued upon a showing of good cause, "to protect a party or person from
annoyance, embarrassment, oppression, or undue burden, including . . . forbidding the disclosure
of discovery." Gambale v. Deutsche Bank AG, 377 F.3d 133, 142 (2d Cir. 2004).  "[T]he party
seeking a protective order has the burden of showing that good cause exists for issuance of that
order." Id.  A court has broad discretion "to decide when a protective order is appropriate and
what degree of protection is required." Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984).
A court may issue an order "forbidding inquiry into certain matters or limiting the scope of
disclosure or discovery to certain matters." Fed. R. Civ. P. 26(c)(1)(D).

2.     Discussion

In this case, Simmons' discovery requests are overly broad and unduly
burdensome to the government.  The government's criminal investigation into 1MDB is
sprawling, ongoing and involves an international fugitive.  To date, the government's 1MDB



The Honorable James R. Cho
April 24, 2024
Page 28

database contains over 5.7 million documents collected from a variety of sources.  The sheer breadth of Simmons' requests makes narrowing the database using search terms impracticable, and reviewing such a database would be an enormous undertaking.  See Sec. & Exch. Comm. v. Collins & Aikman Corp., 256 F.R.D. 403, 411 (S.D.N.Y. 2009) ("A page-by-page manual review of ten million pages of records is strikingly expensive in both monetary and human terms and constitutes 'undue hardship' by any definition."); Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 496 B.R. 713, 726 (S.D.N.Y. 2013) ("The burden and expense resulting from requiring the Trustee to turn over millions of pages of documents necessarily outweighs the slight, if any, benefit that can be revealed from the requested material.").

Requiring the government to respond to Simmons' document requests would not only be improper because they are outside the scope of authorized discovery and irrelevant to the limited question before the Court, but also because they would impose an undue burden.  Specifically, a government response to these requests would: (1) potentially reveal the nature and subjects of the ongoing investigation; (2) interfere with an ongoing investigation involving an indicted defendant who remains at large; (3) chill witness candor and inhibit cooperation; and (4) waste the government's resources by requiring a page-by-page review for responsiveness.  For these reasons alone, the government should not be compelled to produce documents responsive to the discovery requests to which the government objects.

As described above, Petitioner Simmons' requests are overly broad on their face and exceed the bounds of authorized discovery.  Simmons has effectively conceded that he assigned his interest in Nu Horizons before he filed his petition.  Here, he is seeking broad discovery to try to reverse that assignment and to shoehorn into this ancillary proceeding his claims now pending in a separate civil action in California against Lee and Leissner.  Indeed, these requests are based on rank speculation and an unsubstantiated claim that he is the victim of fraud and a criminal conspiracy.  This is not a proper basis for propounding document requests, especially in the context of the tailored discovery that the Court has ordered here.  But even if there was some reasonable basis for Simmons to levy these allegations and to believe that the sought-after documents existed, his requests are nevertheless unduly burdensome on the government.  Requiring the government to comb its vast database during this period of expedited discovery to inquire into whether certain items are responsive would take many people many months, and the burden of engaging in a page-by-page inspection of the millions of documents contained in the government's database would be untenable.  See Tucker v. American Int'l Grp., Inc., 281 F.R.D. 85, 95 (D. Conn. 2012); Wells Fargo Bank, N.A. v. Konover, 05CV1924 (CFD), 2009 WL 585434, at *4-5 (D. Conn. 2009) (party moving to compel must make prima facie showing that discovery sought is more than fishing expedition).  The government therefore should not be required to indulge in Simmons' clear fishing expedition by responding to his overly broad document requests.



The Honorable James R. Cho
April 24, 2024
Page 29

      C.    <u>The Documents Sought from the Government by Simmons Are Protected from Disclosure by the Attorney Work Product Doctrine</u>

        Simmons' discovery requests seek agents' notes and memoranda of interviews collected during the government's underlying criminal investigation, which remains ongoing. These documents are protected from disclosure because they fall within the scope of the attorney work product doctrine, as they were prepared at the direction of this Office in anticipation of litigation.

      1.    <u>Legal Standard</u>

        At a high level, the work product doctrine protects factual material, including the result of a factual investigation as well as material that reveals the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative. <u>United States v. Adlman</u>, 134 F.3d 1194, 1197 (2d Cir. 1998). To qualify as "attorney work product," the party asserting protection must demonstrate that the material at issue is "(1) a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party or by his representative." <u>Sec. & Exch. Comm. v. Collector's Coffee Inc.</u>, 337 F.R.D. 70, 74 (S.D.N.Y. 2020). "In anticipation of litigation" means that "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." <u>Id.</u>

        Once a document or material is determined to be attorney work product, it is ordinarily protected from discovery pursuant to Federal Rule of Civil Procedure 26(b)(3). This Rule states that "documents and tangible things that are prepared in anticipation of litigation or for trial" are not discoverable unless "(i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party [seeking discovery] shows that it has a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(i)-(ii). Even if the party seeking discovery manages to show the "substantial need" and "undue hardship" needed to overcome the shield of Rule 26(b)(3)(A), the court must nevertheless "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B).

