

*U.S. Department of Justice*

*United States Attorney*
*Eastern District of New York*

HDM:DAS/BDM:SMF  
F. #2016R00467

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 17, 2024

By ECF

The Honorable James R. Cho  
United States Magistrate Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

   Re: In re Forfeiture Order of Tim Leissner  
     Miscellaneous Docket No. 23-1505 (MKB) (JRC)

Dear Judge Cho:

  The government respectfully writes in response to petitioner Russell Simmons' ("Simmons") renewed motion to compel the government to produce documents responsive to certain discovery requests to which the government has lodged objections. See ECF No. 49. For the reasons set forth below, the Court should issue a protective order directing that the government need not produce various categories of documents sought by Simmons that fall outside the limited scope of discovery authorized by the District Court.

I. Background

  The government assumes the Court's familiarity with the facts and circumstances giving rise to the seizure of approximately 3,370,787 shares of stock in Celsius Holdings, Inc. (the "Celsius Shares"), which are set forth in the government's portion of the joint discovery letter filed on April 24, 2024 (the "Joint Letter"). See Joint Letter, ECF No. 42, at 17-18. In addition, the government adopts and incorporates the prior arguments advanced in its section of the Joint Letter. Id. at 21-30.

  By Order entered on December 26, 2023, the District Court granted, in part, the government's motion to dismiss the petition filed by Simmons contesting forfeiture of the Celsius Shares (the "Simmons Petition"). In particular, the District Court dismissed Simmons' individual claims to the shares but allowed his derivative claim on behalf of Nu Horizons Investment Group LLC ("Nu Horizons") to proceed. See Simmons Petition, ECF No. 5; Order, ECF No. 24 (the "Partial Dismissal Order"). The government moved for reconsideration of the Partial Dismissal Order, and while the motion was denied, the District Court directed the parties to engage in limited discovery on the issue of whether Simmons held a membership interest in

Nu Horizons as of the petition filing date sufficient to confer standing on Simmons to assert a derivative claim on behalf of Nu Horizons ("Limited Discovery"). See ECF No. 32. The District Court then referred the matter to Your Honor for further proceedings.

Thus, the threshold issue before this Court is whether Simmons held a membership interest in Nu Horizons as of the date that he filed his claim in this forfeiture proceeding. Simmons' purported interest in Nu Horizons arises from a series of agreements between Simmons and Kimora Lee Simmons-Leissner ("Lee") and/or entities associated with Lee. As alleged in the Simmons Petition, on or about April 26, 2018, Simmons and Lee signed a letter of intent (the "LOI") memorializing Simmons' intent to sell all his interest in Nu Horizons to Keyway Pride Limited LLC ("Keyway Pride"), a company controlled by Lee.[1] See Simmons Petition ¶ 42. As further alleged in the Petition, on or about May 25, 2018, Simmons, Keyway Pride, Rush Digital Media, LLC (a company founded by Simmons), and Nu Horizons entered into a Stock Transfer Agreement (the "Stock Transfer Agreement"), which directed the transfer of Simmons' "entire Ownership Percentage . . . in Nu Horizons," among other assets, to Keyway Pride "at an aggregate purchase price of $14,250,000." See Simmons Petition ¶¶ 49, 51. Despite these clear agreements, the Petition alleges that in or about 2018, Simmons, Lee, Keyway Pride, and Erok Ventures LLC (another company controlled by Lee) entered into a superseding Member Interest Transfer Agreement that nullified and voided both the LOI and Stock Transfer Agreement, thus preserving the petitioner Simmons' interest in Nu Horizons and entitling him to certain of the Celsius Shares. See Simmons Petition ¶ 61.

A. Procedural History

On February 16, 2024, Simmons propounded upon the government a first set of requests seeking production of seventeen categories of documents. See Simmons First Set of Requests, Gov. Ex. A to Joint Letter. The government responded by agreeing to search for and produce, to the extent such documents exist, non-privileged documents responsive to four of the requests, subject to entry of an appropriate protective order. See Gov't Amended Responses and Objections to Simmons' First Set of Requests, Gov. Ex. B to Joint Letter.

On March 15, 2024, the District Court extended the deadline for completion of Limited Discovery until May 17, 2024. See March 15, 2024 Minute Entry.

At a status conference held on April 5, 2024, the Court ordered Simmons, Lee and the government to submit a joint letter setting forth their respective views as to whether Simmons' requests for production of documents to which the government had objected fell

---

[1] An examination of the purported LOI, which is attached as an exhibit to the Simmons Petitions, reveals that it is not a letter merely reflecting Simmons' intent to transfer his interest in Nu Horizons to Keyway Pride but an agreement to negotiate in good faith, execute and deliver definitive documentation necessary to effectuate the contemplated transfer. See LOI, ECF No. 5-18.

