

PRYOR CASHMAN LLP

New York | Los Angeles | Miami

7 Times Square, New York, NY 10036-6569   Tel: 212-421-4100   Fax: 212-326-0806          www.pryorcashman.com

**Jeffrey Alberts**
Partner

Direct Tel: 212-326-0800
Main Fax: 212-326-0806
jalberts@pryorcashman.com

September 3, 2024

**VIA ECF**

The Honorable Magistrate Judge James R. Cho
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    *In re Forfeiture Order of Tim Leissner*, 23-mc-1505 (MKB)(JRC)

Dear Magistrate Judge Cho,

      Pursuant to the Court's August 19, 2024 Order, the parties submit this joint discovery letter concerning (i) Petitioner Russell Simmons's document requests to the government and Petitioner Kimora Lee Simmons-Leissner ("Ms. Lee"), and (ii) the location for Ms. Lee's deposition.  Mr. Simmons provided a draft of his portion of the letter to the government and Ms. Lee on August 21, 2024, and the government and Ms. Lee provided their draft portions on August 28, 2024.  The parties did not reach a resolution of all issues during their meet-and-confer call on August 30, 2024, and therefore file this joint letter reflecting their positions regarding the unresolved issues.



**Mr. Simmons's Position**

## I.     Factual and Procedural Background

Following the Court's ruling during the May 20, 2024 discovery hearing providing that "[a]s to the remaining disputes over the scope of discovery, Mr. Simmons may raise with the Court issues regarding specific requests" (May 20, 2024 ECF Order),[1] Mr. Simmons, derivatively on behalf of Nu Horizons Investment Group LLC ("Nu Horizons"), respectfully requests an order compelling the government and Ms. Lee to produce specific and narrowly tailored categories of documents that are responsive to Mr. Simmons's document requests[2] and likely to be not only relevant but highly material and potentially dispositive on the issue of whether Mr. Simmons had standing to file a derivative petition on behalf of Nu Horizons.  Mr. Simmons also requests an order compelling Ms. Lee to attend the deposition that Mr. Simmons has noticed in New York.

Judge Brodie has ordered the parties to engage in fact discovery concerning whether Mr. Simmons had an ownership interest in Nu Horizons when he filed his petition.[3]  The government and Ms. Lee argue that Mr. Simmons did not have an ownership interest in Nu Horizons when he filed his petition because he transferred his interest in Nu Horizons to Keyway Pride in 2018 pursuant to a Stock Transfer Agreement ("STA") and this transfer was not voided or rendered ineffective by the subsequent Member Interest Transfer Agreement ("MITA").

During the April 5, 2024 status conference, the Court ordered the parties to submit a joint discovery letter outlining their respective positions concerning the scope of discovery ("First Joint Discovery Letter"), which they did on April 24, 2024.  (ECF No. 42.)  The Court held a discovery hearing on April 30, 2024 concerning the First Joint Discovery Letter, and required the government and Ms. Lee to produce only the categories of document they had agreed to produce, holding that, "[i]n light of the agreement by the government and Ms. Lee to respond, at least in part, to Mr. Simmons' discovery requests, the Court adopted the position of the government and Ms. Lee regarding the scope of discovery as set forth in the parties' joint letter [ECF No. 42]."  (April 30, 2024 ECF Order.)  The Court "denied without prejudice Mr. Simmons' request as to the scope of discovery to give Mr. Simmons' counsel an opportunity to review the discovery responses from

---

[1]     *See also* transcript of May 20, 2024 discovery conference, attached hereto as Simmons Ex. 3, at 45:8-24 (permitting Mr. Simmons to renew his requests for documents "[i]f there are specific requests for specific documents for which [he] want[s] responses").

[2]     Attached hereto as Simmons Exhibits 1 & 2 are copies of Mr. Simmons's February 16, 2024 requests for production to the government and Ms. Lee, respectively, which are substantively identical.

[3]     The Court summarized the facts relevant to Mr. Simmons's standing in its Order directing the parties to conduct limited discovery.  (ECF No. 32 at 2-3.)  Capitalized terms not defined herein shall have the same meaning as defined in the Court's Order directing the parties to conduct limited discovery.  (ECF No. 32.)



The Honorable James R. Cho
September 3, 2024
Page 3

the government and Ms. Lee" but "grant[ed] Mr. Simmons leave to renew his request for broader discovery, if necessary, after Mr. Simmons' counsel's review of the discovery responses." (*Id*.)

Following Mr. Simmons's counsel's review of the documents produced by Ms. Lee and the government, on May 9, 2024 he renewed his request for the Court to compel the production of documents. (ECF No. 49.) Ms. Lee and the government responded on May 17, 2024. (ECF Nos. 52, 54.) During the discovery hearing on May 20, 2024, the Court "[s]ustain[ed] the government's objection to Document Request 16" and "decline[d] to reconsider its previous ruling on the scope of discovery." (May 20, 2024 ECF Order.) The Court also held, however, that, "[a]s to the remaining disputes over the scope of discovery, Mr. Simmons may raise with the Court issues regarding specific requests." (*Id*.)

The parties have exchanged several document productions following the May 20, 2024 discovery order. Ms. Lee and the government's productions contain multiple substantive and technical deficiencies, which the parties have discussed via numerous letters.[4] Despite Mr. Simmons's explanations for why certain documents that Ms. Lee and/or the government have refused to produce are highly material to the issue of standing, the parties have reached an impasse regarding specific categories of documents discussed below that (i) contain prior statements about who owned Nu Horizons during the time period between Nu Horizons' purchase of the Celsius Shares and Mr. Simmons's filing of his Petition, (ii) documents concerning the effectiveness of the disputed transfers of Mr. Simmons's ownership interest under the STA and the MITA, and (iii) documents concerning the possession of the Celsius Shares by Nu Horizons and Ms. Lee. Indeed, Mr. Simmons is not even seeking all documents concerning these issues, but instead narrowly-tailored subsets of documents that go to the heart of these issues and are not unduly burdensome for Ms. Lee and the government to produce. For the convenience of the Court, these documents are numbered consecutively in § II below.

Mr. Simmons also requested (i) text messages containing context necessary for Mr. Simmons to understand and interpret the standalone text messages the government has produced, and (ii) all responsive text messages in Ms. Lee's possession, custody or control, each of which the government and Ms. Lee have not agreed to produce.

Finally, depositions in this case have been noticed for Mr. Simmons, Ms. Lee, Defendant Leissner, and Richard Slomovitz, although no dates have been set for any. Scheduling conflicts for these individuals and/or their counsel required the extension of fact discovery to September 17, 2024. (ECF No. 68; July 11, 2024 ECF Order.) The majority of these individuals and/or their counsel reside in or have agreed to travel to New York to be deposed, and Mr. Simmons has repeatedly attempted to coordinate the scheduling of these depositions in a narrow span of time in New York to reduce the travel burden on all parties. Ms. Lee has steadfastly refused to agree to

---

[4]    Attached hereto as Simmons Exs. 5 through 13 are copies of the discovery correspondence referenced in Mr. Simmons's portion of this letter.



attend her deposition in New York, and Mr. Simmons accordingly moves to compel her attendance.

## II.     Argument

### A.     Mr. Simmons is Entitled to Discovery of All Documents Relevant to His Standing Arguments.

Judge Brodie's February 9, 2024 Order directed the Parties to engage in discovery concerning "the question of the status of Petitioner's membership interest in Nu Horizons as of the date of the filing of the Petition." (ECF No. 32.)  Judge Brodie in no way limited or altered the fundamental rules that apply to discovery, and Mr. Simmons is entitled "*any* nonprivileged matter that is relevant to *any* party's claim or defense." Fed. R. Civ. P. 26(b)(1) (emphases added).

The documents Mr. Simmons has requested, and that Ms. Lee and the government refuse to produce, are not only are *relevant* to Mr. Simmons's legal theory on standing, but go to the heart of the standing dispute.  As discussed below, the government even requested many of these same categories of documents from Mr. Simmons, and Mr. Simmons produced responsive documents. Indeed, if this Court endorses the one-sided narrowing of discovery requests strategically pursued by Ms. Lee and the government, it is effectively granting summary judgment against Mr. Simmons by barring him from developing his legal theories.  Forcing Mr. Simmons to defend himself against the government's standing arguments without the benefit of obtaining the documents supporting his legal theories would deny him the substantive rights that discovery is intended to guarantee. The government and Ms. Lee are asking the Court to deny those substantive rights in a manner that is flatly contrary to law, and the Court should refuse to do so.  "Although a district court has considerable latitude in determining the scope of discovery, it abuses its discretion when the discovery is so limited as to affect a party's substantial rights." *Long Island Lighting Co. v. Barbash*, 779 F.2d 793, 795 (2d Cir. 1985).  One such right is to "be afforded a meaningful opportunity to establish the facts necessary to support its claim."  *In re 650 Fifth Ave. & Related Properties*, 934 F.3d 147, 157 (2d Cir. 2019) (holding the district court abused its discretion by denying a forfeiture claimant's motion to compel discovery where it rejected a claimant's defense "on a hardly developed record"); *see also Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 84 (2d Cir. 1990) (holding the district court abused its discretion by declining to compel defendant to answer plaintiff's interrogatory, even though the interrogatory went "beyond the narrow confines" of plaintiff's employment to facts pertaining to defendant's employment practices more generally, because the request was nonetheless "relevant to [plaintiff's] case.").

The government and Ms. Lee have gone to great lengths in their briefs and correspondence to attack the legal sufficiency of Mr. Simmons's standing arguments as a basis to resist discovery, rather than the relevance of documents to those arguments.  (*See, e.g.*, First Joint Discovery Letter at 21-26, 34-42.)  Ms. Lee does so again in this letter.  (*See, e.g., infra* at 23-25.)  But despite Ms. Lee's attempt to frame "the core of the dispute over Mr. Simmons's derivative standing[] [as being]



The Honorable James R. Cho
September 3, 2024
Page 5

whether the MITA rendered the STA void ab initio and transferred Keyway Pride's membership interest in Nu Horizons back to Mr. Simmons" (*see infra* at 21), she does not get to decide what Mr. Simmons's legal arguments are, he does.  And "it is no objection to a[] [discovery request] that it relates to a defense or claim which is insufficient in law."  *Electrified Discounters, Inc. v. MI Techs., Inc*., 2015 WL 2383618, at *6 (D. Conn. May 19, 2015) (citation omitted).  Ms. Lee attempts to reframe this unsound position with the argument that only "relevant" discovery is permissible, that only "fact[s] . . . of consequence in determining the action" are relevant, and, therefore, that "[d]iscovery related to Mr. Simmons's unfounded legal theories of standing and fraud are irrelevant because they have no 'consequence in determining the action.'" (*Infra* at 18 (citing Fed. R. Evid. 401(b).)  This is nothing more than an attempt to seek the "adjudication on the merits" of Mr. Simmons's legal arguments that "comes only after discovery."  *Electrified Discounters*, 2015 WL 2383618, at *6.  Judge Brodie did not rule in her motion to dismiss decision that any of Mr. Simmons's arguments as to his derivative standing were insufficient as a matter of law, and Ms. Lee's "opposition to a discovery motion is not the proper forum for raising challenges to the viability of [a party's] claims, nor are such challenges proper grounds to preclude otherwise appropriate discovery."  *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 48 (E.D.N.Y. 2018).  This Court should not countenance Ms. Lee's attempt to prematurely succeed on the merits of Mr. Simmons's claims by sneaking in such an adjudication in the guise of her objections to producing the discovery that he needs to pursue those legal arguments.

As a result, it is improper for Ms. Lee to attempt to litigate her responses to the merits of Mr. Simmons's standing argument, and Mr. Simmons need not respond to her arguments here.  To the extent Ms. Lee argues that Mr. Simmons's arguments are frivolous, however, Mr. Simmons briefly sets forth his position, as he has already done.  (*See* First Joint Discovery Letter at 8-9.)  Ms. Lee's reliance on the "very narrow fraud exception to the continuous ownership rule in the context of Delaware corporations" articulated in *Ark. Teacher Ret. Sys. v. Countrywide Fin. Corp.*, 75 A.3d 888, 894 (Del. Sup. Ct. 2013) is misplaced.  (*See infra* at 23-25.)  Mr. Simmons does not need an exception to the continuous ownership rule under Delaware law because he always held a membership interest in Nu Horizons.  This is the case not only because the MITA rendered the STA void *ab initio*, but this is also the case because the STA was procured by fraud, which renders it void under California law.  (*See* First Joint Discovery Letter at 9 (citing *Frank Perez Fam. Tr. Dated 5/3/10 v. Wells Fargo Bank*, 2018 WL 6332280, at *2 (C.D. Cal. Oct. 26, 2018).)  As a result, Mr. Simmons never lost his interest in Nu Horizons and needs no exception to the continuous ownership rule.  The fact that there is a "fraud" exception to Delaware standing law does not mean that Mr. Simmons is attempting to invoke it just because his theory also includes the word fraud.

Finally, this Court has suggested that proportionality concerns have motivated some of its discovery rulings.  (*See* Simmons Exhibit 3 (Transcript of May 20, 2024 discovery hearing) at 33:9-12; 35:6-10; 38:7-16; 44:7-16.)  Of course, this Court has some discretion to limit requests that are disproportionate to the issues at stake, but this is not a minor case with little at stake for



The Honorable James R. Cho
September 3, 2024
Page 6

the parties—the Celsius Shares at issue here have been worth as much as *$990 million* since the Amended Preliminary Order of Forfeiture was entered.[5]  (*Cf. id*. at 46:4-13.)  Despite the massive value of this case to Ms. Lee and to the government, Ms. Lee has produced only 426 documents and the government has produced only 1,073 documents (many of which are merely reproduced copies of the documents produced by Ms. Lee or Cooley LLP or, re-productions to correct production deficiencies).  The burden of producing this relatively small number of records is not even close to disproportionate to the size of this matter.  As further discussed below, the burden of producing the handful of documents that are the subject of this motion to compel is certainly not disproportionate to their relevance and materiality in this dispute over standing.  Moreover, as to the government, the drastic asymmetry in power between the government and petitioners in a forfeiture action warrants particular care to ensure that innocent third parties like Mr. Simmons have access to the discovery they need to ensure that they are not deprived of their property.

      B.      <u>The Documents Mr. Simmons Seeks Are Relevant to His Derivative Standing.</u>

          *1.*     *Documents containing prior statements about who owned Nu Horizons after the purchase of the Celsius Shares and before the filing of Mr. Simmons's Petition.*

The factual issue on which the parties were ordered to engage in discovery is whether Mr. Simmons had standing to file a forfeiture petition derivatively on behalf on Nu Horizons on May 5, 2023.  The parties dispute who owned Mr. Simmons's original membership interest in Nu Horizons as of the date of Mr. Simmons's forfeiture petition.  Mr. Simmons alleges that it was him, Ms. Lee alleges that it was her.  Because it cannot have been both, documents related to Ms. Lee's alleged ownership of that interest at that time are necessarily relevant to Mr. Simmons's ownership of that interest at that time.  When there is a dispute between two parties who both claim to have owned property during the same time period, statements about such ownership made by those parties during that time period, especially when the parties had different motives for asserting ownership, can be incredibly powerful evidence of whether their current assertions of ownership are valid.  And that is exactly the evidence that documents in categories Nos. 1-7 below seek.

