# SIMMONS EXHIBIT 3

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

------------------------------X Docket#
IN RE FORFEITURE ORDER          : 23-mc-01505-MKB-JRC
OF TIM LEISSNER, et al.,        :
                                :
              Plaintiffs,       :
                                :
     - versus -                 : U.S. Courthouse
                                : Brooklyn, New York
USA,                            :
                                : May 20, 2024
              Defendant         : 10:38 a.m.
------------------------------X
```

TRANSCRIPT OF MISCELLANEOUS CAUSE FOR DISCOVERY HEARING
BEFORE THE HONORABLE JAMES R. CHO
UNITED STATES MAGISTRATE JUDGE


**A   P   P   E   A   R   A   N   C   E   S:**

**For the Plaintiffs:**          **Jeffrey Ehrlich Alberts, Esq.**
                                 **Aaron Wiltse, Esq.**
                                 Pryor Cashman LLP
                                 7 Times Square
                                 New York, NY 10036

                                 **Gina M. Parlovecchio, Esq.**
                                 Mayer Brown LLP
                                 1221 Avenue of the Americas
                                 New York, NY 10020

                                 **Teny R. Geragos, Esq.**
                                 Agnifilo Intrater LLP
                                 445 Park Avenue, 7th Floor
                                 New York, NY 10022


              (Appearances continue on next page)



**Transcription Service:**       **Transcriptions Plus II, Inc.**
                                 61 Beatrice Avenue
                                 West Islip, New York 11795
                                 RL.Transcriptions2@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

**APPEARANCES CONTINUED**

**For the Plaintiffs**          **David K. Willingham, Esq.**
**Continued**:                  **Michael Roth, Esq.**
                                King & Spalding LLP
                                633 W. Fifth Street, Suite 1600
                                Los Angeles, CA 90071


**For the Defendants**:         **Brian Morris, Esq.**
                                **Tanisha R. Payne, Esq.**
                                **Sean Fern, Esq.**
                                U.S. Attorney's Office, EDNY
                                271 Cadman Plaza East
                                Brooklyn, NY 11201

3

Proceedings

```
1            THE COURT:  Hi.  Good morning, everyone.  It's
2    Judge Cho.  We're here for a conference in In re
3    Forfeiture Order of Tim Leissner, et al., case number 23-
4    mc-1505.
5            Who do we have on for the government?
6            MR. MORRIS:  Oh yes, good morning, Judge.  For
7    the government, it's Brian Morris joined by Sean Fern
8    with the Department of Justice's Money Laundering and
9    Asset Recovery Section as well as AUSA Tanisha Payne on
10    the line as well.  Good morning.
11            THE COURT:  Who's on for Russell Simmons and Nu
12    Horizons?
13            MR. ALBERTS:  Good morning, your Honor.
14    Jeffrey Alberts of Pryor Cashman.  And I'm accompanied
15    today by Aaron Wiltse who's an associate in our office.
16            THE COURT:  All right.  Who's on for Kimora Lee
17    Simmons-Leissner?
18            MR. ROTH:  Good morning, your Honor.  This is
19    Michael Roth and David Willingham of King Spalding, for
20    Kimora Lee Simmons.
21            THE COURT:  All right.  Who's on for Ken
22    Siazon?
23            MS. PARLOVECCHIO:  Good morning, your Honor.
24    Gina Parlovecchio of Mayer Brown on behalf of petitioner
25    Ken Siazon.
```

4

                          Proceedings

1           THE COURT:  All right.  And finally, who's on

2   for Mr. Ng?

3           MS. GERAGOS:  Good morning, your Honor.  This

4   is Teny Geragos of Agnifilo Intrater for Mr. Ng.

5           THE COURT:  All right.  Good morning, everyone.

6   And thanks for rescheduling to today.

7           We have a number of things we want to cover.

8   There's a motion to quash the subpoena directed toward

9   the Pryor Cashman attorneys, a motion by counsel as well

10  to expand the scope of discovery, and a motion by the

11  government to subpoena a witness in Italy.

12          All right.  So why don't I take the subpoena

13  issue first?  Mr. Morris, let me hear from you first.

14  You issued subpoenas to depose these Pryor Cashman

15  attorneys.  Do you want to be heard on that request to

16  conduct those depositions?

17          MR. MORRIS:  Yes, Judge.  On the motion to

18  quash, Mr. Fern is going to address that at this point.

19          THE COURT:  All right.  Go ahead, Mr. Fern.

20          MR. FERN:  Yes, your Honor.  As a threshold

21  matter I think we reject the premise of Pryor Cashman's

22  motion that we are seeking to depose opposing counsel in

23  this case.  I think the cases that the government cites

24  in its response are that we are not actually seeking to

25  depose opposing counsel, we are seeking to depose the

Proceedings

1    transactional counsel who dealt with the fundamental

2    transactional documents at issue in this proceeding.  And

3    the cases that we cite to show that there's a -- you can

4    distinguish between those two.  And therefore, the

5    Friedman analysis that guides Pryor Cashman's filings is

6    inappropriate and inapposite.

7            THE COURT:  Now, let me ask you, Mr. Fern --

8    let me interrupt you for a minute.  What I'm trying to

9    understand is why you need these depositions of these

10   lawyers.  I understand these are lawyers that were

11   involved in executing or negotiating the agreement at

12   issue in this case.  In the absence of those depositions,

13   are you still able to respond to any motions that are

14   filed in this case?  In other words, do you need their

15   testimony?

16           MR. FERN:  I believe we do, your Honor.  I

17   think being able to depose the attorneys who created the

18   foundational documents at issue here and understanding

19   what key terms within those documents mean would give us

20   a context required in order to adequately respond or file

21   a good motion in this case.

22           And I would say that just opposing counsel, the

23   Cooley LLP attorneys, would give us an incomplete

24   understanding of the different terms at issue here.  We

25   don't know necessarily how their recollections may differ

6

Proceedings

1   or especially with respect to the member interest

2   transfer agreement at issue here.  It is our

3   understanding that the Cooley LLP attorneys were not

4   necessarily involved in the drafting of that agreement.

5   That was primarily the work of Pryor Cashman.

6           THE COURT:  So this discussion brings me back

7   to my first year of law school where we talked about

8   contracts.  I know there are no other agreements that the

9   parties are disputing to what they entail and what they

10  actually mean.  But my recollection is if we're going to

11  rely on these contracts or these agreements, that's it.

12  You don't look at extrinsic evidence in connection with

13  these contracts.

14          So what I'm asking you, Mr. Fern, then is are

15  you trying to have it both ways?  Are you going to rely

16  on these agreements in terms of the standing argument and

17  being able to respond to what Mr. Simmons sets forth

18  ultimately, or will you be relying on this extrinsic

19  evidence as well as to what these agreements really mean

20  based on the testimony of these lawyers?  Are you trying

21  to have it both ways?

22          MR. FERN:  No, we're not trying to have it both

23  ways, your Honor.  I think it's just important to have

24  context for specifically how certain terms of the (audio

25  cut out) drafted, what they mean because we were not

7

Proceedings

1   necessarily present at the creation of those agreements.

2   I think --

3           THE COURT:  On the inside --

4           MR. FERN:  -- depending on -- I mean our

5   argument is that, our argument primarily is that the

6   agreements can be interpreted from the face of the

7   agreements themselves.  And if your Honor chooses to rule

8   in that way, I think that would be fine, but I think we

9   still need the context for these agreements and the

10  specific terms at issue.

11          THE COURT:  All right.  I mean look, you can

12  certainly make alternative arguments but I'm just saying

13  you need context as to what certain terms of this

14  agreement mean.  Are you essentially saying that you

15  believe that these agreements are ambiguous?

16          MR. FERN:  No, not necessarily, your Honor.  I

17  think a lot of it just depends on how your Honor rules

18  with respect to the threshold scope of discovery issue.

19          THE COURT:  All right.  Mr. Alberts, do you

20  want to be heard on your motion to quash?

21          MR. ALBERTS:  Your Honor, my associate Aaron

22  Wiltse will be addressing that motion.

23          THE COURT:  All right.  Go ahead.

24          MR. WILTSE:  Good morning, your Honor.  I first

25  want to turn to the threshold issue that the government

8

Proceedings

1   raises which is more or less because these lawyers have

2   not appeared in this case.  They are not protected by

3   Friedman at all.

4          They cite three cases for this argument and

5   none of them actually said that.  Two of them, *Brock*

6   *(phonetic) Petro* and *Chase Manhattan* were decided upon

7   the Shelton rule from the Eight Circuit which is

8   obviously not the law in this circuit.  This isn't

9   important just because they were applying the wrong

10  standard.  It's important because the Shelton rule

11  generally does only apply to trial counsel.  But under

12  Friedman, that categorical rule doesn't really apply and

13  instead puts that analysis to the extent that it's

14  relevant into the second factor, the role of the lawyer.

15         *Broncort* (phonetic), which is the primary case

16  that they cite for this argument, makes this quite clear.

