UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

In Re Forfeiture Order of Tim Leissner

**MEMORANDUM & ORDER**
23-MC-1505 (MKB)

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Tim Leissner pleaded guilty in 2018 to one count of conspiracy to violate the Foreign Corrupt Practices Act ("FCPA") in violation of 18 U.S.C. § 371 and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). (Am. Prelim. Order of Forfeiture ("Am. Forfeiture Order") 1, Docket Entry No. 1; Information ¶¶ 46–48, *United States v. Leissner*, No. 18-CR-439, Docket Entry No. 16.) Leissner consented to the entry of a $43.7 million money judgment against him, and the Government seeks forfeiture of 3,325,942 shares of stock in Celsius Holdings, Inc. ("Celsius") held in a J.P. Morgan Chase Bank brokerage account in the name of Kimora Lee Simmons (the "Celsius Shares"). (Am. Forfeiture Order 1–2.) Petitioner Ken Siazon ("Siazon") filed a petition pursuant to 21 U.S.C. § 853(n) asserting a claim to the forfeited shares (the "Siazon Petition").[1] (Verified Pet. of Ken Siazon ("Siazon's Pet."), Docket Entry No. 8-1.)

---

[1] Petitioner Ng Chong Hwa, also known as Roger Ng, ("Ng"), Kimora Lee Simmons-Leissner ("Lee"), and Russell Simmons ("Simmons") have also filed petitions pursuant to 21 U.S.C. § 853(n) asserting a claim to the forfeited shares. (Verified Pet. of Roger Ng, Docket Entry No. 4-1; Verified Pet. of Kimora Lee Simmons-Leissner, Docket Entry No. 3-1; Verified Pet. of Russell Simmons ("Simmons' Pet."), Docket Entry No. 5-1.) Simmons' petition asserted both a direct and a derivative claim to the forfeited shares. (Simmons' Pet.) On December 26, 2023, the Court dismissed Simmons' direct claim for lack of standing, but determined that he had standing to pursue a derivative claim on behalf of Nu Horizons Investment Group, LLC ("Nu Horizons"), the original purchaser of the Celsius Shares (the "December 2023 Decision"). (Dec. 2023 Decision, Docket Entry No. 24.) Discovery into Simmons' standing to pursue a derivative claim on behalf of Nu Horizons is ongoing.

On February 10, 2025, Petitioner Simmons moved to dismiss the Siazon Petition pursuant to Rule 32.2(c)(1)(A) of the Federal Rules of Criminal Procedure.[2] For the reasons discussed below, the Court grants Simmons' motion to dismiss Siazon's claim.

## I. Background

The Court assumes familiarity with the extensive factual and procedural background of the case as detailed in the Court's prior decisions, and provides below a summary of the relevant history pertinent to Simmons' motion to dismiss the Siazon Petition. (*See* Dec. 2023 Decision; Feb. 2024 Decision, Docket Entry No. 32; Oct. 2024 Decision, Docket Entry No. 87; Feb. 2025 Decision, Docket Entry No. 127; Mar. 2025 Decision, Docket Entry No. 131.)

### a. Factual background

In or about July of 2016, Leissner approached Siazon with an offer to purchase $500,000 worth of shares in Celsius, consisting of 561,798 shares at a price of $0.89 per share from "a friend of [his] [who] needed liquidity" (the "Siazon Shares").[3] (Siazon's Pet. 1–2.) During their negotiation of the terms of the written purchase agreement, Leissner informed Siazon that Cuscaden Capital Limited ("Cuscaden"), a British Virgin Islands special purpose vehicle, held the shares in Celsius. (*Id.* at 2; Negotiation Emails, annexed to Siazon's Pet. as Ex. D, Docket

---

[2] (Russell Simmons' Mot. to Dismiss Siazon's Pet. ("Simmons' Mot."), Docket Entry No. 121; Simmons' Mem. in Supp. of Simmons' Mot. ("Simmons' Mem."), Docket Entry No. 122; Ken Siazon's Opp'n to Simmons' Mot. ("Siazon's Opp'n"), Docket Entry No. 123; Simmons' Reply in Supp. of Simmons' Mot. ("Simmons' Reply"), Docket Entry No. 124.)

[3] The Court assumes the truth of the factual allegations in the Siazon Petition for the purposes of this Memorandum and Order. *See United States v. Swartz Fam. Tr.*, 67 F.4th 505, 514 (2d Cir. 2023) ("We assume that all facts alleged in the petition are true and will affirm a dismissal 'only where the plaintiff fails to plead any factual content that allows the court to draw the reasonable inference that he is entitled to relief.'" (citation omitted)); *United States v. Watts*, 786 F.3d 152, 161 (2d Cir. 2015) (explaining that the court "must assume all facts alleged in the petition to be true" in deciding a motion to dismiss a petition brought under section 853(n)).

Entry No. 8-5.)[4] As part of Siazon's due diligence, Siazon confirmed that, among other things, Leissner was the "beneficial owner of 3,539,326 shares in Celsius as of July 15, 2016," and "served on the Celsius Board of Directors." (Siazon's Pet. 2; *see also* Celsius Common Stock Purchase Agreement, annexed to Siazon's Pet. as Ex. A, Docket Entry No. 8-2; Celsius Investors' Rights Agreement, annexed to Siazon's Pet as. Ex. B, Docket Entry No 8-3.)

On August 25, 2016, Siazon and Cuscaden executed an agreement in which Siazon agreed to purchase a 13.7% stake in Cuscaden for $500,000. (Siazon's Pet. 2.) In exchange, Cuscaden would "transfer all economic rights" in its shares in Celsius "in proportion" to Siazon's stake (the "Cuscaden Agreement"). (*Id.*; *see also* Cuscaden Agmt., annexed to Siazon's Pet. as Ex. E, Docket Entry No. 8-6.) Leissner sent the Cuscaden Agreement to Siazon from his personal email account, and Leissner's ex-wife Judy Chan, who Siazon understood to be an officer of Cuscaden, signed the agreement. (Siazon's Pet. 3.)

In connection with this purchase, on August 26, 2016, Siazon wired $500,000 to Cuscaden pursuant to instructions he obtained from Leissner. (Siazon's Pet. 3; *see also* Aug. 26, 2016 HSBC Premier Acct. Statement, annexed to Siazon's Pet. as Ex. G, Docket Entry No. 8-8; July 15, 2015 Email from Leissner to Siazon Regarding Wire Instructions, annexed to Siazon's Pet. as Ex. H, Docket Entry No. 8-9.) Siazon believed that he was the "beneficial, sole and absolute owner" of the 561,798 Celsius shares held by Cuscaden and that Leissner was "overseeing the handling of his Celsius shares on Siazon's behalf" and "act[ing] pursuant to his requests." (Siazon's Pet. 3.)