        Investigative reports prepared by law enforcement investigators are "quintessential" work product. <u>See</u>, <u>e.g.</u>, <u>Nishnic v. Dep't of Just.</u>, 671 F. Supp. 771, 772 (D.D.C. 1987); <u>Wilson v. Dep't of Just.</u>, No. 87-2415-LFO, 1991 WL 120052, at *3 (D.D.C. June 18, 1991); <u>United States v. All Assets Held at Bank Julius Baer & Co., Ltd.</u>, 169 F. Supp. 3d 54, 57-58 (D.D.C. 2015) (citing <u>United States v. Nobles</u>, 422 U.S. 225, 238 (1975)) (IRS agent's Special Agent's Report (SAR) is protected by the work product doctrine); <u>United States v. Chatham City Corp.</u>, 72 F.R.D. 640, 642-44 (S.D. Ga. 1976) (holding that FBI investigative



The Honorable James R. Cho
April 24, 2024
Page 30

reports and notes of interviews by FBI agents were shielded from disclosure by work product doctrine). These investigative reports are not verbatim statements of a witness but instead reflect the thought processes of FBI agents with regard to witnesses, evidence and potential prosecutions. See United States ex rel. Landis v. Tailwind Sports Corp., 303 F.R.D. 419, 425 (D.D.C. 2014) (confirming that a government agent's work on behalf of a federal prosecutor can be protected as work product). Additionally, the factual material contained therein cannot be segregated from those parts of the interview reports that reveal the theory of the case or mental impressions. Nishnic, 671 F. Supp. at 772 (citing Hickman v. Taylor, 329 U.S. 495, 508-12 (1947)).

        2.      Discussion

        In this case, Simmons' document requests include a request for FBI interview reports and the interview notes on which those reports are based. As noted above, those documents are protected by attorney work product doctrine; it is beyond dispute that the interview reports at issue were prepared in anticipation of litigation and not for any other purpose. Simmons is therefore not entitled to such material.

        The fact that such reports were previously disclosed to Ng as part of the government's discovery obligations in his criminal trial does not amount to a waiver of the aforementioned privilege. While voluntary or even inadvertent disclosure of documents may result in a waiver of privilege, involuntary or compelled disclosure does not give rise to a waiver. In re Parmalat Sec. Litig., No. 04-MD-1653 (LAK), 2006 WL 3592936, at *4 (S.D.N.Y. Dec. 1, 2006); see Leonen v. Johns-Manville, 135 F.R.D. 94, 99 (D.N.J. 1990) (when defendant objected to a disclosure of documents and produced them only pursuant to a court order, privilege was not waived even though plaintiff already had possession of the documents). Thus, the fact that such material was disclosed to Ng—and not Simmons—as part of the government's discovery obligations under 18 U.S.C. § 3500 and Federal Rule of Criminal Procedure 16 in the context of Ng's criminal trial does not entitle Simmons to the same documents in the present proceeding.

**III.**    **Conclusion**

        For the foregoing reasons, the Court should issue a protective order with respect to Requests 1-6, 8(c), 9 and 12-17.

**Ms. Lee's Position**

**I.**    **Introduction**

        On February 9, 2024, Judge Brodie ordered limited, expedited discovery about "the status of [Mr. Simmons's] membership interest in" Nu Horizons Investment Group, LLC ("Nu


PRYOR CASHMAN LLP

The Honorable James R. Cho
April 24, 2024
Page 31

Horizons") "as of the date of the filing of [Mr. Simmons's] Petition." (Dkt. 32 at 10.) The limited scope of discovery was intended to address Mr. Simmons's standing "to bring a derivative claim on behalf of Nu Horizons." (*Id.*). This Court should adhere to Judge Brodie's express limitation.

Nu Horizons is a Delaware limited liability company. Under Delaware law, derivative standing to bring a claim on behalf of an LLC is limited to "members" and "assignees." 6 Del. C. § 18-1002. Moreover, "to have standing a derivative plaintiff must satisfy two tests: (1) the **contemporaneous ownership test**, which requires stockholders to have owned stock at the time of the wrong complained of, and (2) the **continuous ownership rule** requiring stockholders to maintain their shareholder status throughout the litigation." *Parfi Holding AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 935 (Del. Ch. 2008) (footnote omitted) (emphases added).

Here, Mr. Simmons *sold* his entire interest in Ms. Lee's investment vehicle, Keyway Pride Limited LLC ("Keyway Pride") on May 25, 2018 by a Stock Transfer Agreement (also, the "STA"). (Dkt. 5-1, Simmons Petition ¶ 51.) As part of that transaction, Mr. Simmons executed an Assignment Separate from Certificate were he "hereby sells, assigns and transfers . . . his entire Ownership Percentage [ ] of Nu Horizons and does hereby irrevocably constitute and appoint the Secretary of Nu Horizons to transfer said equity interests on the books of the Company with full power of substitution in the premises." (Dkt. 5-20 at 11.) That transfer defeats any claim that Mr. Simmons can make to *contemporaneous* and *continuous* ownership of an interest in Nu Horizons.