2

within the scope of the District Court's Limited Discovery order.[2]  See April 5, 2024 Minute Order.  In addition, on April 23, 2024, the Court entered a protective order in this case.  See ECF No. 41.  Simmons, Lee and the government submitted their Joint Letter on April 24, 2024.  See ECF No. 42.

On April 30, 2024, the parties appeared for a hearing during which the Court heard argument on the respective positions of Simmons, Lee and the government as to the proper scope of discovery.[3]  The Court then adopted the government and Lee's position as to the scope of the discovery but granted Simmons leave to renew his request seeking broader discovery after he reviewed the government's document production and Lee's anticipated document production.  See April 30, 2024 Minute Entry.  The Court also directed the government to undertake a review of its memoranda and notes of interviews to determine if they contain responsive information.  Id.

On May 9, 2024, Simmons filed a renewed request for broader discovery on the threshold issue of his standing.  See ECF No. 46 (the "Renewed Mot.").  On May 10, 2024, the Court granted the parties' joint request to extend the period until July 16, 2024 for discovery as to Simmons' standing to resolve discovery disputes, complete document production, and take appropriate depositions.  See May 10, 2024 Minute Entry.

      B.      The Government's Production of Documents in Response to Simmons' Broad Discovery Requests

With respect to Simmons' requests, the government agreed to produce the following categories of documents, to the extent any exist in its possession or control, because they fall within the scope of the District Court's Limited Discovery order:

| Request No. | Subject Matter |
| --- | --- |
| 7 | The Letter of Intent dated April 26, 2018 |
| 8(a)-(b) | The Stock Transfer Agreement executed on or about May 25, 2018 |
| 10 | The Membership Interest Transfer Agreement entered into in or about December 2018 |
| 11 | The direct or indirect ownership or control of Nu Horizons or the Celsius Shares between 2018 and the present |

The remaining requests, as set out below, fall outside Limited Discovery as they do not relate to the issue of whether Simmons has standing to assert a derivative claim on behalf

---

[2]    The Court also directed petitioner Simmons and the government to address whether memoranda and notes of interviews prepared by FBI agents were protected from disclosure by the work product doctrine.

[3]    The government also informed the Court that, on April 29, 2024, it had made a production responsive to those requests to which the government had previously agreed to produce documents.

3

of Nu Horizons.[4]  See Gov't Amended Responses and Objections to Simmons' First Set of Requests, Gov. Ex. B to Joint Letter.

| Request No. | Subject Matter |
|---|---|
| 1 | May 2018 SEC Schedule 13G listing Keyway Pride as the 100% owner of Nu Horizons |
| 2 | Midas Commodities' interest in Keyway Pride |
| 3 | Ownership or control of Midas Commodities |
| 4 | Ownership or control of Keyway Pride |
| 5 | A 2018 acquisition in Nu Horizons or the Celsius Shares by third parties |
| 6 | Lee's knowledge of Tim Leissner's ("Leissner") conduct vis-à-vis 1MDB |
| 8(c) | Whether any assets held by Lee or Keyway Pride were proceeds of a crime |
| 9 | Advice sought or obtained by Lee or Leissner concerning asset protection |
| 12-13 | An appearance bond for Leissner |
| 14 | A loan or transfer of the Celsius Shares from Nu Horizons to Lee or Keyway Pride |
| 15 | Ownership and control of a brokerage account into which the Celsius Shares were transferred |
| 16 | A February 5, 2020 document regarding a purported ex post facto statement by Leissner regarding beneficial ownership of the Celsius Shares |
| 17 | The affidavit submitted in support of the warrant authorizing seizure of the Celsius Shares |

As discussed above, the government made its first document production on April 29, 2024, approximately six days after the Court's entry of a protective order in this case. In addition, the government made supplemental document productions on May 1, May 6, May 8 and May 14, 2024. All told, the government has produced nearly 1,900 pages responsive to those requests to which the government agreed to provide responsive documents.[5]

---

[4]  In Simmons' request for production, the term "document" is defined to include FBI-302s and agent notes on which the FBI-302s are based. Pursuant to the Court's order entered on April 30, 2024, the government reviewed its repository of interview reports and notes held within its 1MDB document database and the FBI case file (together, the "1MDB Databases"). In total, there are approximately 518 unique FBI-302 reports within the 1MDB Databases. Approximately seven FBI-302s, totaling roughly 191 pages in connection with interviews of Tim Leissner, contain information responsive to Simmons' discovery requests to which the government has agreed to produce documents. In addition, the agent notes associated with the seven responsive FBI-302s total approximately 264 pages, many of which are handwritten and therefore not text searchable. It would be impractical to separate the responsive portions of those FBI-302s from the non-responsive portions.