Realizing the obvious relevance of prior statements of Mr. Simmons concerning whether he owned Nu Horizons, the government expressly requested them in discovery.  These included, for example, requests for "federal and state tax documents that were issued or filed by you, or on your behalf," "financial statements prepared . . . by you, or on your behalf, stating your assets, liabilities, net worth or other financial data" and "any loans or other extension of credit for which

---

[5]    *See* https://www.cnbc.com/quotes/CELH (identifying a high of *$99.62* per share on March 14, 2024).  This value cited above takes into account the 3-for-1 stock split issued by Celsius on November 13, 2023.  *See*  https://ir.celsiusholdingsinc.com/news/news-details/2023/Celsius-Holdings-Announces-Three-for-One-Stock-Split/default.aspx.



The Honorable James R. Cho
September 3, 2024
Page 7

you cited your interest in Nu Horizons as security, for the period from May 25, 2018 to the present."[6]   Mr. Simmons recognized the relevance of whether his tax returns and financial statements during the relevant time period reflected his interest in Nu Horizons and produced responsive documents to the government and to Ms. Lee.  The government and Ms. Lee likely will use these to cross-examine Mr. Simmons (even when they do reflect his interest in Nu Horizons).

Mr. Simmons, however, is not being given access to the exact same categories of documents for other people making competing assertions of a direct or indirect ownership interest in Nu Horizons, including the very persons (Keyway Pride and/or Ms. Lee) that the government and Ms. Lee now argue acquired Mr. Simmons's ownership interest in Nu Horizons.  The government and/or Ms. Lee refuse to produce the following specific documents in response to Mr. Simmons's narrowly targeted follow-up requests and the Court should compel them to produce these documents:

1.   Ms. Lee's tax filings for the tax year 2018 to the present.[7]
2.   Keyway Pride's tax filings for the tax year 2018 to the present.[8]
3.   Documents summarizing the assets owned, directly or indirectly by Ms. Lee (*e.g.*, summaries of assets in a loan application).[9]

Each of these documents are relevant for at least one of three reasons: they contain an assertion of ownership of Nu Horizons, they omit an assertion of ownership of Nu Horizons (implying the absence of such an ownership interest), or they contain an indirect assertion of an ownership interest in Nu Horizons by referencing an ownership interest in the Celsius Shares owned by Nu Horizons.  The reason references to the Celsius Shares are highly relevant to answering the question of who really owned Nu Horizons is obvious to anyone who has experience discussing indirect ownership of assets.  When someone says she owns a specific asset that is technically owned through an entity such as an LLC, she often means she has an ownership interest in the entity that owns the asset.  It is natural for people with an indirect ownership interest in an

---

[6]       *See* United States of America's First Set of Interrogatories to Claimant Russell Simmons, Derivatively on Behalf of Nu Horizons Investment Group, dated February 29, 2024 (attached hereto as Simmons Ex. 4), Interrogatories Nos. 5, 6, 13 & related requests for production.

[7]       *See* Simmons Ex. 7 (June 17 Simmons letter to Lee, requesting documents); Simmons Ex. 11 (August 12 Lee letter to Simmons, refusing to produce).  These documents are responsive to Request Nos. 4, 11.

[8]       *See* Simmons Ex. 7 (June 17 Simmons letter to Lee, requesting documents); Simmons Ex. 11 (August 12 Lee letter to Simmons, refusing to produce).  These documents are responsive to Request Nos. 4, 11.

[9]       *See* Simmons Ex. 5 (June 9 Simmons letter to Government, requesting documents) & Simmons Ex. 7 (June 17 Simmons letter to Lee, same); Simmons Ex. 6 (June 13 Government letter to Simmons, refusing to produce) & Simmons Ex. 11 (August 12 Lee letter to Simmons, same). These documents are responsive to Request Nos. 4, 11.



The Honorable James R. Cho
September 3, 2024
Page 8

asset to say they own that asset without referencing the indirect nature of their ownership. An example of such a use of language in this case would be a statement by Defendant Leissner that he owned Nu Horizons when he only had an indirect interest through Cuscaden Capital or a statement by Ms. Lee that she owned Nu Horizons even when her fully articulated position—disputed by Mr. Simmons—is that she owned Keyway Pride, which in turn owned Nu Horizons. And for accounting purposes, it can be preferable to list as an asset the stock (*e.g.*, Celsius) whose share price is the basis for a valuation rather than to list an entity that owns that stock (*e.g.*, Nu Horizons) whose value is indirectly fluctuating based on changes in the share price of the stock.

Ms. Lee accuses Mr. Simmons of engaging in a "fishing expedition into his ex-wife's assets" (*see infra* at 19), but that is not what is happening here. This entire dispute is about business dealings involving Ms. Lee, who is now trying to take more than she bargained for. Her financial documents that bear directly on those specific business dealings are completely germane to Mr. Simmons's standing. She has agreed only to produce documents "to the extent [they] cover[] (a) control of Keyway Pride (b) at the time of the May 25, 2018 Stock Transfer Agreement." (First Joint Discovery Letter at 39.) Narrowing responsive documents to only those covering "control" of Keyway Pride as of a certain date before the MITA deprives Mr. Simmons of documents that are relevant to his derivative standing, and Ms. Lee has refused to produce additional materials.[10] Moreover, the documents she has produced under her unacceptable narrowing are heavily redacted copies of organization charts and asset portfolio summaries that purport to show her indirect ownership of Keyway Pride and Nu Horizons in or around April 2018—this is not even sufficient to show her control of Keyway Pride at the time of the May 25, 2018 STA, which she agreed to produce. Nor do they demonstrate her direct or indirect ownership of Keyway Pride, Nu Horizons or the Celsius Shares after the MITA, which would show whether her contemporaneous conduct was consistent with her current claim of ownership.

If Ms. Lee is willing to represent that her and Keyway Pride's tax filings for 2018 to the present, as well as the documents in categories Nos. 3-6, do *not* reflect that Ms. Lee or Keyway Pride held direct or indirect ownership of Mr. Simmons' interest in Nu Horizons or the portion of the Celsius shares attributable to Mr. Simmons's interest in Nu Horizons after the MITA, Mr. Simmons will withdraw his request for them. Similarly, if Ms. Lee will represent that the unredacted portions of the documents do not demonstrate the ownership structure of Keyway Pride, Mr. Simmons with withdraw his request for them. But if she is not willing to make such a representation about the contents of those documents, Mr. Simmons is entitled to their production.

Despite the significant relevance of prior statements during the relevant time period about ownership of Nu Horizons and the Celsius Shares, the government and/or Ms. Lee refuse to

---

[10]     *See* Simmons Ex. 11 (August 12 Lee letter to Simmons. The government has likewise refused to produce these materials. *See* Simmons Ex. 6 (June 13 Government letter to Simmons).



produce the following specific documents in response to Mr. Simmons's narrowly targeted follow-up requests and the Court should compel them to produce these documents:

4.   Communications between Ms. Lee, Defendant Leissner or their agents or representatives and Celsius personnel concerning Ms. Lee's direct or indirect interest in Nu Horizons and/or shares of Celsius stock.[11]

   • *These documents would contain prior statements/omissions identifying Nu Horizons or the Celsius Shares as owned, directly or indirectly, by Ms. Lee.*

5.   Communications between Ms. Lee, Defendant Leissner or their agents or representatives and Ms. Lee's financial advisors, accountants and tax preparers concerning Ms. Lee's interest in Nu Horizons and/or shares of Celsius stock.[12]

   • *These documents would contain prior statements/omissions identifying Nu Horizons or the Celsius Shares as owned, directly or indirectly, by Ms. Lee.*

6.   Unredacted copies of the organization charts and asset portfolio summaries previously produced by Ms. Lee in redacted form.[13]

   • *These documents would reflect both whether and when Ms. Lee owned Nu Horizons, or assets of Nu Horizons, and through which entities she owned them.*

7.   Documents Ms. Lee submitted to the government in support of an appearance bond for Tim Leissner that concern the Celsius Shares, Nu Horizons, or Keyway Pride.[14]

---

[11]   *See* Simmons Ex. 12 (August 12 Simmons letter to Lee, requesting documents) & Simmons Ex. 13 (August 12 Simmons letter to Government, same). In each of these August 12 letters, Mr. Simmons indicated that he would move to compel production of the documents sought if he did not receive a response by August 14, and neither Ms. Lee nor the government responded. These documents are responsive RFP Nos. 1-4, 11.

[12]   *See* Simmons Ex. 13 (August 12 Simmons letter to Government, requesting documents). In the August 12 Simmons letter to Government, Mr. Simmons indicated that he would move to compel production of the documents sought if he did not receive a response by August 14, and the government has not responded. These documents are responsive to RFP Nos. 4, 5, 11.

[13]   *See* Simmons Ex. 7 (June 17 Simmons letter to Lee, requesting unredacted copies of documents); Simmons Ex. 11 (August 12 Lee letter to Simmons, refusing to produce). These documents are responsive to Request Nos. 4, 11.

[14]   *See* Simmons Ex. 7 (June 17 Simmons letter to Lee, requesting documents); Simmons Ex. 11 (August 12 Lee letter to Simmons, refusing to produce). These documents are responsive to RFP No. 12.



The Honorable James R. Cho
September 3, 2024
Page 10

- *These documents would reflect who owned Nu Horizons in 2018; who owned Keyway Pride, which is the entity that Ms. Lee and the government allege purchased Nu Horizons, and which Mr. Simmons argues could not have purchased Nu Horizons in part because it was not owned by Ms. Lee; and who owned the Celsius Shares, which is indirect evidence of who owned Nu Horizons.*

Ms. Lee and/or the government refuse to produce the preceding seven specific and narrowly-tailored categories of documents to Mr. Simmons even though they are highly relevant to the central standing argument made by Ms. Lee and the government that Mr. Simmons no longer had an ownership in Nu Horizons (nor an indirect interest in the Celsius Shares) after 2018 because Ms. Lee acquired this ownership interest in Nu Horizons through Keyway Pride in 2018.

Withholding such material documents from Mr. Simmons and thus preventing his counsel from confronting witnesses with these documents during their depositions is not a mere violation of the rules of discovery, it undermines the most fundamental notions of due process. This violation is particularly outrageous in this case given that the parties refusing to produce these documents requested and received analogous documents from Mr. Simmons in discovery and likely will use them to bolster their positions during depositions. The Court should give Mr. Simmons a fair chance to build his case and confront witnesses testifying against him, not allow these parties to forfeit or otherwise take property while concealing evidence that undermines their position.

Ms. Lee does not object to the relevance of the documents identified in category No. 4. (*See infra* at 28-29.) She instead first argues the RFPs did not seek the documents identified because the relevant RFPs called for "documents" rather than "communications." (*Id.*) This argument is meritless, as the RFPs defined "documents" to include "correspondence," "e-mail," and "texts." (*See* Simmons Ex. 2, Definition No. 26.) To the extent Ms. Lee objects to the burden of reviewing the "thousands of documents that have @celsius.com email addresses," Ms. Lee can simply produce all emails with an @celsius.com email address in the top email, which will not be privileged and will be responsive regardless of whether they relate to Ms. Lee or Mr. Simmons's interest in Nu Horizons or the Celsius Shares. As to the documents identified in category No. 5, her objection that the relevant RFPs did not call for communications is similarly infirm, and her relevance objection is meritless, as those documents, as with her tax returns, for example, would show whether her contemporaneous conduct was consistent with her current claim of ownership.

With respect to category No. 7, if Ms. Lee and the government are willing to represent that all documents Ms. Lee submitted to the government in connection with the appearance bond have already been produced by the government, Mr. Simmons will withdraw his application for an order compelling the production of those documents.



> 2.    *Documents concerning the effectiveness of the disputed transfers of*
> *Mr. Simmons's ownership interest under the STA and MITA*

A core dispute concerning whether Mr. Simmons retained an ownership interest in Nu Horizons after the STA and the MITA in 2018 is whether the STA and/or the MITA were valid under the Operating Agreement of Nu Horizons.  Mr. Simmons argues that the STA was ineffective for a variety of reasons including that (i) Ms. Lee did not have authority to execute the STA on behalf of Keyway Pride because she had already sold it, (ii) the transfer was not approved by the Managers or Investment Board of Nu Horizons, (iii) the transfer was never effectuated in the manner required by Delaware law and the Nu Horizons Operating Agreement, and (iv) the transfer was part of a fraud on Mr. Simmons to acquire his interest in Nu Horizons in exchange for no payment and through an entity that Ms. Lee had sold without informing Mr. Simmons.  (*See* First Joint Discovery Letter at 3.)  The government and Ms. Lee assert that the STA did transfer the ownership of Mr. Simmons's interest in Nu Horizons to Keyway Pride, but deny that the MITA was effective in voiding that transfer for technical reasons.

Because the parties dispute whether Ms. Lee had the authority to execute the STA on behalf of Keyway Pride, and therefore transfer ownership of Nu Horizons from Mr. Simmons to Keyway Pride, documents that bear on Ms. Lee's authority are highly relevant.  Ms. Lee has refused to produce the following specific documents in response to Mr. Simmons's narrowly-targeted follow-up requests and the Court should compel her to produce these documents:

> 8.    Any agreement, assignment, or other legal document effectuating a transfer of interests in Midas or Keyway Pride to Newland Inc. Limited, Oryx Investment Limited, or Ghanim Saad M Al Saad al-Kuwari.[15]
>
> - *This document (or documents) would reflect whether Ms. Lee owned Keyway Pride directly, or indirectly through Midas, and would likely reflect any limitations on, or grant of, authority to Ms. Lee to act on behalf of Keyway Pride after such transfers to continue to execute transactions, such as the STA.*

Similarly and relatedly, because the parties dispute whether the STA and MITA were properly approved by any required Members, Managers and Investment Board members of Nu Horizons, documents concerning any changes in who the Members, Managers and Investment Board members were between the signing of the Operating Agreement and the end of 2018 are highly relevant to this standing dispute.  Ms. Lee has refused to produce the following specific

---

[15]    *See* Simmons Ex. 10 (August 1 Simmons letter to Lee, requesting documents); Simmons Ex. 11 (August 12 Lee letter to Simmons, refusing to produce).  These documents are responsive to RFP Nos. 1-5.