17  Although the government is correct that *Broncort* does

18  discuss the distinctions between trial and non-trial

19  counsel, it does so as part of the Friedman analysis.

20         So I'll discuss this more when I get to that

21  factor but I just wanted to quickly dispel their argument

22  that Friedman doesn't apply to the situation at all

23  simply because the lawyers, you know, haven't filed

24  notices of appearance in this case.

25         Turning to the third factor, I think, as your

9

Proceedings

1   Honor was kind of just getting at, I think the government

2   quite obviously loses here.  You know, they argue that

3   this testimony is at the heart of the threshold standing

4   issue in this litigation and they offer three categories

5   of testimony that they're looking for but they completely

6   fail to argue why they can't get this information from

7   anyone else, just Mr. Simmons or the other parties to the

8   transactions or the negotiations.  And a lot of the

9   information that they're really trying to get with these

10  depositions is quite obviously privileged.

11          So the third category boils down to Mr.

12  Simmons's motivation for entering into the letter of

13  intent and the stock transfer agreement.

14          Again, as your Honor just noted, the government

15  is talking out of both sides of its mouth here.  As

16  recently as Friday they oppose some of our discovery

17  requests saying that given the clear language of the

18  merger clause that's at issue, after the fact statements

19  by a party about their subject beliefs regarding a

20  contract are not probative as an aid to interpreting the

21  contracts at issue.  And that's either their position or

22  it isn't.

23          And I think that, you know, they just

24  articulated that they need context for terms in the

25  contract.  It's unclear to me what that means other than

10

Proceedings

1   their subjective legal impressions as to the meaning of

2   the contract which, you know, isn't really relevant to

3   this Court's determination and the plain meaning of the

4   contract.

5          And the distinction between what they're

6   looking for here which is just, you know, a fishing

7   expedition for legal opinions of Mr. Simmons's lawyers

8   compared to the type of extrinsic information we're

9   looking for, is that our theory is that these agreements

10  are unenforceable because of the fraudulent intent of

11  Kimora Lee Simmons and Time Leissner.  That's a key part

12  of our legal theory.  It's independently legally relevant

13  what their intent was as to the enforceability of the

14  agreement.

15         But here the government is just on a fishing

16  expedition for what Mr. Simmons's lawyers think now about

17  the contract.

18         But a bit more to the point is if the

19  government really wants to know what Mr. Simmons's

20  motivations were for entering into the contract, they

21  should ask him when they depose him which they're already

22  planning to do and they're entitled to do.  They haven't

23  articulated any reason why they need to get this

24  information from Mr. Simmons's lawyers instead of Mr.

25  Simmons himself.

Proceedings

1      And you know, if you take the government at

2  their word, what they really want to know is what Mr.

3  Simmons told his lawyers about his motivation and that

4  information obviously would have been attained as part of

5  privileged conversations between Mr. Simmons and his

6  lawyers.  So you know, even if it were relevant to this

7  case, it's clearly privileged and totally off the table.

8      The second category of information that they're

9  asking about is the events surrounding the letter of

10  intent and the representations, the letter of intent and

11  the stock transfer agreement as well as the

12  representations made during those negotiations.  And you

13  know, whatever the government really means by the events

14  surrounding the negotiation of these agreements, they

15  don't even attempt to articulate why the Pryor Cashman

16  lawyers are the best people or the only people that they

17  can get this information from.  There were other people

18  party to the agreement.  They will have the emails

19  themselves.  They haven't even tried to articulate why

20  the Pryor Cashman attorneys' impressions at those

21  meetings is relevant so that they need them.

22      As for whatever representations were made

23  during the negotiations, the government already has some

24  of these emails.  And I think the complete lack of any

25  examples or representations in these emails that they can

12

Proceedings

1   point to that they want more information about is quite

2   telling.  But a bit more to the point, representations by

3   their nature are made from one party to another.  And the

4   government hasn't offered any reason at all why they

5   can't depose the counterparties to those representations.

6          The third, the facts and opinions in emails

7   that the lawyers sent about these agreements.  And again,

8   the government already has some of these emails.  They

9   haven't offered a single example of a fact or an opinion

10  contained in the emails that they offered that they need

11  more information about or why that would be relevant to

12  this case.  And in any event, especially with respect to

13  whether opinions were offered in these emails, any

14  information that the lawyers could testify about beyond

15  the, you know, because it's in the emails, is certainly

16  going to be their privileged, you know, mental

17  impressions and legal advice about these documents.

18          So I think in sum, the government has

19  completely failed to allege why any of the information

20  that they seek is somehow only available from the

21  lawyers.  And for anything that deals with the lawyers

22  are the only people who would know, that's their

23  impressions of Mr. Simmons's motivation or what their

24  legal opinions were as to the terms of the contract.

25  That information is almost certainly going to be

13

Proceedings

1  privileged.

2          And you know, I would submit that, as Judge

3  Brodie has held, a very weak showing on this factor alone

4  is sufficient reason to grant this motion to quash.  And

5  I submit that this is exactly one of those scenarios

6  where the government has completely failed to articulate

7  a need to depose the lawyers.

8          Turning to --

9          THE COURT:  Why don't you hold on for one

10 second?  Mr. Fern, do you want to address any of those

11 points?

12         MR. FERN:  Yes, a few points, your Honor.

13         First, as to the *Broncourt* case that we cite

14 to, it says that you just can't hide behind litigation

15 counsel to shield from discovery all relevant

16 information.

17         Here again, we're talking about not after the

18 fact statements but before the fact statements that would

19 sort of guide the government and guide the parties in

20 understanding a lot about the transactions and how they

21 came to be.  And especially, you know, we cite in our

22 briefing a lot about how the negotiations have to be at

23 arms length and between sophisticated counsel.  And I

24 think a lot of what we hope to obtain or need to obtain

25 for our case is along those lines as well.

14

Proceedings

1          THE COURT:  Okay.  Let me turn back to counsel
2   for Mr. Simmons.  Mr. Wiltse, anything else you want to
3   add on your end?
4          MR. WILTSE:  As to the first point or turning
5   to the second factor under Friedman?
6          THE COURT:  I don't think I need to hear
7   outsiders.  I'm inclined to grant the motion to quash the
8   subpoenas.
9          Turning to you, Mr. Fern, my view is seeking
10  depositions of counsel, even transactional counsel, is a
11  high bar.  And given that the discovery period has been
12  extended, I do think that there are alternative
13  mechanisms by which you can obtain this same information
14  short of deposing these attorneys.  So I'm prepared to
15  grant the motion to quash the subpoenas as to the
16  lawyers.  Okay, Mr. Fern?
17         MR. FERN:  Okay.  What about (indiscernible),
18  your Honor?  The document subpoena for external
19  communications?
20         THE COURT:  Yes.  In other words, the discovery
21  directed towards the lawyers as to depositions and the
22  documents in connection with your subpoenas I am
23  quashing.  All right?
24         MR. FERN:  Okay.
25         THE COURT:  I'm granting the motion to quash.

15

Proceedings

1   All right?  My view is there are alternative mechanisms

2   by which you can obtain that same discovery whether it's

3   deposing Mr. Simmons or other witnesses in this case

4   short of deposing and getting documents from these

5   transactional lawyers.  So I am granting the motion to

6   quash.  Okay?

7           MR. FERN:  Okay.

8           THE COURT:  All right.  Now, also with the

9   government, you filed a motion to subpoena a witness in

10  Italy.  Help me out, how do you pronounce this guy's

11  name?

12          MR. FERN:  (Indiscernible).

13          THE COURT:  Hoffman (indiscernible)?  Okay.

14  All right.  Do you want to be heard on your motion for

15  the subpoena?

16          MR. FERN:  Yes, your Honor.  I think -- again,

17  this is Mr. Fern.  28 U.S. Code Section 1783 allows the

18  Court to issue, to order the issuance of a subpoena to a

19  U.S. citizen living abroad if it's in the interest of

20  justice.  And I think as we've laid out in our motion,

21  the statutory test is met for this case and the witness

22  has told the government, has told the FBI that he does

23  not intend to come to the United States to sit for a

24  deposition.

25          THE COURT:  All right.  Let me ask you a

16

Proceedings

1  question.  So in your motion, do you indicate that he's a

2  business associate of Mr. Simmons or a business partner?

3  Is that correct?

4       MR. FERN:  That's correct.

5       THE COURT:  All right.  What information are

6  you hoping to obtain from this witness that you can't get

7  from Mr. Simmons?

8       MR. FERN:  He again was part of the

9  negotiations surrounding the transactional documents at

10 issue in this case.

11      With respect to the actual negotiations, I

12 think he took a much more essential role than petitioner

13 Simmons did in actually negotiating and effectuating

14 these transactions.  I actually wrote in our motion he

15 was a percipient witness to the transactions at issue.