On August 28, 2018, Leissner pleaded guilty to one count of conspiracy to violate the FCPA, in violation of 18 U.S.C. § 371, and one count of conspiracy to commit money

[4] Because the Negotiation Emails are not consecutively paginated, the Court refers to the page numbers assigned by the electronic case filing system.

laundering, in violation of 18 U.S.C. § 1956(h), arising out of bond transactions that took place during 2012 and 2013. (Information ¶¶ 46–50.) Leissner secured his bond using the Celsius Shares and consented to a forfeiture money judgment in the amount of $43,700,000. (Siazon's Pet. 3.) In or about November of 2018, Siazon learned of Leissner's guilty plea. (*Id.*) Siazon asserts that, without his knowledge, Leissner "authorized [the] placement of more than [$]3.9 million shares of Celsius stock" into Lee's J.P. Morgan Chase brokerage account prior to his arrest. (*Id.*)

In May of 2021, Siazon learned that Simmons "had filed a lawsuit regarding Celsius shares." (*Id.* at 4.) In July of 2022, Siazon further reviewed Simmons' allegations and understood that "Simmons alleged that a company called Nu Horizons held an ownership interest in Leissner's Celsius shares." (*Id.* at 4.) "Through a series of court filings, Siazon learned that Cuscaden — the company of which Siazon held a 13.7% interest — was, allegedly, a majority shareholder of 51% of Nu Horizons," and Leissner corroborated Simmons' claim that Cuscaden held a majority share of Nu Horizons. (*Id.* at 5.) Through further conversations with Leissner, Siazon learned that "Leissner was a managing member and was authorized to act on its behalf." (*Id.* at 5; *see also* Nu Horizons Operating Agmt., annexed to Siazon's Pet. as Ex. J, Docket Entry No. 8-11.)

On August 17, 2022, Leissner consented to forfeiting the Celsius Shares. (Siazon's Pet. 3.) "Prior to August [of] 2022, Leissner had consistently represented to Siazon that Siazon's Celsius shares were part of the shares that the [G]overnment had seized from [Lee's] account." (*Id.* at 4.) In response to Siazon's inquiries about the status of his shares, Leissner provided updates about his efforts to have the shares released to Siazon and assured Siazon that he would receive his shares after Leissner's sentencing. (*Id.*; *see also* WhatsApp Messages, annexed to Siazon's Pet. as Ex. I, Docket Entry No. 8-10.) After learning of Simmons' lawsuit "and

learning of an additional lawsuit filed by Roger Ng in November [of] 2022," Siazon sought additional reassurance from Leissner regarding the status of his shares in Celsius. (Siazon's Pet. 5.) Leissner reassured Siazon that his shares were intact and provided additional reassurances after November of 2022. (*Id.*; WhatsApp Messages 5.) For example, in February of 2023, Leissner "agreed" that "he bought approximately 561,000 shares after his initial investment in Celsius," and that the basis of the Cuscaden Agreement was securing $500,000 worth of shares in Celsius for Siazon's benefit. (Siazon's Pet. 5; WhatsApp Messages 6.) Leissner later stated that he was prepared to sign a declaration that he sold Siazon $500,000 of shares in Celsius. (Siazon's Pet. 5 n.2; WhatasApp Messages 7.)

**b. Procedural background**

On November 1, 2018, the Court entered a Preliminary Order of Forfeiture against Leissner that provided for a forfeiture money judgment in the amount of $43.7 million, pursuant to 21 U.S.C. § 853(p) and 18 U.S.C. § 982(b)(1). (*See* Prelim. Order of Forfeiture, *United States v. Leissner*, No. 18-CR-439, Docket Entry No. 21; Simmons Pet. ¶ 7; Siazon's Pet. 3.) On August 17, 2022, Leissner consented to the forfeiture of the Celsius Shares, which were sized by the Government. (Siazon's Pet. 3.) On March 3, 2023, the Court entered an Amended Preliminary Order of Forfeiture against Leissner, directing the forfeiture of all right, title and interest in the Celsius Shares as: (a) property, real or personal, involved in the violation of 18 U.S.C. § 1956(h), or property traceable to such property; and (b) property, real or personal, constituting or derived from proceeds traceable to a violation of 18 U.S.C. § 371, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 982(b)(1), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c).[5]

[5] 18 U.S.C. § 981(a)(1)(C) provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" an enumerated violation, or "a conspiracy to commit such offense." 18 U.S.C. § 982(a)(1) provides for the forfeiture of "any property, real or personal, involved in" an offense in violation of 18 U.S.C. § 1956, "or any

(*See* Am. Forfeiture Order; Siazon's Pet. 1.)

On May 22, 2023, Siazon filed a petition seeking to contest the forfeiture of the Celsius Shares, (Siazon's Pet.), and Simmons filed a petition on behalf of himself and derivatively on behalf of Nu Horizons seeking to do the same, (Simmons' Pet.). On December 7, 2023, the Government moved to dismiss Simmons' petition pursuant to Federal Rule of Criminal Procedure 32.2(c)(1)(A). (Gov't Mot. to Dismiss, Docket Entry No. 21.) In the December 2023 Decision, the Court granted the Government's motion in part and denied it in part, dismissing Simmons' direct claim, and allowing Simmons' derivative claim to proceed. (Dec. 2023 Decision.) The Government moved for reconsideration, (*see* Gov't Mot. for Reconsideration, Docket Entry No. 25), and the Court denied the Government's motion but directed the parties to engage in expedited discovery limited to the question of the status of Simmons' membership interest in Nu Horizons as of the date of the filing of his petition (the "February 2024 Decision"), (Feb. 2024 Decision). Discovery into Simmons' standing to assert a derivative claim on behalf of Nu Horizons is ongoing.

On February 10, 2025, Simmons filed a motion to dismiss Siazon's petition, and Siazon opposed the motion. (Simmons' Mot.; Siazon's Opp'n.)

## II. Discussion

### a. Standard of review

Under 18 U.S.C. § 982(b)(1), any property forfeited under Section 982 shall be "governed by the provisions of" 21 U.S.C. § 853. *See United States v. Watts*, 786 F.3d 152, 160 (2d Cir. 2015); *United States v. Kurland*, 771 F. Supp. 3d 142, 149 (E.D.N.Y. 2025) ("The forfeiture of property under Section 982, including 'any related judicial or administrative

---

property traceable to such property." 18 U.S.C. § 982(b)(1) states that any property forfeited under Section 982 "shall be governed by the provisions of" 21 U.S.C. § 853.

proceeding,' is governed principally by 21 U.S.C. § 853." (quoting 21 U.S.C. § 982(b)(1))). "Among other things, [Section] 853 establishes the procedures by which a third party may claim an interest in funds ordered forfeited to the United States." *Watts*, 786 F.3d at 160. Should a third party claim a legal interest in the forfeited property, Section 853(n) "allows him to recover his interest through an ancillary proceeding following the preliminary forfeiture order." *Id.*; *see also Bongiorno v. United States*, No. 22-2900, 2023 WL 7648621, at *1 (2d Cir. Nov. 15, 2023) ("[T]he law is clear that the only way a third party may challenge a post-indictment forfeiture order is through an ancillary proceeding under [S]ection 853(n) . . . ." (emphasis omitted) (citing *United States v. Daugerdas*, 892 F.3d 545, 553 (2d Cir. 2018))); *United States v. Rodriguez-Perez*, No. 10-CR-905, 2019 WL 188400, at *3 (S.D.N.Y. Jan. 11, 2019) ("An ancillary proceeding provides a procedural mechanism for a third party to assert, through the filing of a petition, its interest in the property of a criminal defendant that is subject to a preliminary order of forfeiture."). The procedures laid out in Section 853(n) are "further elaborated" in Federal Rule of Criminal Procedure 32.2(c), which states that the "court may, on motion, dismiss the petition for lack of standing, for failure to state a claim, or for any other lawful reason." *Watts*, 786 F.3d at 161 (quoting Fed. R. Crim. P. 32.2(c)(1)(A)); *see also Kurland*, 771 F. Supp. 3d at 149 ("Federal Rule of Criminal Procedure 32.2 sets forth additional procedural rules applicable to forfeiture proceedings."); *United States v. Sharma*, No. 18-CR-340, 2023 WL 1365138, at *2 (S.D.N.Y. Jan. 31, 2023) ("A motion to dismiss a [Section 853(n)] petition may be granted 'for lack of standing, for failure to state a claim, or for any other lawful reason.'" (quoting Fed. R. Crim. P. 32.2(c)(1)(A))).