Indeed, Mr. Simmons cannot point to *any* document where the membership interests in Nu Horizons were reconveyed to him. That should be the end of the standing inquiry. Instead, he has advanced to the Court four theories of why his May 25, 2018 conveyance should be unwound, but those theories are legally insufficient and cannot form the basis for the broad discovery he now seeks to take—which would serve no other purposes than for him to circumvent the Court's recent ruling regarding the protective order and allow Mr. Simmons to take discovery that will only be relevant, if at all, in the California Case.

Specifically, to establish standing to sue derivatively on behalf of Nu Horizons, Mr. Simmons claims he can seek discovery to show:

1.  Ms. Lee allegedly did not own Keyway Pride at the time of the May 25, 2018 transaction, so, according to Mr. Simmons, she could not enter the transaction on behalf of Keyway Pride**.**

    -   The argument, however, is simply wrong. The authority to enter into a transaction on behalf of an LLC is based on *managerial authority*, not membership. And at all times Ms. Lee had (and still has) managerial authority of Keyway Pride. That can be shown by the Keyway Pride Operating Agreement. No further discovery should be allowed.



The Honorable James R. Cho
April 24, 2024
Page 32

2.  The transfer of Nu Horizons to Keyway Pride was fraudulent because it was part of a scheme to either (a) take Mr. Simmons's membership interest from him, or (b) protect Ms. Lee's and Mr. Leissner's assets.

- Both theories are factually and legally incorrect. In the wake of more than a dozen allegations of rape and sexual misconduct by Mr. Simmons, the transfer was done as part of an overall attempt to distance him from his investments. As Mr. Simmons stated at the time (and as was widely reported in places like The New York Times and Rolling Stone): "I have separated myself from my businesses and charities in order to not become a distraction." In any event, under Delaware law, the only type of fraud relevant to derivative standing is one done with the intent to deprive a shareholder (or member in the case of an LLC) of that standing. The 2018 STA had nothing to do with this forfeiture issue, which did not even ripen until 2023, so as a matter of law Mr. Simmons's fraud theories *cannot* form the basis for discovery into standing.

3.  The transfer of Nu Horizons to Keyway Pride was purportedly undone by another transaction in December 2018, the Membership Interest Transfer Agreement (the "MITA") (Dkt. 5-22.)

- Mr. Simmons and Ms. Lee have extensively briefed the legal effect of the MITA and it simply does not do what Mr. Simmons claims it does. It certainly does not have an assignment or reconveyance like the original Stock Transfer Agreement.

Based on the foregoing, and as more fully set forth below, to the extent discovery is still allowed on the issue of Mr. Simmons's derivative standing, its scope should be limited to the legal effects of the MITA. Indeed, the transaction documents related to that contract are integrated agreements, and if and how they impacted Mr. Simmons's membership interest in Nu Horizons is a question of law for the Court to decide, not a factual dispute to be manufactured by Mr. Simmons.[9]

## II.    Factual and Procedural Background

Mr. Simmons formed Nu Horizons in 2011 and became its sole member and manager. On January 1, 2016, Mr. Simmons and Tim Leissner ("Mr. Leissner"), on behalf of Cuscaden Capital Limited ("Cuscaden"), executed an Operating Agreement for Nu Horizons, by which Mr. Leissner became a manager and Ms. Lee became a member of Nu Horizons' investment board (*see* Dkt. 5-

---

[9] Ms. Lee will produce additional documents as part of the discovery process upon the Court's entry of a Protective Order. The documents relevant to Mr. Simmons's standing are universally supportive of her position.



15 at 1, §8.9.) As of January 1, 2017, Keyway Pride, Ms. Lee's investment vehicle, owned the shares of Nu Horizons previously owned by Cuscaden.

Nu Horizons invested in Celsius Holdings, Inc. ("Celsius") and eventually owned 3,972,659 shares of Celsius stock.

In late 2017, Mr. Simmons was publicly confronted with accusations of more than a dozen cases of rape and sexual misconduct. *See, e.g.*, Elias Leight, *Russell Simmons Sexual Assault Allegations: A Timeline*, Rolling Stone, Feb. 9, 2018, https://www.rollingstone.com/music/music-news/russell-simmons-sexual-assault-allegations-a-timeline-202515/. Consequently, Mr. Simmons announced his divestment from his businesses and charities to not distract or detract from their operations. *Id.* As he publicly represented he would, on December 1, 2017, Mr. Simmons resigned from All Def Digital ("ADD"), one of his media businesses. Mr. Simmons also resigned as manager of Nu Horizons on January 22, 2018, mere weeks after the accusations surfaced. (Dkt. 5-15.)

As part of his divestment efforts, on April 26, 2018, Mr. Simmons and Keyway Pride entered into a letter of intent for Mr. Simmons to transfer his entire ownership interest in Nu Horizons to Keyway Pride (Dkt. 5-18.) A formal Stock Transfer Agreement was executed on May 25, 2018 by Mr. Simmons, Keyway Pride, Nu Horizons, and Rush Digital Media, LLC. (Dkt. 5-20.) As contemplated by the parties, the Stock Transfer Agreement transferred Mr. Simmons's "entire" ownership interest in Nu Horizons to Keyway Pride. (*Id.*) The Stock Transfer Agreement contained a clause which provided, "No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement." (Dkt. 5-20 §10(c).)