[5]  Simmons contends that the government failed to produce documents, in response to Request No. 8, regarding "whether Keyway Pride or Kimora [Lee] intended to pay or had the ability to pay Russell Simmons the full purchase price" under the Stock Transfer Agreement. See Renewed Motion, at 5 n.5. The government submits that Lee, or persons or entities associated with her—rather than the government—are more appropriate sources of the

II.  **Argument**

    A.  <u>Simmons Seeks Documents That Fall Outside the Scope of Limited Discovery</u>

In the District Court's February 2024 Order, the Court ruled that the parties are to engage in Limited Discovery focused on the specific question of whether Simmons held a membership interest in Nu Horizons at the time the Simmons Petition was filed. This issue is central to the question of whether Simmons has standing to bring the instant derivative claim on Nu Horizons' behalf. Apart from the requests to which the government has consented, Simmons' other requests are beyond the scope of that narrow order and are also irrelevant and improper. Specifically, those requests are irrelevant because the facts they purport to establish are of no consequence in determining the issue before the Court and have limited probative value. Similarly, those requests are improper because, given the specific issue on which the District Court has ordered discovery, they amount to a speculative fishing expedition.

    1.  <u>Legal Standard</u>

Pursuant to Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any parties claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Information is "relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." <u>Walsh v. Top Notch Home Designs Corp.</u>, CV 20-05087, 2022 WL 3300190, at *3 (E.D.N.Y. Aug. 11, 2022). The "party seeking the discovery must make a prima facie showing that the discovery sought is more than merely a fishing expedition." <u>Id.</u>; <u>Collens v. City of N.Y.</u>, 222 F.R.D. 249, 253 (S.D.N.Y. 2004) ("[C]ourts should not grant discovery requests based on pure speculation that amounts to nothing more than a fishing expedition . . . .").

Permissible discovery under Rule 26 must be relevant to "any party's claim or defense" and "proportional to the needs to the case." <u>White v. County of Suffolk</u>, No. 20-CV-1501, 2022 WL 1154839, at *2-3 (E.D.N.Y. Apr. 19, 2022). Proportionality goes "hand-in-hand" with relevance, <u>Gilead Sciences, Inc. v. Safe Chain Sol. LLC</u>, 345 F.R.D. 22, 29-30 (E.D.N.Y. 2024), and focuses on the marginal utility of the discovery sought. <u>Vaigasi v. Solow Mgmt. Corp.</u>, 11 Civ. 5088, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16. 2016). Thus, the less relevant the information sought is, the more likely a court would find the subject discovery disproportionate. <u>See White</u>, 2022 WL 1154839, at *2. Indeed, the information sought must be "relevant to an <u>actual</u> claim or defense." <u>Id.</u> at *7 (emphasis added). While the scope of

---

information Simmons seeks. Nevertheless, as part of its May 14, 2024 document production, the government provided a number of financial documents, including Bates Nos. EDNY_1MDB_ANC_00001860 to EDNY_1MDB_ANC_00001883, potentially bearing on Lee's ability to pay Simmons the purchase price under the Stock Transfer Agreement.

discovery is broad, it is not limitless.  Holloway v. City of N.Y., No. 21-CV-3858, 2023 WL 6614599, at *8 (E.D.N.Y. Sept. 28, 2023).

Because motions to compel are left to the court's sound discretion, Gilead Sciences, Inc., 345 F.R.D. at 30, discovery related to an insubstantial claim may be refused.  See, e.g., Solarex Corp. v. Arco Solar, Inc., 121 F.R.D. 163, 179 (E.D.N.Y. 1988) (citing Chubb Integrated Sys. Ltd. v. Nat'l Bank of Wash., 103 F.R.D. 52, 59 (D.D.C. 1984)) ("It is, of course, within the court's discretion to deny discovery related to a patently insubstantial claim, for example, where the claim or defense appears baseless and the discovery would work a hardship on the answering party."); In re Aredia & Zometa Prod. Liab. Litig., 352 F. App'x 994, 995-96 (6th Cir. 2009) (where claims are facially deficient, even run-of-the-mill discovery should be denied); Navel Orange Admin. Comm. v. Exeter Orange Co., Inc., 722 F.2d 449, 454 (9th Cir. 1983) (discovery barred as to immaterial and irrelevant affirmative defenses); Apel v. Murphy, 70 F.R.D. 651, 654 (D.R.I. 1976) (refusing discovery before formal dismissal of an insubstantial claim).  Additionally, discovery of information of limited probative value may also be refused.  Malone v. Ameren UE, 646 F.3d 512, 516 (8th Cir. 2011); Hoffman v. Cnty. of L.A., No. CV 15-03724, 2016 WL 4698939, at *8 (C.D. Cal. Jan. 5, 2016) (limited probative value of information requires restriction of discovery).  Thus, a court does not abuse its discretion by limiting discovery only to substantial or viable claims.