The Honorable James R. Cho
September 3, 2024
Page 12

documents in response to Mr. Simmons's narrowly targeted follow-up requests and the Court should compel her to produce these documents:

9.     Documents effectuating Keyway Pride's acquisition in or about January 2016 of Cuscaden Capital Limited's interest in Nu Horizons.[16]

- *Cuscaden Capital is the entity through which Defendant Leissner had an interest in Nu Horizons. Mr. Leissner had been a Manager and Investment Board member of Nu Horizons prior to this purported sale. If he sold his entire indirect ownership interest, documents concerning this sale are likely to reflect whether he transferred some or all of these to Keyway Pride and/or Ms. Lee. These documents also will bear on the dispute discussed in the preceding section concerning whether Ms. Lee was an owner of Keyway Pride or authorized to act on its behalf, because they likely will reflect who executed the documents on behalf of Keyway Pride and why that person had authority to execute the documents.*

10.    Documents concerning approvals, consents or acknowledgements by Ms. Lee, Mr. Simmons, Defendant Leissner, Rich Slomovitz or Osman Eralp as Members, Managers or Investment Board members of Nu Horizons or approvals, consents or acknowledgements of their status as members, Managers or Investment Board members of Nu Horizons, or changes to that status, including resignation, withdrawal or acquisition of such position.[17]

- *These documents not only relate to, but likely would determine, whether any approvals, consents or acknowledgements for the STA and/or the MITA were obtained.*

These documents are also relevant for the additional reason that they reflect whether persons who now claim to have had ownership of Nu Horizons were then acting in a manner inconsistent with that claim. Just as documents containing prior explicit statements about ownership are highly relevant to any dispute over ownership (even if they don't themselves *create* that ownership), documents reflecting actions inconsistent with ownership are highly relevant. Actions often speak louder than words. Any litigator knows this. The government is certainly

---

[16]    *See* Simmons Ex. 10 (August 1 Simmons letter to Lee, requesting documents); Simmons Ex. 11 (August 12 Lee letter to Simmons, refusing to produce). These documents are responsive to RFP No. 11.

[17]    *See* Simmons Ex. 12 (August 12 Simmons letter to Lee, requesting documents). In the August 12 Simmons letter to Lee, Mr. Simmons indicated that he would move to compel production of the documents sought if he did not receive a response by August 14, and Ms. Lee has not responded. These documents are responsive to RFP No. 11.



The Honorable James R. Cho
September 3, 2024
Page 13

aware of this.  Accordingly, the government asked Mr. Simmons for a variety of documents that would reflect whether he was *acting* as an owner of Nu Horizons during the relevant time period. For example, the government asked for "any business entity tax payments to the state of Delaware on behalf of Nu Horizons", "any and all payments made by you for debts, taxes, expenses or other obligations incurred or owed by Nu Horizons for the period from May 25, 2018 to the present," and "who made decisions concerning management and/or operations of Nu Horizons, including, but not limited to, ownership decisions, payment of obligations, maintenance, corporate decisions."[18]  As with prior statements on ownership, it is easy for any trained litigator to see why these requested documents are potentially important in a dispute over ownership.  If counsel is deposing someone claiming to have been the owner of a company, it is effective to confront them with evidence that they did not *act* as the owner by paying taxes and expenses, arranging for maintenance, paying tax filers, etc.  The government requested and received such evidence from Mr. Simmons.  Mr. Simmons has requested such evidence from the government and Ms. Lee, including the foregoing transactional documents relating to Nu Horizons, but these documents are being strategically withheld.

With respect to the documents in category No. 10, if Ms. Lee is willing to represent that she has produced all approvals, consents or acknowledgements by Ms. Lee, Mr. Simmons, and Defendant Leissner as Members, Managers or Investment Board members of Nu Horizons concerning (i) transactions to which Nu Horizons was a party and (ii) Ms. Lee, Mr. Simmons, and Defendant Leissner's status as members, Managers or Investment Board members of Nu Horizons, or changes to that status, including resignation, withdrawal or acquisition of such position, Mr. Simmons will withdraw his request for those documents.

### 3.      Documents concerning possession of the Celsius Shares

The final disputed specific documents that the government and Ms. Lee refuse to produce to Mr. Simmons are documents concerning the possession of shares of Celsius stock by Nu Horizons and Ms. Lee.  These are likely to be a small number of documents concerning how Nu Horizons came to transfer the Celsius Shares and other shares of Celsius Stock to Ms. Lee's brokerage account and representations that were made to Celsius and to Ms. Lee's broker concerning who owned the shares and how they owned the shares.  Such documents are likely to be relevant to the truth of the position taken by the government and Ms. Lee that Keyway Pride acquired Mr. Simmons's interest in Nu Horizons through the STA and did not lose it in the MITA. For example, if Ms. Lee said that the shares were *not* owned by Nu Horizons or that Keyway Pride did *not* have an indirect ownership interest in the Celsius Shares, this would be facially inconsistent with the position that Ms. Lee and the government now take, and Mr. Simmons should be permitted to explore such assertions when deposing Ms. Lee.  Ms. Lee refuses to produce the following

---

[18]      *See* United States of America's First Set of Interrogatories to Claimant Russell Simmons, Derivatively on Behalf of Nu Horizons Investment Group, dated February 29, 2024 (attached hereto as Simmons Ex. 4), Interrogatories Nos. 3(f), 12, 14(b) & related requests for production.


PRYOR CASHMAN LLP

The Honorable James R. Cho
September 3, 2024
Page 14

specific documents in response to Mr. Simmons's narrowly targeted follow-up requests and the Court should compel her to produce these documents:

> 11.    Documents concerning how Nu Horizons, and later, Ms. Lee came to possess shares of Celsius stock.[19]

### 4.    Text messages

Finally, Mr. Simmons has requested text messages responsive to any of the Requests within Ms. Lee's possession, custody or control, and Ms. Lee has refused to produce them.[20]   The only text messages Ms. Lee has produced appear to be messages sent or received by Defendant Leissner, not her.  Mr. Simmons is entitled to text messages that contain responsive content, excluding those between her and Defendant Leissner (unless third parties are also party to those messages).

The government has produced certain text messages, but the government produced these as standalone messages without additional messages necessary to understand their context.  The government indicates below that it will search to determine whether it can produce the messages necessary to understand the context of the messages it has already produced.  (*See infra* at 45.)  To the extent the government is able to produce these additional messages, Mr. Simmons will withdraw his request for them, but if the government cannot or will not, Mr. Simmons requests *all* messages from sent by the participants in the previously produced texts.[21]

### C.    Ms. Lee Must Attend her Deposition in New York

Counsel for Ms. Lee has steadfastly refused to agree to attend her deposition in New York, or, despite repeated requests, even to provide dates that Ms. Lee is available for deposition.  As a result of Ms. Lee's counsel's intransigence, Mr. Simmons has noticed her deposition at his counsel's offices in New York for September 6, 2024.[22]   As basis for refusing to attend the

---

[19]    *See* Simmons Ex. 12 (August 12 Simmons letter to Lee, requesting documents).  In the August 12 Simmons letter to Lee, Mr. Simmons indicated that he would move to compel production of the documents sought if he did not receive a response by August 14, and Ms. Lee has not responded.  These documents are responsive to RFP Nos. 13-15.

[20]    *See* Simmons Ex. 12 (August 12 Simmons letter to Lee, requesting documents).  In the August 12 Simmons letter to Lee, Mr. Simmons indicated that he would move to compel production of the documents sought if he did not receive a response by August 14, and Ms. Lee has not responded.

[22]    Ms. Lee criticizes Mr. Simmons for "unilaterally" noticing Ms. Lee's deposition.  As a preliminary matter, depositions are not noticed by committee, so this accusation makes little sense.  To the extent Ms. Lee is actually faulting Mr. Simmons for not noticing the deposition at a date agreeable to her, that fault lies with her counsel's refusal to provide any.



The Honorable James R. Cho
September 3, 2024
Page 15

deposition in New York, or even to provide any dates that Ms. Lee is available, counsel for Ms. Lee has contended that there is a presumption that non-residents, who are not the plaintiff, will be deposed where they reside. "Underlying this rule appears to be the concept that it is the plaintiffs who bring the lawsuit and who exercise the first choice as to the forum. The defendants, on the other hand, are not before the court by choice." *Mill-Run Tours, Inc. v. Khashoggi*, 124 F.R.D. 547, 550 (S.D.N.Y. 1989) (quoting *Farquhar v. Shelden*, 116 F.R.D. 70, 72 (E.D. Mich. 1987). As with Ms. Lee, however, Mr. Simmons had no ability to file his petition in any other forum. "Where this factual premise is attenuated, the presumption is weakest. This is such a case." *Id*. Moreover, that presumption "can be overcome by a showing that factors of cost, convenience, and litigation efficiency militate in favor of holding the deposition somewhere other than the district of the deponent's residence or place of business." *Id*. All three of these factors weigh heavily in favor of compelling Ms. Lee to attend her deposition in New York.

**Cost**. As between Mr. Simmons and Ms. Lee, the costs for the deponent and their counsel to travel to New York or California is likely to be at least roughly equivalent. That said, Mr. Simmons, who resides in Bali, has already agreed to be deposed in New York, a far greater cost than it would be for Ms. Lee to travel to New York. Moreover, Ms. Lee's counsel will already be traveling to New York for other depositions, which reduces the cost to Ms. Lee of her deposition taking place in New York. Mr. Simmons also assumes that the government and counsel for at least some other parties will also attend Ms. Lee's deposition,[23] and the overall cost to all parties and counsel to be borne for a deposition in California are consequently significantly greater than they would be for a deposition in New York.

**Convenience**. Even if the Court "must consider the extent to which each witness' affairs would be disrupted if that individual were required to travel to attend a deposition," Ms. Lee has failed to provide any evidence "demonstrating in any detail how [her] businesses or other interests might be harmed if [she] were to take the time to come to New York for deposition." *Mill-Run Tours*, 124 F.R.D. at 551. Moreover, "[a]lthough less important than any hardship on the parties, the convenience of counsel should be taken into account. . . . In this case, the interests of counsel would best be served by holding the depositions in New York, since the attorneys [for all other parties] practice here." *Id*. The convenience for Ms. Lee to attend her deposition in California is drastically outweighed by the inconvenience to counsel for not only Mr. Simmons, but also the government and any other parties who wish to attend, to travel to California.

**Litigation efficiency**. This factor alone warrants compelling Ms. Lee to attend her deposition in New York. The majority of the witnesses and their counsel reside in New York, and requiring them to travel to California for one deposition would be inefficient. Additionally, counsel for Ms. Lee need only attend with their witness in tow. If the government and counsel for

---

[23]     The June 20, 2024 deposition of David Young was attended by three attorneys from the government and a member of the Federal Bureau of Investigation, as well an attorney for Petitioner Roger Ng.



The Honorable James R. Cho
September 3, 2024
Page 16

Mr. Simmons or other parties must travel to California, however, "'voluminous' documents would need to be transported from New York for the deposition to go forward" and the "litigation efficiency factor therefore weighs in favor of holding the deposition in" New York. *E&T Skyline Constr., LLC v. Talisman Cas. Ins. Co.*, at *2 (S.D.N.Y. Jan. 28, 2020).

\*     \*     \*

During the meet-and-confer on August 30, 2024, the parties agreed that they would jointly request an extension of the deadline for fact discovery. The parties are not currently proposing a specific extension because the Court's ruling on this discovery letter may impact the amount of time needed for fact discovery.[24] Mr. Simmons respectfully requests that the Court grant the parties leave to confer after the Court's ruling on this discovery letter and to propose to the Court a revised discovery deadline so that the parties may produce any additional documents and prepare for the depositions. [25]

### Conclusion

The Court should reject the legally unsupported and fundamentally unjust limitations on discovery for which the government and Ms. Lee advocate. Mr. Simmons is entitled to full discovery on his standing theories, and this Court should compel the government and Ms. Lee to produce documents responsive to the Mr. Simmons's discovery requests. The Court should also compel Ms. Lee to attend her deposition in New York in the interests of cost, convenience to all parties and counsel, and litigation efficiency.

---

[24]     Mr. Simmons notes in this regard that counsel for Defendant Leissner has not responded to the numerous emails and phone calls from counsel for Mr. Simmons seeking to discuss Defendant Leissner's discovery responses and the scheduling of his deposition that Mr. Simmons has noticed.

[25]     Ms. Lee accuses Mr. Simmons's counsel of making "misleading statements" regarding the dates Mr. Simmons is available for deposition. This is inaccurate. Counsel for Mr. Simmons never represented that Mr. Simmons was available every single day between Labor Day and September 17, 2024, and instead has suggested since July 18, 2024 (Ex. L2) that all depositions should take place in that timespan. (*See also* Simmons Ex. 10 (August 1 Simmons letter to Lee).) At the time, Mr. Simmons was generally available during that period, and intended to accommodate a schedule during that time period that would be convenient for all parties, but by August 13, 2024, at which point the deposition scheduling could no longer be delayed by the unproductive back-and-forth, Mr. Simmons was no longer available other than the week of September 9, 2024. (Ex. L3.) In any event, counsel for Ms. Lee has never attempted to determinate a date for Mr. Simmons's deposition (nor has the government recently done so), and so this outrage rings hollow.



The Honorable James R. Cho
September 3, 2024
Page 17

<u>**Ms. Lee's Position**</u>

This letter motion is the third time that Mr. Simmons has improperly attempted to expand the scope of discovery, which is currently limited to the narrow issue of whether Mr. Simmons has derivative standing to assert a claim on behalf of Nu Horizons Investment Group LLC ("Nu Horizons").  As it has done twice before, the Court should again *deny* Mr. Simmons's attempt to go beyond the limits of derivative standing and, this time, the Court should do so *with prejudice*.

**I.      Introduction**

On February 9, 2024, Judge Brodie ordered expedited discovery over a 30-day period, which was explicitly limited to the "status of [Mr. Simmons's] membership interest in" Nu Horizons, "as of [May 5, 2023,] the date of the filing of [Mr. Simmons's] Petition."  (Dkt. 32 at 10.)  The Court permitted this narrow discovery to determine Mr. Simmons's standing "to bring a derivative claim on behalf of Nu Horizons."  (*Id.*)

Nu Horizons is a Delaware limited liability company ("LLC"), and under Delaware law, derivative standing to bring a claim on behalf of an LLC is restricted to "members" and "assignees" of a membership interest.  6 Del. C. § 18-1002.  Instead of adhering to those limits, Mr. Simmons sought to expand the scope of discovery twice before, and this Court denied both attempts.  (*See* Apr. 30, 2024 Minute Entry; May 20, 2024 Minute Entry.)  Having dragged out what was supposed to be a 30-day discovery period into nearly seven months, Mr. Simmons is back for a third time, largely rehashing the same discovery disputes and again asking to exceed the scope of discovery set by this Court and dictated by Delaware law.