16      THE COURT:  Have you been in contact with him

17 or in touch with him through a lawyer of his?

18      MR. FERN:  No, the FBI I understand called his

19 cell phone which is a U.S. cell phone and he picked up

20 and said that he was in Italy.

21      THE COURT:  Okay.  Does anyone on the line now,

22 counsel for Simmons, Lee, Siazon, or Ng object to this

23 request for subpoena?

24      MS. GERAGOS:  Your Honor, this is Teny Geragos

25 for Mr. Ng.  We support this request for a subpoena for

17

Proceedings

 1    Mr. (indiscernible).

 2              THE COURT:  Okay.  Anyone else?

 3              MR. ROTH:  Yes, your Honor.  This is Michael

 4    Roth for Kimora Lee Simmons.  We also support the

 5    request.  I'll just add that Mr. (indiscernible) was an

 6    executive member of Nu Horizons and probably has unique

 7    information about Nu Horizons from his position at the

 8    company.

 9              THE COURT:  Okay.  All right.  So turning back

10    to Mr. Fern --

11              MR. ALBERTS:  Your Honor?

12              THE COURT:  Yes, go ahead.  Who is this?

13              MR. ALBERTS:  Your Honor, this is Jeffrey

14    Alberts for Mr. Simmons.  And I guess our main concern is

15    that, you know, at this point we literally are not being

16    allowed to obtain documents that is in the custody of

17    other parties in which they make explicit representations

18    about whether they do own or don't own Nu Horizons.

19              So given that that's the situation, it's

20    completely inconsistent with the limitations that are

21    being imposed on Mr. Simmons to allow the other parties

22    to, you know, try to require individuals to fly in from

23    other countries so that they can ask them questions just

24    in the hope that maybe they have something to say that is

25    relevant to the ownership of Nu Horizons.

18

Proceedings

1          So we just want a level playing field.  Like if

2   the Court is going to allow the other parties to engage

3   in this kind of very broad exploratory discovery into

4   witnesses that are not parties to the agreements that

5   even the government is focused on and just because they

6   might have information, then Mr. Simmons should be

7   allowed to obtain information that is literally in the

8   possession of the other parties and it's directly about

9   the ownership of Nu Horizons which they currently are

10  refusing to turn over.

11          THE COURT:  All right.  Let me hear from Fern

12  or Mr. Morris on that issue.  So as I understand Mr.

13  Alberts's argument on behalf of Mr. Simmons, his view is

14  if the government's going to fly in a witness from Italy

15  for a deposition in connection with the ownership issue

16  of Nu Horizons, they should also be permitted to expand

17  the discovery that they requested as it relates to what

18  may be in the possession of the government and other

19  parties in this case.  So I mean Mr. Morris or Mr. Fern,

20  do you want to be heard on that argument?

21          MR. MORRIS:  Yes.  Yes, Judge.  Hi.  This is

22  Brian Morris.

23          You know, so our view on it is that we have

24  responded.  Frankly, the request as to the agreements at

25  issue and the question of the ownership fall within those

19

Proceedings

1   requests that the government has already agreed to search

2   for and produce relevant documentation or responsive

3   documentation and in fact has done so.  So we don't

4   really think that there's any expansion that's

5   necessary.

6            You know rather, when we talk about like a

7   witness from the communications that we've seen thus far,

8   Mr. Erlp, I hope that's the right pronunciation, you

9   know, was involved in structuring and basically handling

10  these transactions as a business associate of Mr. Simmons

11  and therefore, as Mr. Fern had mentioned, is a percipient

12  witness to these particular transactions.

13           In fact, it's actually consistent with your

14  Honor's ruling just a few moments ago that we should

15  seek, you know, try to get the information that we're

16  seeking about these particular agreements and

17  transactions that were effectuated pursuant to them from

18  other witnesses beside the attorneys that represented Mr.

19  Simmons at the Pryor Cashman firm.  This is one such

20  witness.

21           So we're simply really trying to respect the

22  Court's prior rulings and do not believe that any

23  additional enhanced scope of discovery would be necessary

24  because what we intend to ask him are the very agreements

25  that we've already agreed to produce information and

20

Proceedings

1   responsive documents on.

2       THE COURT:  Now, Mr. Morris, in connection with

3   this witness as well, is it the goal of the government or

4   perhaps other parties to determine whether these

5   agreements do in fact say what the agreements say?  Or

6   are you questioning whether these agreements perhaps say

7   something else?  Is that the purpose of these depositions

8   or this deposition?

9       MR. MORRIS:  Well, I mean I think there's a few

10  different purposes.  We really, you know, what we're

11  really looking at here is sort of agreements on paper.

12  You know, we do have some communications incidentally

13  that we did not get from Mr. Simmons.  We actually got

14  the communications from, you know, counsel for Ms. Lee

15  and we produced them as part of our discovery.  You know,

16  those are the communications that we were seeking before

17  that we're not going to be able to get from the Pryor

18  Cashman firm based upon your Honor's prior ruling.

19       So you know, ultimately what we really want to

20  be able to sort of establish and just get -- you know,

21  this sort of puts some meat on the bones if you would I

22  think is the best way to say it to really explain the

23  situation from start to finish how these agreements came

24  to bear, how they were entered into, that they were

25  executed, you know, that they were effectuated.

Proceedings

1          And we didn't really see, you know, a witness

2    out there who would be more likely to have that

3    information than this particular one given that Mr.

4    Simmons was not like, as far as we can tell from the

5    communications we've seen thus far, he wasn't like

6    handling the day to day.  You know, he has both given his

7    role, you know, he has folks that reported to him or that

8    were associates of his that kind of handled this and

9    that's what we see from the communications.

10          We really want to be able to ask about the

11    communications, find out what's going on, and really

12    provide a clear record to the Court in ruling on any

13    potential motion that the government may make at the end

14    of this expedited discovery period.

15          THE COURT:  So refresh my recollection now.

16    For any of these agreements that we've been discussing,

17    is he a signatory to any of these agreements?

18          MR. MORRIS:  Well, yeah.  Actually --

19          MR. ROTH:  Your Honor, this is --

20          MR. MORRIS:  Yeah, go ahead.

21          MR. ROTH:  Yeah.  This is Michael Roth for

22    Kimora Simmons.

23          Mr. Erlp was a signatory to the stock transfer

24    agreement.  He signed it on behalf of Nu Horizons and on

25    behalf of West Digital Media.  There were only three

22

Proceedings

1    signatories to that agreement.  There was Mr. Erlp, Mr.

2    Simmons, and Ms. Lee.

3            The subsequent agreement Mr. Erlp was not a

4    signatory to because it didn't have -- the parties didn't

5    match up.  You know, that's a key issue in this case of

6    whether the December agreement could have unwound the

7    earlier stock transfer agreement without all the

8    signatures.  And Mr. Erlp is the key witness for that

9    issue.

10           THE COURT:  Okay.  All right.  Given that he

11   was a signatory to at least one of these agreements, I

12   will allow the subpoena.  I will so order the subpoena.

13   But at the appropriate time if necessary I will certainly

14   consider any objections or a motion to quash the subpoena

15   if in fact he ends up responding to the subpoena that

16   way.  Okay?  So I will grant the motion to subpoena Mr.

17   Erlp.  Okay?

18           All right.  Now, the next issue deals with Mr.

19   Simmons's request to expand the scope of discovery based

20   on his review of the document production.  So Mr. Alberts

21   or Mr. Wiltse, do you want to be heard on your request?

22           MR. ALBERTS:  Yes, your Honor.  So before I get

23   into --

24           THE COURT:  Remind me is this Mr. Alberts or

25   Mr. Wiltse?

23

Proceedings

1          MR. ALBERTS:  I'm sorry, this is Jeffrey

2     Alberts.

3          THE COURT:  Go ahead.  Thank you.

4          MR. ALBERTS:  So before I get into our general

5     argument regarding the scope, I just want to briefly

6     address the relevant comment that the government made.

7     And the government is saying it is agreeing to produce

8     all documents that relate to ownership but there are

9     multiple examples of categories of documents that

10    directly relate to ownership that they're refusing to

11    produce.

12          One example is request number 12 which is the

13    bond application.  So a bond application is when a party

14    goes into the court and says I should be entitled to be

15    released because I have all these assets.  But then they

16    give the government, and ultimately that's presented to

17    the Court, a list of assets.  In this case some of those

18    assets are the Celsius shares.  Presumably there's some

19    kind of representation about who owns the Celsius shares

20    and how they own them.  The government's refusing to turn

21    that over.

22          Similarly --

23          THE COURT:  Okay.  Let's take it one at a time,

24    let's take it one at a time since you mentioned that.

25          Request number 12.  Mr. Morris or Mr. Fern,

24

Proceedings

1   counsel believes there was a bond application which lists

2   certain assets including information related to

3   ownership.  Are you in possession of that document?  Do

4   you know what he's referring to?