"A motion to dismiss a third-party petition 'should be treated like a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b).'" *Watts*, 786 F.3d at 161 (quoting *Willis Mgmt. (Vt.), Ltd. v. United States*, 652 F.3d 236, 241 (2d Cir. 2011)); *Kurland*, 771 F.

Supp. 3d at 150 ("A motion to dismiss a third-party petition 'is evaluated on the same standard as a civil complaint on a motion under Rule 12(b)(6).'" (quoting *Daugerdas*, 892 F.3d at 552)). Therefore, "[t]o survive a motion to dismiss, the petition need only 'state [] enough facts to state a claim to relief that is plausible on its face.'" *Watts*, 786 F.3d at 161 (quoting *Willis*, 652 F.3d at 241–42) (second alteration in the original); *see also United States v. Hiller*, No. 07-CR-568, 2023 WL 7924180, at *2 (E.D.N.Y. Nov. 16, 2023) ("To survive a dismissal motion, the petitioner need only state enough facts to state a claim to relief that is plausible on its face." (alterations and internal quotation marks omitted)). The court "must assume all facts alleged in the petition to be true." *Watts*, 786 F.3d at 161; *see also* Fed. R. Crim. P. 32.2(c)(1)(A) ("For purposes of the motion [to dismiss], the facts set forth in the petition are assumed to be true."); *Hiller*, 2023 WL 7924180, at *2 (same). However, the court is "not required to accept any legal conclusions included in the petition." *Willis*, 652 F.3d at 242; *Kurland*, 771 F. Supp. 3d at 150 ("While the court accepts as true all factual allegations in the petition, '[it] need not do the same for legal conclusions.'" (citations omitted)).

**b. Nu Horizons is not equitably estopped from making arguments contrary to Leissner's and Cuscaden's representations to Siazon**

Siazon argues that Nu Horizons, a company which Simmons alleged held title to the Celsius Shares and of which Cuscaden is majority owner, is estopped from making arguments contrary to Leissner's and Cuscaden's representations to him. (Siazon's Pet. 4; Siazon's Opp'n 1, 15–17.) Siazon argues that "[e]ven if Nu Horizons did have standing,"[6] Nu Horizons "would

---

[6] Siazon argues that Simmons "has not established that he has the requisite derivative standing on behalf of Nu Horizons," and that "Nu Horizons itself lacks standing to contest the forfeiture because it was a mere nominee holder of Celsius shares on behalf of Leissner." (Siazon's Opp'n 1.) The Court determined in the December 2023 Decision, however, that Simmons has derivative standing to pursue his claim based on the allegations in his petition. (Dec. 2023 Decision 8–12.) The Court later, upon the Government's motion for reconsideration, approved limited discovery regarding Simmons' interest in Nu Horizons at the time his petition

be equitably estopped from contesting the validity of the representations made by its [manager] (Leissner) and majority owner (Cuscaden) to Siazon regarding his purchase of the Siazon Shares." (Siazon's Opp'n 1–2.) In support, Siazon argues that Nu Horizons' "Manager (Leissner) and 89% majority owner (Cuscaden)" were not "acting independently of their capacities as [m]anager and owner of Nu Horizons" when they made the representations to him. (*Id.* at 16.) Siazon also argues that "[t]he elements of equitable estoppel are . . . clearly satisfied," because Leissner and Cuscaden made the representations with "aware[ness] of the true facts" and "with the obvious intent that they would be relied upon." (*Id.* at 16.)

Simmons argues that, "[a]s best [he] can tell, Siazon is arguing that Nu Horizons is somehow bound by Cuscaden['s] or Leissner's conduct under a theory of apparent or actual corporate agency, but neither theory helps him." (Simmons' Reply 3.) In support, Simmons argues that Siazon "has failed to plead *any* fact suggesting that Nu Horizons itself 'made the representations in question'" or that "an entity can be collaterally estopped from making arguments because of a fraud by others." (*Id.*) Simmons also argues that Leisner's acts cannot be imputed to Nu Horizons because he "acted in his own financial interest, adversely to and in total abandonment of Nu Horizons' interest." (*Id.* at 5.)

was filed, but affirmed that the December 2023 Decision is still valid. (Feb. 2024 Decision.) At this stage, Simmons therefore has standing to proceed with his derivative claim on behalf of Nu Horizons, and may move to dismiss Siazon's petition. *See, e.g.*, *United States v. Dupree*, 919 F. Supp. 2d 254, 276–82 (E.D.N.Y. Jan. 28, 2013) (adjudicating a petitioner's motion to dismiss a fellow petitioner's petition), *aff'd in part, vacated in part on other grounds sub nom. Watts*, 786 F.3d 152; *United States v. Ida*, 14 F. Supp. 2d 454, 460 (S.D.N.Y. 1998) (finding that petitioner was not a nominee where the petitioner did not engage in "clear-cut attempts at circumvention," such as taking "a gratuitous transfer of the subject property from the criminal defendant"); *cf. Stonewell Corp. v. Conestoga Title Ins. Co.*, No. 04-CV-9867, 2009 WL 10695617, at *3 (S.D.N.Y. Sept. 29, 2009) (explaining that the district court "concluded that [the corporation] was acting as a nominee for [defendant]" when the corporation "allowed its name to be used on the title even though it had no claim to the property").

Because Siazon's estoppel arguments are premised on the fact that Leissner and Cuscaden were acting in "their capacities as [m]anager and owner of Nu Horizons," (Siazon's Opp'n 16), the Court first addresses whether Leissner or Cuscaden had the authority to act on Nu Horizons' behalf.

An agent can have actual or apparent authority to act on behalf of a principal. *See Hayden v. Int'l Bus. Machs. Corp.*, No. 21-CV-2485, 2025 WL 1697021, at *19 (S.D.N.Y. June 17, 2025) ("A 'principal is liable only for the conduct of an agent acting within the scope of his actual or apparent authority.'" (citation omitted)); *Northwell Health, Inc. v. Premera Blue Cross*, No. 23-CV-389, 2025 WL 959651, at *15 (E.D.N.Y. Mar. 15, 2025) ("[A]n agent can have actual or apparent authority." (citations omitted)); *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 286–87 (S.D.N.Y. 2014) (discussing potential vicarious liability of principal under a theory of actual and apparent authority); *Douyon v. N.Y. Med. Health Care, P.C.*, 894 F. Supp. 2d 245, 272 (E.D.N.Y. 2012) ("Where a principal does not control an agent, the principal may still be vicariously liable for the agent's actions where the agent is vested with apparent authority." (citing *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 289 (2d Cir. 2003))), *amended on reconsideration by* No. 10-CV-3983, 2013 WL 5423800 (E.D.N.Y. Sept. 25, 2013); *see also Meisel v. Grunberg*, 651 F. Supp. 2d 98, 121 (S.D.N.Y. 2009) (finding that the plaintiff had sufficiently alleged a co-defendant's indirect liability for fraud pursuant to an agency theory of vicarious liability).