The closing date of the Stock Transfer Agreement was May 25, 2018, and it was accompanied by the aforementioned assignment, which "irrevocably" authorized the immediate transfer of Mr. Simmons's interest in Nu Horizons to Keyway Pride. (Dkt. 5-20 at 11.) Upon the transfer of Mr. Simmons's interest in Nu Horizons, Keyway Pride owned the entirety of Nu Horizons.

On June 7, 2018, *United States of America v. Tim Leissner*, Case No. 1:18-cr-00439 (the "1MDB Matter") was filed. While the Celsius shares were initially supposed to be "temporarily loaned" to Ms. Lee for the purpose of securing a bond for Mr. Leissner, to facilitate the bond, the full ownership interest was required to be transferred. Thus, on July 5, 2018, Nu Horizons, acting through its sole manager, sold all of its shares in Celsius to Ms. Lee. On November 1, 2018, the Court entered a Preliminary Order of Forfeiture.

On December 17, 2018, two additional contracts were executed: (1) the MITA (Dkt. 5-22), and (2) a Transfer Agreement between Nu Horizons and Erok Ventures, LLC. At this point, the Celsius shares were already transferred to Ms. Lee. Thus, contrary to Mr. Simmons's



The Honorable James R. Cho
April 24, 2024
Page 34

allegations, the purpose of the MITA was to finalize Mr. Simmons's exit from any interest in the ownership of ADD.  It did not, and as a matter of law could not, render the Stock Transfer Agreement void *ab initio*, as (among other things) it was not even signed by the parties to the Stock Transfer Agreement, and it was not accompanied by any conveyance of Keyway Pride's membership interest in Nu Horizons. (*Compare* Dkt. 5-20 at 11 *with* Dkt. 5-22.)

On May 18, 2021, Mr. Simmons filed a lawsuit in Los Angeles Superior Court, entitled *Simmons v. Leissner, et al.*, LASC Case No. 21STCV18852 (the "California Case"), individually and derivatively on behalf of Nu Horizons.  Mr. Simmons's allegations center around the transfer of his interest in Nu Horizons to Keyway Pride, and the transfer of the Celsius shares from Nu Horizons to Ms. Lee in connection with Mr. Leissner's bond proceeding.

An Amended Preliminary Order of Forfeiture in the instant matter was filed on March 23, 2023.  *See United States v. Leissner*, 18-CR-439 (MKB) (Dkt. 564). That ordered facilitated the forfeiture of "3,325,942 shares of stock in Celsius Holdings, Inc. held in . . . [the] brokerage account . . . in the name of Kimora Lee Simmons." (*Id.* at 2.) Mr. Simmons filed his Petition on May 5, 2023, asserting claims individually and derivatively on behalf of Nu Horizons, to an interest in the Celsius shares.  The Court dismissed Mr. Simmons's individual claims and ordered limited discovery on his standing to pursue claims derivatively on behalf of Nu Horizons.

On February 16, 2024, Mr. Simmons propounded requests for production on Ms. Lee.  On March 7, 2024, Ms. Lee objected to each document request, primarily on the ground that the Requests were not limited to the issue of Mr. Simmons's derivative standing and exceeded the narrow scope of the Court's February 9, 2024, Order.  (*See* Ex. L1.)

### III.   <u>Legal Standard for Derivative Standing</u>

Under Delaware law, to have derivative standing to bring a claim on behalf of a limited liability company, "the plaintiff must be a *member or an assignee of a limited liability company interest* at the time of bringing the action and . . . at the time of the transaction of which the plaintiff complains."  6 Del. C. § 18-1002 (emphasis added).  "The plain language of 6 Del. C. § 18–1002 is unambiguous and limits derivative standing in LLCs exclusively to 'member[s]' or 'assignee[s].'"  *CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011), as corrected (Sept. 6, 2011). And the statute reflects the requirements of both contemporaneous and continuous ownership in the company.  *See also* 8 Del. C. § 327 (requiring contemporaneous ownership of a corporation); *Conrad v. Blank*, 940 A.2d 28, 41 (Del. Ch. 2007) ("The stockholder must also continue to hold stock throughout the litigation.").  "A plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit."  *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. Sup. Ct. 1984).

Delaware courts have recognized a very narrow fraud exception to the *continuous ownership rule* in the context of Delaware corporations where a shareholder maintains derivative



The Honorable James R. Cho
April 24, 2024
Page 35

standing after a merger so long as "the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of their standing to bring or maintain a derivative action." *Ark. Teacher Ret. Sys. V. Countrywide Fin. Corp.*, 75 A.3d 888, 894 (Del. Sup. Ct. 2013). However, this narrow exception "applies only in the limited circumstance" where an allegedly fraudulent transaction itself was "perpetrated merely to deprive shareholders of their standing to bring the derivative action. . . ." *Id.* at 897 (quoting *Lambrecht v. O'Neal*, 3 A.3d 277, 284, n.20 (Del. Sup. Ct. 2010)); *see also Bamford v. Penfold, L.P.*, No. CV 2019-0005-JTL, 2020 WL 967942, at *29 (Del. Ch. Feb. 28, 2020) ("The exception applies when "a principal purpose" of the transaction is the elimination of standing to assert derivative claims.") (quoting *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 763 (Del. Ch. 1986)).