The party seeking discovery bears the burden of proving the discovery is relevant.  Citizens Union of N.Y. v. Att'y Gen. of N.Y., 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017).  In this case, given the limited scope of the District Court's discovery order, a document is relevant only if it bears directly on the threshold standing issue.

2.  Discussion

Simmons contends that various deficiencies exist in the government's document productions.  As set forth below, Simmons assertions are without merit and the Court should reject them.

The requests to which the government has objected fall well beyond the scope of the Limited Discovery that the District Court ordered and are thus irrelevant.  Rather than focus on the threshold standing issue, the requests seek evidence to support Simmons' wholly speculative claim that Leissner and Lee were engaged in a criminal conspiracy to defraud Simmons and that the existence of such a conspiracy renders unenforceable the Stock Transfer Agreement by which Simmons agreed to convey away any interest in Nu Horizons.  Specifically, Simmons claims, without any basis, that the Stock Transfer Agreement was "unenforceable and ineffective" because it was: (1) part of a fraud on Simmons to acquire his interest in Nu Horizons in exchange for no payment and through an entity that Lee had sold; and (2) part of an illegal money laundering conspiracy involving Lee and Leissner.  See Renewed Mot. at 2.  These speculative claims cannot support the discovery requests Simmons has propounded, which are disproportionate to the narrow scope of the District Court's discovery order and, as discussed below, have no bearing on the specific issue being litigated.  Indeed, these requests are tantamount to an unreasonable fishing expedition premised on pure conjecture.  The requests should therefore be barred.  See Walsh, 2022 WL 3300190, at *3.

6

i. <u>Simmons' Complaints about the Government's Document Productions are Unfounded</u>

Simmons raises several complaints about the government's document production. They are all without merit. Specifically, Simmons complains that the government has failed to produce (1) documents regarding Leissner's appearance bond and evidence that would support Simmons' theory that he was defrauded by Lee and Leissner; (2) communications concerning the sale of Keyway Pride as part of an alleged "asset protection scheme" by Lee and Leissner to purportedly defraud Simmons; (3) records regarding ownership or control of Nu Horizons that may have been created after June 2018; and (4) documents regarding ownership of third-party entities separate and apart from Nu Horizons.

<u>First</u>, Simmons complains that the government has refused to produce documents to support his claim that he was fraudulently induced into entering the LOI and the Stock Transfer Agreement. Specifically, Simmons propounded Requests 1-6, 8(c), 9 and 12-17 seeking extrinsic evidentiary support for his claim that the relevant contracts were procured through some misconduct and thus were void <u>ab initio</u>. See Renewed Mot. at 2. But this argument is fatally flawed. There is no dispute that: (1) these contracts contain integration clauses;[6] (2) Simmons was a sophisticated party represented by sophisticated counsel; and (3) the LOI and Stock Transfer Agreement were the product of arm's-length negotiations. For the reasons stated in the government's portion of the Joint Letter, these facts undermine Simmons' fraudulent inducement argument. See Joint Letter, at 26; see also <u>Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.</u>, 343 F.3d 189, 195 (2d Cir. 2003) (when a sophisticated party represented by sophisticated counsel "nevertheless proceeds with a transaction without . . . inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as presented") (internal quotation marks, citation and emphasis omitted). Simmons' standing can be determined based upon the agreements at issue without any further discovery from the government beyond those categories of documents that it has already agreed to produce.

As such, the argument that Simmons proffers as forming the basis for his standing is plainly without any merit. Discovery related to such an insubstantial claim should be refused because any information obtained would have little marginal utility and have no bearing on the threshold question of Simmons' standing. See <u>Vaigasi</u>, 2016 WL 616386, at *14. At this stage of the proceedings, discovery is not focused on the broad merits of a party's claims, but instead, is limited to the threshold issue of whether petitioner Simmons has standing to assert a derivative

---

[6] An integration clause, also known as a merger clause, is a provision in a contract that declares the document to be the complete and final agreement between the parties, merges all prior discussions between the parties into the contract, and states that there are no representations, agreements, arrangements or understandings between the parties that are not contained therein. Courts across the Second Circuit have found that the inclusion of an integration clause in a contract precludes a claim of fraud-in-the-inducement such as the claim Simmons seeks to raise here. See <u>Carlin Equities Corp. v. Offman</u>, No. 07-Civ-359, 2008 WL 4387328, at *6 (S.D.N.Y. Sept. 24, 2008) (a merger clause should alert a sophisticated party represented by sophisticated counsel that it cannot rely on representations that are not included in the final contract).

claim. Thus, Simmons' requests not only rest on a faulty theory—and thus are not relevant to an <u>actual</u> claim—but they are also beside the point. <u>Walsh</u>, 2022 WL 1154839, at *7.