As Ms. Lee briefed in the prior discovery disputes, Mr. Simmons has flouted the narrow scope of authorized discovery by propounding overbroad document requests that probe widely into Ms. Lee's finances and seek to prove baseless theories of fraud, which are irrelevant to any legitimate theory of derivative standing and disproportionate to the needs of the case.  Contrary to Mr. Simmons's claim, he is not entitled to all discovery related to his standing *arguments*, regardless of their merit or legal basis.  The law circumscribes the proper scope of discovery to what is "relevant" and "proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  In turn, what is relevant is tied to "fact[s] . . . *of consequence* in determining the action."  Fed. R. Evid. 401(b) (emphasis added).  Discovery related to Mr. Simmons's unfounded legal theories of standing and fraud are irrelevant because they have no "consequence in determining the action." *Id.*; *see also Navel Orange Admin. Comm. v. Exter Orange Co., Inc.*, 722 F.2d 449, 454 (9th Cir. 1983) ("[I]f the affirmative defenses are not cognizable in an enforcement proceeding, discovery relating to those defenses is irrelevant and immaterial.").[26]  And, of course, discovery that is not

---

[26]      Mr. Simmons incorrectly argues that limiting discovery to cognizable legal claims effectively grants summary judgment against him.  Of course, that is not true.  Mr. Simmons has pursued and obtained discovery regarding his legitimate theories of standing.  Precluding



The Honorable James R. Cho
September 3, 2024
Page 18

relevant to any legitimate theory of derivative standing is not "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).

A clear sign that Mr. Simmons is delving far beyond facts "of consequence" is that he again completely fails to tie his discovery requests to Delaware law, which dictates the requirements for derivative standing. As Ms. Lee has repeatedly briefed, Mr. Simmons cannot meet these requirements because he sold his entire interest in Nu Horizons to Ms. Lee's investment company, Keyway Pride Limited LLC ("Keyway Pride") on May 25, 2018 in a Stock Transfer Agreement ("STA"). (*See, e.g.*, Dkt. 5-1, ¶ 51.) The only cognizable theory of standing advanced by Mr. Simmons is that the STA was supposedly undone by another transaction in December 2018, the Membership Interest Transfer Agreement ("MITA") (Dkt. 5-22). While this theory also fails for the reasons previously briefed—including that as a legal matter, the MITA couldn't unwind the STA, and as a factual matter, the MITA didn't actually transfer any interest back to Mr. Simmons—in accordance with the narrow, expedited discovery ordered by the Court, Ms. Lee has searched and reviewed a database of more than 171,000 documents, and has produced 2,250 pages of documents relevant to the issue of Mr. Simmons's derivative standing.

Nonetheless, instead of pursuing discovery limited to the disputed 2018 transactions, Mr. Simmons (again) demands production of eleven broad categories of documents. Some of these categories do not correspond to any propounded request for documents, and most of them relate *not* to Mr. Simmons's status as a member or assignee of Nu Horizons, but to his various, wholly speculative theories of fraud. Indeed, the primary documents Mr. Simmons seeks—Ms. Lee's and Keyway Pride's tax returns—are protected from production by a heightened standard that Mr. Simmons does not mention, let alone try to meet. *See Sadofsky v. Fiesta Prod., LLC*, 252 F.R.D. 143, 149 (E.D.N.Y. 2008) (For tax returns, either corporate or personal, to be produced, "the requesting party must satisfy a two-prong test: (1) the tax returns must be relevant to the subject matter of the action, and (2) a compelling need must exist because the information is not readily obtainable from a less intrusive source."). The Court should not allow Mr. Simmons to go on this fishing expedition into his ex-wife's assets—the documents he seeks have nothing to do with derivative standing and, therefore, are likely being sought for an improper purpose.

Likewise, the Court should deny Mr. Simmons's attempt to force Ms. Lee to be deposed in New York, nearly 3,000 miles from her home in Los Angeles. While it would be more convenient for Mr. Simmons's legal team to conduct the deposition in New York, it would not be more convenient for Ms. Lee or her counsel, and there are no "special circumstances" to overcome the presumption that a non-resident defendant or claimant should be deposed where they live.

---

discovery regarding other theories his counsel has made up and that have no basis in Delaware law is simply enforcing the boundaries of Rule 26; it has nothing to do with granting or denying summary judgment.



The Honorable James R. Cho
September 3, 2024
Page 19

*United States Sec. & Exch. Comm'n v. Collector's Coffee Inc.*, No. 19CIV4355LGSGWG, 2020
WL 4034733, at *2 (S.D.N.Y. July 17, 2020) ("*Collector's Coffee*").

This is Mr. Simmons's third attempt to expand the limited discovery allowed by the Court. Unless the Court denies Mr. Simmons's motion *with prejudice*, he will clearly continue seeking irrelevant and invasive discovery, including during the upcoming depositions, and the parties will surely be back before this Court in short order to relitigate the proper scope of discovery.

## II.      Factual and Procedural Background

In 2011, Mr. Simmons formed Nu Horizons, becoming its sole member and manager. On January 1, 2016, Mr. Simmons and Mr. Leissner, on behalf of Cuscaden Capital Limited ("Cuscaden"), executed Nu Horizons' Operating Agreement, whereby Cuscaden became a member of Nu Horizons, Mr. Leissner became a manager, and Ms. Lee became a member of Nu Horizons' investment board. (Dkt. 5-15 at 1, § 8.9.) As of January 1, 2017, Ms. Lee's investment vehicle, Keyway Pride, owned the shares of Nu Horizons that Cuscaden previously owned.

Nu Horizons invested in Celsius Holdings, Inc. ("Celsius") and by early 2017 held 3,972,659 shares of Celsius stock.

In late 2017, more than a dozen women publicly accused Mr. Simmons of rape and sexual misconduct. *See, e.g.*, Elias Leight, *Russell Simmons Sexual Assault Allegations: A Timeline*, Rolling Stone, Feb. 9, 2018, https://www.rollingstone.com/music/music-news/russell-simmons-sexual-assault-allegations-a-timeline-202515/. In response to these allegations, Mr. Simmons announced his divestment from his businesses and charities to not distract or detract from their operations. *Id.* These efforts included Mr. Simmons's unconditional resignation as manager of Nu Horizons on January 22, 2018 (Dkt. 5-15), which left Mr. Leissner as its sole manager.

As part of his divestment efforts, Mr. Simmons also entered into a letter agreement (the "Letter Agreement") with Keyway Pride on April 26, 2018, for Mr. Simmons to transfer his entire ownership interest in Nu Horizons to Keyway Pride. (Dkt. 5-18.) Mr. Simmons, Keyway Pride, Nu Horizons, and Rush Digital Media, LLC then executed a formal Stock Transfer Agreement (the "STA") on May 25, 2018, transferring Mr. Simmons's "entire" membership interest in Nu Horizons to Keyway Pride. (Dkt. 5-20.) The STA contained the following clause: "No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement." (*Id.* §10(c).) The STA was accompanied by an Assignment, whereby Mr. Simmons "hereby sells, assigns and transfers . . . his entire Ownership Percentage [ ] of Nu Horizons and does hereby irrevocably constitute and appoint the Secretary of Nu Horizons to transfer said equity interests on the books of the Company with full power of substitution in the premises." (*Id.* at 11.) The STA and accompanying Assignment (an immediate conveyance) made Keyway Pride the 100% owner



The Honorable James R. Cho
September 3, 2024
Page 20

of Nu Horizons and Ms. Lee the beneficial owner of its 3,972,659 shares of Celsius stock.  (Dkt. 3-1, ¶¶ 23–24.)

On June 7, 2018, *United States of America v. Tim Leissner*, Case No. 1:18-cr-00439 (the "1MDB Matter") was filed.  In order to facilitate Mr. Leissner's bond, which was to be secured by the Celsius shares, the full ownership interest of the Celsius shares was required to be transferred.  Accordingly, on July 5, 2018, Nu Horizons (acting through its sole manager) sold all of its Celsius shares to Ms. Lee and the shares were transferred to Ms. Lee's JP Morgan brokerage account.  (Dkts. 58 & 58-1.)  The Court entered a Preliminary Order of Forfeiture on November 1, 2018.

On December 17, 2018, two additional relevant agreements were executed:  (1) the MITA, relating to the membership interests in an entity called Erok Ventures, LLC ("Erok"); and (2) a separate transfer agreement between Nu Horizons and Erok.  (Dkt. 5-22.)  The MITA was not signed by the parties to the STA, and it was not accompanied by any conveyance of Keyway Pride's membership interest in Nu Horizons.  (*Compare* Dkt. 5-20 at 11 *with* Dkt. 5-22.)  Nonetheless, the core of the dispute over Mr. Simmons's derivative standing is whether the MITA rendered the STA void *ab initio* and somehow conveyed Keyway Pride's membership interest in Nu Horizons back to Mr. Simmons.

On May 18, 2021, Mr. Simmons filed a lawsuit in Los Angeles Superior Court, individually and derivatively on behalf of Nu Horizons.  *See Simmons v. Leissner, et al.*, LASC Case No. 21STCV18852 (the "California Case").  Therein, Mr. Simmons challenges the transfer of his interest in Nu Horizons to Keyway Pride and the transfer of the Celsius shares from Nu Horizons to Ms. Lee in connection with Mr. Leissner's bond proceeding.

On March 3, 2023, this Court entered the Amended Preliminary Order of Forfeiture, which ordered the forfeiture of "3,325,942 shares of stock in Celsius Holdings, Inc. held in [the] J.P. Morgan Chase Bank brokerage account . . . in the name of Kimora Lee Simmons."  (Dkt. 1 at 2.)  Ms. Lee filed her Petition for the return of the approximately 892,000 Celsius shares that she purchased with her separate funds on May 5, 2023.  Mr. Simmons filed his Petition later that same day.  (Dkts. 3, 5.)  Mr. Simmons asserted claims to an interest in all of the Celsius shares, both individually and derivatively on behalf of Nu Horizons.  The Court dismissed Mr. Simmons's individual claims and ordered limited discovery on his derivative standing on February 9, 2024.  (Dkt. 32 at 10 (ordering "expedited discovery over a period of thirty (30) days limited to the question of the status of [Mr. Simmons's] membership interest in Nu Horizons as of the date of the filing of the Petition").)

On February 16, 2024, Mr. Simmons propounded requests for production ("RFPs") on Ms. Lee.  On March 7, 2024, Ms. Lee objected to each document request, primarily on the ground that the RFPs were not limited to the issue of Mr. Simmons's derivative standing and exceeded the narrow scope of the Court's February 9, 2024 Order.  (Ex. L6.)  On March 1, 2024, Mr. Simmons



The Honorable James R. Cho
September 3, 2024
Page 21

first sought to take Ms. Lee's deposition in New York.  Ms. Lee objected on March 7, 2024 (Ex. L1), and has steadfastly maintained that as a California resident, she must be deposed (if at all) in California (*see, e.g.*, Simmons Ex. 11; Exs. L2, L3).

The parties' dispute over the scope of discovery allowed by the February 9, 2024 Order was first presented to the Court by a joint letter motion on April 24, 2024.  (Dkt. 42.)  At the April 30, 2024 hearing on the first letter motion, the Court adopted the position of the government and Ms. Lee as to the proper scope of discovery, which was set forth in the parties' joint letter.  (*See* Apr. 30, 2024 Minute Entry).  In accordance with that order, Ms. Lee produced documents in response to the following RFPs:

- RFP 4 – but only to the extent it covers (a) *control* of Keyway Pride, (b) at the time of the May 25, 2018 Stock Transfer Agreement.  That is the moment Mr. Simmons challenges Keyway Pride's authority to purchase his interest in Nu Horizons and the only point in time that control of the company is relevant.  And, as discussed above, ownership of a manager-managed LLC is also irrelevant.

- RFP 7 – which asks for "All documents concerning the LOI dated April 26, 2018."

- RFP 8 – but without subparts (a)-(c), so that it encompasses only "All documents concerning the Stock Transfer Agreement executed on or about May 25, 2018, including the assignment attached thereto as Exhibit A."

- RFP 10 – which asks for "All documents concerning the MITA entered into in or about December 2018."

- RFP 11 – but only to the extent it asks for documents *sufficient to show* direct ownership of Nu Horizons between 2018 and the present, which is all that is relevant for the issue of Mr. Simmons's standing.

(Dkt. 42 at 39.)  In other words, Ms. Lee produced (1) the relevant agreements and documents concerning those agreements; (2) documents showing Keyway Pride's authority to enter into those agreements; and (3) documents sufficient to show Keyway Pride's direct ownership of Nu Horizons as a result of those agreements.

Mr. Simmons renewed his motion to compel on May 9, 2024 (Dkt. 49), and Ms. Lee again explained that the broad categories of documents he seeks "have no bearing on whether he has standing to bring a derivative claim on behalf of [Nu Horizons]" (Dkt. 54).  The Court, again, rejected Mr. Simmons's attempt to expand the scope of discovery.  (May 20, 2024 Minute Entry.)



The Honorable James R. Cho
September 3, 2024
Page 22

This letter motion is thus the third time Mr. Simmons has sought to expand the limited scope of discovery, once again, ignoring the principles of Delaware law that control whether or not he might have derivative standing (which he does not have).

### III.      Delaware Law Controls and Mr. Simmons Ignores It

Nu Horizons is a Delaware LLC, and Delaware law controls the requirements for how Mr. Simmons must prove his derivative standing. *See RCM Sec. Fund, Inc. v. Stanton*, 928 F.2d 1318, 1326 (2d Cir. 1991) (the state of incorporation controls the substantive requirements for derivative standing); *Locs. 302 & 612 of Int'l Union of Operating Engineers - Emps. Const. Indus. Ret. Tr. v. Blanchard*, No. 04 CIV. 5954 (LAP), 2005 WL 2063852, at *4 (S.D.N.Y. Aug. 25, 2005) ("New York Courts must look to the law of the state of incorporation for all principles that will govern the action.").

Specifically, to have derivative standing to bring a claim on behalf of a limited liability company, "the plaintiff *must be a member or an assignee of a limited liability company interest* at the time of bringing the action and . . . at the time of the transaction of which the plaintiff complains." 6 Del. C. § 18-1002 (emphasis added). "The plain language of 6 Del. C. § 18–1002 is unambiguous and limits derivative standing in LLCs exclusively to 'member[s]' or 'assignee[s].'" *CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011), as corrected (Sept. 6, 2011). And the statute reflects the requirements of both contemporaneous and continuous ownership in the company. *See also* 8 Del. C. § 327 (requiring contemporaneous ownership of a corporation); *Conrad v. Blank*, 940 A.2d 28, 41 (Del. Ch. 2007) ("The stockholder must also continue to hold stock throughout the litigation."). "A plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit." *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. Sup. Ct. 1984).[27]

As Ms. Lee has repeatedly briefed to this Court—and which Mr. Simmons has never been able to refute—Delaware courts recognize only a very narrow fraud exception to the continuous ownership rule in the context of Delaware corporations where a shareholder maintains derivative standing after a merger so long as "the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of their standing to bring or maintain a derivative

---

[27]      Similarly, Nu Horizon's Operating Agreement limits the rights of purported transferees and dictates that under Mr. Simmons's theories, he would not be a "member" or "assignee" permitted to bring a derivative claim on behalf of the company: "[I]f the Transfer of a Member's interest in the Company is required by the operation of law, the transferee shall receive only the economic rights associated with that interest and *shall not be admitted to the Company as a Member nor have any rights to participate in the affairs of the Company as a Member* without the written consent of the Managers and the Investment Board." (Dkt. 5-15 at 10, § 9.2 (emphasis added).)