5           MR. MORRIS:  You know, we do actually have, I'm

6   sure we have the bond application.  We have not, you

7   know, sort of searched for and sort of polled it to

8   actually review the ultimate content of it.  But we're

9   happy to have had addressed the sort of substantive

10  objection that we have with respect to producing it for

11  sure.

12          THE COURT:  All right.  Do you want to be heard

13  then on your objection without necessarily having that

14  document in front of you?

15          MR. MORRIS:  Yes.

16          THE COURT:  (Indiscernible) there.  Go ahead.

17          MR. MORRIS:  Yes.  Thank you, Judge.  So you

18  know, unlike what we were sort of just discussing before

19  with respect to the witnesses and documentation

20  concerning a particular agreement, what we're talking

21  about here is an after the fact ex post facto statement

22  or discussion that we believe is what is being searched

23  for here.  And based upon the case law that we had

24  decided to your Honor in our submission here as well as

25  the initial submission in which your Honor ruled that the

Transcriptions Plus II, Inc.

25

Proceedings

1  government did not have to produce this information, you

2  know, the ex post facto statement about the ownership,

3  you know, of either Nu Horizons or the Celsius shares is

4  really an after-the-fact statement because the merger

5  provisions in the contract surrender those statements and

6  material.

7          I think on the ex post facto statements Mr.

8  Simmons that cited to the *United States v. Julius Baer*

9  case.  And there, the Court had actually held that the

10 claimant's own tax records mentioning the property at

11 issue, were relevant to the topic of his standing, but

12 you know, that case did not involve contracts like we

13 have here with very, very carefully, it appears carefully

14 inserted merger provisions which render the extrinsic

15 evidence as to about what one might have said after the

16 fact just plainly irrelevant.  So we think that case is

17 distinguishable.

18         And so at the end of the day, we think given

19 the district court's ruling here asking for focused

20 discovery on this question of standing, the parties

21 should be directed to the key transactional agreements

22 and that's really what the government has been focused on

23 all the while and we think that, you know, the focus of

24 the discovery should be limited to those agreements and

25 the legal impact of them, including as we've heard before

26

Proceedings

1   just mentioned, the impact of the MITA agreement.  As

2   counsel for Ms. Lee mentioned, there's like an issue as

3   to whether the MITA agreement is legally effective to

4   undo or void ab initio the prior transfers given that it

5   appears that like not every party on the MITA was

6   actually, you know -- not every signatory to the prior

7   agreement was actually on the MITA.

8           So those are the kind of issues that will sort

9   of bear, or you know, the decision on standing should

10  turn on, not what one witness or another might have said

11  after the fact about this question of ownership given the

12  particular burden.  I mean this particular one is not a

13  whole lot of burden because it's a small set of documents

14  but, you know, consistent with the other requests, you

15  know, where there are burdens placed on the government to

16  search its vast database.  You know, we think the prior

17  ruling should stand.

18          THE COURT:  All right.  No, I understand that.

19  So Mr. Morris, why don't you look at that bond

20  application.  Okay?  Since I don't necessarily disagree

21  that it's not a burden to look at that argument.  Take a

22  look at it and if there's information in there that goes

23  to the question of ownership of Nu Horizons, I believe

24  that's what Mr. Alberts is seeking, take a look at that

25  and see whether that's a document that could be produced.

27

Proceedings

1  Okay?

2          MR. MORRIS:  Okay.  Yes, your

3          MR. ALBERTS:  Your Honor, just to be clear --

4          THE COURT:  Hold on.  Go ahead, Mr. Morris.

5  One at a time.  Mr. Morris, you were going to say

6  something.

7          MR. MORRIS:  Yeah, no problem.  I was just

8  acknowledging your Honor's prior ruling and we will go

9  ahead and do that and specifically to see whether or not

10 there's any mention, you know, given that the burden is

11 quite limited, any question as to the ownership of Nu

12 Horizons set forth within the bond application.

13         THE COURT:  Okay.  Mr. Alberts, were you going

14 to say something?

15         MR. ALBERTS:  Yes.  I was just going to clarify

16 that the primary way that it's likely that the

17 representations will be relevant to the ownership of Nu

18 Horizons is representations that would be concerning the

19 Celsius stock.  So the Celsius stock, you know, it's the

20 position of the government, that it was owned by Nu

21 Horizons.  The Celsius stock we understand was used as an

22 effort to support the bond.

23         So statements about who owned the Celsius

24 stock, whether it said, you know, Tim Leissner, Kimora

25 owns it, Nu Horizons owns it, whatever was said, those

28

Proceedings

1   are relevant to the ownership of Nu Horizons because it's

2   very common for somebody to say, you know, for example, I

3   own an asset when they own it indirectly through some

4   entity.  So any statements about who actually owns the

5   Celsius shares is indirectly a statement about who owns

6   Nu Horizons which is the entity --

7              THE COURT:  All right.  So Mr. Morris, Mr.

8   Morris, take a look at the bond application.  All right?

9   I'm not saying you need to produce it at this point in

10  time.  Take a look at it.  If there's information in

11  there regarding ownership of Nu Horizons or Celsius, as

12  Mr. Alberts just discussed, have a conversation with Mr.

13  Alberts to see whether that's a document that the

14  government is prepared to produce.  Okay?

15             If there are other objections to production of

16  that document, we can have a conversation about it if it

17  needs to be redacted in some way or otherwise, but have

18  the conversation with Mr. Alberts about that document

19  once you obtain it.  Okay, Mr. Morris?

20             MR. MORRIS:  Yes.  Absolutely.  Thank you, your

21  Honor.  All right.  Mr. Alberts --

22             MR. ROTH:  Your Honor, your Honor?  I'm

23  sorry --

24             THE COURT:  Yes, go ahead, Mr. Roth.

25             MR. ROTH:  -- this is Michael Roth.

29

Proceedings

1          THE COURT:  Okay.  Go ahead, Mr. Roth.

2          MR. ROTH:  Yes, this is Michael Roth for Kimora

3   Lee Simmons.

4          I just wanted to point out the same request was

5   propounded to Ms. Lee and the burden is significantly

6   different for Ms. Lee which is we would have to search

7   171,000 documents and sort through (indiscernible)

8   anything whether it was pertaining to -- was protected by

9   the marital privilege and other issues.  And whereas

10  anything that was actually submitted to the government

11  should be in the government's possession.  And we'd like

12  to be clear that we are not a part of a requirement of

13  that search at this time.

14         THE COURT:  Okay.  Understood.  I'm only going

15  to ask the government to try to obtain that document if

16  it has it readily available.  Okay?

17         All right.  Mr. Alberts, I know your request is

18  a bit more broader than just request number 12.  Are

19  there any other specific requests you want to discuss in

20  this point in time?

21         MR. ALBERTS:  Yeah.  Another specific request

22  was request number 16.  And I would note that, you know,

23  the government earlier on this call said it was agreeing

24  to produce all the documents that relate to ownership.

25  It's already modified that position and admitted it's not

30

Proceedings

1    agreeing to produce documents that relate to ownership

2    that were created after the MITA.  That's a very

3    different position.  And that is actually the

4    government's position.

5            Request number 16 is another document that

6    falls into that category.  It's a document that was --

7    request 16 relates specifically to a representation that

8    was made by Tim Leissner in which he said that Russell

9    Simmons was the beneficial owner of the Celsius shares

10   through Nu Horizons.  It's hard to imagine a more

11   directly relevant statement.  And yet both parties are

12   refusing to produce the documents that relate to that

13   request which is directly about the ownership of Nu

14   Horizons by Russell Simmons.  We think they should have

15   to produce all those documents.

16           THE COURT:  All right.  So you're referring to

17   a very specific document, a document from February 2020,

18   correct?

19           MR. ALBERTS:  Well, documents concerning that

20   document, yes.  That representation in that document.  So

21   I think we have that document, but anything that concerns

22   the statement in that document or that document that's

23   the nature of the --

24           THE COURT:  All right.  That February 2020

25   document, what is that document?

31

Proceedings

1          MR. ALBERTS:  I do not have it in front of me.
2   I believe it's a written statement by Tim Leissner saying
3   that Russell Simmons is a beneficial owner of the Celsius
4   shares.  I mean that's part of what we want in discovery
5   is to know exactly what that document is.  Like any
6   information that anyone has about it, you know, how it
7   was created, who created it, who sent it, what the basis
8   for it was.  You know, we want to know.
9          THE COURT:  Right.  And your view is that
10  document, the February 5, 2020 document, supports your
11  position.  Is that fair to say?
12         MR. ALBERTS:  Yeah, we think it supports our
13  position but more to the point, I don't think either side
14  should be limited to documents that support their
15  position.  It's relevance.
16         THE COURT:  I understand.  But I'm asking you
17  the February 5, 2020 document, the statements set forth
18  in that document support Mr. Simmons's position in this
19  case.  Is that fair to say?