"Actual authority 'is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him.'" *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003) (quoting *Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996)); *see Soni v. Comm'r*, 76 F.4th 49, 60 (2d Cir. 2023) (same); *United States v. Gatto*, 986

F.3d 104, 127 (2d Cir. 2021) (recognizing that actual authority occurs "when the agent receives 'explicit permission from the principal to act on its behalf'" (quoting *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 71 (2d Cir. 2012))). Such authority "is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all circumstances attending those manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware." *ABM Indus. Grps., LLC v. Int'l Union of Operating Eng'rs, Loc. 30, 30A, 30B, AFL-CIO*, 968 F.3d 158, 163 (2d Cir. 2020) (quoting *Highland Cap. Mgmt. LP v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010)); *Northwell Health, Inc.*, 2025 WL 959651, at *15 (same). A court may infer actual authority "from words or conduct which the principal has reason to know indicates to the agent that he is to do the act." *United States v. Int'l Bhd. of Teamsters*, 986 F.2d 15, 20 (2d Cir. 1993) (citation omitted); *see also Soni*, 76 F.4th at 60 (explaining that an agent's authority "exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act").

"Apparent authority exists when a principal, either intentionally or by lack of ordinary care, induces [a third party] to believe that an individual has been authorized to act on its behalf." *Highland Cap. Mgmt.*, 607 F.3d at 328 (quoting *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997)); *see Gatto*, 986 F.3d at 127 (recognizing that apparent authority occurs "when an agent has the ability to bind the principal to transactions with third parties because representations that the principal made to the third party make it reasonable for the third party to believe the agent has such an ability"); *Dinaco*, 346 F.3d at 69 ("Apparent authority arises from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf

by the person purporting to act for him.'" (alterations in original) (quoting *Minskoff*, 98 F.3d at 708)); *N.Y. Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 232–33 (S.D.N.Y. 2020) ("Apparent authority . . . turns on the putative principal's representations (through words or conduct) to the third party, and it exists 'if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists.'" (quoting *Themis Cap., LLC v. Democratic Republic of Congo*, 881 F. Supp. 2d 508, 522 (S.D.N.Y. 2012))); *Brown v. Marriott Int'l, Inc.*, No. 14-CV-5960, 2017 WL 4484194, at *12 (E.D.N.Y. Sept. 29, 2017) ("Apparent authority is based on the principle of estoppel . . . . If a third person holds the reasonable belief that the agent was acting within the scope of this authority and changes his position in reliance on the agent's act, the principal is estopped to deny that the agent's act was not authorized." (quoting *Masuda v. Kawasaki Dockyard Co.*, 328 F.2d 662, 665 (2d Cir. 1964))); *Edinburg Volunteer Fire Co., Inc. v. Danko Emergency Equip. Co.*, 867 N.Y.S.2d 547, 549 (App. Div. 2008) ("Apparent authority will only be found where words or conduct of the principal — not the agent — are communicated to a third party, which give rise to a reasonable belief and appearance that the agent possesses authority to enter into the specific transaction at issue." (citations omitted)). To prove that an agent has apparent authority, the plaintiff must establish that "(1) the principal was responsible for the appearance of authority in the agent to conduct the transaction in question and (2) the third party reasonably relied on the representations of the agent." *Star Funding, Inc. v. Tire Ctrs., LLC*, 717 F. App'x 38, 41 (2d Cir. 2017) (quoting *Herbert Constr. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 993–94 (2d Cir. 1991)); *Fadlevich v. JD 34th St. Realty LLC*, No. 19-CV-4227, --- F. Supp. 3d ---, ---, 2025 WL 974545, at *17 (E.D.N.Y. Mar. 31, 2025) (same).

"Equitable estoppel is properly invoked 'where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the

former's words or conduct.'" *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 400 (2d Cir. 2011) (quoting *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001)); *In re RJT Food & Rest., LLC*, --- B.R. ---, ---, 2025 WL 1020345, at *10 (Bankr. E.D.N.Y. Apr. 4, 2025) (quoting *Kosakow*, 274 F.3d at 725). "The party alleging equitable estoppel must demonstrate: (1) [a]n act constituting a concealment of facts or misrepresentation; (2) [a]n intention or expectation that such acts will be relied upon; (3) [a]ctual or constructive knowledge of true facts by the wrongdoers; [and] (4) [r]eliance upon the misrepresentation which causes the innocent party to change its position to its substantial detriment." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90 (2d Cir. 2013) (quoting *Gen. Elec. Cap. Corp. v. Armadora, S.A.*, 37 F.3d 41, 45 (2d Cir. 1994)); *United Cmty. Bank, Inc. v. DPSG Enters., LLC*, No. 21-CV-46, 2022 WL 17847396, at *5 (N.D.N.Y. Dec. 22, 2022) (same); *see also Schwebel v. Crandall*, 967 F.3d 96, 102 (2d Cir. 2020) ("The elements of estoppel are a material representation, reasonable reliance, and provable damages." (citations omitted)). That party must also demonstrate that it "(1) lacked knowledge of the true facts; (2) relied upon the adverse party's conduct; and (3) prejudicially changed its position." *Garrett v. Music Pub. Co. of Am., LLC*, 740 F. Supp. 2d 457, 464 (S.D.N.Y. 2010); *see also In re RJT Food & Rest., LLC*, 2025 WL 1020345, at *10 ("The party asserting estoppel must show with respect to itself: '(1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial change in [its] position.'" (alteration in original) (quoting *In re Vebeliunas*, 332 F.3d 85, 94 (2d Cir. 2003))).

Nu Horizons is not estopped from making arguments contrary to Leissner's and Cuscaden's representations to Siazon because Siazon has not alleged any false representations or concealment of material facts on the part of Nu Horizons. First, Siazon has not sufficiently alleged that Leissner or Cuscaden acted with actual authority on behalf of Nu Horizons because

the Nu Horizons Operating Agreement does not give any such authority to Leissner or Cuscaden. (*See* Nu Horizons Operating Agmt. ¶¶ 8.1(a), 8.4 (explaining that "[a]ll acts, decisions and consents of the Managers shall require unanimous approval of the Managers" and that "no Member shall take part in the control or management of the affairs of [Nu Horizons] or have any authority to act for or on behalf of [Nu Horizons]."")); *see also Accent Delight Int'l Ltd. v. Sotheby's*, No. 18-CV-9011, 2023 WL 2307179, at *16 (S.D.N.Y. Mar. 1, 2023) ("Establishment of an agency relationship requires facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent." (*In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 79 (2d Cir. 2019))); *Skanga Energy & Marine Ltd. v. Arevenca S.A.*, 875 F. Supp. 2d 264, 270 (S.D.N.Y. 2012) ("Whether actual authority exists 'depends on the actual interaction between the putative principal and agent, not on any perception a third party may have of the relationship.'" (quoting *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 702 (2d Cir. 1990))), *aff'd*, 522 F. App'x 88 (2d Cir. 2013); *Mehra v. Teller*, No. 2019-812, 2021 WL 300352, at *4 (Del. Ch. Jan. 29, 2021) (explaining that the terms of the company's operation agreement, taken together, "prevent[ed] [a founder] from using his 85% [m]embership [i]interest to remove [plaintiff] as [m]anager or take other action on behalf of [the company] without [the manager's] consent"). Thus, Siazon has not sufficiently alleged that Leissner or Cuscaden had actual authority to bind Nu Horizons based on an actual agency theory.