## IV.  Mr. Simmons's Lone Theory Which Could Support Standing Requires Only Minimal Discovery

Mr. Simmons sets forth four arguments regarding his standing, which he contends should allow for wide-sweeping discovery. Three of the four arguments must fail, and cannot form the basis of the fishing expedition Mr. Simmons is pursuing. Only one might entitle Mr. Simmons to limited discovery—whether the transfer of his membership interest in Nu Horizons to Keyway Pride was purportedly undone by a later agreement. However, this hinges on the legal effect of merely a few contracts. Thus, the Court should limit discovery to only this narrow issue.

***First***, Mr. Simmons contends he is entitled to discovery about the ownership of Keyway Pride in 2018, because he claims that if Ms. Lee did not own Keyway Pride at the time of the Stock Purchase Agreement, she could not have authorized the transaction for Keyway Pride's acquisition of Mr. Simmons's membership interest. However, whether Ms. Lee had an ownership interest in Keyway Pride is irrelevant to whether she could act on behalf of Keyway Pride. Keyway Pride is manager-managed, not member-managed. It is also governed by California law. California Corporations Code section 17704.07(c) provides, "In a manager-managed limited liability company, the following rules apply: 1. Except as otherwise expressly provided in this title, any matter relating to the activities of the limited liability company is decided ***exclusively by the managers***" (emphasis added). *See also* Cal. Corp. Code §17701.02(n) (defining "manager"). In turn, members of a manager-managed LLC "have no right to control the management and conduct of the LLC's activities." *Swart Enterprises, Inc. v. FTB*, 7 Cal. App. 5th 497, 510 (2017).

Ms. Lee was a manager of Keyway Pride at all relevant times and is still a manager today.[10] At all times Ms. Lee had full authority to act on behalf of Keyway Pride, and discovery into Keyway Pride's membership is simply irrelevant to whether Ms. Lee had authority to enter into

---

[10] Ms. Lee will produce a copy of the Keyway Pride Operating Agreement in response to discovery and after the Protective Order is entered.



The Honorable James R. Cho
April 24, 2024
Page 36

the Stock Purchase Agreement for Keyway Pride.  Correspondingly, it is irrelevant to Mr. Simmons's standing to bring a derivative claim.

*Second*, Mr. Simmons's fraud theories do not support his claim of derivative standing.  Nu Horizons is a Delaware limited liability company and is governed by Delaware law, pursuant to section 13.1 of its operating agreement.  (Dkt. 5-15 § 13.1.)  Under Delaware law, standing to assert a claim derivatively on behalf of a limited liability company is limited to "members" and "assignees" and requires both continuous and contemporaneous ownership of that company.  *See* 6 Del. C. § 18–1002. As Mr. Simmons admits, he transferred his "entire" ownership interest in Nu Horizons on May 25, 2018 through the Stock Transfer Agreement,[11] and is thus neither a member nor an assignee.  (Simmons Petition ¶ 51.)

The *narrow* fraud exception cannot save Mr. Simmons from his lack of standing to bring derivative claims.  Under *Arkansas Teacher*, to confer derivative standing, the fraud must have been "perpetrated merely to deprive shareholders of their standing to bring the derivative action." 996 A.2d at 323. However, this is not supported by Mr. Simmons's allegations as pled in his Petition (or as argued to this Court).  Rather, he alleges the transfer occurred to (1) protect the assets of Ms. Lee and Mr. Leissner, and/or (2) take Mr. Simmons's shares from him.  Indeed, the acts Mr. Simmons complains of occurred in mid-2018—five years before the amended forfeiture order was entered and more than five years prior to the filing of his petition.  In other words, because Ms. Lee and Mr. Leissner could not see years into the future, the transfer of Mr. Simmons's interest in Nu Horizons in 2018 could not have been effectuated with the principal purpose of depriving Mr. Simmons of derivative standing in 2023.

The supposed frauds Mr. Simmons has asserted are being litigated in the California Case.  However, as a matter of law, they cannot be the basis for his derivative standing here.  Accordingly, Mr. Simmons should *not* be able to pursue his incorrect and irrelevant fraud theories as part of any limited discovery about his derivative standing.

*Third*, Mr. Simmons's theory that the MITA purportedly unwound the Stock Purchase Agreement is the only potential basis for limited discovery on this narrow issue.  However, whether the transfer was undone turns on the legal effect of the underlying documents: (a) the May 25, 2018 Stock Transfer Agreement selling Mr. Simmons's interest in Nu Horizons to Keyway Pride and (b) the December 17, 2018 Membership Interest Transfer Agreement which Mr. Simmons claims undoes the previous agreement.  Both agreements contain integration clauses.  (Dkt. 5-20

---

[11] To the extent Mr. Simmons is now (wrongly) challenging the corporate formalities of the Stock Transfer Agreement itself, he did not raise that issue in his Petition, and it is not properly the subject of discovery.  (*See* Petition, at ¶¶ 49 – 52.)