<u>Second</u>, Simmons accuses the government of intentionally excluding documents from a period in 2018 concerning the circumstances surrounding why Lee and Leissner entered into these agreements. Simmons argues that these communications would supposedly reveal evidence of a conspiracy to defraud Simmons of his interest in Nu Horizons. <u>See</u> Renewed Mot. at 4. Simmons is wrong.

The government has not intentionally excluded any responsive documents or communications; to the contrary, the significant volume of communications from the period surrounding the agreements at issue that the government has produced reveal that the actual reason for Simmons' transfer of his interest in Nu Horizons to Keyway Pride came not from Leissner or Lee, but rather from Simmons himself and/or his own business advisors. This was because, beginning at the end of 2017, Simmons was the subject of serious allegations of sexual misconduct by multiple women and needed to divest himself of certain interests.[7] Indeed, documents confirm that, in response to these allegations, Simmons and his advisors were working to divest Simmons of his interest in various businesses, including Rush Digital Media LLC and All Def Digital, Inc., which were held directly or indirectly through Nu Horizons. In sum, the government has produced the responsive documents, and they do not support Simmons' unsubstantiated allegations because of the facts, not because anything was withheld.

<u>Third</u>, Simmons complains that the government did not produce communications concerning the sale of Keyway Pride, which he alleges occurred right before execution of the Stock Transfer Agreement on May 25, 2018 and were a part of an asset protection scheme. <u>See</u> Renewed Mot. at 4. The government previously lodged objections, on relevance grounds, to producing documents concerning the purported sale of Keyway Pride. <u>See</u> Joint Letter, at 24-25. Simmons argues these documents are relevant because if Lee sold her interest in Keyway Pride as part an asset protection scheme prior to execution of the Stock Transfer Agreement, then Lee must have lacked the authority to sign the agreement, rendering it ineffectual. This argument also lacks merit. As the government explained in its portion of the Joint Letter, even if Lee held no interest in Keyway Pride as of the date of the Stock Transfer Agreement, that would have no impact on her ability to enter into the Stock Transfer Agreement as manager of Keyway Pride, a position to which she was appointed under Keyway Pride's operating agreement (which has been produced in discovery). <u>Id.</u> at 25. Accordingly, the communications sought by Simmons are

---

[7] See, e.g., Elahe Izade, <u>Russell Simmons Exits His Companies Following New Sexual Misconduct Allegations</u>, Wash. Post, Nov. 30, 2007, https://www.washingtonpost.com/news/arts-and-entertainment/wp/2017/11/30/russell-simmons-exits-his-companies-following-a-new-sexual-misconduct-allegation; Joe Coscarelli & Melena Ryzik, <u>Music Mogul Russell Simmons is Accused of Rape by 3 Women</u>, N.Y. Times, Dec. 13, 2017, https://www.nytimes.com/2017/12/13/arts/music/russell-simmons-rape.html; Elisa Leight, <u>Russell Simmons Sexual Assault Allegations: A Timeline</u>, Rolling Stone, Feb. 9, 2018, https://www.rollingstone.com/music/music-news/russell-simmons-sexual-assault-allegations-a-timeline-202515.

immaterial to Simmons' transfer of his interest in Nu Horizons to Keyway Pride and, in turn, irrelevant to the question of his standing.

Fourth, Simmons complains that the government has not produced documents created after 2018 regarding the ownership of Nu Horizons and whether the Membership Interest Transfer Agreement rendered the Stock Transfer Agreement void.  See Renewed Mot. at 5. Simmons complaint is unfounded.  Documents responsive to those requests to which the government agreed to respond generally originated from Leissner's laptop and cell phone, which were seized by the government incident to his arrest in or around June 2018.  Thus, there are few, if any, responsive documents created after June 2018.

Fifth, Simmons complains that the government has not produced documents about whether Lee owned Keyway Pride.  See Renewed Mot. at 5.  The government previously objected to producing documents regarding the ownership of Keyway Pride (Request No. 4). See Joint Letter, at 24.  As set forth in the government's portion of the Joint Letter, documents concerning ownership of a third-party entity, such as Keyway Pride, do not concern whether Simmons had a membership interest in Nu Horizons at the time the Petition was filed, and therefore have no bearing on the issue of Simmons' standing.  Id.