The Honorable James R. Cho
September 3, 2024
Page 23

action." *Ark. Teacher Ret. Sys. v. Countrywide Fin. Corp.*, 75 A.3d 888, 894 (Del. Sup. Ct. 2013). However, this narrow exception "applies only in the limited circumstance" where an allegedly fraudulent transaction itself was "perpetrated merely to deprive shareholders of their standing to bring the derivative action. . . ." *Id.* at 897 (quoting *Lambrecht v. O'Neal*, 3 A.3d 277, 284, n.20 (Del. Sup. Ct. 2010)); *see also Bamford v. Penfold*, L.P., No. CV 2019-0005-JTL, 2020 WL 967942, at *29 (Del. Ch. Feb. 28, 2020) ("The exception applies when 'a principal purpose' of the transaction is the elimination of standing to assert derivative claims." (quoting *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 763 (Del. Ch. 1986).)

When Judge Brodie ordered limited discovery regarding Mr. Simmons's derivative standing, she emphasized that Delaware's continuous ownership requirement might be an insurmountable hurdle to his derivative claims. (*See* Dkt. 32 at 9–10 ("[A] plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit (quoting *In re Merrill Lynch & Co., Inc., Securities, Derivative, & ERISA Litig.*, 597 F. Supp. 2d 427, 429 (S.D.N.Y. 2009).)

For the first time in seven months, Mr. Simmons's briefing (provided only after the parties' meet and confer call) at least acknowledges Delaware's derivative standing requirements. However, his blanket assertion that he "does not need an exception to the continuous ownership rule under Delaware law" does not make it true. In the same breath, Mr. Simmons **concedes** that his standing hinges on (1) "the MITA render[ing] the STA void *ab initio*" and (2) "the STA [being] procured by fraud, which," he contends, "renders it void under California law." First, whether the MITA rendered the STA void *ab initio*—which it did not—is a question of law, and the parties have produced thousands of pages about those transactions. As to Mr. Simmons's second point, even if the STA was "procured by fraud," *which it was not*, that cannot confer standing under Delaware law. Initially, Mr. Simmons's statement about California law is wrong—a contract procured by fraud is "voidable," not void. *See Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 415 (1996); *id.* at 432 ("a claim that a contract . . . is unenforceable because of fraud in the inducement . . . would make the contract voidable but not void") (Kennard, J., concurring). In any event, *Arkansas Teacher* requires a fraudulent transaction to have occurred *in order to* deprive shareholders of their standing. Mr. Simmons did not allege this point in his Petition. Nor has he argued as much in his stream of motions.

To the contrary, Mr. Simmons has conceded that he does *not* contend that the narrow fraud exception from *Arkansas Teacher* applies in this case. (*See, e.g.*, Apr. 30, 2024 Tr. 8:14–21; *id.* at 61–62:4). Instead, he has argued that the exception has been limited to the context of mergers. That is also wrong. Although "the fraud exception has been discussed in the context of mergers . . . the broader principle is *not limited* to that species of transaction." *Bamford*, 2020 WL 967942, at *29 (Del. Ch. Feb. 28, 2020) (emphasis added). Indeed, Delaware courts have cautioned that the fraud exception to derivative standing "is a narrow exception that should be cautiously applied even when the affected plaintiffs act with diligence." *Parfi Holding AB v. Mirror Image Internet, Inc.*,



954 A.2d 911, 936 (Del. Ch. 2008).  And, as Ms. Lee previously set out (Dkts. 42 at 41, 54 at 4), a trial court in Connecticut recently adhered to the narrow parameters of the fraud exception in a similar, non-merger context.  *See Zhao v. Dean*, No. FST-X08-CV-19-6042813-S, 2024 WL 686901, at *6 (Conn. Super. Ct. Feb. 16, 2024) ("The fraud exception applies 'when a plaintiff loses standing based on a [transaction] [that] itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of their standing to bring or maintain a derivative action.'" (quoting *Bamford*, 2020 WL 967942, at *29).)

Mr. Simmons's prior and current concessions that he does *not* contend the fraud exception to derivative standing applies is reason to deny this motion.  His attempts to pursue discovery based on his various (incorrect) fraud theories are not relevant to derivative standing and are not proportional to the needs of the case.  Mr. Simmons has deliberately ignored Delaware's "unambiguous" standing requirements for the simple reason that he cannot satisfy them.  *CML V, LLC v. Bax*, 28 A.3d at 1041.  Instead, for the third time, Mr. Simmons again asks the Court to entertain his fanciful fraud theories,[28] and the Court should (again) deny Mr. Simmons's expansive requests.  *See Solarex Corp. v. Arco Solar, Inc.*, 121 F.R.D. 163, 179 (E.D.N.Y. 1988) ("[i]t is, of course, within the court's discretion to deny discovery related to a patently insubstantial claim") (quotations and citations omitted).

As detailed below, Mr. Simmons's requests are unrelated to his status as a member or assignee of Nu Horizons and designed to impose undue burdens on Ms. Lee, when the parties' *only* directive in this discovery period is to determine *Mr. Simmons's* derivative standing.

## IV.   Mr. Simmons's Requests Are Irrelevant and Disproportionate to the Narrow Issue of His Derivative Standing at the Time He Filed His Petition

Mr. Simmons has only one theory that could possibly support his derivative standing—that the MITA unwound the STA—and that theory requires minimal discovery.  (*See* Dkt. 42 at 36–37.)  Whether the STA was unwound hinges on the agreements themselves.  Both agreements contain integration clauses, so at the very most, discovery could extend to the circumstances of those transactions, and that discovery has already occurred.  (*See* Dkt. 5-20 § 10 (c); Dkt. 5-22 § 7.8.)

---

[28]     The government's position in the parties' April 24, 2024 Joint Letter, which the Court adopted and should continue to enforce, summarizes the issue concisely:  Mr. Simmons's "requests purport to seek evidence to support Simmons' wholly speculative claim that Leissner and Lee were engaged in some sort of criminal conspiracy to defraud Simmons and that the existence of such a conspiracy renders unenforceable the Stock Transfer Agreement by which Simmons agreed to convey away any interest in Nu Horizons.  Such a tenuous foundation cannot support the discovery requests Simmons has propounded, which are disproportionate to the narrow scope of the District Court's discovery order [and] have little bearing on the specific issue being litigated.  Moreover, the requests go beyond even that speculative theory."  (Dkt. 42 at 22.)



The Honorable James R. Cho
September 3, 2024
Page 25

Mr. Simmons once again asks the Court to change its prior rulings, but his requests go beyond those relevant to his membership interest in Nu Horizons, improperly veer into the fraud theories he has alleged in the California Case, and should not be allowed.  As has been ordered multiple times, Mr. Simmons may not litigate his fraud theories as part of an expedited proceeding regarding his derivative standing.  Indeed, those fraud theories cannot support derivative standing. And Mr. Simmons is not a plaintiff—and the parties he accuses of fraud are not defendants—in this ancillary proceeding.  (*See* Apr. 30, 2024 Tr. 28:7–10 (The Court noted that "if there's discovery to be had on that issue, likely it would happen in the California proceeding as well.").) In fact, there is **no claim at all against Ms. Lee or Keyway Pride** (who is not even a party to this proceeding), and Mr. Simmons cannot use this limited discovery period as a free pass to anticipatorily seek discovery unrelated to whether he has derivative standing under Delaware law.

Accordingly, Ms. Lee responds as follows to Mr. Simmons's eleven sweeping categories of current demands, which are barely tethered to his actual document requests.

> A.    Broad Discovery Regarding Prior Statements About Who Owned Nu
>       Horizons Is Irrelevant and Disproportionate

The only relevant inquiry is whether *Mr. Simmons* actually had a membership interest in Nu Horizons when he filed his Petition in May 2023.  Accordingly, Ms. Lee has already produced hundreds of documents showing her relevant interest in Nu Horizons, Keyway Pride, and the Celsius shares.    (*See, e.g.*, KLSL0000000283; KLSL0000000307; KLSL0000002249; KLSL0000002250.)  The remaining documents sought by Mr. Simmons are irrelevant, disproportionate to the needs of his derivative standing claim, and beyond the permissible limits of discovery.

> *1.   Ms. Lee's tax filings for the tax year 2018 to the present.*
> *2.   Keyway Pride's tax filing for the tax year 2018 to the present.*

Mr. Simmons has already produced Nu Horizons' tax returns and the K-1s it issued to its members, including to Keyway Pride.  To the extent tax returns have information relevant to Mr. Simmons's derivative standing, the information is in the documents issued by Nu Horizons that have been produced, not in the returns of Ms. Lee or Keyway Pride.  While Mr. Simmons complains that he "is not being given access to the exact same categories of documents for other people making competing assertions of a direct or indirect ownership in Nu Horizons," that complaint fundamentally misunderstands the limited purpose of discovery, which was permitted only to explore *Mr. Simmons's* claim of derivative standing.  This is not a lawsuit between Mr. Simmons and Ms. Lee involving reciprocal discovery (that is taking place in California).  No discovery has been ordered with respect to Ms. Lee's standing, and Mr. Simmons's efforts to force Ms. Lee to prove her own interest in Keyway Pride and Keyway Pride's interest in Nu Horizons



The Honorable James R. Cho
September 3, 2024
Page 26

should be rejected. The Nu Horizons' tax returns and K-1s produced by Mr. Simmons are the only tax filings concerning *his* purported membership interest (and they reflect Keyway Pride's ownership), and thus, they are the only relevant tax filings.

In any event, tax returns are a unique species of document that are afforded special protection from discovery. Mr. Simmons does not mention, let alone attempt to meet, the heightened standard. To compel the production of any other tax documents, he must demonstrate that (1) those other tax returns are "relevant," and (2) he has a "compelling need" for them. *See Sadofsky*, 252 F.R.D. at 149. As indicated above, Mr. Simmons cannot show that Ms. Lee's and Keyway Pride's tax returns are relevant under the first prong. Self-evidently, those returns do *not* contain any information regarding *Mr. Simmons's* membership interest in Nu Horizons. Similarly, Ms. Lee has *not* claimed a direct interest in Nu Horizons, so that also will not be reflected in any return. And Keyway Pride's returns will show income (which is distinct from ownership interest), which is simply information derived from the K-1s issued to Keyway Pride that have already been produced, not anything about Mr. Simmons.[29] More importantly, what Ms. Lee's and Keyway Pride's tax filings do show are all of their *other* income and assets unrelated to Nu Horizons and the Celsius shares, which Mr. Simmons should not be permitted to dig into as they bear no relevance on whether he has derivative standing.

Mr. Simmons also fails to establish a "compelling need" for Ms. Lee's or Keyway Pride's tax returns under the second prong of the test. To the extent Mr. Simmons argues that his membership interest hinges on Keyway Pride's membership interest in Nu Horizons, that is something that might be shown by other financial documents, including the tax returns for Nu Horizons and K-1s issued to Keyway Pride, which Mr. Simmons has already produced (*e.g.*, RS-ANC-00001951), and other documents the parties have produced. *See Grant v. Her Imports NY, LLC*, No. 15CV5100DLILB, 2017 WL 9938287, at *4 (E.D.N.Y. Mar. 20, 2017) ("compelling need does not exist where the requesting party is in possession of financial documents from which the information sought may be obtained readily, even where the requesting party may need to compile numerous records in its possession to ascertain the information sought from the tax returns") (internal quotations omitted). Thus, to the extent Mr. Simmons seeks tax returns sufficient to show Keyway Pride's interest in the income of Nu Horizons, those very documents (and others) have been produced and there is no compelling need for additional documents.

---

[29]     Mr. Simmons now claims he will withdraw his requests for tax returns if Ms. Lee represents that they "do not reflect that Ms. Lee or Keyway Pride held direct or indirect ownership of Mr. Simmons' interest in Nu Horizons or the portion of the Celsius shares attributable to Mr. Simmons's interest in Nu Horizons after the MITA," Of course, that is not what Ms. Lee is saying. The tax returns show income (profit/loss) attributable to an interest in an LLC, as reflected by the K-1s issued by the company. Mr. Simmons has no compelling need for the returns when the K-1s issued by Nu Horizons (at his direction) have already been produced (by him).



The Honorable James R. Cho
September 3, 2024
Page 27

> 3. *Documents summarizing the assets owned, directly or indirectly by Ms. Lee (e.g., summaries of assets in a loan application).*
> 6. *Unredacted copies of the organization charts and asset portfolio summaries previously produced by Ms. Lee in redacted form.*

Ms. Lee has already produced responsive documents regarding the ownership of Nu Horizons by Keyway Pride, and the control of Keyway Pride by Ms. Lee, including the Letter Agreement—which was executed by Mr. Simmons—that expressly describes Keyway Pride as an entity "controlled by" Ms. Lee.  (*See* KLSL0000001872.)  In addition, Ms. Lee has produced, among other things, a redacted ownership chart for Ms. Lee's ventures and redacted asset portfolio summaries demonstrating ownership of Keyway Pride and the Celsius shares. (KLSL0000000208, KLSL0000000219, and KLSL0000000220).  These documents were redacted because, as stated above, Ms. Lee has many other assets unrelated to Nu Horizons and Celsius, which have no bearing on Mr. Simmons's derivative standing.

Mr. Simmons's request for *unredacted* copies of organization charts and asset portfolio summaries is not supported by his proffered reasoning and is simply a roundabout way for him to request information about his irrelevant fraud theories.  Indeed, Mr. Simmons argues that the unredacted documents will show whether "Ms. Lee owned Nu Horizons, or assets of Nu Horizons, and through which entities she owned them."  But that is in the *unredacted* portions of the documents.  Thus, to the extent that statements about who owned *Nu Horizons* during the disputed time period are all he is looking for, as Mr. Simmons argues, he already has that information in the produced documents.  Indeed, following a meet-and-confer call on August 30, 2024, Ms. Lee's counsel reviewed what was produced to Mr. Simmons, and confirmed that the redactions applied to other assets unrelated to Nu Horizons, Keyway Pride, and the Celsius shares.  There is no legitimate reason to allow Mr. Simmons to generally probe into *all* of his ex-wife's assets.

> 4. *Communications between Ms. Lee, Defendant Leissner or their agents or representatives and Celsius personnel concerning Ms. Lee's direct or indirect interest in Nu Horizons and/or shares of Celsius stock.*

The parties have produced hundreds of documents regarding the actual ownership of Nu Horizons and the Celsius shares.  Those documents show that Ms. Lee currently owns the Celsius shares, and Celsius has acknowledged that ownership in public SEC filings (Dkt. 74-2.)

While Mr. Simmons now asserts that his requests also included all communications with any Celsius personnel about the ownership of Nu Horizons or the Celsius stock—*i.e.*, he contends these communications were included in broader RFPs relating to the ownership of Keyway Pride, Nu Horizons, or Celsius shares—these communications were not specifically identified in Mr. Simmons's original RFPs *or* the prior discovery disputes brought before this Court.  (*See* Simmons Ex. 2; Dkts. 42, 49.)  Accordingly, while many of these documents *have been produced* (because



The Honorable James R. Cho
September 3, 2024
Page 28

they were included in the scope of the Court's prior orders), Ms. Lee did not previously search for these specific communications.  To locate further responsive documents would require Ms. Lee to re-search a database of more than 171,000 documents.  Preliminary searches indicate that thousands of documents have @celsius.com email addresses and those documents would all need to be searched for any reference to *Ms. Lee's* indirect ownership of Nu Horizons and ultimate ownership of the Celsius stock—not *Mr. Simmons's* ownership of Nu Horizons.  This arduous task for documents that, on their face, do not address Mr. Simmons's standing would have marginal relevance, if any, would provide information duplicative of what has already been produced, and would not be proportional to the narrow issue of **Mr. Simmons's** membership status **in Nu Horizons** in 2023.