20         MR. ALBERTS:  Yes.
21         THE COURT:  Okay.  So help me understand what
22  more do you need beyond that?  Well, let me ask you
23  another question.  Your understanding is that statement
24  was prepared by Mr. Leissner, correct?
25         MR. ALBERTS:  We think so.  But whatever

32

Proceedings

1    information anyone has about it is going to shed light on

2    it.  Presumably the other parties are not going to just

3    concede yes, that's accurate.  So you know, if for

4    example, Kimora met with Tim Leissner and they drafted it

5    together and they basted it on a bunch of other documents

6    they had, that would be very helpful to know.

7              You know, any other information that other

8    people have will affect the strength of the arguments

9    that Mr. Simmons can develop based on the statement this

10   is in that document.

11             And this goes more generally to the point that

12   it's not the case that a document in order to be relevant

13   to ownership has to be determinative on ownership which

14   seems to be the government's position.  Like the

15   government's position seems to be anything after the MITA

16   can't be relevant even if it's an explicit statement

17   about ownership because he didn't determine the

18   ownership.  But that is not how relevance works.  Mr.

19   Simmons should be allowed, for example, to confront Ms.

20   Lee with any statements that she made where she said that

21   she didn't own Nu Horizons.

22             The government can't just rely on documents

23   that say she does own Nu Horizons but not provide us with

24   information that we could use to inquire other witnesses

25   about whether or not they actually had ownership.  And

33

Proceedings

1   that may lead to fruitful lines of examination in

2   depositions which is why discovery works that way.

3   You're not required to only produce documents that are

4   determinative of the issue.  It's documents that may shed

5   light on the truth or falsity of the position that you're

6   taking and the other side is taking.

7            THE COURT:  Right.  I understand.

8            MR. ALBERTS:  And (inaudible).

9            THE COURT:  I understand.  But I'm also

10  balancing the needs of this case given the issues before

11  the Court at this point in time but also proportionality

12  as well.

13           So as I understand it in request number 16, you

14  are looking for any additional documents that form the

15  basis for the representations in that document that Mr.

16  Simmons has beneficial ownership of the Celsius stocks.

17  Is that fair to say?

18           MR. ALBERTS:  Or that relate to it in some

19  other way.  For example, if Ms. Lee and her husband were

20  sending drafts of that document back and forth by email,

21  we would want to see those drafts by email.  Or if they

22  were chatting by text with each other whether they should

23  send that statement, we would want to see those texts

24  where they're chatting about whether to send that

25  document.  And it's not likely that that's going to be a

34

Proceedings

1  huge number of documents or tremendously burdensome on

2  anybody.  And it relates directly to an incredibly

3  powerful piece of evidence.

4       THE COURT:  All right.  Mr. Morris or Mr. Fern,

5  do you want to be heard on request number 16?

6       MR. MORRIS:  Yes, we would.  Thank you so much,

7  Judge.  I mean look, I think where there's a significant

8  difference here is that based upon the integration

9  provisions of the contract, you know, what defendant

10  Leissner may or may not have said in 2020 about transfers

11  that took place in 2018, and specifically what he may

12  have said about the Celsius shares when the issue here is

13  whether or not for standing purposes Mr. Simmons, you

14  know, was a member of Nu Horizons or had a membership

15  interest in Nu Horizons is really not relevant to the

16  question, the very narrow question that the parties have

17  been asked to focus in on for this purpose of standing.

18       We said before, and no reason to rehash it, but

19  you know, the transfers are governed by those contracts

20  and what defendant Leissner or frankly any other third

21  party said sort of after the fact of who owns what is

22  just really immaterial.

23       And you know, the law really is pretty clear.

24  We've cited the cases on it as to the importance of this

25  rather than -- you know, given the ultimate, you know,

35

Proceedings

1  the size of our sort of database and I was just sort of

2  thinking about how we would go about even trying to find

3  something like this if we were to have it, it's just not

4  entirely clear to us at this point how we're going to

5  even approach that.

6          But suffice it to say, we just think that the

7  balancing between relevance and proportionality on 16,

8  you know, shouldn't counsel in favor of any further

9  discovery on this document that the defendant Leissner

10 had made.

11         THE COURT:  Mr. Roth, do you want to be heard

12 on this (inaudible)?

13         MR. ROTH:  Yes, I do, your Honor.  And let me

14 say we do agree it's not relevant.  But let me provide a

15 little context for this document.

16         It's a letter written on February 5, 2020 on Nu

17 Horizons' letterhead by Mr. Leissner.  Ms. Lee wasn't

18 involved in the drafting of this document.  And we

19 produced the document and have searched for documents

20 relating to it.  The actual creation of the document,

21 there's not going to be other documents to produce.

22         The problem with this request is it's much

23 broader than what has just been described to you because

24 it includes any documents concerning Ms. Lee's awareness

25 about this document, her knowledge concerning this

36

Proceedings

1  document, or her belief in the truth of this statement.

2  And we've spent the last three years in California

3  litigating over this document.  We've had hearings that

4  have gone on for hours.  We've had I think almost three

5  hours of hearings in trial court.  We've had an appellate

6  argument.  There's a petition to the Supreme Court

7  including on the veracity of this document.  And the

8  expansive scope of this request goes way beyond the

9  document itself and its creation.  The burden on that

10  would be minimal.

11          Request number 16 states, like many of these

12  requests, it starts with a narrow statement and then goes

13  on to have including clauses.  There are (indiscernible)

14  require the production of thousands of documents, or

15  pages of documents.

16          THE COURT:  Mr. Alberts, I'll give you the last

17  word.  Anything else you want to say on request number

18  16?

19          MR. ALBERTS:  Yeah.  I guess if there were

20  thousands of pages of documents about whether Ms. Lee

21  thought it was true that Russell Simmons owned Nu

22  Horizons, we should see those thousands of pages of

23  documents.

24          MR. ROTH:  I'm sorry, (inaudible cross talk) --

25          MR. ALBERTS:  That is the core of this --

37

Proceedings

1          MR. ROTH:  -- the documents (inaudible cross

2   talk) --

3          THE COURT:  Mr. Roth, one at a time.

4          MR. ROTH:  -- (inaudible cross talk) --

5          THE COURT:  Mr. Roth, hold on.  Mr. Alberts has

6   the floor.  Go ahead, Mr. Alberts.

7          MR. ALBERTS:  And my second point is the fact

8   that Ms. Lee has been expending substantial resources in

9   another action to I guess avoid producing these documents

10  doesn't mean they're not relevant.  To the extent that

11  she has documents that are about whether or not she

12  believed that Russell Simmons owned Nu Horizons, those

13  are obviously within the scope of permissible discovery

14  in a dispute that is focused on whether or not Russell

15  Simmons owned Nu Horizons.  That is the core of the

16  standing dispute that is currently before the Court.

17         THE COURT:  All right.  Mr. Roth, you want to

18  be heard?  You were going to say something else.

19         MR. ROTH:  Yeah.  That just misstated what I

20  said completely.  There are thousands of pages of

21  documents in the California case that relate to the

22  veracity of the statements in this document.  They're not

23  thousands of documents about this document and the

24  underlying ownership issue.  And many of those documents

25  are privileged.

38

Proceedings

1          These requests are drafted in such a broad

2    term, you have a letter brief about the scope of

3    discovery, but they don't address the scope of these

4    particular requests.  And the way Mr. Alberts is

5    mischaracterizing my statements in these requests is

6    incorrect.

7          THE COURT:  All right.  I'm going to deny the

8    request for additional production regarding request

9    number 16.  I find based on the conversation we've had

10   this morning that in fact the statements in that letter

11   support Mr. Simmons's position.  If they didn't, that

12   would be different conversation we'd be having.  But I do

13   find that in light of the fact that they support Mr.

14   Simmons's position, I think additional discovery beyond

15   that would be disproportionate to the needs of this case

16   at this time.  Okay?

17          All right.  Mr. Alberts, any other request you

18   want to discuss today?

19          MR. ALBERTS:  So the other arguments we wanted

20   to make don't relate to the specific requests but rather

21   the broader dispute between the parties.  So may I turn

22   to it now?

23          THE COURT:  All right.  You want to be heard on

24   that?

25          MR. ALBERTS:  Yes.

                                                                    39
                              Proceedings

 1          THE COURT:  All right.  Go ahead.

 2          MR. ALBERTS:  So first of all, the government

 3   and Ms. Lee spent a great amount of their time attacking

 4   an argument that Mr. Simmons is not making which is that

 5   he's entitled to documents because they're relevant to

 6   other disputes in this action.  That's just not the case.

 7          Mr. Simmons is requesting documents that relate

 8   directly to his theories on standing and neither the

 9   government nor Ms. Lee have identified any document

10   requests that are not relevant to Mr. Simmons's standing

11   arguments.