Second, Siazon has not sufficiently alleged that Leissner or Cuscaden acted with apparent authority on behalf of Nu Horizons because he has not alleged that Nu Horizons made representations as to Leissner's or Cuscaden's abilities to act as its agent. *See Fadlevich*, 2025 WL 974545, at *17 ("It is the law in this circuit, as well as generally, that customarily only the representation of the principal to the third party can create apparent authority, not the

representation of the agent alone." (quoting *Gatto*, 986 F.3d at 127)); *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 216 (S.D.N.Y. 2024) (finding plaintiffs' allegations were insufficient to establish apparent authority where, among other things, the plaintiff "d[id] not allege words or conduct of [d]efendant that would have led a reasonable third party to believe that the telemarketers were acting on [d]efendant's behalf"). Accordingly, because Siazon has not established that Leissner or Cuscaden had actual or apparent authority to act on Nu Horizons' behalf, Siazon has not established that any false representations or concealment of any material facts were made on the part of Nu Horizons to which the doctrine of equitable estoppel would apply. *See Shaoxing Daqin Imp. & Exp. Co. v. Notations, Inc.*, No. 19-CV-2732, 2019 WL 6498397, at *4 (S.D.N.Y. Dec. 3, 2019) ("A plaintiff asserting equitable estoppel must show, *on the part of the party being estopped:* '(1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts." (citation omitted and emphasis added)); *Ferrostaal, Inc. v. M/V SEA BAISEN*, No. 02-CV-1900, 2004 WL 2734745, at *5 (S.D.N.Y. Nov. 30, 2004) ("[N]either [the apparent authority or estoppel] doctrine is available in the absence of affirmative actions by the purported principal against whom estoppel is asserted.").

**c. Siazon does not have standing to assert a direct claim under 21 U.S.C. § 853(n)**

Siazon argues that he has standing to challenge the preliminary forfeiture because (1) "he is a bona fide purchaser for value of a portion of the . . . Celsius Shares" based on the Cuscaden Agreement, (2) he holds an interest "in the same portion of the Celsius Shares via a constructive trust," and (3) he owns any shares Leissner purchased using his $500,000 through a resulting trust. (Siazon's Pet. 6, 8–15; Siazon's Opp'n 8–11.) The Court addresses each argument below.

#### i. Siazon does not have standing based on his stake in Cuscaden

Simmons argues that Siazon's claim should be dismissed with prejudice because he has no legal interest in the shares owned by Cuscaden or Nu Horizons. First, Simmons argues that Siazon was "at most, an investor in, or creditor to" Cuscaden and therefore Siazon "never himself owned any shares." (Simmons' Mem. 10–11 (citations omitted).) In support, Simmons argues that Siazon purchased "something that (apparently) did not exist: shares of Celsius stock directly owned by Cuscaden." (*Id.* at 11.) Simmons contends that Cuscaden "d[oes] not itself own the Celsius Shares," and that Siazon's claim that he has "an interest through Cuscaden in assets owned by Nu Horizons requires misreading the Cuscaden Agreement to somehow implicate Cuscaden's interests through Nu Horizons, even though the Cuscaden Agreement does not even mention Nu Horizons." (*Id.*) Second, Simmons argues that Siazon has provided no law from the British Virgin Islands, Cuscaden's place of incorporation, to contradict the "principle that 'shareholders do not hold legal title to any of the corporation's assets.'" (*Id.* (quoting *United States v. Castle*, No. 18-CR-531, 2020 WL 4059808, at *3 (S.D.N.Y. July 20, 2020)).) Simmons argues, that even if the law of Cuscaden's place of incorporation permitted such an arrangement, the "structure of the Cuscaden Agreement makes . . . clear" that Siazon has no legal interest in specific shares of Celsius stock. (*Id.* at 12.) Simmons contends that "whatever 'economic' rights [Siazon] has, they are rights afforded to him to receive distributions as a member of Cuscaden, rather than an owner of the shares themselves." (*Id.* at 13.)

Siazon argues he has alleged a valid claim to the Siazon Shares based on being a "bona fide purchaser for value" or through the shares being "purchased . . . on his behalf and/or using [his] funds." (Siazon's Opp'n 8.) First, Siazon argues he has alleged "a legal interest in the Siazon Shares by virtue of his contractual rights" under the Cuscaden Agreement, which granted Siazon "all economic rights" to 561,798 shares in Celsius "held by Leissner through Cuscaden."

(*Id.* at 9.) Siazon argues that any ambiguity in the Cuscaden Agreement regarding Siazon's legal interest is "resolved by the clear understanding of the parties." (*Id.*) In support, Siazon argues the parties' intent is illustrated by Leissner's repeated confirmation that "Siazon acquired an ownership interest in the Siazon Shares" and by Leissner drafting portions of the Cuscaden Agreement. (*Id.*) Siazon contends that he acquired "specific rights to the Siazon Shares," such as "the right to direct their sale and receive the profits from that sale." (*Id.* at 10.) Second, Siazon argues that **"**the only way [he] would not have an interest" in the shares "is if [he had been] defrauded by Leissner, Cuscaden, and, through them, Nu Horizons." (*Id.* at 10.) Siazon argues that even if they defrauded Siazon, then "Siazon would be the beneficiary of a constructive trust over the Siazon Shares" under Nevada law. (*Id.*)

"To establish standing to challenge an order of forfeiture under [Section] 853(n), a petitioner must demonstrate that he has a 'legal interest in [the forfeited] property.'" *Watts*, 786 F.3d at 161(second alteration in the original) (quoting *United States v. Ribadeneira*, 105 F.3d 833, 835 (2d Cir. 1997)); *see also United States v. Swartz Fam. Tr.*, 67 F.4th 505, 516 (2d Cir. 2023) ("In order to have standing to bring a claim under Section 853(n)(2), a petitioner must demonstrate a 'legal interest' in the property at issue." (quoting *Watts*, 786 F.3d at 160–61)); *United States v. Rahmankulov*, No. 20-CR-653, 2024 WL 68419, at *3 (S.D.N.Y. Jan. 5, 2024) ("To establish [statutory] standing to challenge an order of forfeiture under [Section] 853(n), a petitioner must demonstrate that he has a 'legal interest in [the forfeited] property." (first and third alterations in original) (quoting *Watts*, 786 F.3d at 161)). Whether a petitioner has an interest in the forfeited property "is determined in accordance with state law," and "[w]here the petitioner has no valid interest in the property under state law, 'the inquiry ends, and the claim fails for lack of standing.'" *Watts*, 786 F.3d at 161 (quoting *United States v. Timley*, 507 F.3d 1125, 1130 (8th Cir. 2007)); *Swartz*, 67 F.4th at 516 ("Where the petitioner has no valid interest

in the property under state law, the inquiry ends, and the claim fails for lack of standing." (quoting *Watts*, 786 F.3d at 161)).