The Honorable James R. Cho
April 24, 2024
Page 37

§ 10(c); Dkt. 5-22 § 7.8.)  Consequently, discovery need not extend beyond these contracts and, if it does, it should be limited to the purposes of those transactions alone.

**V.      Mr. Simmons's Prior Position Regarding Discovery Also Supports Limiting the Scope of Discovery**

The Court should hold Mr. Simmons to his previous position regarding limited discovery. In his portion of the parties' joint letter regarding the protective order, Mr. Simmons admitted, "The scope of discovery in the New York Case, which is currently supposed to be limited to the standing of Mr. Simmons, is much narrower than the scope of issues relevant to the California cases."  Mr. Simmons argued vigorously against the use of any discovery materials in this matter being used in the California Case, despite the similarity of issues in the two matters.  He argued that if such use was permitted, it may present the risk of abusing the discovery process to gain otherwise impermissible discovery to use in the California Case.

However, despite admitting the narrow scope of discovery and citing the potential for abuse of wide-ranging discovery, Mr. Simmons propounded expansive discovery requests to Ms. Lee that grossly exceed the limited discovery appropriate here.  For example, Mr. Simmons requested:

- "All documents concerning trips by Kimora or Leissner to Liechtenstein or Switzerland in 2018;"

- "All documents concerning advice sought . . . about the creation of trusts or other entities outside the United States, the purpose and effect of transferring assets into these entities;"

- "All documents concerning Kimora's knowledge before Leissner's arrest in or about June 2018 of . . . Leissner's participation in the . . . wrongdoing involving 1MDB . . . ."; and

- "All documents submitted to the Government . . . in support of an appearance bond for Tim Leissner that concern Celsius Shares, Nu Horizons, or Keyway Pride."

Ms. Lee requests that the Court hold Mr. Simmons to his position taken less than two weeks ago by ordering discovery limited to the lone, narrow issue of whether the MITA undid the transfer of Mr. Simmons's ownership interest in Nu Horizons to Keyway Pride. That should consist of the documents encompassing and surrounding the two transactions, and limited deposition testimony related to those transactions.



The Honorable James R. Cho
April 24, 2024
Page 38

## VI. <u>Response to Mr. Simmons's Position</u>

### A. <u>This Briefing is Not a Motion to Compel</u>

Ms. Lee respectfully submits that the Court requested briefing on the scope of discovery, rather than the propriety of the discovery requests propounded by Mr. Simmons. The Court cannot determine whether Mr. Simmons's discovery requests are outside the scope of discovery without first determining what the scope of discovery should be. Yet Mr. Simmons's analysis puts the cart before the horse in structuring his portion of the joint letter as something akin to a motion to compel. Specifically, he claims that the issues are first "whether various discovery requests by Petitioner Simmons are outside the scope of discovery on the issue of standing . . . ," and second "whether the government can be compelled to produce [certain documents]."

Not only is this joint letter an inappropriate vehicle for such motion, but Mr. Simmons's portion of the letter relies on a one-sided view of the facts and mischaracterizations of his requests that could not be present in a true motion to compel. Specifically, he intentionally omits large portions of his requests to make them appear more narrowly tailored and reasonable than they actually are. He also does not attach the actual requests to his letter. Nor does he even acknowledge that Ms. Lee timely responded to his requests with objections and responses on March 7, nor include her objections and responses in his analysis.[12] Put simply, Mr. Simmons asks the Court to rule on the validity of his requests without including the full requests and without providing the Court the benefit of Ms. Lee's responses and objections.

### B. <u>Mr. Simmons's Requests are Objectionable</u>

As a threshold issue, evidence of whether or not Mr. Simmons—who alleges he has been a manager of Nu Horizons since 2016—is a member of Nu Horizons, should be in his possession, custody, or control. This is why Ms. Lee objected that discovery regarding Mr. Simmons's derivative standing should be limited to discovery between the government and Mr. Simmons. (*See* Ex. L1.)

Mr. Simmons's allegations, however, are demonstrably untrue: Mr. Simmons unconditionally resigned as a manager on January 22, 2018. (Dkt. 5-15.) This is why he is seeking documents from Ms. Lee about the company he (falsely) claims to manage. Thus, if discovery is permitted of Ms. Lee, she mostly agrees with the government's position. In such event, discovery should be limited to:

---

[12] Mr. Simmons does, however, note that government objected to his requests to them. His failure to include this information for Ms. Lee, stating only that "Ms. Lee has refused to produce any documents," is misleading.



The Honorable James R. Cho
April 24, 2024
Page 39

- RFP 4 – but only to the extent it covers (a) *control* of Keyway Pride, (b) at the time of the May 25, 2018 Stock Transfer Agreement. That is the moment Mr. Simmons challenges Keyway Pride's authority to purchase his interest in Nu Horizons and the only point in time that control of the company is relevant. And, as discussed above, ownership of a manager-managed LLC is also irrelevant.

- RFP 7 – which asks for "All documents concerning the LOI dated April 26, 2018."

- RFP 8 – but without subparts (a)-(c), so that it encompasses only "All documents concerning the Stock Transfer Agreement executed on or about May 25, 2018, including the assignment attached thereto as Exhibit A."

- RFP 10 – which asks for "All documents concerning the MITA entered into in or about December 2018."