Finally, Simmons complains that the government has not produced documents to support his wholly speculative claim that the Stock Transfer Agreement was unenforceable because Leissner and Lee were engaged in a conspiracy to defraud him or launder money.  See Renewed Mot. at 5.  As set forth in the government portion of the Joint Letter and above, requests seeking to uncover conspiratorial misconduct by Leissner and Lee have no bearing on Simmons' completed conveyance of his interest in Nu Horizons to Keyway Pride and, in turn, also have no bearing on the central question of whether Simmons had a membership interest in Nu Horizons at the time of the filing of the Simmons Petition.  See Joint Letter, at 22-24.

### ii. Limiting Discovery on Claims Without Any Legal Basis Constitutes an Appropriate Exercise of the Court's Discretion

Petitioner Simmons asks the Court to disregard Rule 26's fundamental requirement that discovery be both relevant to an actual claim and proportional to the needs of the case.  See Renewed Mot. at 5-6; White, 2022 WL1154839, at *2-3, 7.  The Court should reject such an approach that would allow unfettered discovery sought by Simmons in contravention of the District Court's narrowly tailored order limiting discovery to the threshold question of his derivative standing.

Petitioner Simmons contends that the viability of his claims is not germane to determining the proper scope of discovery.  See Renewed Mot. at 5-6.  In support of his argument, Simmons cites to N. Shore-Long Island Jewish Health Sys., Inc. v. Multiplan, Inc., 325 F.R.D. 36 (E.D.N.Y. 2018) and Electrified Discounters, Inc. v. MI Techs., Inc., No. 3:13-CV-1332(RNC), 2015 WL 2383618, at *6 (D. Conn. May 19, 2015).  But Simmons reads Multiplan and Electrified Discounters incorrectly.  In Multiplan, the court held that, as part of discovery on the merits, a party could not resist discovery based on a proffered unviable claim because a motion for a protective order was not the correct vehicle for striking various claims or defenses.  325 F.R.D. at 48-49.  Unlike Multiplan, this case is not at the merits stage and the

9

government is not resisting discovery whole cloth; instead, the government is arguing that discovery should be limited proportionally to the scope of the District Court's narrow discovery order. Indeed, the Multiplan court noted that even if, generally speaking, information sought is relevant, it must still be proportional to the needs of the case. Id. at 50 ("[W]here the breadth and volume of the data requested is potentially vast, proportionality requires tailoring production to the subject matter of the litigation . . . .").[8]

Simmons' reliance on Electrified Discounters is misplaced for the same reasons. In that case, the parties were also engaged in discovery on the merits when a party resisting discovery argued that the claim to which it related was not sufficiently specific, but lodged no objection based on burden. 2015 WL 2383618, at *6. In contrast, here the government contends not only that Simmons seeks discovery to support arguments that necessarily fail as a matter of law—rendering them of minimal utility given the limited inquiry into his standing—but that responding to Simmons' broad requests would pose an unduly high burden on the government. See Joint Letter, at 22-26, 27-28. Accordingly, Simmons reliance on Electrified Discounters, like Multiplan, is misplaced, and this Court should not endorse his attempt to circumvent the District Court's Limited Discovery order.

Relying on this faulty legal standard, Simmons argues that he is entitled to discovery on matters that fall well beyond the limited scope of the District Court's discovery order. See Renewed Mot. at 6. In particular, Simmons renews his request for documents concerning transactions referenced in Celsius' Schedule 13G filed on May 21, 2018 (Request No. 1), which he claims are relevant with regard to Lee's interest in Nu Horizons. But as discussed in the government's portion of the Joint Letter, the only documents germane to the issue of Simmons standing are those concerning his interest in Nu Horizons. See Joint Letter, at 24. In addition, as discussed above, any purported sale by Lee of her interest in Keyway Pride, whether as part of an asset protection scheme alleged by Simmons or otherwise, is immaterial.

Further, Simmons renews his request for documents concerning the knowledge and state of mind of Leissner and Lee and the criminal conspiracy in which Simmons speculates they were engaged. See Renewed Mot. at 6. As already discussed, whether any such conspiracy existed is irrelevant to the question of whether Simmons conveyed away his interest in Nu Horizons that deprived him of standing to assert a derivative claim. See Joint Letter, at 25-26. Simmons offers no persuasive reason why the government should be forced to search for and produce documents responsive to these requests other than to support his wholly speculative theory that he was defrauded by Leissner and Lee. The Court should therefore reject Simmons' demands as not germane to the threshold issue of his standing. Collens, 222 F.R.D. at 253.