Mr. Simmons seems to acknowledge the undue burden that reviewing all documents containing @celsius.com email addresses would impose on Ms. Lee. His proposed solution, however, is for Ms. Lee to produce documents containing @celsius.com email addresses "regardless of whether they relate to Ms. Lee or Mr. Simmons's interest in Nu Horizons or Celsius shares."  This proposal self-evidently goes far beyond the scope of limited discovery ordered by Judge Brodie, which has nothing to do with the ownership of the Celsius shares and is instead focused entirely on Mr. Simmons's membership interest in Nu Horizons at the time he filed his Petition. (*See* Dkt. 32 at 10.)

> 5. *Communications between Ms. Lee, Defendant Leissner or their agents or representatives and Ms. Lee's financial advisors, accountants and tax preparers concerning Ms. Lee's interest in Nu Horizons and/or shares of Celsius stock.*

As an initial matter, Mr. Simmons failed to meet and confer with Ms. Lee about this specific request prior to moving to compel.  (*Compare* Simmons Ex. 13 (August 12 letter to the government discussing these documents) *with* Simmons Ex. 12 (August 12 letter to Ms. Lee omitting any mention of these documents).)  In addition to this procedural defect, there are several reasons, based on the merits, that the Court should deny Mr. Simmons' broad request for communications with Ms. Lee's advisors concerning her interest in Nu Horizons and/or shares of Celsius stock.

First, this request is untethered to Mr. Simmons's actual RFPs.  Despite their breadth, RFPs 4, 5, and 11 did not specifically request communications between Ms. Lee and her advisors about her interest in Nu Horizons or Celsius shares.  *See* Simmons Ex. 2 at 8 (RFP No. 4, including an enumerated list of documents concerning Keyway Pride's ownership or control, but omitting "communications" and any reference to Ms. Lee's ownership interest); *id.* at 9 (RFP No. 5, generally requesting documents concerning an actual or potential acquisition in 2018 of an interest in Nu Horizons or the Celsius shares by certain entities, but omitting reference to Ms. Lee or any "communications"); *id.* at 10 (RFP No. 11 including an enumerated list of documents but omitting "communications").



The Honorable James R. Cho
September 3, 2024
Page 29

Second, to the extent this request is simply an indirect way to acquire Ms. Lee's and/or Keyway Pride's tax returns (or the information therein), as described above, Mr. Simmons cannot meet the heightened standard to compel such documents because he cannot establish their relevance or a "compelling need" for their production. *See Sadofsky*, 252 F.R.D. at 149.

Third, this request seeks irrelevant information. Mr. Simmons's standing to bring a derivative claim is determined by *his actual status* as a member or assignee of Horizons when he filed his Petition on May 5, 2023. *See* 6 Del. C. § 18-1002. His standing is not determined by communications between Ms. Lee and her advisors about *Keyway Pride's interest* in Nu Horizons, and it is certainly not determined by *Ms. Lee's ownership* of the Celsius shares. (*See* Ex. L4 at 21–22.) The STA included an assignment of Mr. Simmons's interest in Nu Horizons to Keyway Pride. The relevant inquiry is regarding whether those shares were transferred back to Mr. Simmons—they were not—not regarding whether there are communications about Keyway Pride's interest in Nu Horizons or Ms. Lee's subsequent ownership of Celsius.

Finally, the Court should deny this request as yet another improper attempt by Mr. Simmons to peer into his ex-wife's finances and effectively seek discovery for use in the California Case. (*See* Apr. 30, 2024 Tr. 28:7–10.)

> *7. Documents Ms. Lee submitted to the government in support of an appearance bond for Tim Leissner that concern the Celsius Shares, Nu Horizons, or Keyway Pride.*

The Court should deny Mr. Simmons's request to compel these documents from Ms. Lee because they are not in her possession, and they have already been produced by the government in accordance with the Court's prior Order.

First, Ms. Lee does not have documents responsive to this request because she did not submit documents to the government in support of Mr. Leissner's bond. *See Sidman v. Concord Arena Parking, LLC*, No. 15-CV-7426-CBA-SJB, 2021 WL 1940255, at *3 (E.D.N.Y. May 11, 2021) ("A court cannot order a party to produce that which does not exist."). Rather, Mr. Leissner, through his counsel, submitted documents in support of his own bond.

Second, the Court already addressed this issue at the May 20, 2024 discovery hearing. It specifically ordered "*the government* [to] review the bond application at issue in Document Request 12 and consider whether it should be produced," but "decline[d] to reconsider its previous ruling on the scope of discovery." (*See* May 20, 2024 Minute Entry (emphasis added).) During that hearing, Ms. Lee's counsel specifically noted that the bond documents "should be in the government's possession," and asked for clarification on whether Ms. Lee was "part of [the] requirement [to] search" for such documents. (May 20, 2024 Tr. 29:11–13.) In response, the



The Honorable James R. Cho
September 3, 2024
Page 30

Court stated, "I'm only going to ask *the government* to try to obtain that document if it has it readily available." (*Id.* 29:14–16 (emphasis added).)

The government subsequently produced documents submitted by counsel for Mr. Leissner in support of his appearance bond, which included Ms. Lee's July 11, 2018 declaration in support of that bond (EDNY_1MDB_ANC_00007745). *See also* EDNY_1MDB_ANC_00007786 (email exchange between Mr. Leissner's counsel and the government about whether certain All Def Digital and Nu Horizons financial documents sufficed for bond), EDNY_1MDB_ANC_00008695 (Mr. Leissner's counsel forwarding the executed bond form to the government.) During the August 30, 2024 meet-and-confer call regarding this motion, the government confirmed that it has produced all responsive documents in its possession, that Ms. Lee did not directly submit any documents in connection with the bond proceeding, and that the July 2018 declaration by Ms. Lee was the only document she provided in relation to Mr. Leissner's bond. Accordingly, the Court should deny this request.

        B.      <u>Discovery Concerning the Effectiveness of the Disputed Transfers in 2018</u>
                     <u>Should Be Limited to Whether the MITA Unwound the STA</u>

Throughout this limited discovery period, Mr. Simmons has espoused a number of baseless theories regarding his standing, which he contends entitle him to seemingly limitless discovery. (*See* Dkt. 42 at 3.) None of these theories, however, have any grounding in Delaware law. Mr. Simmons has conceded that his theories do not fall into the narrow fraud exception for derivative standing articulated by *Arkansas Teacher*—*i.e.*, any purported fraud must have been "perpetrated merely to deprive shareholders of their standing to bring the derivative action," 75 A.3d at 897 (quoting *Lambrecht*, 3 A.3d at 284, n.20)—and the Court should not countenance Mr. Simmons's fishing expedition into other unfounded theories.

        8.   *Any agreement, assignment, or other legal document effectuating a transfer of interests in Midas or Keyway Pride to Newland Inc. Limited, Oryx Investment Limited, or Ghanim Saad M Al Saad al-Kuwari.*

Mr. Simmons seeks to compel documents about the ownership of Keyway Pride in 2018, because he claims that if Ms. Lee did not own Keyway Pride at the time of the STA, she could not have authorized Keyway Pride's acquisition of Mr. Simmons's membership interest.

However, Ms. Lee's continuous ownership interest in Keyway Pride is *irrelevant* to whether she could act on its behalf. As was previously briefed to the Court (Dkt. 42 at 35–36), according to Keyway Pride's Operating Agreement, it is *manager*-managed, not *member*-managed. (*See* KLSL0000000042 ("The Company shall be a 'manager-managed' limited liability company for purposes of the Act and shall be managed by a manager.").) It is also governed by California law. California Corporations Code section 17704.07(c) provides, "In a manager-



PRYOR CASHMAN LLP

The Honorable James R. Cho
September 3, 2024
Page 31

managed limited liability company, the following rules apply: 1. Except as otherwise expressly provided in this title, any matter relating to the activities of the limited liability company is decided **exclusively by the managers**" (emphasis added).  *See also* Cal. Corp. Code § 17701.02(n) (defining "manager").  In turn, members of a manager-managed LLC "have no right to control the management and conduct of the LLC's activities."  *Swart Enters., Inc. v. FTB*, 7 Cal. App. 5th 497, 510 (2017).

Ms. Lee has produced documents showing she was a manager of Keyway Pride at the time of the STA.  In fact, at all times, Ms. Lee had full authority to act on behalf of Keyway Pride, and discovery into its membership is simply irrelevant to whether she had authority to enter the STA on its behalf.  Correspondingly, it is irrelevant to Mr. Simmons's derivative standing claim.

9.  *Documents concerning Keyway Pride's acquisition in or about January 2017 of Cuscaden Capital Limited's interest in Nu Horizons.*

Mr. Simmons's contention that documents concerning Keyway Pride's acquisition of Cuscaden's interest in Nu Horizons in January 2017 are responsive to his RFP No. 8 is disingenuous.  RFP No. 8 requested all documents concerning the STA on May 25, 2018, and makes no mention of, or reference to, the 2017 transaction.  (*See* Simmons Ex. 2 at 9.)

Nonetheless, Ms. Lee has produced documents concerning Keyway Pride's acquisition of Cuscaden's interest in Nu Horizons.  In some of these documents, individuals (who Mr. Simmons claims were his agents) acknowledged the transfer.  That is because the 2017 acquisition is not disputed.  Indeed, there are ample documents that have been produced by Mr. Simmons, the Government, and Ms. Lee—including Nu Horizons' own tax returns prepared by Mr. Simmons's accountants—affirming that Keyway Pride acquired Cuscaden's interest.  No more is required.

Even if the 2017 acquisition were disputed (which it is not), it has no bearing on Mr. Simmons's ownership interest in Nu Horizons.  Mr. Simmons has never claimed that the shares transferred from Cuscaden to Keyway Pride belong to him, nor could he.  Thus, regardless of whether those shares were owned by Cuscaden or Keyway Pride, documents related to the 2017 transaction are simply irrelevant to *Mr. Simmons's* claim of derivative standing, and the Court should not countenance Mr. Simmons's attempt to force Ms. Lee to prove her own membership interests as part of this limited discovery period.

Mr. Simmons is also wrong in claiming that these documents relate to "whether Ms. Lee was an owner of Keyway Pride or authorized to act on its behalf."  The 2017 transaction transferred an interest in *Nu Horizons* to Keyway Pride.  It had nothing to do with Ms. Lee's ownership, or managerial authority on behalf of, Keyway Pride.  As briefed above and elsewhere, Ms. Lee has produced documents giving her managerial authority (which is not based on ownership status) to enter transactions on behalf of Keyway Pride at all relevant times.  *See supra* Lee Section IV.B.8.



The Honorable James R. Cho
September 3, 2024
Page 32

Mr. Simmons's request for documents related to the 2017 Cuscaden transaction shows that he continues (and will continue) to cast an ever-widening net for discovery unrelated to his derivative standing, and his motion should be denied.

> *10. Documents concerning approvals, consents or acknowledgements by Ms. Lee, Mr. Simmons, Defendant Leissner, Rich Slomovitz or Osman Eralp as Members, Managers or Investment Board members of Nu Horizons or approvals, consents or acknowledgements of their status as members, Managers or Investment Board members of Nu Horizons, or changes to that status, including resignation, withdrawal or acquisition of such position.*

While Mr. Simmons argues that the above category of documents was included in RFP No. 11, it was not one of the enumerated documents in that RFP and not something the Court ordered the parties to produce. Given the wide breadth of the general request in RFP No. 11, Ms. Lee objected to it and the Court agreed that only a limited category of documents responsive to RFP No. 11 need be produced.

Ms. Lee first learned that Mr. Simmons was further attempting to expand the scope of RFP 11 upon receipt of Mr. Simmons's August 12, 2024 letter. (Simmons Ex. 12 at 2.) Mr. Simmons gave Ms. Lee just 2 days—an unreasonably short amount of time—to respond to this letter before asking the Court for leave to move to compel. (*Id.* at 3.)

But documents related to all "approvals, consents, or acknowledgements" (1) by Nu Horizon's members or representatives, or (2) of their member or representative status, or (3) of changes in their member or representative status is grossly overbroad. The only person's membership status that is relevant is Mr. Simmons's. Documents relating to other members' statuses is entirely irrelevant and a red herring. Ms. Lee has produced documents regarding the three transactions the Court previously identified as relevant, which are the Letter Agreement, the STA, and the MITA. (*See* Apr. 30, 2024 Minute Entry) (adopting Ms. Lee's and the government's position on the scope of discovery.) Ms. Lee has also produced documents showing the signatories' authority to enter into each of those transactions at the time they were entered. Ms. Lee is not required to produce documents to prove the roles of each Nu Horizons member, manager, or investment board member at every point in time, as Mr. Simmons's request suggests.

If what Mr. Simmons really seeks, here, is evidence supporting his argument that his resignation from Nu Horizons in 2018 was invalid because other members did not consent to it, that is yet another unfounded theory of fraud that has no bearing on his derivative standing. Nu Horizons' Operating Agreement did not require consent by other members, or anyone else, for a resignation to be effective. (*See* KLSL0000000008 ("A Manager may voluntarily resign as a manager of the Company upon written notice to the other then serving Mangers (if any) and a



The Honorable James R. Cho
September 3, 2024
Page 33

Majority in Interest of the Members.").)  Additionally, Mr. Simmons did not resign as a result of fraud or some invalid procedure.  He chose to resign due to the multiple accusations of sexual misconduct against him.

Finally, many of the documents produced by Ms. Lee are, in fact, responsive to this category.  For example, she has produced numerous documents regarding Mr. Simmons's withdrawal from Nu Horizons and transfer of ownership interest to Keyway Pride because those are relevant to his claim of derivative standing.  To the extent the documents he seeks by other members and about other members' statuses is somehow relevant, those requests are more properly directed to those members, not Ms. Lee.

      C.      <u>Ms. Lee Has Produced Documents Sufficient to Show Her Possession of the Celsius Shares at the Time Mr. Simmons Filed His Petition</u>

          *11. All documents concerning Nu Horizons' or Ms. Lee's possession of shares of Celsius stock.*

Mr. Simmons' status as a member or assignee of Nu Horizons at the time he filed his Petition is not determined by identifying the party owning the Celsius shares.  Thus, a request for "*all* documents concerning Nu Horizons' or Ms. Lee's possession of [Celsius] shares" (emphasis added) goes beyond the scope of the Court's discovery orders, and Rule 26's limits on relevance and proportionality.  *See, e.g.*, *Multi-State Partnership for Prevention, LLC v. Samuel Kennedy, et al.*, No. 24-CV-00013JMW, 2024 WL 3758802, at *7 (E.D.N.Y. Aug. 12, 2024) ("[T]he discretionary authority to allow discovery of 'any matter relevant to the subject matter involved in the action' has been eliminated[.]" (quoting *Pothen v. Stony Brook Univ.*, No. 13-CV-6170 (JFB) (AYS), 2017 WL 1025856, at *2 (E.D.N.Y. Mar. 15, 2017)).