12          The actual dispute here is not about whether

13   the requests are relevant to Mr. Simmons's standing

14   arguments.  The actual dispute is whether the government

15   and Ms. Lee can refuse to produce documents that are

16   directly relevant to Mr. Simmons's standing arguments by

17   offering summary judgment style attacks on the legal

18   narrative of those arguments.

19          So I'd like to now turn to the only real

20   dispute here which is about whether they can refuse to

21   produce documents that are relevant to Mr. Simmons's

22   standing argument.  And on that, they basically argued

23   two categories of arguments.

24          First, that Mr. Simmons's defenses are based on

25   pure speculation.  That should be denied because they're

40

Proceedings

1   speculative.  There's not a factual basis.

2          And second, that Mr. Simmons's defenses are

3   legally flawed.

4          So turning first to the argument on whether

5   they're speculative.  Defenses for which they are

6   refusing to produce responsive documents include first

7   that Kimora secretly sold Keyway Pride before signing the

8   stock transfer agreement and therefore lacked authority

9   to execute the stock transfer agreement.  So there's a

10  clear factual basis for that which is that Celsius

11  Holdings, the company itself, filed an SEC filing that

12  stated that Keyway Pride had been sold before the stock

13  transfer agreement was executed.  That's a clear factual

14  basis.

15         It's not -- neither is it disputed that Kimora

16  concealed from Russell Simmons that she no longer owned

17  Keyway Pride when she signed the document on behalf of

18  Keyway Pride.  So the argument then owner of Keyway Pride

19  can't act on behalf of the company after selling it is

20  hardly speculative.

21         The second defense that Kimora offers is that

22  she was entering into the stock transfer agreement to

23  defraud Russell Simmons with no intention of paying him.

24  That also is not speculation.  This isn't a situation in

25  which, you know, Mr. Simmons is just saying I don't

41

Proceedings

1    think -- I think maybe my ex-wife wasn't going to pay me.

2    There are very specific facts that support this.

3           First, as I mentioned about Kimora did not

4    disclose to Russell Simmons when she signed the stock

5    transfer agreement under which Keyway Pride promised to

6    pay him 14 million, the Keyway Pride was no longer owned

7    by her.  That's obviously a major deception and it's not

8    factually disputed.  It's also obviously a huge material

9    change that from Russell Simmons's perspective he wasn't

10   doing a deal with his ex-wife who he knew well, he was

11   doing a deal with some Middle Eastern businessmen whose

12   identity has not been disclosed to him as counterparties.

13          Second of all, both parties here make much of

14   this notion that the idea that there was some type of

15   attempt to engage in an asset protection scheme that

16   Kimora and Tim Leissner were engaged in in May of 2018 is

17   just this wild speculation.

18          But there's a very clear factual basis in the

19   record from the trial of Roger Ng as to that being the

20   case.  Tim Leissner testified under oath that he and

21   Kimora were planning in 2018 to sell assets including

22   Keyway Pride to Ghanim Al-Saad and then hide the proceeds

23   in a bank in Liechtenstein.

24          He testified that Ghanim owned Newland Limited.

25   He explained that the plan was for Kimora to sell Keyway

42

Proceedings

1   Pride to Gamine through entities that he owned including

2   Newland, and he testified that this is part of an asset

3   protection plan and that as part of this plan he and

4   Kimora went to Liechtenstein in May 2018 and the two of

5   them met with lawyers and trust companies in an effort to

6   hide the assets.

7            And he testified that what the plan was was to

8   sell the assets to Ghanim Al-Saad, then put the proceeds

9   from the sale in a bank in Liechtenstein where nobody

10  could touch them.  This was in May 2018.  This is the

11  exact time period when she entered into the stock

12  transfer agreement with Russell Simmons which was dated

13  May 25, 2018 right when during the period that she was

14  going to Liechtenstein.  And who was the company that was

15  secretly owning Keyway Pride?  It was Newland.  It was

16  Ghanim Al-Saad.  We have evidence that this is exactly

17  what was happening.

18           Third, another powerful piece of evidence that

19  Kimora intended to quickly sell the assets to Newland and

20  then hide the proceeds in Liechtenstein rather than pay

21  Russell Simmons is that Russell Simmons in fact wasn't

22  paid.  So everything happened exactly the way that Tim

23  Leissner testified, who's a cooperating witness for the

24  government, exactly the way that he testified it was

25  supposed to work during his trial.  So that's hardly

43

Proceedings

1   speculation.  This is incredibly compelling and direct

2   evidence that there was fraud going on.

3          THE COURT:  So Mr. Alberts, let me stop you for

4   a minute there.  Given that you have all this evidence

5   supporting your argument that there was a fraud going on

6   here, what more do you need in discovery then if you

7   already have all this evidence that's corroborated?

8          MR. ALBERTS:  Well, the evidence that we have

9   is evidence of Tim Leissner, that he was engaging

10  generally in an asset protection scheme that involved

11  Newland.  Presumably Ms. Lee is going to say that this

12  transaction wasn't part of that scheme, that even though

13  yes, it involved Newland and it was done right when she

14  traveled to Liechtenstein, in fact it was a good faith

15  contract that she was signing and is completely

16  enforceable.  We need evidence to rebut that.  That's

17  what discovery is for.  We're not required to rely on,

18  you know, the testimony of Kimora's ex-husband who's a

19  cooperating witness and who presumably Ms. Lee will feel,

20  you know, very entitled to attack.

21         THE COURT:  I understand.  But the evidence you

22  have for Mr. Leissner, that evidence supports your view

23  as to the fraud that took place in this case and your

24  client's standing.  Is that fair to say?

25         MR. ALBERTS:  It supports it, yes.  I mean it's

44

Proceedings

1    a good faith basis for us to make these highly relevant

2    document requests.  It can't be a Catch-22 where you

3    can't request documents unless you have a good faith

4    basis but if you have a good faith basis you're then not

5    allowed to get the documents because you already have the

6    good faith basis.

7             THE COURT:  I understand.  But during the

8    timeline that we're operating under here, right, I'm

9    trying to balance the burdens on all parties and the

10   proportionality of the request as well.  Right?  You have

11   evidence that you articulated of this alleged fraud by

12   Leissner in protecting his assets.  Right?  So what

13   you're seeking now I suppose is, and that evidence

14   supports your position, I take it you're trying to seek

15   evidence to the contrary, right, which would

16   theoretically hurt your position.  Is that fair to say?

17            MR. ALBERTS:  No, that's not at all what I was

18   trying to say.  The focus of the trial of Roger Ng was

19   not on Mr. Simmons's ownership interest in Nu Horizons.

20            THE COURT:  Understood.

21            MR.  ALBERTS:  There were statements made that

22   there was a fraud going on involving Newland.  The

23   primary discussion was about other assets of Newland.

24   And while it provides a good basis for us to inquire

25   further of Ms. Lee, who was the person who actually

45

Proceedings

1   signed all of these documents and who isn't the person

2   who testified in this way at the trial, to confirm

3   whether or not this transaction was actually part of that

4   fraudulent scheme unless she's willing to concede it.

5   But if she's going to deny it and sit on all the

6   documents that she has that are relevant to that, that

7   will not allow us to properly develop our defense.

8           THE COURT:  Okay.  What would be helpful for

9   the Court is, I know you've listed your requests

10  specifically, if there are specific requests for which

11  you think you still need responses, I think it might be a

12  more efficient way to proceed that way as opposed to this

13  broad perspective where you want all discovery related to

14  this alleged fraudulent transaction.  All right?  If

15  there are specific requests for specific documents for

16  which you want responses to, it might be more productive

17  talking about each of those individually.  Okay?

18          I'm not prepared at this point to reconsider my

19  prior view as to the scope of discovery.  I know we've

20  addressed a couple of these requests today including

21  number 16 and 12 and 13 relating to the appearance bond.

22  If there are specific documents for which you think you

23  still need responses, or request any responses to, maybe

24  we could address it that way.  Okay?

25          MR. ALBERTS:  Okay.

46

Proceedings

1           THE COURT:  But just a broad let's expand the

2   scope of discovery I'm not prepared to think about it in

3   that fashion.  Okay?

4           MR. ALBERTS:  Okay.  I would just like to say,

5   if I may, one quick thing on the nature of the burden

6   because it seems like the reason that Mr. Simmons is not

7   being allowed to obtain documents that support his

8   defenses is somehow based on a concept of proportionality

9   or burden.  And I would just like to underscore that

10  first of all, this is a billion dollar dispute.  The

11  burden that is being cited by the government and Ms. Lee

12  are nowhere close to what is customary in a dispute for

13  even a tiny fraction of this size.

14          And second of all, it's not the case that the

15  government has been withholding documents because it

16  doesn't have the resources to devote to identifying the

17  documents.  It's withholding the documents tactically.