Siazon's theory of direct ownership does not establish standing sufficient for him to assert a direct claim to the Celsius Shares under Section 853(n). First, under English law,[7] a corporation is a separate legal entity. *See In re Aozora Bank Ltd. v. Sec. Inv. Prot. Corp.*, 480 B.R. 117, 125 (S.D.N.Y. 2012) ("Under common law of the U.K., applicable to Cayman Islands and the BVI, '[a] company's property belongs to the company and not to its shareholders.'" (citing Johnson v. Gore Wood & Co., [2002] 2 AC 1 (HL), 40)), *aff'd, sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 708 F.3d 422 (2d Cir. 2013); Various Claimants v. G4S PLC [2023] EWHC (Ch) 2863 (explaining that there is a "separation of the company and its shareholders"); Aabar Holdings SARL v. Glencore Plc [2024] EWHC (Comm) 3046, [2025] B.C.C. 491, 502 ("[A] company is a separate legal entity that is distinct from its shareholders."). Siazon's petition alleges that he entered into the Cuscaden Agreement with the understanding "that he would take title to [shares in Celsius] via Cuscaden." (Siazon's Pet. 8.) Siazon alleges that he "wired to Leissner $500,000 to buy a 13.7% stake in Cuscaden," and in return, it "was Siazon's understanding that he acquired 'economic rights' in 561,768 Celsius shares." (*Id.*) By his own

[7] Siazon asserts that Nevada law governs his claim because Celsius is incorporated in Nevada. (Siazon's Pet. 6–7; Siazon's Opp'n 10 n.6.) Simmons notes that "[a]s an initial matter, Cuscaden is a British Virgin Islands company." (Simmons' Mem. 11 (citing Siazon's Pet. 2).) Because Siazon claims to have an interest in the Celsius Shares through his purchase of a stake in Cuscaden, (Siazon's Pet. 6, 8), and the Cuscaden Agreement states that its "term sheet is governed by English law," (Cuscaden Agmt.), the Court applies English law to interpret Siazon's rights under the Cuscaden Agreement. However, even under Nevada law, "corporations are generally to be treated as separate legal entities." *Ene v. Graham*, 546 P.3d 1232, 1236 (Nev. 2024) (quoting *LFC Mktg. Grp., Inc. v. Loomis*, 8 P.3d 841, 845 (Nev. 2000)); *Bermuda Rd. Props., LLC v. EcoLogical Steel Sys., Inc.*, No. 12-CV-1579, 2017 WL 797092, at *3 (D. Nev. Mar. 1, 2017) (same); *see also Russo v. Lopez*, No. 11-CV-284, 2012 WL 846462, at *3 (D. Nev. Mar. 12, 2012) ("[S]hareholders do not directly own any part of a corporation's property or assets. They only own shares of stock, which represent a proportionate interest in the corporate equity remaining after a corporation meets all its other debts and obligations.")

admission, Siazon was not a direct purchaser of shares in Celsius, but rather an investor in Cuscaden. (*Id.*) In addition, the terms of his investment agreement with Cuscaden identify Siazon as an "investor" and similarly indicate that, should Siazon "decide he wants to sell shares held by [Cuscaden]," Cuscaden would sell shares in proportion to his stake, (Cuscaden Agmt.), but it does not indicate that he was a direct purchaser of shares in Celsius. Siazon, at most, was an investor in Cuscaden, which he understood held shares in Celsius.[8] (*Id.*) *See* Anchor 2020 Ltd v. Midas Constr. Ltd, [2019] EWHC 435 (TCC) ("English law generally adopts an objective theory of contract formation, ignoring the subjective expectations and the unexpressed mental reservations of the parties."). This is insufficient to establish that Siazon held a legal interest in any portion of the Celsius Shares. *See In re Aozora Bank Ltd.*, 480 B.R. at 125 (explaining that company property does not belong to shareholders under the common law of the United Kingdom); Various Claimants [2023] EWHC 2863 (Ch) ("Shareholders have no actual interest in the assets of a company."); *Castle*, 2020 WL 4059808, at *3 (dismissing the petition for lack of standing where the petitioner asserted he was the sole owner in a Chinese company because, despite the petitioner's failure to allege the company's jurisdiction of incorporation, "courts in many jurisdictions . . . have explained that while members of limited liability companies or

[8] The Court notes that it is unclear whether Cuscaden held shares in Celsius and whether the shares Siazon seeks are the Celsius Shares which the Government seeks to forfeit. Siazon argues that "[w]ithout the benefit of discovery, Siazon cannot conclusively state when the relevant shares were purchased or which source of funds was used to purchase them, and he is not required to do so at this stage of the proceedings." (Siazon's Opp'n 8 n.4.) The Cuscaden Agreement, executed on August 25, 2016, states that "Cuscaden holds 4,101,624 shares of Celsius Holdings," (Cuscaden Agmt.), but Celsius Form 10-K lists Nu Horizons as a shareholder and lists both Leissner and Simmons as beneficial owners of shares in Celsius through Nu Horizons, (Celsius Form 10-K, 21, 32, annexed to Siazon's Pet. as Ex. C, Docket Entry No. 8-4). In addition, Celsius' common stock purchase agreement and investors rights' agreement list Nu Horizons — not Cuscaden — as a purchaser and investor as of April 20, 2015. (*See* Celsius Common Stock Purchase Agreement 25; Celsius Investors' Rights Agreement 35.)

shareholders of a corporation possess an interest in the shares of their company, they do *not* possess any interest in the company's assets").

**ii. Siazon does not have standing based on his constructive trust or resulting trust theory**

Simmons argues that Siazon has not alleged he is the beneficiary of a constructive trust over the Celsius Shares because he has failed to establish two of the three elements to impose a constructive trust under Nevada law[9] — (1) "retention of legal title by the holder thereof against another would be inequitable," and (2) "the existence of such a trust is essential to the effectuation of justice." (Simmons' Mem. 15 (quoting *Waldman v. Maini*, 195 P.3d 850, 857 (Nev. 2008)).) First, Simmons argues that Siazon "cannot maintain a constructive trust theory" as to Leissner because Siazon "alleges that Cuscaden (or Nu Horizons), not . . . Leissner, held legal title to the Celsius Shares seized by the [G]overnment." (*Id.*) Simmons also argues that "[e]ven if Cuscaden did hold title to the Celsius Shares," a constructive trust theory as to Cuscaden would fail because (i) Siazon "cannot seek a constructive trust over Cuscaden's assets by virtue of . . . Leissner's conduct" and (ii) there is no basis for a constructive trust where there is an express, written contract since a constructive trust is based on unjust enrichment. (*Id.* at 16–17.) In support, Simmons argues that "[Siazon] alleges no basis, such as alter ego liability, to