- RFP 11 – but only to the extent it asks for documents *sufficient to show* direct ownership of Nu Horizons between 2018 and the present, which is all that is relevant for the issue of Mr. Simmons's standing.

The limitations on these Requests are crucial to contain the scope of discovery to the issue of Mr. Simmons's derivative standing. For example, Request 8(c) requests "all documents concerning whether any assets held by Kimora or Keyway Pride in May 2018 were proceeds of a crime" and Request 11(c) asks for "financial records . . . reflecting the assets of [Ms. Lee]" and others. Such broad requests are not relevant to the issue of Mr. Simmons's standing and are not proportional to the needs of that narrow issue.

Indeed, Mr. Simmons's remaining requests are wildly irrelevant to the limited scope of discovery ordered by the Court. Ms. Lee has already identified some of the most egregious requests (*see*, *supra*, § V). And Mr. Simmons's attempt to slot his overbroad requests into four general categories demonstrates the issue.

*First*, Mr. Simmons claims he is entitled to documents relating to a Schedule 13G filed on or about May 21, 2018. *See* Simmons Section III.A. The Schedule itself (RFP 1), of course, is a public document available through the SEC's EDGAR search engine (https://www.sec.gov/edgar/search-and-access). The remaining requests under this category, RFPs 2–5, all go to the *ownership* of Keyway Pride, not the *ownership* of Nu Horizons. Thus, when Mr. Simmons claims these documents are relevant to the "validity of the STA itself," he completely misses the mark. The pertinent issue is identifying Keyway Pride's manager(s). *See* Cal. Corp. Code § 17704.07(c). And Ms. Lee will produce the Keyway Pride Operating Agreement to show she had full authority to enter into the STA for Keyway Pride.



*Second*, Mr. Simmons claims he is entitled to documents concerning the LOI, STA, and MITA (RFPs 7, 8, and 10). *See* Simmons Section III.B. Ms. Lee will produce documents responsive to RFP 7 and 10, and a narrow version of RFP 8. Mr. Simmons cannot couch "documents concerning the STA" to go on an improper fishing expedition of Ms. Lee's assets in 2018, which has no bearing on Mr. Simmons's standing.

*Third*, Mr. Simmons claims he is entitled to documents "Relating to Knowledge and State of Mind of Ms. Lee and Defendant Leissner and Their Alleged Conspiracy." *See* Simmons Section III.C (citing RFPs 6, 8(b), 8(c), and 9). He is wrong. All of these documents go to his (incorrect) theories of fraud. However, as a matter of law, those fraud theories do not support a claim for derivative standing. Indeed, even Mr. Simmons has not alleged or argued that the STA was entered into to deprive him of derivative standing. *See*, *supra*, § III.

Instead, for the first time, Mr. Simmons asserts his unpled theory that a fraudulent transfer of his interest in Nu Horizons would create a constructive trust sufficient to support his standing. Preliminarily, by failing to plead a claim for constructive trust, Mr. Simmons should be barred from pursuing discovery about a purported constructive trust. In any event, Mr. Simmons badly mischaracterizes the cases he cites—none of which pertain to derivative standing. Indeed, while in certain circumstances a claim for a constructive trust may support individual standing in a forfeiture proceeding, Mr. Simmons cites no authority that a constructive trust can confer derivative standing. The cases upon which Mr. Simmons relies are thus inapposite. Mr. Simmons cites *United States v. Lesak*, a New York case that does not discuss a shareholder's standing to bring a derivative claim under Delaware law, but rather the standing of a general creditor to contest a forfeiture order under 21 U.S.C. § 853(n)(6). *United States v. Lesak*, No. 07 CR. 0396 (GEL), 2009 WL 1788411, at *4 (S.D.N.Y. June 23, 2009). Mr. Simmons also cites *Willis Mgmt. (Vermont), Ltd. v. United States,* 652 F.3d 236 (2d Cir. 2011), which also does not discuss standing to bring a derivative claim under Delaware law. Rather, *Willis Mgmt.* clarifies that a judicially imposed constructive trust is not inconsistent with the forfeiture statutory scheme. *Id*. at 245.

In addition, the aforementioned cases apply federal law. But Delaware law—which Mr. Simmons ignores completely—governs the substantive requirements for his standing to bring a derivative claim on behalf of Nu Horizons, a Delaware corporation. *See RCM Sec. Fund, Inc. v. Stanton,* 928 F.2d 1318, 1326 (2d Cir. 1991). By contrast, "[FRCP] 23.1 is a rule of pleading that creates a federal standard as to the specificity of facts alleged," *RCM Sec. Fund, Inc.* 928 F.2d at 1330, "it does not abridge, enlarge or modify any substantive right." *Halebian v. Berv,* 590 F.3d 195, 204 (2d Cir. 2009), *abrogated on other grounds by Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229 (2d Cir. 2015) (quotation omitted); *see* 28 U.S.C. § 2072 (the Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right"). Thus, "[t]he



The Honorable James R. Cho
April 24, 2024
Page 41

adequacy of pleadings for a derivative suit brought under Rule 23.1 of the Federal Rules of Civil Procedure is determined under state law." *C.D.S., Inc. v. Zetler*, 288 F. Supp. 3d 551, 560 (S.D.N.Y. 2017) (holding shareholder's "standing to bring a derivative suit" on behalf of a Delaware corporation "is governed by Delaware law").