Moreover, Simmons renews his request for documents concerning subsequent statements about ownership of Nu Horizons or the Celsius Shares. See Renewed Mot. at 6. As discussed above and in the government's portion of the Joint Letter, the existence of integration

---

[8] Likewise, as the court in Multiplan made clear, the party seeking production must make at least a prima facie showing that the discovery sought "is more than merely a fishing expedition." Id. at 48. As discussed throughout the government's portion of the Joint Letter, Simmons has failed to make such a showing. See Joint Letter, at 17-28.

clauses in the LOI and Stock Transfer Agreement render extrinsic evidence, such as the ex post facto statements sought by Simmons as to the parties' subjective beliefs regarding ownership, of no import.  See Joint Letter, at 26 (citing AT&T Corp., 2024 WL 379952, at *12 and Primedia, 2003 WL 22220375, at *6).

Additionally, given the clear language of the merger clauses at issue, after-the-fact statements by a party about their subjective beliefs regarding a contract are not probative as an aid to interpreting the contract at issue.  See Dreni v. PrinterOn Am. Corp., No. 18-cv-12017, 2021 WL 4066635, at *14 (S.D.N.Y. Sept. 3, 2021) (citing cases); LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp., 424 F.3d 195, 207-08 (2d Cir. 2005) (noting that where a contract's terms are unambiguous and straightforward, courts need not rely on extrinsic evidence for its interpretation).

In support of his request for production of such after-the-fact statements, Simmons cites to United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 234 F. Supp. 3d 115, 120 (D.D.C. 2017), the facts of which are distinguishable from those of the present case.  In Julius Baer, the court directed the claimant to produce his own tax records for the period that followed the events giving rise to the forfeiture of property, as relevant to whether the claimant held an interest in the property sufficient to confer standing upon him to contest the forfeiture.  United States v. All Assets Held at Bank Julius Baer & Co., Ltd., 142 F. Supp. 3d 37, 43-44 (D.D.C. 2017).  The court reasoned that tax records mentioning the property filed by the claimant himself would be relevant to assessing the claimant's standing.  Here, however, Simmons seeks statements made by others which, unlike tax records filed by the claimant in Bank Julius Baer, constitute extrinsic evidence that is rendered irrelevant by the governing contracts that contain merger provisions.  Moreover, unlike here, the producing party in Bank Julius Baer did not lodge any objection based on burden.  Accordingly, Bank Julius Baer is inapposite.

Finally, Simmons suggests that placing limitations on discovery as to claims that lack any sound legal basis amounts would amount to an abuse of discretion by the Court.  See Renewed Mot. at 7.  Simmons is mistaken.  Limiting discovery to those claims that are viable, while rejecting discovery of information that is of limited probative value, falls squarely within the Court's discretion, particularly given the District Court's narrowly tailored order directing discovery as to the threshold issue of Simmons' standing.  See, e.g., Solarex Corp., 121 F.R.D. at 179; Chubb, 103 F.R.D. at 59; Aredia, 352 Fed. App'x at 995-96; Navel Orange, 722 F.3d at 454; Apel, 70 F.RD. at 65; Malone, 646 F.3d at 516; Hoffman, 2016 WL 4698939, at *8.

The cases to which Simmons cites lend little support to his sweeping assertion.  For instance, in Long Island Lighting Co. v. Barbash, 779 F.2d 793 (2d Cir. 1985), the Second Circuit held that a court abused its discretion when it limited discovery by ordering a party to examine a witness under oath without any notice or opportunity to review documents that had just been produced.  Id. at 795.  Similarly, in In re 650 Fifth Avenue and Related Properties, 934 F.3d 147 (2d Cir. 2019), the Second Circuit held that a district court abused its discretion in limiting discovery based solely on the idea that a claimant waived discovery on an issue by not seeking it during the relevant discovery period.  Id. at 157.  Likewise, Hollander v. American Cyanamid Co., 895 F.2d 80 (2d Cir. 1990), concerned a district court's refusal to compel a party

11

to answer an interrogatory where that interrogatory was relevant to a valid claim or defense. Id. at 84. Indeed, in that case, the Second Circuit assessed the validity of the claim to which the information sought related before ruling that the lower court had abused its discretion in limiting discovery. Id. Thus, none of these cases have any bearing on the circumstances presented here.

      B.      <u>The Documents Sought from the Government by Simmons Would be Unduly Burdensome to Search, Collect and Produce</u>

Simmons contends that the government has made only vague references to the burden it would face by having to produce documents responsive to his broad request. See Renewed Mot, at 6. Simmons is incorrect. The government previously reported, in detail, on the sheer size of the 1MDB Databases, which contain over 5.7 million documents. See Joint Letter, at 27-28. In addition, at the April 30, 2024 hearing, the government explained the difficulty in using search terms to narrow the volume of documents that must then be manually reviewed. If it were required to respond to Simmons' broad discovery requests seeking documents with limited potential benefit or relevance, the government estimates that nearly 350,000 documents would need to be individually reviewed.