Even though not relevant to Mr. Simmons's derivative standing, the Celsius shares were transferred to Ms. Lee's J.P. Morgan account in July 2018, and they were in her account at the time Mr. Simmons filed his Petition in May 2023, and are there today.  As part of the meet and confer process—in a good faith attempt to avoid burdening the Court with this issue unrelated to Mr. Simmons's standing—Ms. Lee produced her JP Morgan brokerage account statements showing her ownership of the Celsius shares in July 2018 and at the time of Mr. Simmons's Petition.  But the production of *all* documents concerning her or Nu Horizons' possession of Celsius shares is irrelevant to Mr. Simmons's derivative standing and disproportionate to that narrow question.

      D.      <u>Mr. Simmons's Request for All Responsive Text Messages Should Be Limited as Described Above</u>

The Court should deny Mr. Simmons's request for "all text messages" between Ms. Lee and "any person" responsive to his wide-sweeping discovery requests.  Not only has Mr. Simmons



The Honorable James R. Cho
September 3, 2024
Page 34

failed to produce *any* of his own text messages in the last seven months, which his counsel acknowledged during the parties' August 30 meet and confer, but Ms. Lee has already reviewed and produced relevant and responsive text messages.  Mr. Simmons's request for more is irrelevant and disproportionate.

The Court adopted the government and Ms. Lee's position that the scope of discovery in this proceeding should be limited to documents encompassing and surrounding the Letter Agreement, STA and the MITA.  (*See* Dkt. 42 at 38–39.)  Ms. Lee and the government have already produced numerous documents regarding those transactions, including text messages.  As explained above, the vast majority of Mr. Simmons's discovery requests seek information beyond what the Court has ordered and irrelevant to his derivative standing.  That renders text messages responsive to those requests (if any exist) irrelevant as well.

Additionally, requiring Ms. Lee to search through six years of text messages would be unduly burdensome and disproportionate to the limited, straightforward issue of whether Mr. Simmons held an interest in Nu Horizons when he filed his Petition—which will be determined by any actual conveyances, not text messages.  And reviewing years of text messages is particularly burdensome due to their sheer volume and the need to filter out numerous privileged messages between Ms. Lee and her husband, Mr. Leissner.  It is well established that private communications between a married couple, which were intended to remain confidential, are shielded from disclosure by the marital communications privilege.  *See United States v. Pugh*, 945 F.3d 9, 18 (2d Cir. 2019).  Indeed, this issue was briefed before Judge Brodie, who found that counsel was "not entitled to" private emails forwarded by Mr. Leissner to Ms. Lee because they were privileged.  *See United States v. Leissner*, 18-CR-439 (MKB), Dkt. 160; Ex. L5 (*United States v. Roger Ng*, 18-CR-00583 (MKB) Mar. 8, 2022 Tr. 2169:18–2170:4).  That Mr. Simmons *concedes* that he is not asking for the production of privileged text messages, does not lessen the burden on Ms. Lee to review and identify those privileged messages.

And the burden on Ms. Lee would be patently disproportional to the needs of the case.  Mr. Simmons himself has not produced any text messages as of the date of this filing.  During the August 30, 2024 meet-and-confer call, Mr. Simmons's counsel anticipated later producing less than two dozen text messages.  Ms. Lee has already produced more text messages than that.  Where discovery is limited to *Mr. Simmons's* derivative standing, it would be disproportionate to require Ms. Lee to undertake a burdensome search to produce additional and irrelevant (or marginally relevant) text messages.  The Court should deny Mr. Simmons's request.

## V.      Mr. Simmons Has Not Demonstrated "Special Circumstances" to Depose Ms. Lee Nearly 3,000 Miles from Her Home

Ms. Lee lives in Los Angeles.  Three of her five children are school-age minors and live with her in Los Angeles.  Mr. Simmons knows this—he is Ms. Lee's ex-husband and, as the Court knows, he has even sued Ms. Lee in Los Angeles.  Thus, during the limited portion of this



The Honorable James R. Cho
September 3, 2024
Page 35

proceeding focused on **Mr. Simmons's derivative standing**, Ms. Lee has insisted that—in accordance with customary practice—she be deposed (a) in Los Angeles where she (and her counsel) resides, and (b) after Mr. Simmons, who is the focal point of the current discovery proceeding and whose deposition was noticed first (but has not been scheduled).

Instead of following ordinary practice and noticing Ms. Lee's deposition for a place where she resides, Mr. Simmons (1) made misleading statements that he would be deposed between Labor Day (September 2, 2024), and the current close of discovery (September 17, 2024); (2) implied that Ms. Lee chose the forum and thus should be deposed in New York; and then (3) unilaterally noticed Ms. Lee's deposition for September 6 to occur in New York, then stated (only on August 23) that his own availability would subsequently be on an unspecified day during the week of September 9.[30]  Mr. Simmons's suggestion that he is the only one who has in good faith attempted to schedule depositions in this matter is flat out misleading—he has engaged in sheer gamesmanship to attempt to depose Ms. Lee in New York the week before he agrees to appear himself.

> A.    Ms. Lee's Deposition Presumptively Should Occur in Los Angeles Where She Lives

"'[C]ourts presume that a deposition of a non-resident defendant should generally be conducted in the district where the defendant lives or works.'"  *Davis v. Farrell*, No. CV164874ADSAYS, 2017 WL 2817051, at *2 (E.D.N.Y. June 29, 2017) (quoting *Robert Smalls Inc. v. Hamilton*, 2010 WL 2541177, at *1 (S.D.N.Y. 2010)).  In other words, "there is a rebuttable presumption that, absent *special circumstances*, the deposition of a defendant will be held where the defendant resides."  *Collector's Coffee Inc.*, 2020 WL 4034733, at *2 (emphasis added); *see also Est. of Gerasimenko v. Cape Wind Trading Co.*, 272 F.R.D. 385, 390 (S.D.N.Y. 2011) ("The usual rule . . . in federal litigation, is that in the absence of special circumstances, a party seeking discovery must go where the desired witnesses are normally located.") (quotation marks and citation omitted).

During the meet-and-confer process, Mr. Simmons implied that Ms. Lee *chose* to litigate in New York and thus the presumption should not apply.  Of course, that is not true, and Mr. Simmons now claims that neither Ms. Lee nor Mr. Simmons chose the forum and therefore there should be no presumption that Ms. Lee's deposition occur in Los Angeles.  But Ms. Lee did *not choose* to be part of this limited discovery about Mr. Simmons's standing *at all*.  The government moved to dismiss Mr. Simmons's claim, limited discovery was ordered, and Mr. Simmons has responded by seeking far-reaching discovery from Ms. Lee based on theories that have no basis in the law.  Under these circumstances—where Ms. Lee's deposition will take place now on the

---

[30]     *See* Simmons Ex. 12; Exs. L2, L3.



The Honorable James R. Cho
September 3, 2024
Page 36

limited issue of Mr. Simmons's derivative standing and potentially again later on the merits—Ms. Lee's deposition should presumptively be taken where she resides in Los Angeles.

        B.     <u>No "Special Circumstances" Overcome the Default Presumption of Deposing Ms. Lee in Los Angeles</u>

      Still, "[a] party may overcome this presumption by satisfying a three-factor test to determine whether '*peculiar circumstances*' have been shown." *RP Family Inc. v. Commonwealth Land Title Ins. Co.*, Nos. 10 CV 1149(DLI)(CLP), 2011 WL 6020154, at *2 (E.D. N.Y. Nov. 30, 2011) (emphasis added). Those three factors are cost, convenience and litigation efficiency. *Id.* However, there are no "special" or "peculiar" circumstances here that warrant a departure from the "usual" rule. Rather, Mr. Simmons's arguments regarding cost, convenience, and litigation efficiency would flip the foregoing presumption on its head by making it the default that depositions occur where litigation is filed, and not where a deponent resides. That is not the law.

      ***Cost.*** Mr. Simmons does not even attempt to argue that the cost he would incur to depose Ms. Lee in Los Angeles outweighs the cost to her to be deposed in New York. Nor could he. Pryor Cashman—Mr. Simmons's law firm—has approximately 200 lawyers, an office in Los Angeles,[31] and is representing Mr. Simmons in the California Case. For his part, Mr. Simmons maintains an office on Wilshire Blvd. in Los Angeles and has insisted that he travels frequently to both New York and Los Angeles. *See e.g.*, Nardine Saad, *Russell Simmons defends Taraji P. Henson's Bali visit, lists contributions to Black Groups*, available at https://www.latimes.com/entertainment-arts/story/2024-08-21/russell-simmons-taraji-p-henson-bali-visit-misconduct-allegations (last visited Sept. 2, 2024) ("I'll be in New York next week, this idea that I'm hiding is stupid. I call the paparazzi on myself every time I'm there. *I have an office on Wilshire Boulevard. I'm there all the time.* I work out of New York sometimes, but I live here. I live here to heal people.") (emphasis added).

      Moreover, if Ms. Lee is deposed in Los Angeles, neither she nor her counsel will need to travel to New York specifically for the deposition. The deposition itself would thus be a one-day commitment with no airfare, no hotel, and significantly less lawyer time. By contrast, while in theory some of the costs associated with Ms. Lee's counsel attending a New York deposition could be mitigated through coordinated scheduling, Mr. Simmons deliberately has attempted to schedule Ms. Lee's deposition in New York on a Friday, and hold off his deposition and others until the following week, which would presumably require Ms. Lee to pay for her counsel to be in New York for a week or more to cover the depositions.

---

[31]     Pryor Cashman, *About Us*, https://www.pryorcashman.com/about-us (last visited Sept. 2, 2024).



The Honorable James R. Cho
September 3, 2024
Page 37

Mr. Simmons is perfectly able to afford to take Ms. Lee's deposition in Los Angeles, where she resides and has caregiving responsibilities, and the cost factor weighs in favor of Ms. Lee.

***Convenience.*** Analysis of the convenience factor involves consideration of (1) the convenience of counsel, (2) the defendant's residence, and (3) the extent to which travel to and from a deposition would disrupt the defendant's affairs. *E&T Skyline Constr., LLC v. Talisman Cas. Ins. Co., LLC*, No. 19-CV-08069 (AT)(SN), 2020 WL 469623, at *1 (S.D.N.Y. Jan. 28, 2020). It would obviously be more convenient for Ms. Lee to be deposed in Los Angeles than New York. She lives in Los Angeles. Her kids live there and three of them have just started the school year there. Even Mr. Simmons has acknowledged he is often in Los Angeles. (*See* n.6, *supra*.) While Mr. Simmons now argues it would be more convenient for counsel (meaning his counsel) to take the deposition in New York—that would be true in virtually every case where a deposition was sought away from a witness's residence. That is why, as Mr. Simmons acknowledges, courts readily conclude that "the convenience of counsel" is "less important" than the convenience of the deponent. *Mill-Run Tours, Inc. v. Khashoggi*, 124 F.R.D. 547, 551 (S.D.N.Y. 1989). Moreover, the one case Mr. Simmons relies upon, *Mill-Run*, involved a request to take depositions "in a variety of foreign countries" and how that would inconvenience a "solo practitioner." *Id.* Los Angeles is nothing like the remote destinations involved in *Mill-Run* and Pryor Cashman is nothing like a solo practitioner. Rather, the firm has offices in Los Angeles, and it represents Mr. Simmons in litigation in Los Angeles. Ms. Lee's attorneys are based in Los Angeles, and at least one other lawyer representing another petitioner is admitted to practice in California.[32] The convenience factor thus also weighs in favor of a deposition in Los Angeles.

***Litigation Efficiency.*** Because the cost and convenience factors obviously weigh in favor of applying the default rule and Ms. Lee being deposed in Los Angeles, Mr. Simmons attempts to argue that litigation efficiency "alone warrants" Ms. Lee's deposition proceeding in New York. But Mr. Simmons's three arguments for "litigation efficiency" ring hollow.

*First*, Mr. Simmons argues that Ms. Lee's deposition should proceed in New York because Ms. Lee's counsel "never attempted to determinate a date for Mr. Simmons's deposition." (Simmons Position, at n. 25.) That is simply not true. (*See, e.g.,* Ex. L2; Ex. L3.) The government first noticed Mr. Simmons's deposition for a date certain. Subsequently, for months, Ms. Lee has told Mr. Simmons that her deposition must occur in Los Angeles after his deposition. Mr. Simmons made misleading statements about rescheduling the date of his deposition, still hasn't scheduled a date for it, and has attempted to force Ms. Lee's deposition to occur first and in New York. At best, deposition scheduling has been held up over a discovery dispute; at worst, Mr. Simmons is engaged in gamesmanship. Either way, his argument about efforts to schedule depositions has nothing to do with litigation efficiency and should be rejected out-of-hand.

---

[32] *See* Agnifilo Intrater, *Teny Geragos*, https://agilawgroup.com/lawyers/teny-geragos (last visited Sept. 2, 2024).



The Honorable James R. Cho
September 3, 2024
Page 38

*Second*, Mr. Simmons argues that having Ms. Lee's deposition occur where she resides would be inefficient because "[t]he majority of the witnesses and their counsel reside in New York." But this is just a repackaging of his baseless convenience argument and again fails. The convenience of other witnesses has nothing to do with where Ms. Lee's deposition should occur, and the convenience of *Mr. Simmons's* counsel does not trump the convenience to Ms. Lee and her counsel.

*Third*, and finally, Mr. Simmons argues that Ms. Lee's deposition should occur in New York because "voluminous documents" would need to be transported to Los Angeles for his counsel to take the deposition there. The only case he cites for this argument is *E&T Skyline*, but in that case the need to transport documents was undisputed. *E&T Skyline Constr., LLC*, 2020 WL 469623, at *2. Here, of course, Pryor Cashman could simply print documents in its Los Angeles office and avoid transporting any documents. Alternatively, as is now commonplace, it could take Ms. Lee's deposition remotely about the limited issue of *Mr. Simmons's* derivative standing.[33] *See Uni-Sys., LLC v. U.S. Tennis Ass'n*, No. 17CV147KAMCLP, 2018 WL 1335354, at *4 (E.D.N.Y. Mar. 15, 2018) ("[C]ourts have universally recognized that depositions conducted remotely are a valid, reliable, efficient, and cost-effective method of obtaining required discovery without needless expense.") Having to travel for a deposition, however, does not dictate that the deposition should occur thousands of miles from where the witness resides, as that would overcome the presumption in virtually every case where a party seeks to depose a witness outside of the forum.

In short, none of the factors that courts examine defeats the presumption, and ordinary practice, that Ms. Lee—a witness to the issue of Mr. Simmons's derivative standing—should be deposed where she resides.