18  The government claims that its database has 4.5 million

19  documents but it also has told Mr. Simmons that it

20  individually reviewed every document in the database that

21  contained the terms Kimora, Keyway, Nu Horizons and

22  Celsius.  It says it reviewed them.

23          So at this point there's no burden if they

24  looked at those documents in a database.  It could click

25  responsive and produce or not responsive.  And document

47

Proceedings

1    after document it refused to produce them.

2          At the last oral argument, the government

3    stated there were 44,000 hits for Kimora and 18,000 hits

4    for Celsius.  But the total number of documents produced

5    for those two terms and the term Nu Horizons and Keyway

6    is 129 documents.  So it's not the case that the

7    government is avoiding producing documents because of a

8    constraint on resources or proportionality.  It's sitting

9    there looking at all the documents that have the words Nu

10   Horizons and document after document saying don't

11   produce, don't produce, don't produce, don't produce.

12         And to sum up that process, after the

13   government devoted all the resources it needed to look at

14   every single document that refers to Nu Horizons, it's

15   producing a total of 129 documents.

16         So there's no disproportionality, there's no

17   burden.  There's just a tactic to further the

18   government's litigation strategy not producing documents

19   that it is looking at and that it knows we've requested

20   and we want because it thinks it would advance its chance

21   of prevailing in this action to not turn them over.

22         THE COURT:  All right.  Let me turn back to the

23   government.  Now, in document number 52, which is your

24   response to the motion filed by Mr. Simmons, in footnote

25   4 you refer to your view of the underlying agent notes

48

Proceedings

1   302 and the statements and you indicated that there are

2   about I believe 264 pages of documents that could be

3   responsive.  Is that correct, Mr. Morris?

4            MR. MORRIS:  Actually, Mr. Fern was going to

5   address that.  He's done the work on that.

6            THE COURT:  Go ahead, Mr. Fern.

7            MR. MORRIS:  Okay.  Thank you.

8            MR. FERN:  Yes, your Honor.  Now, so there are

9   191 pages of 302s, seven 302s that total 191 pages.  On

10  top of that, there are also 264 pages of notes that are

11  attached to those 302s.  So the ultimate number would be

12  191 plus 264.

13            THE COURT:  All right.  So about 400 plus

14  pages?

15            MR. FERN:  That's right.

16            THE COURT:  All right.  And is it your view --

17            MR. FERN:  455.

18            THE COURT:  Is it your view that these

19  documents are responsive to the requests that you had

20  agreed to respond to?

21            MR. FERN:  Not the bulk of the 302's.  There

22  may be like portions of those 302s that may be responsive

23  in part.  The bulk of the 302s go to the underlying 1MDB

24  investigations of fraud.  There are just specific

25  portions of those seven 302s that are potentially

49

Proceedings

1    responsive.

2            THE COURT:  All right.  Are you open to

3    producing perhaps in redacted form some of those notes?

4            MR. FERN:  One second, your Honor.  No, your

5    Honor, we would not be because as we wrote in footnote 4,

6    it would just be impossible or impractical to separate

7    the responsive portions from the non-responsive portions.

8            And in addition, I think the case that we cite

9    at the end of our thing, the -- one second, your Honor.

10   The *American Oversight v. Department of Justice* case that

11   we cite, (2d. Cir. 2022), those 302s are attorney work

12   product and therefore we would not want to only reveal

13   portions of attorney work product.

14           THE COURT:  Okay.  When you say it's impossible

15   to parse out the responsive and non-responsive portions,

16   what do you mean by that?  You can't redact certain parts

17   that are non-responsive?

18           MR. FERN:  It just wouldn't make sense because

19   you would need the context of the underlying sort of

20   paragraphs that they're broken up into.  Part of the 302s

21   discuss, you know, underlying parts of the investigation

22   and then how it ties to the responsive part.  So it just,

23   it would be like a broken sentence.

24           THE COURT:  All right.  And these are I think

25   you mentioned statements from seven different witnesses

50

Proceedings

1    or is that -- how many witnesses are memorialized in

2    these statements?  Is it just one person?

3              MR. FERN:  One witness.  The government's

4    cooperating witness.

5              THE COURT:  Okay.  So Leissner?

6              MR. FERN:  Yes.

7              THE COURT:  All right.  Mr. Alberts, do you

8    want to be heard on the notes?

9              MR. ALBERTS:  Yes.  Two things.  I mean first

10   of all, I think there are a number of current and former

11   federal prosecutors on the line and every federal

12   prosecutor knows that not only is it possible to turn

13   over redacted versions of 302s, it happens in almost

14   every criminal trial.  It's part of your Brady and Giglio

15   obligations and prosecutors do it all the time.  Courts

16   expect it.  No prosecutor said with a straight face, look

17   at a district court judge in a criminal case and say we

18   just can't turn over the Brady and Giglio because we

19   can't figure out how to redact the interview notes.

20             And that's such a common process that when

21   they're prepared, the people preparing them often know

22   that they're going to be later turned over.  And that's

23   completely typical, it happens all the time and it's

24   absurd to assert that it's something that cannot be done.

25             And to the extent that there are portions where

51

Proceedings

1  it's difficult for some reason, there are well

2  established ways of addressing those reasons.  So you

3  know, it may be possible to retype a summary of a certain

4  portion if it's somehow not relevant.

5          But also in this case there's a protective

6  order.  You know, there potentially could be a way of

7  addressing issues through an attorneys eyes only order.

8  Those are all readily achievable.

9          With respect to the government's citation to

10 *American Oversight v. United States Department of*

11 *Justice*, I would just point out that the distinction that

12 the federal courts draw both in the Second Circuit and

13 outside the Second Circuit is between fact and opinion

14 testimony.  And the courts have ordered the production of

15 interview notes.  So it's clearly not the case that

16 interview notes are somehow protected as per se work

17 product privilege.

18         For example, we cite *In re John Doe Corp.*, 675

19 F.2d 482 (2d Cir. 1982) in which there was a requirement

20 the interview notes be turned over, as well as *United*

21 *States (indiscernible)* in which there was -- and it was

22 D.C. Circuit decision.  And that one it involved

23 statements recorded by FBI agents and other criminal

24 investigators.  And the Court said that they had to be

25 turned over because the relevant threshold was met.

52

Proceedings

1        So I think in this case they should be

2   required -- it's easy to redact and turn over just the

3   portions that are relevant.  It's not realistic to

4   somehow undermine the government's law enforcement and so

5   there are easy ways to address that issue.  And they

6   clearly fall into the category , 80 what I do the phone

7   you of statements that were identified in *United States*

8   *v. (indiscernible) Sports Corp*. of statements where

9   there's a demonstrable need.  So accordingly, we think

10  that those statements should be permitted.

11       THE COURT:  All right.  How about this?  Mr.

12  Fern, why don't you produce those records to the Court in

13  camera for the Court's review.  Submit to the Court a

14  clean version of the materials and a version that's

15  highlighted where you highlight those portions of the

16  statements that could be responsive to the request to

17  which you had already agreed to respond to.  Okay?  If

18  you can submit that to the Court in camera, how much time

19  do you think you'll need to do that?

20       MR. FERN:  I mean your Honor, the underlying

21  302s may be a little bit easier, the agent notes.  That

22  would take substantially more time because again, they're

23  handwritten notes and we would have to go back to the

24  authors of the 302s to figure out what the notes, to the

25  extent that they're unreadable or at least, you know,

53

Proceedings

1  hard to decipher what was said.  But the underlying 302s

2  I think would take about a week.

3          THE COURT:  Well, help me understand.  Is there

4  a difference between the typed notes and the handwritten

5  notes?  Are the typed notes summaries or are they based

6  on the handwritten portions of the notes?

7          MR. FERN:  No.  So some FBI agents will

8  handwrite their notes and then use their handwritten

9  notes to generate the 302 which is the formal interview

10 report.  Other agents will handwrite -- will, I'm sorry,

11 type their notes and then use those typed notes to

12 generate the formal FBI 302 report.

13         THE COURT:  Okay.  Now, in terms of the

14 handwritten notes, do you believe there's information in

15 those handwritten portions that could be responsive?

16         MR. FERN:  I presume they may be to the extent

17 that it made its way into the actual formal 302 report

18 but we haven't looked at the handwritten notes.

19         THE COURT:  So just so I'm -- I want to be

20 precise here.  The handwritten notes were not sent (audio

21 broke up) later on.  Is that correct?

22         MR. FERN:  They were typed up as a formal FBI

23 302 report.  So there are two sort of pieces to an FBI

24 302 report.  There's the formal report that gets -- that

25 formally memorializes the interview.  And then there's

54

Proceedings

1    the notes that sort of an agent will take contemporaneous

2    with the interview so that he can sort of refresh his

3    recollection while preparing the formal report.