---

[9] In his petition, Siazon conducts a choice of law analysis and concludes that Nevada law applies to his claims because Celsius is incorporated in Nevada, (Siazon's Pet. 6–7), and both parties apply Nevada law to determine Siazon's legal interest under his constructive and resulting trust theory. (*See generally* Simmons' Mem. 15–18; Siazon's Opp'n 22–25; Simmons' Reply 6–8.) Accordingly, the Court applies Nevada law to his constructive and resulting trust claims. *See Jones v. Atl. Recording Corp.*, No. 23-1348, 2025 WL 1872808, at *2 n.2 (2d Cir. July 8, 2025) (explaining that "implied consent is sufficient to establish choice of law"); *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) ("The parties' briefs assume that New York law controls, and such 'implied consent . . . is sufficient to establish choice of law.'" (quoting *Krumme v. Westpoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000))); *cf. NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10-CV-5762, 2013 WL 489020, at *5 (S.D.N.Y. Feb. 8, 2013) (conducting choice of law analysis where "[t]he parties cite[d] to both Delaware and New York law but [did] not address choice of law"), *vacated and remanded on other grounds*, 801 F.3d 92 (2d Cir. 2015).

disregard the corporate form to seek Cuscaden's assets" from Leissner and that the Cuscaden Agreement is an express contract that eliminates any basis for a constructive trust. (*Id.*) Second, Simmons argues that a constructive trust is not essential to the effectuation of justice because such an equitable remedy is not appropriate where Siazon may maintain an action at law for breach of contract against Cuscaden or fraud against Leissner. (*Id.* at 17–18.) Lastly, Simmons argues that Siazon cannot assert a resulting trust claim because Siazon has not alleged Leissner or Cuscaden intended to create a trust for his benefit. (Simmons' Reply 8.)

Siazon argues that he has an ownership interest in the Siazon Shares through a constructive trust. (Siazon's Opp'n 22.) First, Siazon argues he had a confidential relationship with Leissner "based on their decades-long friendship and Leissner's agreement to purchase and hold the Siazon Shares on Siazon's behalf." (*Id.* at 11.) Second, Siazon argues that "the presence or absence of a claim by the titleholder is irrelevant" to whether Siazon can assert a constructive trust claim in an ancillary proceeding. (*Id.* at 22–23.) In support, Siazon argues "Nevada law does not require that the party whose actions necessitate the constructive trust be the same as the titleholder," and thus Siazon is the beneficiary of a constructive trust "if Leissner, Cuscaden, and/or Nu Horizons defrauded Siazon with respect to his purchase of the Siazon Shares." (*Id.* at 10, 23.) In addition, Siazon argues that Simmons' reliance on law addressing unjust enrichment is improper because Siazon "asserted a constructive trust based on the distinct elements of Nevada law." (*Id.* at 24.) Third, Siazon argues that imposition of a constructive trust is essential to the effectuation of justice because "Nevada courts have regularly recognized constructive trusts without considering the alternative adequacy of money damages," and "[i]n any event, Siazon's claim is for a specific set of Celsius shares, not a quantifiable amount of money." (*Id.* at 25.) Lastly, Siazon argues that he may own a portion of the Celsius Shares through a resulting trust "to the extent Leissner used Siazon's $500,000," which Siazon wired in

August of 2016, "to purchase additional shares on Siazon's behalf." (Siazon's Opp'n 11; Siazon's Pet. 3.)

"A constructive trust is a remedial device by which the holder of legal title [right, or interest] to property is held to be a trustee of that property for the benefit of another who in good conscience is entitled to it." *Matsugishi v. Chen*, --- F. Supp. 3d. ---, ---, 2025 WL 1506306, at *9 (D. Nev. May 23, 2025) (quoting *Waldman*, 195 P.3d at 857). Under Nevada law, the creation of a constructive trust requires: "(1) that a confidential relationship exists between the parties; (2) retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice." *EVIG, LLC v. New Relief, LLC*, No. 24-CV-0065, 2024 WL 4349310, at *2 (D. Nev. Sept. 29, 2024) (quoting *Waldman*, 195 P.3d at 857). A confidential relationship "exists when one party gains the confidence of the other and purports to act or advise with the other's interests in mind." *EVIG*, 2024 WL 4349310, at *2 (quoting *Perry v. Jordan*, 900 P.2d 335, 337–38 (Nev. 1995) (per curiam)); *Waldman*, 195 P.3d at 857 ("The requirement that a confidential relationship exist is based on the idea that the existence of the relationship creates an inference of fraud or undue influence when property is obtained without consideration." (citing *Schmidt v. Merriweather*, 418 P.2d 991, 993–94 (Nev. 1966))). "[A] confidential relationship may arise by reason of kinship or professional, business, or social relationships between the parties." *EVIG*, 2024 WL 4349310, at *2 (quoting *Perry*, 900 P.2d at 337–38)). In addition, "[a] constructive trust requires money or property identified as belonging in good conscience to the plaintiff [which can] clearly be traced to particular funds or property in the defendant's possession." *Rivard-Crook v. Accelerated Payment Techs., Inc.*, No. 10-CV-2215, 2012 WL 6138229, at *5 (D. Nev. Dec. 10, 2012) (second alteration in original); *see also Takiguchi v. MRI Int'l, Inc.*, 47 F. Supp. 3d 1100, 1121 (D. Nev. 2014) ("The requirement that a constructive trustee have title (not mere

possession) to the property involved is critical to the imposition of a constructive trust." (quoting *Danning v. Lum's, Inc.*, 478 P.2d 166, 167 (Nev. 1970)). A constructive trust also requires that "its issuance be necessary to prevent a failure of justice." *Rivard-Crook*, 2012 WL 6138229, at *6; *Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*, 440 F. Supp. 2d 1184, 1196 (D. Nev. 2006) (explaining that "[w]here a plaintiff can maintain an action at law and the legal remedy is adequate, [resorting] to equity is not appropriate"), *aff'd*, 583 F.3d 1232 (9th Cir. 2009).

"A resulting trust exists where the acts or expressions of the parties indicate an intent that a trust relation results from their transaction." *JPMorgan Chase Bank, N.A. v. KB Home*, 632 F. Supp. 2d 1013, 1029 (D. Nev. 2009) (quoting *Bemis v. Est. of Bemis*, 967 P.2d 437, 441 n.4 (Nev. 1998)); *see also Waldman*, 195 P.3d at 858 ("We have concluded that a resulting trust may be imposed when parties' actions or expressions indicate that they intended to create a trust relationship." (citing *Bemis*, 967 P.2d at 441 n.4)); *Bemis*, 967 P.2d at 441 ("Despite some confusion in the courts between resulting and constructive trusts, the concepts are distinguishable. . . . [A] constructive trust, unlike a resulting trust, does not require that the parties specifically intended to create a trust." (citation omitted)). A resulting trust may arise where (1) "an express trust fails in whole or in part"; (2) "an express trust is fully performed without exhausting the trust estate"; or (3) "property is purchased and the purchase price is paid by one person and at his direction the vendor conveys the property to another person." *Reza v. Mannan*, No. 09-CV-23, 2022 WL 16860294, at *10 (E.D.N.Y. Sept. 26, 2022) ("The case law on purchase money resulting trusts is scant, but what there is provides that such a trust can arise in three circumstances . . ." (citations omitted)); *KB Home*, 632 F. Supp. 2d at 1029 ("If one pays all or part of the purchase price for land and the conveyance is made to another, the latter may hold upon a resulting trust for the former." (quoting *Werner v. Mormon*, 462 P.2d 42, 44 (Nev.