Crucially, under Delaware law, "[a] constructive trust is an equitable ***remedy***, rather than a standalone claim." *Apennine Acquisition Co., LLC v. Quill*, 2023 WL 3139934, at * (Del. Ch. April. 28, 2023) (citing *iBio, Inc. v. Fraunhofer USA, Inc.*, 2020 WL 5745541, at *12 (Del. Ch. Sept. 25, 2020); *VTB Bank v. Navitron Projects Corp.*, 2014 WL 1691250, at *6 (Del. Ch. Apr. 28, 2014)). Mr. Simmons thus has the analysis backwards. The claim he would bring (if he had pled it) would be a derivative claim asking for the establishment of a constructive trust, not that a constructive trust gives him standing to bring a derivative claim. Thus, it is no surprise that Mr. Simmons has not cited any authority even suggesting that the remedy of a constructive trust can be used as a substitute for being a "member" or "assignee of a limited liability company interest" under Delaware law. 6 Del. C. § 18-1002.

In fact, a trial court in Connecticut recently rejected the same types of fraud-based arguments that Mr. Simmons advances here. *See Zhao v. Dean, et al.*, No. FST-X08-CV-19-6042813-S, 2024 WL 686901 (Conn. Super. Ct. Feb. 16, 2024). In *Zhao*, the court addressed whether allegations of non-payment and fraud in a stock sale agreement could confer derivative standing to bring claims for breach of fiduciary duty and a constructive trust. After reviewing Delaware law regarding standing to bring a derivative claim, including the narrow fraud exception, the court rejected all of the plaintiffs' theories. *Id.* at *6. Allegations of a fraud that was not "perpetrated merely to deprive the plaintiffs of their standing to bring or maintain a derivative action" are insufficient to confer standing. *Id.*

*Fourth*, Mr. Simmons seeks to cram the scope of seven sweeping document requests under the caption "Requests Relating to Subsequent Statements About Ownership of Nu Horizons and Celsius Shares." *See* Simmons Section III.D (citing RFPs 11, 12, 13,14, 15, and 16). As stated above, Ms. Lee will produce documents sufficient to show the direct ownership of Nu Horizons. That is the corollary of Mr. Simmons's sale of his interest—he sold his interest, and it is held by Keyway Pride. However, in no way is Mr. Simmons entitled to the broad discovery he seeks. For example, even the caption admittedly seeks documents regarding the ownership of *Celsius*, and his requests seek statements from Ms. Lee's brokerage account holding the Celsius shares. That has nothing to do with *Mr. Simmons's ownership, or lack thereof, of Nu Horizons.*

Almost all of Mr. Simmons's requests seek, either in full or in part, undiscoverable material. Hence, Ms. Lee joins in the government's objections to all of Mr. Simmons's requests,



The Honorable James R. Cho
April 24, 2024
Page 42

which are identical to those served on Ms. Lee.  Ms. Lee also reasserts all of her objections. In sum, Mr. Simmons cannot use this briefing as a vehicle to deceptively get the Court's approval of his objectionable discovery requests.

      C.   <u>Rule 26 Must Apply as Amended</u>

Finally, Mr. Simmons attempts to improperly return Rule 26 to its pre-December 2015 scope.  (*See* Simmons § III.A.1.a, *supra*, citing *Hutchins v. Palmer*, No. CV125927JFBAKT, 2015 WL 13713335, at *7 (E.D.N.Y. Mar. 31, 2015) and *Pegoraro v. Marrero*, 281 F.R.D. 122, 128–29 (S.D.N.Y. 2012)).  As amended, Rule 26 no longer contains language regarding discovery that is merely reasonably calculated to lead to the discovery of admissible evidence. Instead, Rule 26 is now limited to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).

The *only* claim at issue is Mr. Simmons's claim to derivate standing and the vast majority of his requests are not relevant to that issue.  Moreover, his discovery requests are not proportional to the needs of the case.  Ms. Lee has hundreds of thousands of documents relating to her various business ventures.  The document collection for the California Case alone includes more than 170,000 records, most of which have nothing to do with the issues in this ancillary matter and few of which have anything to do with Mr. Simmons's standing.  The irrelevant and overbroad requests propounded by Mr. Simmons—such as for all of Ms. Lee's financial records (RFP 10(c))—are blatantly not proportional to the limited issue of Mr. Simmons's standing.

**VII.   Conclusion**

The Court properly ordered limited discovery targeted only at the issue of whether Mr. Simmons has standing to bring a derivative claim.  Because the only viable (albeit incorrect) claim of Mr. Simmons relates to whether the MITA undid the transfer of his interest in Nu Horizons to Keyway Pride, the Court should limit discovery to only the legal effect of the contracts related to those transactions, which encompasses only the requests Ms. Lee identified above.

* * *

All parties thank the Court for its time and attention to this discovery matter.

      Sincerely,

      /s/ *Jeffrey Alberts*

      Jeffrey Alberts

cc: All counsel of record (via ECF)