Consequently, petitioner Simmons' requests are overly burdensome and exceed the bounds of authorized discovery. As described above, the requests have no relevance to the threshold standing issue because they do not concern any actual or viable claim with respect to Simmons' standing in this matter. In addition, the requests are sweeping and beyond the scope of the District Court's narrow discovery order. In essence, Simmons is asking this Court to sanction a highly burdensome fishing expedition for meaningless information to support unviable claims based on nothing more than conjecture. See Coffee v. City of Chi., No. 05-C-6745, 2006 WL 8460635, at *2 (N.D. Ill. Nov. 29, 2006) (finding limited probative value of the information sought substantially outweighed by burden of compliance with overbroad subpoena).

For these reasons, and those set forth in the government's portion of the Joint Letter, the Court should refrain from requiring the government to indulge in Simmons' clear fishing expedition. Id.; see also Walsh, 2022 WL 3300190, at *6 ("[F]ishing expeditions are not allowed when premised on mere speculation of what may come up in the production."). Instead, the Court should exercise its sound discretion to deny Simmons' motion to compel and issue a protective order confirming that the current phase of discovery is limited to those categories of documents that the government has already agreed to produce.

      C.      <u>The Memoranda of Interview and Agent Notes Sought by Simmons Are Protected from Disclosure by the Work Product Doctrine</u>

The government incorporates its previous objections to Simmons' request to produce relevant interview reports and agent notes which, based upon the government's review conducted in accordance with the Court's April 30, 2024 order, consist of approximately 500 pages. See Joint Letter, at 29-30; see also Am. Oversight v. Dep't of Just., 45 F.4th 579, 591 (2d Cir. 2022) ("Prosecutors' use of agents to conduct or memorialize interviews is not unusual in criminal investigations, and courts have frequently held 302s . . . to constitute attorney work

product") (citing cases).  To be sure, the government is not in the practice of producing interview reports of its cooperating witnesses to third parties, nor does it disclose a witness' interview reports to the witness himself.[9]  Indeed, as a judge in the Southern District of New York noted about the need to protect FBI-302s from disclosure:

> [P]ublic disclosure of the contents of 302 interview reports for particular witnesses has the potential to compromise the integrity of an FBI investigation by revealing to other witnesses and potential witnesses the questions that were asked by the FBI and the specific information reported to the FBI as part of its investigation . . . .  The FBI has asserted a "higher value" in maintaining the confidentiality of its 302s.  Disclosure of the content of the 302 may reveal, for example, what information the FBI has focused on or not focused on, and what information it has obtained or not obtained.  Disclosure of this information has the potential both to compromise the integrity of an investigation and to discourage candor and cooperation of future witnesses with FBI investigations.  This higher value, moreover, persists, even if the "information" has been disclosed through other means.

In re Terrorist Attacks on Sept. 11, 2001, No. 03-MDL-1570, 2020 WL 8611148, at *2-3 (S.D.N.Y. Oct. 2, 2020).  This "higher value" is particularly acute in a case such as this one, which involves an ongoing investigation and an international fugitive—Low Taek Jho—who has been charged with crimes in multiple districts and jurisdictions.

      Of course, Simmons remains free to depose Leissner as part of the present litigation and obtain the information he seeks by that means.  See Sec. & Exch. Comm'n v. Collector's Coffee, Inc., No. 19 Civ. 4355, 2021 WL 391298, at *6 (S.D.N.Y. Feb. 4, 2021) (substantial need for notes vitiated if party has opportunity to depose witness; "party's desire to use interview notes for impeachment purposes does not itself constitute substantial need").  The Court should therefore reject Simmons' request for production of agent notes and reports as protected from disclosure under the work product doctrine.

---

[9]    The government further notes that, pursuant to the protective order entered in United States v. Ng Chong Hwa, petitioner Ng would be precluded from using any FBI-302 reports disclosed during that case in connection with the present litigation.  See Criminal Docket No. 18-538, ECF No. 26.

III.     Conclusion

        For the foregoing reasons, the Court should deny Petitioner Simmons' renewed motion to compel and grant the government's request for protective order.

                                Respectfully submitted,

                                BREON PEACE
                                United States Attorney

By:    /s/
        Dylan A. Stern
        Brian D. Morris
        Tanisha R. Payne
        Assistant U.S. Attorneys
        (718) 254-7000

By:    /s/
        Margaret A. Moeser
        Acting Chief, Money Laundering and Asset
        Recovery Section - Criminal Division
        U.S. Department of Justice
        (202) 514-2000

cc:     All Counsel of Record (by ECF)