*       *       *

Given that at least four depositions (including Ms. Lee's) have yet to take place, and that other issues need to be resolved, including the issues raised in this motion to compel, the production of additional documents by Mr. Simmons, the resolution of an outstanding privilege log owed by Mr. Simmons, and (apparently) the scheduling of Mr. Simmons's travel from Bali, Ms. Lee agrees that the parties will jointly request an extension of the deadline for discovery into Mr. Simmons's derivative standing.

---

[33]     Mr. Simmons has not responded to Ms. Lee's proposal that her deposition be taken remotely, but this is a solution that directly addresses Mr. Simmons's concerns regarding cost, convenience, and litigation efficiency.



The Honorable James R. Cho
September 3, 2024
Page 39

## The Government's Position

Following the Court's prior rulings denying Petitioner Simmons' motion to compel responses to his Requests for Production of Documents, Simmons again seeks an order from the Court compelling the government and Kimora Lee Simmons-Leissner ("Lee") to produce documents responsive to those same Requests. As explained below, Simmons' motion to compel is without merit and should be denied. First, the Court has already denied Simmons' prior motion seeking to compel responses to the very Requests in dispute, and Simmons has offered no new facts or law to warrant reconsideration of the Court's prior rulings. Second, as previously argued by the government, including in the Parties' joint letter filed on April 24, 2024, the Requests at issue fall beyond the scope of the limited discovery ordered in this proceeding and are irrelevant to the threshold issue of whether Simmons held an ownership interest in Nu Horizons at the time of the filing of his Petition sufficient to confer standing on him to assert a derivative claim to the Celsius Shares at issue in this criminal forfeiture ancillary proceeding.[34]

### I.    Background

#### A.    Procedural History

On or about March 5, 2021, the Honorable Peggy Kuo, United States Magistrate Judge for the Eastern District of New York, issued a warrant authorizing the seizure of 3,370,787 shares of Celsius stock, finding probable cause to believe that the shares were subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C), and 982(a)(1), as: (i) property constituting or derived from proceeds traceable to violations of the Foreign Corrupt Practices Act (the "FCPA"), codified at 15 U.S.C. §§ 78dd-1, et seq., and a conspiracy to violate the FCPA, in violation of U.S.C. § 371; and (ii) property involved in money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

On or about March 3, 2023, the Honorable Margo K. Brodie, Chief United States District Judge for the Eastern District of New York, entered an Amended Preliminary Order of Forfeiture against defendant Tim Leissner imposing a forfeiture money judgment, in addition to directing the forfeiture of all right, title and interest in the Celsius Shares as: (a) property, real or personal, involved in the violation of 18 U.S.C. § 1956(h), or property traceable to such property; and (b) property, real or personal, constituting or derived from proceeds traceable to a violation of 18 U.S.C. § 371. See United States v. Tim Leissner, No. 18-CR-439, ECF No. 68 (the "Amended Preliminary Order").

Following the entry of the Amended Preliminary Order, the government took steps to commence the ancillary proceeding by publishing notice of the forfeiture and sending notice to

---

[34]    Simmons also seeks an order compelling the government to produce additional context for responsive text messages that it previously produced from its 1MDB database. As discussed below, the government is presently conducting a further review of text messages to determine whether surrounding context for these messages can be provided.



The Honorable James R. Cho
September 3, 2024
Page 40

known potential claimants with an interest in the Celsius Shares regarding how to file a claim to the shares.   Notice of the forfeiture was posted on an official government website (www.forfeiture.gov) for a 30-day period that began on May 2, 2023. On May 5, 2023, a petition was filed on behalf of Lee seeking to contest the forfeiture of certain of the Celsius Shares. <u>See</u> ECF No. 3. In addition, on the same date, a petition was filed on behalf of Roger Ng seeking to contest the forfeiture of the certain of the Celsius Shares. <u>See</u> ECF No. 4. Further, on the same date, a petition was filed by Simmons on behalf of himself and derivatively on behalf of Nu Horizons seeking to contest the forfeiture of the Celsius Shares. <u>See</u> ECF No. 5 (the "Simmons Petition"). On May 22, 2023, a petition was filed on behalf of Ken Siazon seeking to contest the forfeiture of certain of the Celsius Shares. <u>See</u> ECF No. 8.

B.    <u>The Limited Discovery Order and Simmons' Broad Discovery Requests</u>

By Order entered on December 26, 2023, the Court granted, in part, the government's motion to dismiss the Simmons Petition, dismissing Simmons' individual claims to the Celsius Shares but allowing his derivative claim on behalf of Nu Horizons to proceed. <u>See</u> ECF No. 24 (the "Partial Dismissal Order"). The government moved for reconsideration of the Partial Dismissal Order, and while the motion was denied, the Court responded by directing the Parties to engage in limited discovery on the threshold issue of whether Simmons held a membership interest in Nu Horizons as of the date of filing his petition sufficient to confer standing upon him to assert a derivative claim. <u>See</u> ECF No. 32.[35]

On February 16, 2024, Simmons propounded upon the government a first set of requests seeking production of seventeen categories of documents. <u>See</u> Simmons First Set of Requests, attached hereto as Government Exhibit A.

Consistent with the limited discovery ordered by the Court, the government agreed to search for and produce, and has produced, documents responsive to four of the requests, specifically Request Nos. 7, 8(a)-(b), 10 and 11, detailed in the table below, to the extent any existed in the government's possession or control. <u>See</u> Government's Amended Responses and Objections, attached hereto as Government Exhibit B.

---

[35] The standing issue is rooted in the requirement that, in order to assert a derivative claim, an individual must allege that he was a member of the corporate entity "at the time of the transaction complained of." Fed. R. Civ. P. 23.1(b)(1). While "Rule 23.1 . . . does not expressly require that a derivative plaintiff be a shareholder at the time of suit[,] such a requirement is implied by the rule . . . ." <u>Werfel v. Kramarsky</u>, 61 F.R.D. 675, 679 (S.D.N.Y 1974).



The Honorable James R. Cho
September 3, 2024
Page 41

| Request No. | Subject Matter |
|---|---|
| 7 | The Letter of Intent dated April 26, 2018 |
| 8(a)-(b) | The Stock Transfer Agreement executed on or about May 25, 2018 |
| 10 | The Membership Interest Transfer Agreement entered into in or about December 2018 |
| 11 | The direct or indirect ownership or control of Nu Horizons or the Celsius Shares between 2018 and the present |

The government objected to the remaining thirteen Requests, detailed in the table below, on the grounds that they requested documents that were, *inter alia*, beyond the scope of the limited discovery ordered by the Court and/or privileged. See id.

| Request No. | Subject Matter |
|---|---|
| 1 | May 2018 SEC Schedule 13G listing Keyway Pride as the 100% owner of Nu Horizons |
| 2 | Midas Commodities' interest in Keyway Pride |
| 3 | Ownership or control of Midas Commodities |
| 4 | Ownership or control of Keyway Pride |
| 5 | A 2018 acquisition in Nu Horizons or the Celsius Shares by third parties |
| 6 | Lee's knowledge of Leissner's conduct vis-à-vis 1MDB |
| 8(c) | Whether any assets held by Lee or Keyway Pride were proceeds of a crime |
| 9 | Advice sought or obtained by Lee or Leissner concerning asset protection |
| 12-13 | An appearance bond for Leissner |
| 14 | A loan or transfer of the Celsius Shares from Nu Horizons to Lee or Keyway Pride |
| 15 | Ownership and control of a brokerage account into which the Celsius Shares were transferred |
| 16 | A February 5, 2020 document regarding a purported ex post facto statement by Leissner regarding beneficial ownership of the Celsius Shares |
| 17 | The affidavit submitted in support of the warrant authorizing seizure of the Celsius Shares |

At a discovery conference conducted on April 30, 2024, the Court adopted the position of the government and Lee regarding the scope of discovery as set forth in a joint letter filed by the Parties, but granted Simmons leave to renew his request for broader discovery, if necessary, after counsel's review of responses by the government and Lee. See April 30, 2024 Minute Entry; April 24, 2024 Joint Discovery Letter, Dkt. #42. At a further discovery conference held on May 20, 2024, the Court declined to reconsider its previous ruling as to the scope of discovery, but indicated that Simmons may raise issues regarding specific requests. See May 20, 2024 Minute Entry. In addition, the Court sustained the government's objection to Document Request No. 16, but



The Honorable James R. Cho
September 3, 2024
Page 42

directed the government to review bond-related documents at issue in Document Request No. 12, which the government reviewed and produced.  Id.

**II.**     **Argument**

        **A.**     <u>The Documents Sought from the Government by Simmons Fall Outside the Scope of Authorized Discovery</u>

In the District Court's February 2024 order, the Court ruled that the Parties were to engage in limited discovery focused on the specific question of whether Simmons held a membership interest in Nu Horizons at the time the Simmons Petition was filed, i.e., on May 5, 2023. This issue is central to the question of whether Simmons has standing to bring a derivative claim on Nu Horizons' behalf. Apart from the requests to which the government has consented, Simmons' other requests are beyond the scope of that narrow order and are thus irrelevant and improper.

        *1.*     *Legal Standard*

Federal Rule of Civil Procedure 26 provides that a party is entitled to discovery on "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim of defense." <u>Henry v. Morgan's Hotel Grp., Inc.</u>, No. 15-CV-1789 (ER) (JLC), 2016 WL 303114, at *3 (S.D.N.Y. Jan 25, 2016) (internal citations omitted). However, Rule 26(b)(1) is intended to "encourage judges to be more aggressive in identifying and discouraging discovery overuse" and to limit discovery that has "little bearing" on the issues being litigated by emphasizing the need to analyze proportionality before ordering production of relevant information. <u>Id.</u>; <u>State Farm Mut. Auto Ins. Co v. Fayda</u>, No. 14-CV-9792 (WHP)(JCF), 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015). A court should consider both the nature of information sought and whether its production is "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).

The party seeking discovery bears the initial burden of proving the discovery is relevant. <u>Citizens Union of N.Y. v. Att'y Gen. of N.Y.</u>, 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017).  In this case, given the limited scope of the District Court's discovery order, a document is relevant only if it bears on the threshold issue of Simmons'—and not any other claimant such as Lee's—standing.

        *2.*     *Discussion*

In his renewed motion, Simmons seeks to compel the government to produce documents containing extrinsic statements about Lee's ownership of Nu Horizons, including several subcategories of documents discussed below.  However, none of the documents sought by Simmons are probative of the threshold issue of whether Simmons held a membership interest in Nu Horizons as of the date that he filed his claim to the Celsius Shares.  In addition, it would be



The Honorable James R. Cho
September 3, 2024
Page 43

unduly burdensome for the government to be required to search through its vast 1MDB database to try and locate documents of such limited probative value. Simmons attempts to minimize that burden by pointing to the fact that the government's prior document productions total only approximately 1,000 documents. Simmons misses the point. The burden faced by the government does not depend on the number of documents produced, but rather on the burden of having to search millions of pages in its 1MDB database to locate potentially responsive documents. Nor does the fact that Simmons may have produced documents of the nature he is seeking to obtain lessen the burden on the government of searching for those documents. As recognized by the Court in its prior discovery rulings, managing the needs of the case requires an assessment of proportionality before saddling the government with the high burden of attempting to locate documents of such limited, if any, probative value.

> 3.    *Documents Containing Extrinsic Statements About Lee's Ownership of Nu Horizons Are Not Relevant To Simmons' Standing*

The categories of documents sought by Simmons from the government are (a) documents summarizing *all* assets owned by Lee, such as summaries of assets in a loan application, (b) all communications between Lee, defendant Leissner or their agents or representatives concerning Lee's interest in Nu Horizons and/or the Celsius Shares, and (c) all communications between Lee, defendant Leissner or their agents or representatives and Lee's financial advisors, accountants, and tax preparers concerning Lee's interest in Nu Horizons and/or the Celsius Shares. Given the narrowly tailored scope of discovery, these categories of documents are overbroad and bear little, if any, relevance to the threshold issue of Simmons standing to assert a derivative claim to the Celsius Shares. Simmons argues that such categories of documents represent "incredibly powerful evidence" as to whether current assertions of ownership of Nu Horizons by Lee are valid. Simmons is wrong. As a threshold matter, the only inquiry before the Court concerns Simmons' standing—not the standing of Lee or, for that matter, any other claimant. Thus, Simmons broad inquiry into Lee's assets, her asserted interest in Nu Horizons or the Celsius Shares, including communications between Lee, Leissner, their agents or representatives and/or financial advisors, accountants and tax preparers, is not relevant to Simmons' standing and outside the scope of the limited discovery authorized by Judge Brodie. In addition, Simmons' alleged interest in Nu Horizons stems from a series of fully integrated agreements.[36] As a result, the extrinsic statements

---

[36]    In particular, as alleged in the Simmons Petition, on or about April 26, 2018, Simmons and Lee signed a letter agreement (the "Letter Agreement") memorializing the sale of all Simmons' interests in Nu Horizons to Keyway Pride, a company controlled by Lee. See Simmons Petition ¶ 42. As further alleged in the Petition, on or about May 25, 2018, Simmons, Keyway Pride, Rush Digital Media, LLC (a company founded by Simmons), and Nu Horizons entered into a Stock Transfer Agreement, which directed the transfer of Simmons' "entire Ownership Percentage . . . in Nu Horizons," among other assets, to Keyway Pride "at an aggregate purchase price of



The Honorable James R. Cho
September 3, 2024
Page 44

that Simmons seeks to uncover as to *Lee's* assets, including with respect to her claimed interest in Nu Horizons or the Celsius Shares, are irrelevant to *Simmons'* interest in Nu Horizons, which are governed by operation of the agreements themselves.  Thus, discovery as to these broad categories of documents, which have limited, if any, probative value on the issue of Simmons' standing, is not warranted, particularly given the high burden imposed on the government in searching millions of pages within its 1MDB database.

> B.   The Government is Conducting a Further Review of Text Messages

Finally, Simmons complains about the government's production of text messages out of context, without providing all messages within 24 hours of the responsive message.  As the government explained to counsel for Simmons, the responsive messages were produced in the manner in which they are stored in the government's 1MDB database.  In an effort to resolve this dispute, the government is presently conducting a further review of responsive text messages to determine whether messages can be produced with additional context.

---

$14,250,000." See Simmons Petition ¶¶ 49, 51. Despite these agreements, the Petition alleges that in or about 2018, Simmons, Lee, Keyway Pride, and Erok Ventures LLC (another company controlled by Lee) entered into a superseding Member Interest Transfer Agreement that nullified and voided both the Letter Agreement and Stock Transfer Agreement, thus preserving the Petitioner's interest in Nu Horizons and entitling him to certain of the Celsius Shares. See Simmons Petition ¶ 61.



The Honorable James R. Cho
September 3, 2024
Page 45

                       *     *     *     *

      The parties thank the Court for its attention to this matter.

                                      Sincerely,

                                      /s/ *Jeffrey Alberts*

                                      Jeffrey Alberts

cc:      Counsel of record