4              THE COURT:  All right.  So presumably

5    whatever's in the handwritten portion, that was

6    memorialized in the typed report.  Is that fair to say in

7    general?

8              MR. FERN:  That's correct.  Yes.

9              THE COURT:  All right.  So the 191 pages, those

10   are the typed reports.  Is that right?

11             MR. FERN:  That's correct.

12             THE COURT:  All right.  And then the underlying

13   handwritten portions are the 264 pages?

14             MR. FERN:  That's right.

15             THE COURT:  All right.  So submit to the Court

16   for in camera review just the typewritten notes, okay?

17   The 191 pages.  All right?

18             MR. FERN:  Okay.

19             THE COURT:  I do not need the handwritten

20   notes.  And submit to the Court one version that's

21   highlighted where you highlight those portions that could

22   be responsive.  Okay?  And the other --

23             MR. FERN:  Okay.

24             THE COURT:  -- (inaudible) copy.  Okay?

25             MR. FERN: Sure.

55

Proceedings

1          THE COURT:  Now, you can go ahead and file that

2    on the docket sheet under seal.  Okay?  And also give the

3    Court a courtesy hard copy of that as well.

4          All right.  And give me a date by which you can

5    submit that to the Court.  You tell me.

6          MR. FERN:  Next Monday is -- hold on one

7    second, your Honor.  Would the 28th be okay for your

8    Honor?

9          THE COURT:  Make it the 29th.

10         MR. FERN:  Okay.

11         THE COURT:  Now, question for you.  Typically

12   in this situation I ask the government to produce a

13   privilege log.  Would it be just one line or would you

14   have multiple lines on there?  I assume you have multiple

15   agents, right?  This is not one interview.  It's over the

16   course of a period of time.  Is that fair to say?

17         MR. FERN:  Yes, your Honor.  They date back

18   from 2018 through around the time of Roger Ng's trial in

19   2021.  So the staffing changed over that time.

20         THE COURT:  All right.  Between now and May

21   29th, can you prepare a privilege log as well?

22         MR. FERN:  Sorry, one second.  Yes, your Honor,

23   we can do that.

24         THE COURT:  Okay.  So the privilege log, unless

25   you have any objection, go ahead and file that publicly

56

Proceedings

1   on ECF.  Okay?  So make sure Mr. Simmons has just a copy

2   of that privilege log.  Okay?

3            MR. FERN:  Yes, your Honor.

4            THE COURT:  All right.  But the underlying

5   documents, the handwritten portion, submit that under

6   seal and a hard copy to chambers.  Okay?

7            All right.  Now, Mr. Alberts, after I've

8   reviewed the submissions to the Court, I will address

9   whether those should be reproduced and in what form if

10  any at all.  Okay?

11           MR. ALBERTS:  Thank you, your Honor.

12           THE COURT:  All right.  Mr. Morris or Mr. Fern,

13  anything else for the government today?

14           MR. MORRIS:  Yeah, we have nothing else.  Your

15  Honor, just in terms of setting the record straight in

16  case there's any further litigation as it relates to this

17  issue and burden, I just wanted to sort of clarify that

18  we have not -- this is not as easy as counsel for Mr.

19  Simmons makes it out to be.  When we ran for instance

20  Celsius and Nu Horizons against the database, that was in

21  response to a specific request that was date limited, you

22  know, between 2018 and the present which was something

23  that we were able to not have an undue burden in

24  reviewing.

25           If we're going to expand something like Celsius

57

Proceedings

1    and Nu Horizons out across the entire database going back

2    years through the investigation, you know, that would

3    present a significant and substantial burden.  I just

4    wanted to clarify that point.  Thank you, Judge.

5            THE COURT:  All right.  Anything else for you,

6    Mr. Alberts?

7            MR. ALBERTS:  There is one other thing that I

8    think is worth calling to the Court's attention which I

9    guess is a (indiscernible) egregious example of how Mr.

10   Simmons is kind of being subjected to a different burden

11   than some of the other parties and that is the government

12   requested from Mr. Simmons documents concerning Mr.

13   Simmons's ownership of Nu Horizons including Mr.

14   Simmons's tax filings, Mr. Simmons's financial records

15   and other statements by Mr. Simmons of what the assets

16   were that he owned.  And the government requested those

17   because the government thought that that was probative

18   evidence on the ownership of Nu Horizons.

19           Mr. Simmons produced those.  Mr. Simmons has

20   made the exact same request of the government and Ms. Lee

21   saying, you know, it's the positions of the other parties

22   that Nu Horizons -- or Mr. Simmons's position is that Nu

23   Horizons is owned by Mr. Simmons.  The position of the

24   other parties is that Nu Horizons was owned by either

25   directly by Ms. Lee or indirectly through Keyway Pride.

58

Proceedings

1        So the other parties should be required to

2   produce the analogous records for Ms. Lee and Keyway

3   Pride which would reflect in her tax statements, for

4   example, whether she actually owned Nu Horizons.  But the

5   other parties are refusing to produce those documents

6   even though the government requested them and Mr. Simmons

7   produced them.  And there's little more directly relevant

8   to ownership than a sworn statement about whether you own

9   something, whether it is in a tax filing or whether it is

10  in like an application for a loan.  And Mr. Simmons

11  should not be, you know, required to produce these

12  documents in response to requests from the other parties

13  but then be denied to get the exact same analogous

14  records from the other parties in order to defend his

15  claim.

16        And this relates -- you had asked for specific

17  requests which relates to request number 11 which

18  includes tax filings by Nu Horizons and tax filings by an

19  purported owner of Nu Horizons including Tim Leissner or

20  Keyway Pride.

21        THE COURT:  Just so I'm clear, request number

22  11 directed for the government --

23        MR. ALBERTS:  Both the government and Ms. Lee.

24        THE COURT:  Okay.  What I'd like to do is I'm

25  going to schedule another call in a couple of weeks.

59

Proceedings

1   Specific requests such as that one, Mr. Alberts, and the

2   conversation with Mr. Roth.  Okay?  If the requests are

3   tax records, maybe that's something the two of you can

4   work out.  Okay?

5             MR. ALBERTS:  Understood.

6             THE COURT:  All right.  Anything else, Mr.

7   Alberts?

8             MR. ALBERTS:  No, your Honor.

9             THE COURT:  Mr. Roth, anything else for Ms.

10  Lee?

11            MR. ROTH:  No, your Honor.  Thank you.

12            THE COURT:  All right.  Ms. Parlovecchio?

13            MS. PARLOVECCHIO:  Nothing further for us, your

14  Honor.

15            THE COURT:  All right.  Ms. Geragos?

16            MS. GERAGOS:  No.  Thank you, your Honor.

17            THE COURT:  All right.  So we stay on track

18  what I want to do is schedule another call on June 3rd at

19  10 a.m.  Mr. Morris or Mr. Fern, does that day and time

20  work for you?

21            MR. MORRIS:  If you can bear with us one

22  second, Judge, and we'll let you know.  Yes, that works.

23  Thank you, Judge.

24            THE COURT:  All right.  Mr. Alberts?

25            MR. ALBERTS:  Yes, your Honor.

60

Proceedings

1          THE COURT:  All right.  Mr. Roth, what about

2    you?

3          MR. ROTH:  Your Honor, that works.  If there's

4    any way we can do it at 11 a.m. -- I'm sorry, would this

5    be a remote appearance ora  --

6          THE COURT:  Yes, we'll do it by telephone.

7          MR. ROTH:  If there's any way we can do it one

8    hour later?  I'm on the west coast (inaudible).

9          THE COURT:  Okay.  11 a.m. is fine.  Mr.

10   Alberts, does that work for you?

11         MS. GERAGOS:  Your Honor, this is Teny Geragos.

12   I'm sorry, but before we confirm with everybody, I have a

13   court appearance that morning in Yonkers and wondering if

14   we can do it in the afternoon.

15         THE COURT:  All right.  How about 3 o'clock in

16   the afternoon?  Actually no, let's make that 2 o'clock.

17         MS. GERAGOS:  That works for me.  Thank you.

18         THE COURT:  Does 2 o'clock not work for anyone?

19   If so, please tell me now.  Okay.  Hearing no objection,

20   we'll reconvene on June 3rd at 2 o'clock in the afternoon

21   by telephone.  Okay?  I'll expect to see the court's or

22   the government's submission on May 29th.

23         If there are additional motions that are going

24   to be filed in advance of the June third conference, file

25   it by also May 29th.  Okay?

61

Proceedings

1          So in light of that, if the parties need to

2     meet and confer over any of the issues we've discussed

3     today, do it before the 29th.  Okay?

4          All right.  With that, we are adjourned.  Have

5     a nice day, everyone.

6          ALL:  Thank you.

7                    (Matter concluded)

8                        -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

62

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **24th** day of **May**, 2024.

*Mary Greco*
Transcriptions Plus II, Inc.