1969))); *see also Tsai v. Hsu*, 367 P.3d 828, 828 (Nev. 2010) ("In contrast [to a constructive trust], a resulting trust may be created when the parties specifically intended to create an express trust, but the trust failed in whole or in part. Other caselaw suggests a resulting trust may be created when a trust's purpose if fulfilled without exhausting the trust's assets." (citations omitted)); *Bemis*, 967 P.2d at 441 n.4 ("Specifically, a resulting trust may arise on the failure of an express trust." (citing *Washburn v. Park East*, 795 F.2d 870, 872 (9th Cir. 1986))).

**1. Constructive trust**

Siazon has not established standing through a constructive trust because he has not established retention of legal title would be inequitable as to Leissner. First, Siazon has sufficiently alleged that he had a confidential relationship based on Leissner's friendship with Siazon "for over two decades," becoming the godfather of Siazon's first-born child, and facilitating the Cuscaden Agreement. (Siazon's Pet. 7–8, 12.) *See Landow v. Bartlett,* No. 18-CV-499, 2019 WL 1027994, at *3 (D. Nev. Mar. 4, 2019) (finding that a "shared business relationship" where defendant "would advise [plaintiff] about investments with [plaintiff's] self-stated investment objectives and risk tolerance in mind" was sufficient to allege confidential relationship under Nevada law); *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 881 (9th Cir. 2007) (explaining that a confidential relationship is "particularly likely to exist when there is a family relationship or one of friendship" (quoting *Perry*, 900 P.2d at 338)); *Perry*, 900 P.2d at 336–38 (Nev. 1995) (finding a confidential relationship between two "close friends and neighbors" involved in the purchase of a clothing store). However, Siazon has not sufficiently alleged retention of title by Leissner because Siazon alleges that Cuscaden — not Leissner — held title to the Celsius Shares.[10] (Siazon's Pet. 2, 9 (explaining that Leissner informed Siazon

[10] In the Siazon Petition, Siazon argues that "[r]etention of [t]itle by Leissner [i]s [i]nequitable," (Siazon's Pet. 12), but states in his opposition that "[he] is not asserting his

that "his shares in Celsius were held by Cuscaden").) *See Takiguchi*, 47 F. Supp. 3d at 1121 (explaining that the requirement that the constructive trustee hold title is "critical"); *Smith v. Owens*, No. 07-CV-396, 2014 WL 6069826, at *15 (D. Nev. Nov. 13, 2014) (dismissing plaintiff's constructive trust claim in part because "the holder of title to the property [was] . . . an entity that [was] not a party to th[e] action"). In addition, Siazon has not sufficiently alleged that a constructive trust is necessary to effectuate justice where he has a remedy at law. *See United States v. Vilar*, No. 05-CR-621, 2024 WL 4182598, at *6 (S.D.N.Y. Sept. 12, 2024) (concluding that, because petitioners, who were investors with funds in brokerage accounts held by the defendants and an LLC, did not show that there was a constructive trust over certain assets, "the [investors] may have [had] outstanding legal claims against [the defendants]," but "that le[ft] them as merely 'general creditors' who, by definition, cannot prevail in a criminal forfeiture proceeding" (citing *Ribadeneira*, 105 F.3d at 837)); *Crockett & Myers, Ltd.*, 440 F. Supp. 2d at 1197 (explaining that equitable remedies are not appropriate "where a plaintiff can maintain an action at law"). Thus, Siazon's constructive trust theory is insufficient to establish legal interest in the Celsius Shares.

**2. Resulting trust**

Siazon has also failed to allege a legal interest in the Celsius Shares based on his resulting trust theory. Siazon alleges that "Leissner represented that he would purchase Celsius [S]hares and hold them on Siazon's behalf through . . . Cuscaden." (Siazon's Pet. 13; *see also*

---

constructive trust claim against Leissner" because "the presence or absence of a claim by the titleholder is irrelevant" in ancillary forfeiture proceedings, (Siazon's Opp'n 22–23). To the extent Siazon is attempting to assert a constructive trust claim against Cuscaden or Nu Horizons, he fails to do so because he has not alleged a confidential relationship as to these entities. *See Magma Holding, Inc. v. Au-Yeung*, No. 20-CV-406, 2020 WL 2025365, at *7 (D. Nev. Apr. 26, 2020) (dismissing plaintiff's constructive trust claim because the plaintiff cited to no law that "establishes that alter ego liability allows a court to impute a fiduciary duty and confidential relationship from the alter ego to the corporation for the purposes of satisfying the elements of a constructive trust claim").

Negotiation Emails 5 (indicating that Leissner "drafted a quick agreement for [him and Siazon] to do the Cuscaden investment").) In addition, the terms of the Cuscaden Agreement transferred "economic rights" in the shares Cuscaden held, including "dividends" and "proceeds of the sale of shares," in exchange for Siazon's purchase of "13.7% of common shares of Cuscaden." (Cuscaden Agmt.) However, neither Siazon's petition nor the Cuscaden Agreement demonstrate that the parties intended for Siazon to be the beneficiary of a resulting trust in a portion of the Celsius Shares. Rather, the terms of the parties' agreement indicate that they only intended for Siazon to receive "proceeds" from the sale of shares held by Cuscaden. (Cuscaden Agmt.); *see Sec. & Exch. Comm'n v. Beasley*, No. 22-CV-612, 2022 WL 18998847, at *8 (D. Nev. Nov. 28, 2022) (rejecting the intervenors' claims that the funds they invested through the purchase agreements were subject to a resulting trust because "[t]he language of the purchase agreement . . . [was] clear" that the funds held in trust were funds received in connection with a settlement claim), *aff'd*, 2023 WL 2374234 (D. Nev. Mar. 3, 2023), *aff'd in part, appeal dismissed in part*, No. 23-15512, 2024 WL 1133587 (9th Cir. Mar. 15, 2024); *Bemis*, 967 P.2d at 441 n.4 (finding no resulting trust because the father did not demonstrate his intent to adhere to his agreement to create a trust); *KB Home*, 632 F. Supp. 2d at 1029 (finding no resulting trust where "no allegation indicate[d] the parties intended a trust relationship from the transactions involved with the purchase and development of [the land]" and "[i]nstead, [p]laintiff and the other lenders advanced money to [a limited liability corporation] to purchase the land in exchange for payment and other security interests"). Because Siazon has not alleged that Leissner or Cuscaden intended for him to be the beneficiary of a resulting trust in a portion of the Celsius Shares, Siazon has not alleged a legal interest sufficient to assert a direct claim.

Accordingly, the Court finds that Siazon has not alleged that he has standing to assert a direct claim to the Celsius Shares pursuant to Section 853(n), and grants Simmons' motion to dismiss Siazon's petition.[11]

## III. Conclusion

For the reasons stated above, the Court grants Simmons' motion to dismiss Siazon's petition without prejudice.[12]

Dated: July 15, 2025
Brooklyn, New York

SO ORDERED:

s/ MKB
MARGO K. BRODIE
United States District Judge

---

[11] Because the Court finds that Siazon does not have standing to pursue a direct claim, it declines to address Simmons' argument that Siazon cannot show he is a bona fide purchaser of the Celsius Shares or that the shares he seeks are not the same that the Government seeks to forfeit.

[12] Simmons requests that the Court dismiss the Siazon Petition with prejudice. (Simmons' Mem. 18; Simmons' Reply 1.) Although Siazon did not reply to this argument or request leave to amend, (*see generally* Siazon's Opp'n), the Court dismisses Siazon's petition without prejudice.